# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JOSEPH KOSTIC; et al., | ) | CIVIL NO.  12-00184 JMS/RLP |
| | ) | |
| Plaintiffs, | ) | (THREE-JUDGE COURT (28 |
| | ) | U.S.C. § 2284)) |
| v. | ) | |
| | ) | **MEMORANDUM IN** |
| SCOTT T. NAGO, in his official | ) | **SUPPORT OF MOTION FOR** |
| capacity as the Chief Election | ) | **PRELIMINARY** |
| Officer State of Hawaii; et al., | ) | **INJUNCTION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................iii

I.    INTRODUCTION...........................................................1

II.   FACTS ..........................................................................4

   A.   Hawaii's Reapportionment Record .........................4

   B.   Hawaii's Reapportionment Process ........................5

   C.   Census: 1,360,301 "Usual Residents" ....................6

   D.   August 2011 Proposal: Count Everyone;
        September 2011 Plan: "Extract" A Handful ...........8

   E.   September Plan Invalidated: Extract More ............9

   F.   2012 Plan: Extract Usual Residents Of Hawaii
        Deemed To Not Be "Permanent Residents"..........11

        1.   Servicemembers ............................................11

        2.   Families.........................................................13

        3.   Students ........................................................13

   G.   Senate Seat To Hawaii County, Large Deviations...............14

        1.   Senate Deviation: 44.22% ............................15

        2.   House Deviation: 21.57% .............................15

III.  PRELIMINARY INJUNCTION STANDARD .................16

165019

# TABLE OF CONTENTS — CONTINUED

**Page**

IV.  ARGUMENT ..................................................................... 17

    A.  Plaintiffs Will Likely Prevail ................................. 19

        1.  Equal Representation: *Garza* Requires
            Inclusion Of All Persons ............................. 21

        2.  *Intra*-County Inequality ................................. 35

            a.  People Are Represented, Not Counties .............. 36

            b.  Oahu's Ranges Are Excessive ............................ 38

            c.  No Approximation Of Population-Based
               Plan .................................................................... 39

    B.  Constitutional Injury Is Irreparable Harm ......................... 40

    C.  Equities Favor Relief ................................................. 42

V.  CONCLUSION .................................................................. 48

165019

# TABLE OF AUTHORITIES

**Page**

CASES

*Board of Estimate v. Morris*, 489 U.S. 688 (1989) ................................. 37

*Brown v. Thomson*, 462 U.S. 835 (1983) .................................... 20, 35, 37

*Burns v. Richardson*, 384 U.S. 73 (1966) ................................. *passim*

*Citizens for Equitable and Responsible Gov't v. County of Hawaii*, 120 P.3d 217 (Haw. 2005) .......................................... 28, 31

*Chen v. City of Houston*, 532 U.S. 1046 (2001) ...................................... 33

*Davis v. Mann*, 377 U.S. 678 (1964) .................................................. 19, 30

*Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ...................................... 23

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................... 41

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ................................ 6, 27

*Farris v. Seabrook*, 667 F.3d 1051 (9th Cir. 2012) ................................ 41

*Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991)........................................ *passim*

*Kirkpatrick v. Preisler*, 394 U.S. 526 (1969) .......................................... 23

*Mahan v. Howell*, 410 U.S. 315 (1972) ...................................... 18-19, 35

*Matsukawa v. State of Hawaii 2011 Reapportionment Comm'n*, No. SCPW-11-0000741........................................ 9

# TABLE OF AUTHORITIES — CONTINUED

**Page**

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984) ..................................... 41

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997)................. 40

*Reynolds v. Sims*, 377 U.S. 533 (1964).............................. 2, 17-18, 23, 36

*Solomon v. Abercrombie*, 270 P.3d 1013 (Haw. 2012) .... 10, 18, 28, 29, 30

*Solomon v. Abercombie,* No. SCPW-11-0000732 ................................ 9, 10

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009)...................... 17

*Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982) ......................... *passim*

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ................................................ 41

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)................. 16

## CONSTITUTIONS, STATUTES, AND RULES

U.S. CONST. AMEND. XIV............................................................... *passim*

5 U.S.C. § 552a *et seq.* ........................................................................ 12

5 U.S.C. § 552a(a)(4)............................................................................. 29

HAW. CONST. ART. IV, § 4 ........................................................................ 6

HAW. CONST. ART. IV, § 6 ........................................................................ 6

HAW. CONST. ART. IV, § 10 ..................................................................... 45

## TABLE OF AUTHORITIES — CONTINUED

**Page**

Haw. Rev. Stat. § 831-2(a)(1) (1993) ................................................ 31-32

Fed. R. Civ. P. 65 ...................................................................................... 16

**Other Authorities**

Carl Goldfarb, *Allocating the Local Apportionment Pie:
    What Portion for Resident Aliens?*, 104 Yale L. J.
    1441 (1994-1995) ............................................................. 25

*Hawaii Residency Requirements*,
    *available at* http://manoa.hawaii.edu/admissions/
    undergrad/financing/residency.html .............................. 31

Honolulu Star-Advertiser, *Court voids voting districts plan*
    (Jan. 5, 2012) ................................................................... 44

James Hosek, *et al.*, How Much Does Military Spending
    Add to Hawaii's Economy? (2011) ................................. 26

John Manning, *The Equal Protection Clause in District
    Reapportionment: Representational Equality Versus
    Voting Equality*, 25 Suffolk L. Rev. 1243 (1991) ......... 21

Timothy M. Mitrovich, *Political Apportioning is Not a
    Zero-Sum Game: The Constitutional Necessity of
    Apportioning Districts to be Equal in Terms
    of Both Total Population and Citizen Voting-Age
    Population*, 77 Wash. L. Rev. 1261 (2002) .................... 34

Moore's Federal Practice 3d, § 65.22 ............................... 40

165019

# TABLE OF AUTHORITIES — CONTINUED

**Page**

*Non-Permanent Population Extraction for 2011
    Reapportionment and Redistricting—Addendum* (Mar. 2012) ..... 11

*Summaries by Basic Island Units* at 2, 6 (Mar. 8, 2102) ....................... 37

*Summary of the State of Kansas Adjustment to
    Census Figures for Reapportionment* (Sep. 12, 2011).................... 29

165019

# MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*"[G]overnment should represent* all *the people."*

*Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) (emphasis original), *cert. denied*, 498 U.S. 1028 (1991)

## I.   INTRODUCTION

A preliminary injunction may be extraordinary relief, but here it is necessary to remedy an extraordinary wrong: Plaintiffs ask this Court to stop Hawaii's exclusion of military personnel, their families, and university students who do not pay resident tuition, from its reapportionment population base. Equal Protection requires all persons be counted, and Hawaii's 2012 Reapportionment Plan cannot simply ignore the rights of all usual residents to be represented in our legislature. By treating servicemembers, military families, and students as invisible, Hawaii's plan unconstitutionally dilutes their rights and Plaintiffs' rights to equal representation and to petition their government on equal terms.

This case challenges Hawaii's use of "permanent residents" as its reapportionment population basis. Hawaii assumed that servicemembers counted by the Census as usual residents of Hawaii

164988

who pay state taxes elsewhere are "transients," assumed that dependents of servicemembers have the same state residence as their sponsors, and excludes students who did not pay in-state tuition. This exclusionary policy treats nearly 8% of the actual population—a vast majority of whom live on Oahu—as if they did not exist, which grossly distorts the boundaries and actual population of every Oahu district by depriving Oahu of a Senate seat.

The Supreme Court maintains the touchstone of a state legislative reapportionment plan is population. *Reynolds v. Sims*, 377 U.S. 533, 560-61 (1964). In *Burns v. Richardson*, 384 U.S. 73, 93 (1966), the Court noted that states may have leeway to use a population basis other than the Census, *but only if* the resulting plan is not "substantially different" than one based on population. Hawaii's 2012 Plan is not just "substantially" different from population, it is grossly deviant.

In *Garza*, the Ninth Circuit concluded that because local legislatures represent everyone, everyone must be included in the reapportionment basis. The Hawaii legislature represents everyone, not just those who vote, or who register, or who pay state income taxes, and Equal Protection requires legislative seats to be apportioned so that all

2

persons are represented. A basis other than population would "dilute the access of voting age citizens in that district to their representative, and would similarly abridge the right of aliens and minors to petition that representative." *Garza*, 918 F.2d at 775. The same rationale prohibits Hawaii from using a basis that excludes some—but not all—persons selectively deemed by the state to not be "permanent residents."

Moreover, the massive overall ranges in ideal district size in both houses (Senate: 44.22%; House: 21.57%) reveal that even if Hawaii may exclude this many people, the 2012 Plan still does not pass muster because these ranges far exceed the 10% deviations the Supreme Court has established for presuming a plan is unconstitutional.

This case presents two issues that have dogged Hawaii since statehood: may the state reapportion using a basis that excludes nearly 8% of the actual population, and may it give priority to representing counties rather persons, especially when the resulting apportionment deviates wildly from statewide population equality? The last time the first issue was presented to this Court, it did not need to decide the issue, because the overall deviations in the plan were unconstitutionally large (although smaller than presented here). *Travis v. King*, 552 F.

164988

Supp. 554, 562 n.19 (D. Haw. 1982). Since that time, however, the Ninth Circuit established in *Garza* that representational equality prohibits states from using a population basis categorically excluding a huge part of its actual population.

By barring military, their families, and students from representation in the legislature, Hawaii has insured they are represented *nowhere*: because they are counted by the Census *only* as usual residents of Hawaii, they are not counted anywhere else.

## II. FACTS

### A. Hawaii's Reapportionment Record

Hawaii's bicameral legislative consists of a Senate ("Senate") with 25 seats, and a House of Representatives ("House") with 51. The ink was barely dry on the Admissions Act when Hawaii began excluding servicemembers. In the first challenge to reapportionment, *Burns v. Richardson*, 384 U.S. 73 (1966), the Supreme Court reluctantly approved of Hawaii's use of "registered voters" as the population basis (which resulted in military personnel not being counted), but "only because on this record [the plan was] found to have produced a distribution of legislators not substantially different from that which

would have resulted from the use of a permissible population basis." *Id.*
at 93. The Court did not endorse excluding servicemembers, did not
hold that alternative population bases are always permissible, and it
only rejected the challenge because there was no evidence the plan
varied from one based on population.

Indeed, in *Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982), this
Court applied *Burns* and held that a plan based on registered voters
was unconstitutional because it did was different from one based on
population. *Travis* also details the multiple challenges to Hawaii's
reapportionment efforts. *See id.* at 556 & n.2 (citing the "numerous
attacks in both state and federal courts").

## B.   Hawaii's Reapportionment Process

In 1992, the State of Hawaii ceased use of "registered voters" as
the population basis. Since then, it uses "permanent residents" —

> The [Reapportionment] commission shall allocate the total
> number of members of each house of the state legislature
> being reapportioned among the four basic island units,
> namely: (1) the island of Hawaii, (2) the islands of Maui,
> Lanai, Molokai and Kahoolawe, (3) the island of Oahu and
> all other islands not specifically enumerated, and (4) the
> islands of Kauai and Niihau, using the total number of
> permanent residents in each of the basic island units and
> computed by the method known as the method of equal

> proportions; except that no basic island unit shall receive
> less than one member in each house.

HAW. CONST. ART. IV, § 4. After "extraction" of persons deemed not to be

permanent residents, and allocation of legislative seats among the four

counties, the constitution requires the Defendant 2011

Reapportionment Commission ("Commission") only to insure population

equality *within each county*. It must:

> apportion the members among the districts therein [and]
> redraw district lines where necessary in such manner that
> for each house the average number of permanent residents
> per member of each district is *as nearly equal to the average
> for the basic island unit* as practicable.

HAW. CONST. ART. IV, § 6 (emphasis added).

## C.    Census: 1,360,301 "Usual Residents"

In April 2010, the U.S. Census Bureau conducted the decennial

census ("Census"). The Census has used the standard of "usual

residence" since the first Congress. *See Franklin v. Massachusetts*, 505

U.S. 788, 804-05 (1992). Usual resident "can mean more than mere

physical presence, and has been used broadly enough to include some

element of allegiance or enduring tie to a place." *Id.* at 789. Currently,

the Census defines "usual residence" as the "the place where a person

lives and sleeps most of the time. It is not the same as the person's

voting residence or legal residence." Stip. Facts at 2, ¶ 1 (CM/ECF doc. 26, attached as Exhibit "B"). It is the place where "they live and sleep most of the time." *Id*.  For military personnel stationed within the United States, they are counted as "usual residents" of the state in which they are stationed. *Id*. at 2, ¶ 3. For military personnel and federal employees deployed or assigned outside the country, they are counted as "overseas population" and are attributed to a state through a different mechanism than Census Day live counts.  *See* Exhibit "H", at 6-7.

Thus, the 2010 Census resident population of Hawaii included servicemembers, their families, university students, children, legal and illegal aliens, and prisoners incarcerated here, all irrespective of whether they pay state taxes, their eligibility to vote in Hawaii, or actual registration to vote. Hawaii's Census count also included deployed servicemembers whose "home of record" is Hawaii. Most critically, persons counted as usual residents of Hawaii were not counted by the Census in any other state. *Id*. at 2-3, ¶¶1-3, 6-7.

The Census excluded transients such as tourists, who are counted in their state of "usual residence." *Id*. at 3, ¶ 5.

Applying the above-referenced standards, the Census reported the total population of persons usually residing in Hawaii as 1,360,301 ("2010 Census population").

### D.    August 2011 Proposal: Count Everyone; September 2011 Plan: "Extract" A Handful

On August 3, 2011, the Commission proposed a reapportionment plan that used as the population basis all persons determined to be usual residents of Hawaii by the 2010 Census. This plan included maps with district lines, but was not adopted.

On September 26, 2011, the Commission adopted and filed the 2011 Final Report and Reapportionment Plan ("2011 Plan") that "extracted" 16,458 active duty military and university students from the 2010 Census population who were deemed not to be permanent residents, resulting in a "permanent resident" population basis of 1,343,843.

Using this count as the population basis, the Commission allocated the members of each house among the counties:

1.    **Oahu.**    Senate: 18; House: 35.

2.    **Hawaii.**    Senate: 3, House 7.

3.    **Maui.**    Senate: 3; House: 6.

4.    **Kauai.**    Senate: 1; House 3.

8

The Elections Office did nothing to implement the plan because it was waiting for the County of Hawaii to complete its local reapportionment, which it would not complete until late December. Nago Deposition at 20:8-11 (Exhibit "C").

### E.    September Plan Invalidated: Extract More

On October 10, 2011, a Hawaii Island senator instituted an action in the Hawaii Supreme Court to compel extraction of more servicemembers, their families, and university students from the population basis. *Solomon v. Abercombie,* No. SCPW-11-0000732. The action sought to move an Oahu Senate seat to Hawaii. A nearly identical action was filed the following day. *Matsukawa v. State of Hawaii 2011 Reapportionment Comm'n*, No. SCPW-11-0000741.

On December 29, 2011, the Commission submitted the 2011 Plan to the legislature, cautioning that it was subject to the court's rulings in these cases. The Elections Office did nothing to implement the plan because of the *Solomon* case. Nago Deposition at 20:8-11.

On January 4, 2012, the Hawaii Supreme Court concluded the 2011 Plan violated the Hawaii Constitution because it did not extract enough people. The court ordered the Commission to count only "permanent

9

residents" by extracting additional servicemembers, families, and university students who pay non-resident tuition from the 2010 Census population. The court did not require removal of aliens, institutionalized persons, federal civilian workers who were "stationed" in Hawaii, or others who were similarly situated to those who were subject to removal. The parties did not raise Equal Protection arguments, and as a consequence, the court did not consider the effect of federal law. The court's opinion detailed the meaning of the term "permanent resident" under Hawaii law, and which also specified the Commission's process:

1.     First, it was required to "extract non-permanent military residents and non-permanent university student residents from the state's and the counties' 2010 Census population" because they are not "domiciled" in Hawaii. *Solomon v. Abercrombie*, 270 P.3d 1013, 1022 (Haw. 2012).

2.     Next, based on this count of "permanent residents," the Commission was required to apportion Senate and House seats "among the four counties" with each county having at least one seat. *Id.*

10

3.      Finally, the Commission was required to "apportion the senate and house members among nearly equal numbers of permanent residents within each of the four counties." *Id*. at 1024 (footnote omitted).

**F.      2012 Plan: Extract Usual Residents Of Hawaii Deemed To Not Be "Permanent Residents"**

More than two months went by without a plan. Finally, on March 8, 2012, the Commission adopted the Final Report and Reapportionment Plan (2012 Supplement) ("2012 Plan") that, in conformity with *Solomon*, removed 108,767 servicemembers, families, and students from the population basis, nearly 8% of Hawaii's actual population. A summary of how they were extracted follows, and is described in more detail in the *Non-Permanent Population Extraction for 2011 Reapportionment and Redistricting—Addendum* (Mar. 2012) (Exhibit "D").

**1.      Servicemembers**

The Commission started with the 2010 Census population, which included all Census-counted "usual residents." Stip. Facts at 3, ¶¶7-8, 10; 2012 Plan at B-12. Transient military and tourists are not counted as "usual residents." Stip. Facts at 2-3, 5-6, ¶¶3, 5-6, 21-22.

11

The Commission asked the U.S. Pacific Command for information on all active duty servicemembers who were not "legal residents" of Hawaii. Pacific Command, using the Defense Manpower Data Center, provided a spreadsheet of servicemembers who had completed form DD2058 denoting a state other than Hawaii as their "legal residence" for state tax purposes. *Id.* at 3, ¶7; Exhibit "I." This form is used to designate which state should withhold taxes from servicemembers' military pay. *See* Exhibit "E." Servicemembers understand the information provided may be disclosed to tax authorities in that state, but they were not informed that it would be provided to Hawaii to determine "permanent residency" for apportionment. There may be little correlation between the place where a servicemember pays state taxes, and where she is actually located. Nor was there any way to confirm the servicemembers to be extracted based on these forms had actually been in Hawaii on Census Day and thus included in the count of usual residents.

Even though the DD2058 information was not an accurate process to determine permanent residency, and indeed, disclosure may have violated the Privacy Act, 5 U.S.C. § 552a *et seq.*, the Commission

12

extracted 42,332 active duty military personnel based on the form. Stip. Facts at 3-4, ¶¶ 8, 9, 10; 2012 Plan at B-47.

### 2. Families

The Commission then extracted 53,115 military dependents. Stip. Facts at 3-4, ¶¶10-13; 2012 Plan, Page B-47. They were not surveyed nor did the military provide any data about them. 2012 Plan at B-12, B-33. In the absence of such data, the Commission merely "assumed" that dependents have the same legal residency as their military spouse. 2012 Plan at B-53, B-54. The Commission extracted dependents "associated or attached to an active duty military person who had declared a state of legal residence other than Hawaii." Stip. Facts at 3-4, ¶10. The Commission was unable to locate any information as to the permanent or non-permanent residence of military dependents. *Id.* at 4, ¶¶11-13. There was no other data with regard to dependents' residency except their "association" or "attachment" to a military sponsor with a declared legal residence elsewhere. *Id.* at 4, ¶¶ 12-13.

### 3. Students

The Commission's attempt to extract students was also an inexact process, loaded with assumptions. It relied on data from universities

13

that was not related in any way to data gathered on Census Day, April 1, 2010. *See* Stip. Facts at 2-3, 4-5, ¶¶14, 18. For example, the University of Hawaii identified students as non-residents based on its count of those enrolled for spring 2010 semester (not necessarily students who were enrolled on Census Day) who paid non-resident tuition. Exhibit "F." BYU Hawaii, Hawaii Pacific, and Chaminade used "home address." Stip. Facts at 4-5, ¶¶14, 19. Accordingly, the Commission might have extracted persons who were not included in the Census because they were not present or were not usual residents on Census Day. Also, the Commission had data only from the above schools, and did not seek such data for any other of the many public and private colleges in Hawaii, Argosy, and Tokai University. *Id.* at 5, ¶¶15-17.

Using this process, the Commission extracted 13,320 students from the Census. *Id.* at 4, ¶14.

## G.    Senate Seat To Hawaii County, Large Deviations

Excluding these 108,767 persons resulted in 1,251,534 "permanent residents" as the population basis. By this measurement, the ideal population of Senate districts statewide was 50,061, and the ideal

14

population for House districts was 24,540. The 2012 Plan moved one Senate seat from Oahu to Hawaii, the result sought in the *Solomon* and *Matsukawa* lawsuits.

### 1.   Senate Deviation: 44.22%

Under the 2012 Plan, the largest Senate district (Senate 8; Kauai) contains 66,805 "permanent residents," which is a deviation of +16,744 or +33.44%, more than the statewide ideal; the smallest Senate district (Senate 1; Hawaii) contains 44,666 permanent residents, which is a deviation of -5,395, or -10.78% less than the ideal.  The sum of those deviations (the "overall range" of the plan) is 44.22%.

### 2.   House Deviation: 21.57%

The overall range in House districts was less, but still extreme. The largest (House 5; Hawaii) contains 27,129 permanent residents, which is a deviation of +2,589, or +10.55%, more than the statewide ideal; the smallest House district (House 15; Kauai) contains 21,835 permanent residents, a deviation of -2,705, or -11.02% less than the ideal. The overall range in the House is 21.57%.

The Commission, however, reported that the 2012 Plan's deviations were lower and below the 10% federal invalidity threshold when

comparing districts within each county. *See* 2012 Plan at 15-18 (Tables 1-8). It was able to reach this result by dismissing the statewide ideal as set out above. It acknowledged that its methodology does not comply with federal law. *Id*. at 18 ("The Commission is aware that federal courts generally review reapportionment and redistricting plans under a different methodology than set forth above."). It also recognized that because the statewide deviations exceed 10%, the 2012 Plan is "*prima facie* discriminatory and must be justified by the state." *Id*. at 9.

On March 22, 2012, Defendant Nago published notice of the plan, and on March 30, the Office of Elections submitted the plan to the Legislature. The following week—four working days later—Plaintiffs instituted this lawsuit.

## III. PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is warranted under FED. R. CIV. P. 65 where the movant establishes: (1) a likelihood of success on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) a preliminary injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S.

7, 20 (2008); *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009).

## IV. ARGUMENT

Two background principles should be kept in mind. *First*, the text of the Equal Protection Clause protects all "persons"—

> No State shall ... deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. AMEND. XIV. The "person" requirement means that both houses of a state legislature must be apportioned substantially on a population basis, and states may not maintain a legislature modeled on the federal system in which one house represents political divisions, while only the seats in the other house are determined by population. *Reynolds*, 377 U.S. at 560-61. This means that people—not "citizens," "registered voters," "taxpayers," "counties," or "basic island units"—are entitled to be counted and represented equally. The principle of equality is often referred to as the "one person, one vote" standard, but because it applies to all "persons," it also guarantees *representational* equality, without regard to a person's ability to vote, or in which state she pays taxes. *See Garza*, 918 F.2d at 774.

17

In *Travis*, this Court acknowledged these principles: (1) actual population is the "starting point" and "overarching principle." *Travis*, 552 F. Supp. at 559 (citing *Reynolds*, 377 U.S. at 567); (2) "*minor*" deviations may be allowed, provided they are "free from any taint of arbitrariness or discrimination." *Travis*, 552 F. Supp. at 559 (emphasis original) (quoting *Mahan v. Howell*, 410 U.S. 315, (1972)); (3) even when a state has a clearly rational policy to afford counties "a certain degree of representation *as* political subdivisions," population cannot be "submerged as the controlling consideration." *Travis*, 552 F. Supp. at 559 (quoting *Reynolds*, 377 U.S. at 581); and (4) "extreme deviations" will render a plan void even if the state meets its burden under "this limited exception." *Travis*, 552 F. Supp. at 559.

There is no question that all usual residents of Hawaii as reported in the 2010 Census—including every person extracted by the Commission—are "persons" within the jurisdiction of Hawaii and entitled to the equal protection of the laws, and are not represented in any other state legislature. The Census counts them *only* as residents of Hawaii and nowhere else, which means that if Hawaii refuses to represent them in its legislature, they are not represented *anywhere*.

18

*Second*, it is unconstitutional for a state to deny legislative representation to servicemembers merely because they are in the military. In *Davis v. Mann*, 377 U.S. 678 (1964), the Supreme Court rejected the argument that it was constitutional for districts to be underrepresented because those districts contained large numbers of servicemembers:

> Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible.

*Id.* at 691. *See also Travis*, 552 F. Supp. at 558 & n.13 ("civilian population is not a permissible population base").

With these considerations in mind, we address the three preliminary injunction factors.

## A.    Plaintiffs Will Likely Prevail

It is overwhelmingly likely the Plaintiffs will prevail on both of their Equal Protection claims. A plan apportioning seats may make "minor" deviations from the ideal statewide district size. *Mahan*, 410 U.S. at 710. A deviation is presumed unconstitutional when an apportionment plan contains an overall range (the difference between the largest and the smallest deviation from the ideal district

19

population) of more than 10%. *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983). The 2012 Plan results in overall ranges that wildly exceed that threshold.

The Senate's overall range of 44.22%, and the House's 21.57% range render the 2012 Plan presumptively unconstitutional, and place the burden squarely on Defendants to justify (1) ignoring completely the rights of military personnel, their families, and students to be represented in the Hawaii legislature, and (2) dilution of both equal representational power and voting strength based upon county.

The Commission acknowledges the 2012 Plan is "*prima facie discriminatory* and must be justified by the state." 2012 Plan at 9. It supports the deviations with only two justifications: (1) it suggests the *Burns* case allows the state to exclude military and others as long as it does so on the avowed basis of a residence requirement (*id*. at 10), and (2) it argues that preservation of the integrity of political subdivisions can be an overriding concern such that population equality is only required within each county (*id* at 9-10).

164988

### 1.   Equal Representation: *Garza* Requires Inclusion Of All Persons

The 2012 Plan's unjustifiable defect is that it takes no account of the paramount Equal Protection guarantee, the right of all persons in Hawaii to be represented (and represented equally) in the legislature, regardless of where they are registered to vote, or where they pay taxes. *Garza*, 918 F.2d at 774 ("the *Reynolds* Court recognized that the people, including those who are ineligible to vote, form the basis for representative government"). The state's categorical exclusion of persons whom the Census recorded as being usual residents of Hawaii cannot be justified.

In *Garza*, the Ninth Circuit held that equal representation is the dominant Equal Protection principle, "holding that total population provides the appropriate basis for reapportionment of the county supervisor districts, because equal representation for all persons more accurately embodies the meaning of the fourteenth amendment." John Manning, *The Equal Protection Clause in District Reapportionment: Representational Equality Versus Voting Equality*, 25 SUFFOLK L. REV. 1243, 1244 (1991) (footnote omitted).

164988

In *Garza,* the Ninth Circuit concluded that Equal Protection requires use of actual population as the population basis to insure that all persons actually present are equally represented, regardless of their voting registration, or even their eligibility to vote. As a remedy for Voting Rights Act and Equal Protection violations, the district court created a county apportionment plan that used total population as the population basis (which included legal and illegal aliens, and children), and created districts of nearly equal numbers of persons, but sharply unequal numbers of citizens. *Id.* at 773, 774 n.4-5. The county appealed, arguing that as a matter of law actual population was an erroneous standard, and that it was entitled to use "voting population" to insure the "one person, one vote" principle. *Id.* The county argued that *Burns* "seems to permit states to consider the distribution of voting population as well as that of the total population in constructing electoral districts." *Id.* at 774.

The Ninth Circuit generally agreed with that statement, but cautioned that Equal Protection protects both the voting power of citizens, *and* the right of equal representation in the legislature for all persons. *Id.* at 775 ("The purpose of redistricting is not only to protect

164988

the voting power of citizens; a coequal goal is to ensure 'equal representation for equal numbers of people.'") (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969)). The court also acknowledged that *Burns* suggested that for purposes of evaluating equal voting power, states may not be obligated to use Census population when apportioning. *Garza*, 918 F.2d at 774. However, in situations where equal voting power may conflict with equal representation, the Equal Protection principle that "government should represent *all* the people" means that in such situations, actual population is the only permissible basis. *Id.* at 774 (emphasis original). The court highlighted this "fundamental principle of representative government," and held that *Reynolds* "recognized that the people, including those who are ineligible to vote, form the basis for representative government. Thus population is an appropriate basis for state legislative apportionment." *Id.*

The court reasoned that every person has a right to be represented in the legislature, and "the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Id.* at 775 (quoting *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961)). In

23

addition, the "right to petition is an important corollary to the right to be represented." *Garza*, 918 F.2d at 775. The court recognized that non-citizens have the right to petition the government. *Id.* Similarly, Hawaii's military personnel, their families, and university students have the right to petition the state legislature, and to be represented therein. The 2012 Plan, by ignoring their presence and treating them as invisible, grossly distorts the equal population of districts on Oahu. It is forcing the Plaintiffs, who live in districts in which large numbers of "extracted" military personnel, families, or students reside, to compete with more of their fellow residents to gain the attention of their legislator than others in districts in which persons "extracted" are not concentrated. In *Garza*, the court held that such dilution of representational power violates Equal Protection:

> Such a plan would dilute the access of voting age citizens in that district to their representative, and would similarly abridge the right of aliens and minors to petition that representative. … To refuse to count people in constructing a districting plan ignores these rights in addition to burdening the political rights of voting age citizens in affected districts.

*Id.* at 775 (citations omitted). Discussing *Garza*, one commentator wrote:

164988

The court-ordered apportionment plan showed how two prized American values, electoral equality and equal representation, can conflict in areas with large noncitizen populations. Electoral equality rests on the principle that the voting power of all eligible voters should be weighted equally and requires drawing voting districts to include equal numbers of citizens. *The slightly different concept of equal representation means ensuring that everyone—citizens and noncitizens alike—is represented equally and requires drawing districts with equal numbers of residents. Equal representation is animated by the ideal that all persons, voters and nonvoters alike, are entitled to a political voice, however indirect or muted.*

Carl Goldfarb, *Allocating the Local Apportionment Pie: What Portion for Resident Aliens?*, 104 YALE L. J. 1441, 1446-47 (1994-1995) (emphasis added) (footnotes omitted). Substitute "permanent residents" for "citizens" and "voters," and you have the situation presented in this case, and the result here should be no different than in *Garza*: Hawaii's use of "permanent resident," and its application in a way that excludes only military personnel, their families, and university students completely ignores their right to representation in the state legislature. Hawaii has effectively denied them any representation anywhere, because they are counted by the Census nowhere but Hawaii and thus are not represented in any state legislature but ours.

Consequently, Hawaii cannot choose to exclude persons who are admittedly "usual residents" and who are plainly not transients, and

25

whom no one disputes have substantial physical and continuing presences here. In essence, when it apportions its legislative seats, Hawaii attempts to treat servicemembers in Hawaii in the same fashion that the Census considers servicemembers deployed outside of the United States, by attributing them to somewhere other than where they actually are located. But servicemembers actually in Hawaii are obviously not located "overseas" and cannot be treated in the same manner as those physically located outside of the United States. They live, work, rent, own homes, patronize businesses, and pay property and general excise taxes in Hawaii. A study prepared for the Secretary of Defense estimated the presence of the military is responsible for injecting $12 billion into the state, or up to 18% of Hawaii's economy. *See* James Hosek, *et al*., HOW MUCH DOES MILITARY SPENDING ADD TO HAWAII'S ECONOMY? 21 (2011).[1] Military personnel, their families, and students who pay non-resident tuition are a far cry from the "aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of a crime" that *Burns* suggested a state may not count. *Burns*, 384 U.S. at 92. The Census counts them as "usual

---

[1] *available at* http://www.rand.org/content/dam/rand/pubs/technical_reports/2011/RAND_TR996.pdf.

26

residents" of Hawaii, which means that they have "more than mere physical presence, and [have an] … allegiance or enduring tie to a place." *Franklin*, 505 U.S. at 804. The Census already excludes transients such as tourists and those in Hawaii only for a short time; these people are counted back home. Hawaii, however, lumps the military together with transients and excludes them, while at the same time it unquestioningly includes aliens and "persons denied the vote for conviction of a crime" in its population basis. Despite the economic contribution of the military (which the state gladly accepts) and their actual long-term presence here (tours of duty generally range from 18 months to two or more years), by employing irrational and unevenly applied tests, Hawaii deems them not to be "permanent" residents. Instead of acknowledging them as the usual residents they are (they are more in Hawaii than they are anywhere else), the state imposes a purity test that supposedly measures whether military personnel are "truly" here. It imposes this test on no one else, since Hawaii's use of "permanent resident" as interpreted by *Solomon* is irrationally and unevenly applied only to military personnel, their families, and students.

First, in accordance with the Hawaii Supreme Court's mandate in *Solomon*, the Commission simply accepted that if a servicemember declared their desire to pay taxes in a state other than Hawaii on DD2058, that person cannot be a Hawaii "permanent resident." In other words, Hawaii presumes that military personnel who do not pay Hawaii income taxes are not here, because paying taxes elsewhere conclusively reveals they are "merely transitory" in Hawaii. *See Citizens for Equitable and Responsible Gov't v. County of Hawaii*, 120 P.3d 217, 222 (Haw. 2005) (domiciled means someone who "occupies a dwelling within the State, has a present intent to remain within the State for a period of time, and manifests the genuineness of that intent by establishing an ongoing physical presence within the State together with indicia that his presence within the State is something other than merely transitory in nature."). That assumption is unreasonable and unwarranted. The form is only for withholding purposes, and there is nothing that would prevent a servicemembers who indicated on her DD2058 that she pays state taxes in a state other than Hawaii from registering to vote in Hawaii, from renting or owning property in Hawaii, or undertaking any other activity that would qualify as "domiciling" in Hawaii under the

*Citizens* test.[2] The Commission simply could not know whether a servicemember who completed a DD2058 was domiciled here. The DD2058 form cannot be treated as a declaration by servicemembers that they are not "permanent residents" of Hawaii. This assumption resulted in the Hawaii Supreme Court's conclusion that "most military personnel considered Hawaii a temporary home and only 3% opted to become Hawaii citizens." *Solomon*, 270 P.3d at 1015. Moreover, if payment of state taxes is the basis for a determination of "permanent residence," the state does not even attempt to explain why it took no effort to extract others who pay no Hawaii taxes such as children, the unemployed, illegal aliens, and prisoners.

---

[2] Although personally-identifiable information was apparently not disclosed, *see* § 552a(a)(4), servicemembers were "extracted" and denied representation by virtue of personal data they provided, which was supposed to be disclosed only to the taxing state, and only for tax withholding purposes. Disclosure of information for Hawaii reapportionment was not disclosed to servicemembers, and that use may even have violated the Privacy Act. *See* Exhibit "E" ("PURPOSE: Information is required for determining the correct State of legal residence for purposes of withholding State income taxes from military pay."). Kansas, the only other state that does not use the Census as the population basis, avoids the Privacy Act issues by doing its own survey of military personnel. It ends up extracting very few, because most military personnel do not respond to the survey. *See  Summary of the State of Kansas Adjustment to Census Figures for Reapportionment* (Sep. 12, 2011), *available at*  http://hawaii.gov/elections/ reapportionment/2011/staffreports/KansasAdj.pdf.

164988

Second, the fact that the Commission only sought to extract military, families, and students (*see* 2012 Plan at ii), and made no effort to exclude others who have no legal presence in Hawaii at all such as illegal aliens, and did not attempt to extract federal workers and their families who are "stationed" in Hawaii in much the same manner as military personnel, reveals the extractions were, in actuality, targeted only at military and students. This strongly suggests that instead of a neutral and good faith attempt to include only permanent residents, Hawaii's effort was focused more on excluding military and students. Indeed, the Hawaii advisory council expressly declared its desire to exclude "only nonresident military," a result plainly unconstitutional under *Davis*. *See Solomon*, 270 P.3d at 1016 n.4. In the end, the Hawaii Supreme Court directed the Commission to subject only "non-permanent university student residents and non-permanent active duty military residents, as well as … the dependents of the 47,082 non-permanent active duty military residents," to the permanent resident/domicile litmus test and did not require the Commission to apply it to others similarly situated. *Id.* at 1023.

164988

Third, the Commission simply assumed that students who pay nonresident tuition or who listed a "home address" elsewhere failed the "permanent resident" test, another unwarranted and irrational assumption. For example, the University of Hawaii imposes a durational residency requirement of one year in order to begin to qualify for resident tuition. *See Hawaii Residency Requirements* ("you must have been a bona fide resident of Hawaii for at least one calendar year (365 days) prior to the semester for which you want resident tuition status").[3] A student can demonstrate a bona fide intent to make Hawaii his permanent home by paying Hawaii income taxes, registering to vote, opening a local bank account, signing a lease, buying property, or being employed here. *Id*. None of these tests are employed to check the residency status of others who were counted by the Commission as "permanent residents," and indeed, this test is more stringent than the domicile test of the *Citizens* case, which does not contain any durational requirement.

Fourth, the Commission made no attempt to extract minors or prisoners, none of whom can vote. *See* HAW. REV. STAT. § 831-2(a)(1)

---

[3] *available at* http://manoa.hawaii.edu/admissions/undergrad/financing/residency.html.

164988

(1993) ("A person sentenced for a felony, from the time of the person's sentence until the person's final discharge, may not … [v]ote in an election …"). This demonstrates that voting, registering, or even being eligible to vote has no connection to the "permanent residence" test.

Finally, and perhaps most egregiously, the Commission simply "assumed" without inquiry that spouses and other military family members choose the same legal residency as their military sponsors. 2012 Plan at B-53, B-54. Such a presumption regarding the relationship between spouses is parochial, irrational, and overbroad. The decision to extract military families based on whether the sponsor pays out of state taxes ignores contrary indicators such as the purchase or lease of a Hawaii home, off-base employment, and enrollment in local schools, any of which would verify "permanent residence." If the "permanent resident" standard were equally applied, such indicators would lead to the family (and the military sponsor) not being extracted.

*Burns* does not allow Hawaii to deny all usual residents legislative representation because it deems them not to be "permanent" using standards that are vague, underinclusive, and based on assumptions, and admittedly do not result in a plan even coming close to one based

32

on population (the most obvious impact of the 2012 Plan is that it deprives Oahu residents of a Senate seat). *See also* 2012 Plan at 23 ("Under the methodology generally used by federal courts, the size of deviations, particularly as they relate to … Kauai, is substantial."). First, the touchstone of *Burns* remains population: the Court upheld the use of "registered voters" *only* because there was no evidence that the resulting plan differed substantially from a plan based on population, a contrary situation than presented in the case at bar. *See id.* at 9 (statewide deviations exceed 10%, so the 2012 Plan is "*prima facie* discriminatory"). Second, because *Burns* only involved a claim of equal voting power, the right of equal representation was not raised, and thus never considered by the Court. Third, as Justice Thomas pointed out in his dissent from denial of certiorari in *Chen v. City of Houston*, 532 U.S. 1046 (2001), the circuits are split on the issue of the "permissible population basis," with the Ninth Circuit differing from the Fourth and Fifth Circuits in concluding in *Garza* that "districting based on voting populations instead of the total population would have been unconstitutional." *Id.* at 1046 (Thomas, J., dissenting from denial of cert.). Justice Thomas noted that "[w]e have never determined the

33

relevant 'population' that States and localities must equally distribute among their districts." *See also* Timothy M. Mitrovich, *Political Apportioning is Not a Zero-Sum Game: The Constitutional Necessity of Apportioning Districts to be Equal in Terms of Both Total Population and Citizen Voting-Age Population*, 77 WASH. L. REV. 1261, 1263 & n.14 (2002) ("The federal circuit courts are in conflict on this issue. In the Ninth Circuit, states must apportion according to total population in order to ensure representational equality.").

The failure to even attempt to identify others who may not be "permanent residents," and targeting only military, families, and students reveals the bias inherent in Hawaii's scheme. A population basis that on its face is neutral is suspect when it results in a narrow class always bearing the brunt of the exclusion. *See Travis*, 552 F. Supp. at 559 ("*minor*" deviations may be acceptable, if "free from any taint of arbitrariness or discrimination") (emphasis original). A "higher degree of scrutiny" is also appropriate where, as here, the "deviations present begin to approach constitutional limits." *Id.* at 562 n.19.

When the extreme deviations in the 2012 Plan are viewed together with Hawaii's long history of excluding servicemembers from

34

representation starting with its 1959 plan, even a facially neutral standard cannot survive *Burns* analysis. This Court, however, need not make a determination that the state's use of "permanent resident" is a pretext to cover discrimination against the military as prohibited by *Davis*. The gross statewide population ranges in the 2012 Plan are sufficient to shift the burden to the state, which cannot justify completely ignoring the representational rights of all usual residents.

## 2. *Intra*-County Inequality

Even if it is permissible to ignore persons who were deemed not to be "permanent residents," the 2012 Plan resulted in statewide deviations of 44.22% and 21.57%. These deviations are presumptively unconstitutional. *Brown*, 462 U.S. at 842-43 (10% threshold); 2012 Plan at 9 (2012 Plan is "*prima facie* discriminatory and must be justified by the state"). This Court in *Travis* set out the analysis:

> The *Mahan* Court laid out a three step method for analyzing state offered justifications for seemingly substantial population deviations. First, the reason advanced must be a rational one, "free of any taint of arbitrariness or discrimination." … "The inquiry then becomes whether it can reasonably be said that the state policy urged [as a justification for] the divergences in the legislative reapportionment plan … is, indeed, furthered by the plan adopted by the legislature." Finally, "if so justified," the issue is whether "the divergences are also within tolerable limits."

> For no matter how rational a state justification may be, it "cannot constitutionally be permitted the emasculate the goal of substantial equality."

*Travis*, 552 F. Supp. at 560 (citations omitted). The only justifications in the 2012 Plan for the deviations are "geographic insularity and unique political and socio-economic identities of the basic island units," and the desire to avoid so-called "canoe" districts (a district that spans more than one island). 2012 Plan at 23, 21. Neither supports the large deviations in the 2012 Plan.

### a.     People Are Represented, Not Counties

In *Reynolds*, the Supreme Court made geographic and political concerns and the desire to maintain traditional boundaries secondary to population equality:

> the fundamental principle of representative government is one of equal representation for equal numbers of people, without regard to race, sex, or economic status, *or place of residence within a state*.

*Reynolds*, 377 U.S. at 560-61 (emphasis added). Thus, when a plan produces exaggerated population ranges between districts, concerns for political boundaries must yield to population equality.

Moreover, although "canoe districts" may have been unworkable as a practical matter in the past, we no longer travel by canoes. The

36

islands are much more interconnected and unified, and less insular, with easy air travel between the islands, and direct flights to the mainland and internationally from every island unit. Technology has also contributed substantially to making each island less insular and remote, and it is very simple and inexpensive for those on one island to communicate with others across the state. Indeed, CD2 is a massive canoe district, yet it has not seemed to hamper either official or constituent.

The 2012 Plan does not rigidly adhere to the anti-canoe district policy, as shown by Senate 7 and House 13, both of which are multi-island canoe districts encompassing Molokai, Lanai (and Kahoolawe), along with the distant east side of Maui. *Summaries by Basic Island Units* at 2, 6 (Mar. 8, 2102) (Exhibit "G").[4]

The Commission also attempts to lessen the deviations in each house by combining them in an attempt to show that over- or under-

---

[4] *Brown v. Thomson*, 462 U.S. 835 (1983) did not endorse massive deviations if arguably supported by legitimate state concerns. In *Brown*, the Court upheld a plan with an 89% deviation against a challenge to Wyoming's policy of affording each county at least one seat; the challenger did not assert the 89% range itself was unconstitutional. In *Board of Estimate v. Morris*, 489 U.S. 688, 702 (1989), the Court noted that "no case of ours has indicated that a deviation of some 78% could ever be justified."

164988

represented districts are not impacted as severely because they have substantial equality "per legislator" (as opposed to per Senator, or per Representative). 2012 Plan at 21-22 ("equality of representation as it related to reapportionment among the basic island units has been measured by determining whether the total number of legislators (both house and Senate) representing each basic island unit is fair from the standpoint of population represented per legislator"). This Court has already rejected this "combination" approach. *Travis*, 552 F. Supp. at 563 ("The state is unable to cite a single persuasive authority for the proposition that deviations of this magnitude can be excused by combining and figuring deviations from both houses.").

### b.   Oahu's Ranges Are Excessive

Next, *Travis* determined that Hawaii's desire to provide each island unit with representation is rational. The court concluded, however, that the plan did not serve to advance the policy because Oahu, with its large population and many seats, did not contain "the smallest deviation possible." The court held that the maximum deviations of 9.18% in Oahu's Senate districts, and 9.54% in Oahu's House districts

were not justified by the policy of providing each island with representation, and invalidated the plan. *Id.* at 560-61.

The Oahu deviations in the present case are very similar: Oahu's Senate district overall range is 8.89% (2012 Plan at 15-16, Table 1), and Oahu's House district overall range is 9.53% (*id.* at 16-17, Table 2). As in *Travis*, "it would seem that Oahu's legislative districts could have easily been drawn with only minimal population variations," and the 2012 Plan "provides no other reasons for these [intraisland] deviations." *Travis*, 552 F. Supp. at 561.

### c.     No Approximation Of Population-Based Plan

Finally, this court noted "it is clear from *Burns* that … the state is obligated to provide some degree of proof that the proposed plan approximates the results of a plan based on an appropriate population base." *Travis*, 552 F. Supp. at 565. The court found "the state's use of registered voters constitutionally impermissible" because the state did not show its plan was close to a population-based plan. *Id.* Here, it is beyond dispute that the 2012 Plan did not approximate a population-based plan. As set out earlier, such a plan would result in Oahu having 18 Senate seats, while it has only 17 seats under the 2012 Plan.

39

## B.    Constitutional Injury Is Irreparable Harm

In addition to a high likelihood of success on the merits, in the absence of relief, Plaintiffs will suffer irreparable harm. "Irreparable harm is an injury for which the court could not compensate the movant should the movant prevail in the final decree." MOORE'S FEDERAL PRACTICE 3d, § 65.22.   "[A]n alleged constitutional infringement will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (equal protection claim). The rights to equal representation and to petition government on an equal basis are paramount constitutional rights:

> To refuse to count people in constructing a districting plan ignores these rights in addition to burdening the political rights of voting age citizens in affected districts.

*Garza*, 918 F.2d at 775. Indeed, Hawaii's use of "permanent resident" is even more troublesome than the now-jettisoned "registered voter," because is apportions seats without any reference to the right to vote, also a fundamental right:

> No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

*Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964). The loss of these constitutionally-protected rights, even for minimal periods of time, unquestionably constitutes irreparable injury to Plaintiffs. *Farris v. Seabrook*, 667 F.3d 1051, 1061 (9th Cir. 2012) (loss of First Amendment freedoms constitutes irreparable injury) (citations omitted); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (citations omitted). The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 374 (1976).

The 2012 Plan dilutes Plaintiffs' right to equal representation, and their First Amendment rights to petition their government as guaranteed by the Due Process Clause of the Fourteenth Amendment, because it places them in districts in which they must compete with more people for the attention of their legislators than others in other districts.

164988

### C.  Equities Favor Relief

A preliminary injunction is necessary because a consideration of the public interest and the balance of hardships favor immediate relief. The 2012 Plan should not be implemented since it is the most violative and egregious of the existing alternatives, and the public interest is never served by holding an unconstitutional election, especially when those elected would serve under a cloud for two years.

The Court requested Plaintiffs map out two alternative scenarios. *First*, if the Court agrees that the population basis must include all persons counted by the Census, and *second*, if it grants relief only on Count II.

The Court will look for the least disruptive form of relief, which should be viewed in the context of both the 2012 and the 2014 election cycles, and minimizing any issues with districting and precincting. Consequently, there could be two plans ordered implemented—an interim plan for the upcoming election, and a permanent plan for the 2014 election. Thus, the least disruptive alternative is the existing map closest to the desired 2014 permanent result that will avoid voter confusion.

42

1.      **August 2011 map.** If the Court grants relief under Count I, two plans are ready. The most preferable is the August 2011 proposal that extracted no one and which is already mapped out and districted. It may be implemented as the fully constitutional plan.

2.      **September 2011 map.** Alternatively, if the Court concludes there is insufficient time to implement that map, it should order use of the September 26, 2011 plan. Although it is not a wholly constitutional plan because it extracted 16,458 persons and did not represent everyone, it is satisfactory as an interim measure for the upcoming election because it at least maintains the proper apportionment of Senate seats. A constitutional plan based on population can be implemented for the 2014 election cycle.

3.      **Existing 2001 Senate and House maps.** Less preferable but also acceptable is the 2001 Senate and House maps, under which precincts were established in 2010. All other races would be kept in the 2012 Plan (Congressional and City and County of Honolulu apportionments have not been challenged—they make no extractions— and Hawaii County makes so few extractions that its plan approximates a population basis).

43

4.    **Count II only.** Finally, if the Court grants relief only on Count II and permits the state to use 1,251,534 as the population basis, but invalidates Oahu districting (*see* section IV.A.2.b, *supra*), the Commission or this Court would need to adopt new Oahu districts that have lower deviations than the existing 2012 Plan.

Defendant Nago has asserted that it is already too late for this Court to grant relief without altering the 2012 election schedule. *See Relevant 2012 Election Dates* (Apr. 12, 2012) (CM/ECF doc. 23). He asserts (1) candidates would need to "start from scratch" in gathering signatures and submitting nomination papers; (2) the precincting process (determining the place where voters actually vote), is already complete and cannot be redone if the 2012 Plan is unconstitutional.

Any problems Defendants claim regarding impossibility of meeting the election schedule are entirely of their own making. The Hawaii Supreme Court issued the writ on January 4, 2012, but the 2012 Plan was not adopted and filed until more than two months later. They knew that any plan extracting servicemembers was subject to a federal challenge once finalized. *See* HONOLULU STAR-ADVERTISER, *Court voids voting districts plan* (Jan. 5, 2012) ("I think you're opening yourself up

to a federal lawsuit if you exclude (military) dependents on an across-the-board basis,' [the Commission chair] said, noting that some dependents are licensed nurses and public school teachers here."). A lawsuit could be instituted, however, until the Commission actually adopted and filed a new plan. It did not do so until March 8, 2012, and the plan was subject to challenge in state court for 45 days. HAW. CONST. ART. IV, § 10. This 45-day repose period only lapsed on Sunday, April 22, 2012, meaning that the *earliest* the 2012 Plan could be implemented free of challenge was April 23, the day the present motion is being filed, which is more than 10 days *after* the present action was instituted. Thus, the equities on timing run against the state, and the claim that it is "too late" must be taken lightly.

Mr. Nago asserts that precincting presents the major difficulty. However, the fact the Elections Office has already completed precincting for the 2012 plan—which it only began a week after the plan was filed on March 8—shows it only takes a few weeks to accomplish. Nago Deposition at 30:7—32:5. Thus, if the Elections Office starts precincting soon after the May 18, 2012 hearing, it has sufficient time to finish within the statutory deadlines. When weighing the

45

equities, this Court should consider that Mr. Nago rejects any possibility that the 2012 Plan is unconstitutional, since he admits he has absolutely not accounted for that contingency. *Id*. at 27:4-19.

The Office of Elections sets precincts based on five maps: Congressional districts, state Senate and House districts, and the council districts for the City and County of Honolulu and the County of Hawaii. Maui and Kauai Counties elect their councils at-large, so do not undertake districting because there are no lines to draw. All five maps are inputted into a GIS computer program which allows for the districts to be overlaid and precinct maps produced. Nago Deposition at 9:16—12:10. As a result of the Census, the boundary between Congressional District ("CD") 1 (urban Oahu) and CD2 (rural Oahu plus all other islands) changed, as did county districts on Oahu and Hawaii. Thus, the Congressional district change did not impact any precincts on neighbor islands.

For the Office of Elections to precinct in accordance with another plan, the data already exists and the Congressional and County maps will not change. The August 2011 proposed plan is accessible to the Office of Elections because the same GIS computer program is used to

164988

create all the plans and is used to precinct. Should this Court preliminarily enjoin the 2012 Plan, precincting in accordance with a constitutional plan need occur only on Oahu and Hawaii to achieve immediate relief that addresses the main impact of the 2012 plan, the unconstitutional extraction of military personnel, military families, and students, and the resultant move of the Senate seat from Oahu to Hawaii. Although it may be difficult for the Office of Elections to implement a constitutional plan, it is hardly impossible.

Finally, Plaintiffs ask the Court to note that the unavailability of immediate injunctive relief does not affect either declaratory relief, or permanent injunctive relief. Both remain available, even in the event the Court concludes the upcoming election must be held under an unconstitutional apportionment plan because of timing.

164988

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs request this Court grant the

preliminary injunction and the declaratory relief requested.

DATED:  Honolulu, Hawaii, April 23, 2012.

Respectfully submitted,

DAMON KEY LEONG KUPCHAK HASTERT


/s/ *Robert H. Thomas*
ROBERT H. THOMAS
ANNA H. OSHIRO
MARK M. MURAKAMI

Attorneys for Plaintiffs
  JOSEPH KOSTICK, KYLE MARK TAKAI,
  DAVID P. BROSTROM, LARRY S. VERAY,
  ANDREW WALDEN, and EDWIN J. GAYAGAS

164988