DAVID M. LOUIE      2162
Attorney General of Hawaii

BRIAN P. ABURANO   3154
JOHN F. MOLAY      4994
SARAH R. HIRAKAMI 6919
Deputy Attorneys General
Department of the Attorney
  General, State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Telephone:  (808) 586-1494
Facsimile:  (808) 586-1369
E-Mail:      John.F.Molay@Hawaii.gov

Attorneys for Defendants
SCOTT T. NAGO, STATE OF HAWAII 2011
REAPPORTIONMENT COMMISSION,
VICTORIA MARKS, LORRIE LEE STONE,
ANTHONY TAKITANI, CALVERT CHIPCHASE IV,
ELIZABETH MOORE, CLARICE Y. HASHIMOTO,
HAROLD S. MASUMOTO, DYLAN NONAKA, and
TERRY E. THOMASON

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH KOSTICK; KYLE MARK TAKAI; DAVID P. BROSTROM; LARRY S. VERAY; ANDREW WALDEN; EDWIN J. GAYAGAS; ERNEST LASTER and JENNIFER LASTER<br><br>Plaintiffs,<br><br>vs.<br><br>SCOTT T. NAGO, in his official | Civil No. CV 12-00184 JMS-RLP-MMM<br><br>DEFENDANTS SCOTT T. NAGO, STATE OF HAWAII 2011 REAPPORTIONMENT COMMISSION, VICTORIA MARKS, LORRIE LEE STONE,ANTHONY TAKITANI, CALVERT CHIPCHASE IV, ELIZABETH MOORE, CLARICE Y. HASHIMOTO, HAROLD S. MASUMOTO, DYLAN NONAKA, and TERRY E. THOMASON'S |

| | |
|---|---|
| capacity as the Chief Election Officer State of Hawaii; STATE OF HAWAII 2011 REAPPORTIONMENT COMMISSION, VICTORIA MARKS, LORRIE LEE STONE, ANTHONY TAKITANI, CALVERT CHIPCHASE IV, ELIZABETH MOORE, CLARICE Y. HASHIMOTO, HAROLD S. MASUMOTO, DYLAN NONAKA, and TERRY E. THOMASON, in their official capacities of members of the State of Hawaii 2011 Reapportionment Commission; and DOE DEFENDANTS 1-10,<br><br>Defendants. | MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION FILED APRIL 23, 2012 [Docket 28]; DECLARATION OF RANDALL NISHIMURA; DECLARATION OF JAMES ARAKAKI; DECLARATION OF MADGE SCHAEFER; DECLARATION OF CARYN M. MORAN; DECLARATION OF DAVID ROSENBROCK; DECLARATION OF VICTORIA S. MARKS; DECLARATION OF HAROLD S. MASUMOTO; DECLARATION OF DYLAN NONAKA; DECLARATION OF SCOTT T. NAGO; DECLARATION OF BRIAN ABURANO; CERTIFICATION OF WORD COUNT; CERTIFICATE OF SERVICE<br><br>HEARING:<br>DATE:        MAY 18, 2012<br>TIME:        10:00 A.M.<br>JUDGES:    NINTH CIRCUIT JUDGE M. MARGARET MCKEOWN & UNITED STATES DISTRICT COURT JUDGES J. MICHAEL SEABRIGHT & LESLIE E. KOBAYASHI |

DEFENDANTS SCOTT T. NAGO, STATE OF HAWAII 2011 REAPPORTIONMENT COMMISSION, VICTORIA MARKS, LORRIE LEE STONE,ANTHONY TAKITANI, CALVERT CHIPCHASE IV, ELIZABETH MOORE, CLARICE Y. HASHIMOTO, HAROLD S. MASUMOTO, DYLAN NONAKA, and TERRY E. THOMASON'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION FILED APRIL 23, 2012 [Docket 28]

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

I.    INTRODUCTION ................................................................... 1

II.   STATEMENT OF FACTS ........................................................ 1

      A.   History of Hawaii's Reapportionment Bases ........................ 1

      B.   Hawaii's Policy of Protecting the Integrity of Basic Island Units ....... 7

      C.   2011 Reapportionment Commission .................................. 13

III.  ARGUMENT ....................................................................... 15

      A.   Preliminary Injunction Standards .................................... 15

      B.   Plaintiffs Are Not Likely To Succeed On The Merits ........... 16

           1.   Plaintiffs Do Not Have Standing ............................. 16

           2.   Count I:  Equal Protection (Equal Representation) ......... 17

                a.   The Equal Protection Clause Does Not Require
                     the Census Population to be Used as the
                     Reapportionment Base ................................... 17

                b.   Federal Courts Have Approved Excluding Non-
                     Permanent Residents from the Reapportionment Base . 20

                c.   Use of the Permanent Resident Base Does Not
                     Discriminate Against or Disenfranchise the Military .... 21

                d.   The Commission Properly Determined the
                     Permanent Resident Population Base ................... 23

3.    Count II : Equal Protection (Malapportionment).................... 26

      a.    The Supreme Court Has Not Set an Upper Limit on Deviations and Even Large Deviations Can Be Justified by Legitimate State Interests ........................................ 26

      b.    The Deviations in the 2012 Plan are Justified by a Rational State Policy and Legitimate State Interests..... 28

C.    It is Questionable Whether and How Much Irreparable Harm Plaintiffs Will Suffer ................................................. 33

D.    The Balance of Equities or Hardships Favors Defendants................. 34

E.    The Public Interest Favors the State.................................. 37

IV.    CONCLUSION........................................................ 37

## TABLE OF AUTHORITIES

CASES

Alliance for the Wild Rockies v. Cottrell,
    632 F.3d 1127 (9th Cir. 2010) ...................................................... 15

Brown v. Thomson,
    462 U.S. 835 (1983)............................................... 27, 28, 32

Burns v. Gill,
    316 F.Supp. 1285 (D. Haw. 1970)................................... 10, 11, 21

Burns v. Richardson,
    384 U.S. 73 (1966)................................................ *passim*

Citizens for Equit. & Resp. Gov't v. County
    108 Hawai'i 318, 120 P.3d 217 (2005)............................... 20

Daly v. Hunt,
    93 F.3d 1212 (4th Cir. 1996) ........................................ 20

Fairley v. Patterson,
    493 F.2d 598 (1974)................................................. 16

Fortson v. Toombs,
    85 S.Ct. 598 (January 18, 1965) ................................... 2

Gaffney v. Cummins,
    412 U.S. 735 (1973)................................................ 18, 27

Garza v. County of Los Angeles,
    918 F.2d 763 (9th Cir. 1990) ...................................... 19, 20

Holt v. Richardson,
    238 F.Supp. 468 (D. Hawai'i 1965) ................... 1, 2, 3, 7, 8, 21. 36

Karcher v. Daggett,
    462 U.S. 725, 740-741 (1983) ...................................... 33

League of Women Voters of Nassau County v. Nassau County Board of Supervisors,
    737 F.2d 155 (2nd Cir. 1984) ........................................................... 17

Lopez v. Merced County, California,
    473 F.Supp.2d 1072 (E.D. Cal. 2007) ............................................. 17

Mahan v. Howell,
    410 U.S. 315 (1973) ................................................................. 26, 29

Reynolds v. Sims,
    377 U.S. 533 (1965) ........................................................................ 36

S.W. Voter Registration Educ. v. Shelley,
    344 F.3d 914 (9th Cir. 2003) ......................................................... 35

Stanley v. University of Southern California,
    13 F.3d 1313 (9th Cir. 1994) ......................................................... 16

Travis v. King,
    552 F.Supp. 554 (D. Haw. 1982) ......................... 4, 6, 11, 21, 28, 29

STATUTES & RULES

Hawaii Administrative Rules ("HAR") § 18-235-1.09 ........................... 24

HAR §20-4-2 ......................................................................................... 25

HAR §20-4-6 ......................................................................................... 25

HAR §20-4-7 ......................................................................................... 25

Hawaii Revised Statutes § 25-2(a) ................................................. 13, 14

Hawaii Revised Statutes § 304A-402 .................................................. 25

CONSTITUTION

Art. IV §§ 4 and 6, Hawaii Constitution .............................................. 29

## I.   INTRODUCTION

Plaintiffs have moved for a preliminary injunction under Counts I and II of their First Amended Complaint.  Defendants Scott Nago, Chief Election Officer, and members of the 2011 State of Hawaii Reapportionment Commission ("Commission") in their official capacities (collectively "Defendants") oppose the motion because: (a) Plaintiffs have not shown that they are likely to succeed on the merits; (b) Plaintiffs have not suffered significant irreparable harm; (c) the balance of hardships or equities clearly favors Defendants; and (d) the public interest requires that Plaintiffs' requested injunction be denied.  With respect to (c) and (d), the testimony of the Chief Election Officer shows that granting this motion will delay the pending primary election for an unknown amount of time, require the suspension of a number of state laws, create costly and difficult logistical problems, and may endanger the holding of a timely general election.

## II.   STATEMENT OF FACTS

### A.   History of Hawaii's Reapportionment Bases

The Hawaii Constitution initially provided for the State House of Representatives ("House") to be apportioned on the basis of the "registered voter" population.  After the first reapportionment in 1960, the State's use of the registered voter base was challenged in Holt v. Richardson, 238 F.Supp. 468 (D. Hawai'i 1965), *judgment vacated by* Burns v. Richardson, 384 U.S. 73 (1966).  In

Holt, the Court refused to require the State to use the Census total population ("Census population") to reapportion the House, in part, because the Census population included a large and fluctuating military population. The Court said:

> Since the total civilian population of Hawaii (excluding the military) in 1960 was but 585,505 (Ex. 14, Table 12), it is seen that the military did account for about 10% Of [sic] the total population (1960 Census estimate, Ex. 15, Table 9). Hawaii has become the United States' military bastion for the entire Pacific and the military population in the State fluctuates violently as the Asiatic spots of trouble arise and disappear. If total population were to be the only acceptable. Criteria [sic] upon which legislative representation could be based, in Hawaii, grossly absurd and disastrous results would flow from a blind adherence to "the elusive one-person-one-vote aphorism." (Mr. Justice Harlan in Fortson v. Toombs, 85 S.Ct. 598 (January 18, 1965).
>
> For example, if Hawaii's reapportionment year had been 1944, when the civilian population was 464,250 and the military population was over 407,000, then areas which normally might have a total population entitling them to but a small percentage of the total number of legislators would suddenly find themselves controlling over 90% Of [sic] the legislature for the following ten years.
>
> In contrast to the above, in 1950, with a civilian population of 472,780, there were but 21,000 military in Hawaii - less than 5%. In two years, this had jumped to 55,000. In 1958, there were 55,000 military, with a civilian population of 555,222. Two years later, there were 79,000 military in Hawaii. (Ex. 15, Table 11). As the plaintiffs have admitted, if the State were reapportioned at the present time on a straight total population basis, the Fifth senatorial district, containing within its bounds most of the military and naval installations of the State, would be entitled to 13 senators - a majority of the Senate.

Holt, 238 F.Supp. at 474-475. The Court noted that a theoretical redistricting of Oahu based on Census population could result in one representative district being composed completely of Schofield Barracks which while one of the largest

representative districts would be among the smallest in terms of registered voters. In fact, it was possible "in a single representative district so reapportioned on a total population basis, for such a district to have almost no voters at all." Id. at 475.

The Supreme Court upheld the State's use of the registered voter base saying that while both houses of a bicameral state legislature must be apportioned substantially on a population basis, "the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured." Burns, 384 U.S. at 91. The Supreme Court noted, "Hawaii's special population problems might well have led it to conclude that state citizen population rather than total population should be the basis for comparison." and quoted Holt as to the large and fluctuating military population in Hawaii. Id. at 94.

In 1968, the State held a Constitutional Convention which reviewed in depth whether to use the registered voter, Census population, or some other base for reapportionment. A Convention report said "[t]he difficulties attendant in the use of the total population may be particularly unique to Hawaii because of the large pockets of military and maritime personnel on the island of Oahu, largely confined within a few legislative districts on that island." See Exh. 37 - 1968 Convention Proceedings, Volume 1, p. 241. The report said World War II, the Korean conflict,

the Viet Nam crisis, and other near incidents in the far east "have prompted sudden

troop movements causing sharp increases and reductions of significant proportions

in Hawaii Legislative districts in which Schofield Barracks, Pearl Harbor, Kaneohe

Marine Corps Air Station, and other military installations are located" which

would produce:

> ... either extreme over-representation or extreme under-representation if a total population base were used, depending upon the accident of how many military people and dependents were present on the day the [Census] count was taken. Further, between apportionments, the transient and fluctuating circumstances of the military personnel would render the concept of "population" rather elusive and distorted in those districts wherein the military are contained. Fluctuation among the military population does not appear to have meaningful correlation with changes in civilian population ....

Id.

After the 1981 reapportionment, a federal lawsuit was brought challenging,

in part, the State's registered voter base. The Court held the registered voter base

could no longer be used because it did not produce substantially the same

distribution of legislators as a permissible population base. Travis v. King, 552

F.Supp. 554 (D. Haw. 1982). The Court appointed Special Masters to come up

with an interim plan for the 1982 elections. The reapportionment base that the

Special Masters recommended was "total population less non-resident military and

dependents" which was an approximation of the state citizen base. See Exh. 35 -

Robert G. Schmitt, "A History of Recent Reapportionment in Hawaii", 22 Hawaii

Bar Journal (1990), p. 176; and Exh. 27 - Final Report and Recommendations of Special Masters Submitted Pursuant to Order of Court, pp. 24, and 27. The Court accepted the plan with the reapportionment base that excluded non-resident military and their dependents. See Exh. 28.

Following the 1982 elections, the 1981 reapportionment commission ("1981 Commission") was reorganized to come up with a permanent plan of reapportionment. See Exh. 35, pp. 177-179. The reorganized 1981 Commission examined a comprehensive analysis of possible reapportionment bases. Id., p. 181; Exh. 29 - Robert G. Schmitt, "Selection of a Constitutionally Permissible Population Base for Hawaii's Legislative Reapportionment, (August 30, 1983) ("Schmitt Report").

The Schmitt Report said use of the Census population "may result in a distortion of representation in certain areas of Hawaii where there may be a high concentration of temporary residents (military and civilian Federal employees, or others such as students and aliens)." See Exh. 29, pp. 6-7.

The Schmitt Report said "state citizen" has commonly been defined as all legal residents of a state, with certain categories of residents excluded; "residents" included all people with an intent to make a particular state their legal residence. Id., p. 7. It noted that military personnel are required to declare a state of residency for income tax reporting purposes, and such a "process of declaring residency for

the purposes of taxation is a strong indication of an intent to participate in the political processes of that same jurisdiction." Id., p. 8. It said a reasonable definition of state citizen was "the permanent population of a state, thus excluding aliens and residents of other states." It said the federal court in Travis v. King had approved an equivalent of the "state citizen base." Id., p. 11.

Ultimately, the reorganized 1981 Commission adopted a "state resident" base which was the Census population, less the non-resident military and their dependents. See Exh. 35, pp. 185-186.

The 1991 reapportionment commission ("1991 Commission") decided to use a permanent resident base - total population less transients. See Exh. 30 - 1991 Reapportionment Commission Final Report and Plan, pp. 21-24. The 1991 Commission hired experts who determined that non-resident military were the one large, census-block-identifiable group of nonresidents included in the Census who could be excluded from the permanent resident population base. Id., p. 23. The 1991 Commission was briefed on the history of reapportionment bases in Hawaii and why the non-resident military had historically been excluded. Id., pp. A-83 to A85. Then Commissioner Richard Clifton noted that the 1991 Commission had adequate information to exclude non-resident military from the reapportionment base. Id., pp. A-90 to A-91.

In 1992, the Hawaii Constitution was amended to change the reapportionment base from registered voters to permanent residents. See Exh. 39. A Fact Sheet, mailed to absentee voters and posted at election sites, indicated that the permanent resident base would not include nonresident military and their dependents. See Exh 6.

The 2001 reapportionment commission ("2001 Commission") initially decided that the permanent resident population base would be determined by subtracting non-resident military and non-resident students from the Census population. The 2001 Commission received much public testimony against inclusion of non-resident military dependents in the reapportionment base. Ultimately, the 2001 Commission reconsidered its decision and voted to exclude the dependents of non-resident military from the reapportionment base. See Exh. 31 - 2001 Commission Final Report, pp. 16-17 and A-224 to A-231.

   B.   Hawaii's Policy of Protecting the Integrity of Basic Island Units

The Hawaii Constitution initially insured meaningful representation for the neighbor islands in the State legislature by mimicking the U.S. Congress, i.e., the Senate being based on geographic areas while the House was based on population. The provisions for the Senate were admitted to be unconstitutional in Holt v. Richardson, supra. However, the Court noted:

> Hawaii is unique in many respects. It is the only state that has been successively an absolute monarchy, a constitutional monarchy, a republic,

and then a territory of the United States before its admission as a state. Because each was insulated from the other by wide channels and high seas [citation omitted] and historically ruled first by chiefs and then royal governors, after annexation the seven major, inhabited islands of the State were divided up into the four major counties of Kauai, Maui, Hawaii and the City and County of Honolulu. All of this resulted in a strongly centralized form of government.

By 1950, Honolulu, the State capital had by far the largest population of any county, an essentially urban population, and had become an industrial, manufacturing, military and tourist center. The other three counties remained essentially rural and primarily concerned with agriculture and ranching. With the State having complete control over the judiciary, taxation, education, public health and welfare, etc., it was normal therefore that the three more rural counties of Kauai, Maui and Hawaii would not wish to leave such centralized power, particularly control over the State's purse strings, with urban Honolulu.

Holt, 238 F.Supp. at 470-471.

The State's 1968 Constitutional Convention established new apportionment standards.[1] One of the criteria the Convention used was that no district shall extend beyond county (basic island unit) boundaries which was to preserve "the integrity of political subdivisions." See Exh. 37, p. 245. The Convention recommended that the Hawaii Constitution be amended to allocate state legislators among the four basic island units via the method of equal proportions and to provide for minimum representation of the basic island units. Id. at pp. 260-261. The Convention said the term "basic island unit" was adopted "to reflect more

---

[1] Defendants expect to later provide written testimony from the Chair of the Convention committee that proposed these criteria to elaborate on them and how they were developed.

clearly the fact that these areas are not only basic but are historical, geographical and political units with a strong identity of interest." Id., p. 261.[2]

The Convention said rigid adherence to the one-man, one-vote principle "may result in depriving substantial elements of our population in the state legislature in matters of government" due to two factors unique to Hawaii: (1) Hawaii's geographical structure - islands or groups of islands separated by 30-70 miles of open ocean; and (2) Hawaii's highly simplified and centralized government structure. Id. The Convention said "[n]o other state in the union possesses either of these characteristics and, of course, no other state even remotely approaches the situation resulting from a combination of both." Id.

The Convention gave details about how Hawaii's unique geography produced results that must be considered in evaluating any State government structure:

(1)   The Hawaii islands have been separate and distinct fundamental units since their first settlement by human beings; the present counties were separate free nations. In every constitution of the nation, territory, and state, the island units have been recognized as separate political entities.

(2)   Each of the islands has its own unique geographic, topographic, and climatic conditions which have produced strikingly different patterns of economic progress and occupational pursuits; each have their own peculiar needs and priorities.

---

[2] Defendants expect to later offer written testimony regarding the "roots" of the basic island unit concept being grounded in Hawaiian antiquity.

(3)    Statewide news media are centralized in Oahu and the people of Oahu know little about the problems of any neighbor island.

(4)    It is not possible to manufacture tenable senatorial or representative districts by combining parts of two counties.  The result would always be the submergence and effective disenfranchisement of the voters in that county which constituted the lesser number.

Id., pp. 261-262.

The Convention gave details about the unique role of the State legislature - how it controls many matters which in other states would be local government matters, e.g., the State's administration and control of the entire public education system, entire judicial system, all natural resources, boat harbors and airports, hospitals and health and welfare activities, administration and collection of all major taxes, etc.  Id., pp. 262-3.

Following the 1968 Convention, the method of equal proportions was challenged in federal court.  However, the Court, citing the history of Hawaii, said that the 1968 Convention had studiously and with due deliberation determined that "the best means of apportioning its legislative representatives among its peoples in order to secure practical equality of suffrage was again to divide the State into its four basic political (county) units and use the two-tiered method of equal proportions ...."  Burns v. Gill, 316 F.Supp. 1285, 1290 (D. Haw. 1970).  Judge Pence described the unique geography, characteristics, and economies of the various islands; noted that each island was separated by open ocean channels with

public transportation between them only by air; noted that each of the basic island units had geographies that had led to insulating groups of citizens into severable communities of interest; and that this insular life had caused residents to personally identify with their own counties. Id., pp. 1290-1291. The Court described how the State controlled public offices, programs and facilities with the counties having few of the normal municipal powers. Id., pp. 1291-1292. The Court concluded that the 1968 Convention was justified in concluding that if voters were to have functional representation in the State legislature each basic island unit must be given meaningful representation. It cited testimony from the State statistician that it was impossible to set up legislative districts of absolute numerical equality without conjoining areas on two islands that "had no fundamental community of interests" and creating an expensive and difficult campaign problem for the candidates of those districts and stultifying communication for those so elected. Id., p. 1292.

In 1982, a District Court held that the deviations statewide in the State's 1981 reapportionment plan exceeded the limitations allowable under the Equal Protection Clause. Travis, 552 F.Supp. at 563. The Court appointed Special Masters who created a plan that straddled election districts between two islands; the rationale being that unlike legislative-drafted plans, court-drafted plans were self-limited in terms of allowable deviations. See Exh. 35, p. 176. The public and

legislature did not like these "canoe districts." Id. p. 178.  Even the Special

Masters, as residents of this multi-island State, indicated that they would have

preferred a plan with no canoe districts.  See Exh. 27, pp. ii-iii.

The reorganized 1981 Commission was provided a report on the role of

county integrity in Hawaiian politics and the impacts of split counties.  See Exh.

35, p. 182 and Exh. 32 - Jeffrey M. Smith, "Reapportionment and County

Integrity" (September 16, 1983) ("Smith Report").  Among other things, the Smith

Report said: (a) the geographic separateness of the basic island units made it

natural for them to have developed as separate political entities; (b) due to their

separation, Hawaii's counties had developed a strong sense of identity and

community which could be violated by districts that cut across basic island units,

producing voter indifference and reducing voter participation; (c) Kauai had

expressed outrage by being submerged in a canoe district after the 1982 elections;

(d) Hawaii's uniquely centralized governmental structure means that ignoring

county boundaries in districting severely disadvantages local representation in the

State legislature; (e) ignoring county integrity severely hampers legislator-

constituent relations; and (f) focusing only on percentage numbers increased

gerrymandering.  See Exh. 32.  While the reorganized 1981 Commission wanted to

maintain county integrity, it eventually adopted a plan that used canoe districts

despite public animosity to such districts.  See Exh. 35, pp. 182, 186, and 187.

The 2001 Commission's initial proposed plan included a Senate canoe district between Kauai (North Shore) and Oahu (Waimanolo) and a House canoe district between Kauai (North Shore) and Oahu (Wailua/Schofield Barracks).  Due to much public testimony against canoe districts, the 2001 Commission revised its final plan to do away with the canoe district even though that led to high statewide deviations.  See Declaration of David Rosenbrock ("Rosenbrock"), ¶ 12 and Exhs. 12 and 31, pp. 23-26; Declaration of Harold S. Masumoto ("Masumoto"), ¶ 9.

C.    2011 Reapportionment Commission

The 2011 Commission had until September 26, 2011 to prepare and file its reapportionment plan.  See Rosenbrock, ¶ 19 and section 25-2(a), Hawaii Revised Statutes ("HRS").

The Commission was briefed on what groups of persons had been considered for extraction from the Census population by the 2001 Commission to establish the "permanent resident" population base, and what data had been available in 2001 for those groups, i.e., military sponsors and their dependents, university students, sentenced felons, and aliens.  Id., ¶¶ 7-11 and 15.

The 2011 Commission told Commission staff to get residence information for non-permanent resident military, military dependents, and students so that they could be accurately extracted from census blocks for reapportionment and redistricting purposes.  Id., ¶ 16.

By August 3, 2011, the Commission had not received all the information requested from the military and colleges.  Due to the pending deadline for filing the final plan, the Commission accepted a proposed plan that extracted no one from the Census population for the purpose of holding the public hearings required under HRS § 25-2 ("August 2011 Plan").[3]  At the hearings, a major complaint was that the Commission had failed to extract non-permanent residents.  Id.,¶¶ 19-20 and Exh. 15; Declaration of Victoria Marks ("Marks"), ¶¶ 7-8.

By September 2011, the military and some colleges had still not provided all the requested information.  As such, on September 26, 2011, the Commission approved a final reapportionment plan that extracted only some military and students ("September 2011 Plan").  See Rosenbrock, ¶¶ 21-22; Marks ¶¶ 9-11.

The September 2011 Plan was challenged in the Hawaii Supreme Court.  On January 4, 2012, the Court found the September 2011 Plan invalid because it included non-permanent residents in violation of Art. IV, § 4 of the Hawaii Constitution, and ordered the Commission to prepare a new plan.  See Marks, ¶¶ 13-14; Plaintiffs' Exh. A, Parts 1-2, pp. A-1 to A-31.

Commission staff renewed efforts to the military and colleges to provide all of the information that the Commission had previously requested;  eventually, the military and colleges provided the requested data.  See Rosenbrock, ¶¶ 23-26;

---

[3] The statewide deviations in the August 2011 plan are: State Senate 32.42% and State House 27.77%.  See Rosenbrock, ¶ 32 and Exh. 23.

Declaration of Moran ("Moran"), ¶¶ 7-9.  Based on this data, Commission staff was able to extract the following from the Census population to establish the permanent resident population base:  (1) 42,332 military sponsors (47,082 - 4,750 deployed); (2) 53,115 military dependents; and (3) 13,320 students.  The Commission did not extract any active duty military identified as Hawaii residents; the Commission actually included 52,927 military dependents who were <u>not</u> linked to a non-permanent resident military sponsor.  <u>See</u> Rosenbrock, ¶ 27, and Exh. 19.

The Commission's final plan was adopted on March 8, 2012 ("2012 Plan").  In accordance with Art. IV, § 6 of the Hawaii Constitution, the intra-basic island unit deviations in the 2012 Plan are under 10%.  On an average population per legislative seat basis the statewide deviation among all seats is 5.62%.  <u>See</u> Exh. 33, pp. 15-18 and 22-23.

## III.  ARGUMENT

### A.  <u>Preliminary Injunction Standards</u>

A district court may issue a preliminary injunction if:  (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in the plaintiff's favor; **and** (4) the injunction is in the public interest.  <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1131 (9th Cir. 2010).

B.    Plaintiffs Are Not Likely To Succeed On The Merits

When a party seeks more than maintaining the status quo, and seeks

mandatory injunctive relief, it must show that the law and facts clearly favor

granting such relief. Stanley v. University of Southern California, 13 F.3d 1313,

1320 (9th Cir. 1994). Plaintiffs are seeking mandatory injunctive relief that

changes the status quo, i.e., delaying the pending elections, changing statutory

deadlines for those elections, and requiring a reapportionment plan that changes

the State's constitutionally required reapportionment base and/or violates State

constitutional provisions protecting the integrity of the basic island units. As

shown below, Plaintiffs cannot **clearly** show they will succeed on the merits.

1.    Plaintiffs Do Not Have Standing

Other than the recently added Laster Plaintiffs, none of the Plaintiffs are

non-permanent resident active military, military dependents, or students. See Exh.

44-2, 44-7, 44-12, and 44-15. Thus, except for the Laster Plaintiffs, none of the

Plaintiffs have standing to raise Count I. Fairley v. Patterson, 493 F.2d 598, 604

(1974) (only non-resident students excluded from reapportionment base may assert

equal protection claim).

Only persons who reside in underrepresented districts (districts where the

population is greater than the average for all districts) have standing to challenge a

reapportionment plan that is alleged to be malapportioned. Fairley, 493 F.2d at

603-604; <u>League of Women Voters of Nassau County v. Nassau County Board of Supervisors</u>, 737 F.2d 155, 161-162 (2nd Cir. 1984); <u>Lopez v. Merced County, California</u>, 473 F.Supp.2d 1072, 1079-1080 (E.D. Cal. 2007).   In this case, the only Plaintiffs who are in underrepresented districts under the 2012 Plan are Kostick (Senate District 11), Walden (Senate District 11) and Veray (House District 34).  <u>See</u> First Amended Complaint, ¶¶ 1-8 and Exh. 33, pp. 19-21.  The rest of the Plaintiffs are in overrepresented districts (districts where the population is smaller than the average for all districts).  <u>Id</u>.  Thus, only Kostick, Walden, and Veray have standing to raise Count II.

      2.    <u>Count I:  Equal Protection (Equal Representation)</u>

          a.    <u>The Equal Protection Clause Does Not Require the Census Population to be Used as the Reapportionment Base</u>

Plaintiffs wrongly claim that the Equal Protection Clause requires the State to use the Census population as the base for reapportioning the State's legislature. As noted in this Memorandum, the Supreme Court in a case involving Hawaii reapportionment said: "the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured." <u>Burns</u>, 384 U.S at 91.  The Supreme Court went on to say:

      Neither in Reynolds v. Sims nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term

or temporary residents, or persons denied the vote for conviction of a crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured. The decision to include or exclude such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere.

Id. at 92. Citing the large and fluctuating military in Hawaii, the Court said "Hawaii's special population problems might well have led it to conclude that state citizen population rather than total population should be the basis for comparison." Id. at 94. Approving Hawaii's non-use of the Census population, the Court said "[t]otal population figures may thus constitute a substantially distorted reflection of the distribution of state citizenry." Id.

As noted in this Memorandum, this Court and the Supreme Court have previously approved the State's use of a reapportionment base other than Census population on several occasions.

The Supreme Court has noted the inherent inaccuracy of Census figures used for reapportionments. Gaffney v. Cummins, 412 U.S. 735, 745-746 (1973). It said:

> ... it must be recognized that total population, even if absolutely accurate as to each district when counted, is nevertheless not a talismanic measure of the weight of a person's vote under a later adopted reapportionment plan. The United States census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down .... And these figures tell us nothing of the other ineligibles making up the substantially equal census populations among election district: aliens,

nonresident military personnel, nonresident students, for example. [Citations omitted.]

Id., p. 746-747.

Plaintiffs cite the Ninth Circuit's decision in Garza v. County of Los Angeles, 918 F.2d 763 (9th Cir. 1990) as requiring the State to use Census population for reapportionment. This is completely fallacious.

In Garza, the County of Los Angeles was sued for gerrymandering boundaries to dilute Hispanic voting strength. The district court, finding that the County had engaged in intentional discrimination, imposed a plan that created a district in which the majority of voting age citizen population was Hispanic. The County appealed claiming, in part, that the court's plan was erroneous as a matter of law since it was based on Census population alone - which resulted in weighting the votes of citizens in one district more heavily than those of citizens in the other districts. The Ninth Circuit upheld the court's plan saying that while Burns v. Richardson permitted states to consider the distribution of the voting population as well as that of total population, "[i]t does not, however *require* states to do so." Id. at 774. The Ninth Circuit noted that California statutes required the County to redistrict on the basis of total population. Id. citing California Elections Code § 35000. Thus, there was nothing unlawful about the court ordering a plan based on total population. While the Ninth Circuit went on to discuss representational vs. electoral equality, Judge Kozinski gave a well-supported dissent that showed that

Supreme Court decisions including <u>Burns v. Richardson</u>, have been more supportive of electoral vs. representational equality.  <u>Id.</u>, at 779-785.

 <u>Garza</u> does not mean that total population **must** be used for reapportionment.  <u>Garza</u> only means that the Equal Protection Clause does not preclude a court from imposing a reapportionment plan based on total population where that is required by applicable state law.  As noted by one court, in commenting on the import of <u>Burns</u> and <u>Garza</u>: "[t]he more important lesson that may be gleaned from <u>Burns</u> is that courts should generally defer to the state to choose its own apportionment base, provided that such method yields acceptable results."  <u>Daly v. Hunt</u>, 93 F.3d 1212, 1225 (4th Cir. 1996).

 In this case, the Hawaii Constitution, as interpreted by the Hawaii Supreme Court, requires use of a "permanent resident" base not the Census population base.  <u>See</u> order and opinion in Solomon et al. v. Abercrombie, et al, SCPW 11-0000732 and Matsukawa v. State of Hawaii 2011 Reapportionment Commission, et al., SCPW 11-0000741 - Plaintiffs' Exh. A, Parts 1-2, pp. A-1 to A-31.[4]  Thus, <u>Garza</u> does not apply to this case since the applicable state law requires use of the permanent resident population not the Census population for reapportionment.

       b.    <u>Federal Courts Have Approved Excluding Non-Permanent Residents from the Reapportionment Base</u>

---

[4] <u>See also</u> <u>Citizens for Equit. & Resp. Gov't v. County</u>, 108 Hawai'i 318, 120 P.3d 217 (2005).

In Holt and Burns, this Court and the Supreme Court upheld Hawaii reapportionment plans that had the effect of excluding nonresident military from the reapportionment bases. In fact, the courts' opinions show that Hawaii's special problems with a large and fluctuating military presence was the reason for approving a reapportionment base other than Census population. See also Burns v. Gill, supra.

Even in Travis, the Court adopted a court reapportionment plan that excluded nonresident military. In Travis, the Court ordered Special Masters to prepare reapportionment plans for the Court's consideration. See Exh. 27, p. 2. The Court said it preferred a plan based on citizen population as defined in Burns v. Richardson - total population minus nonresident military and their dependents. Id., pp. 3 and 6. The Special Masters recommended and the Court adopted Plan 2 which used as a population base, "total population minus nonresident military and their dependents." Id., pp. 24 and 27 and Exh. 28.

Plaintiffs have cited no federal court decision that holds that the Equal Protection Clause precludes a state from using a reapportionment base that excludes non-permanent resident military, military dependents and/or students.

        c.     Use of the Permanent Resident Base Does Not Discriminate Against or Disenfranchise the Military

Hawaii's permanent residence reapportionment base does not discriminate against the military. Military and their dependents are not excluded from the

reapportionment base because they are part of the military; rather, they are

excluded if they are not permanent residents of the State.[5]   The Commission

included in the reapportionment base service members whose military records

showed that Hawaii was their state of legal residence; it included 52,927 military

dependents in Hawaii who were <u>not</u> linked to a service member who claimed a

state of legal residence other than Hawaii. <u>See</u> Rosenbrock, ¶ 27.

Service members are free to change their state of legal residence by filing a

Certificate of State of Legal Residence form with the military. <u>See</u> Exh. 17.   As

is evident from the form and the website cited by the military, a service member's

state of legal residence is supposed to be what they consider as their "permanent

home." <u>See</u> Exhs. 8 and 17.

The State places no impediment to military and their dependants becoming

permanent residents or to vote in Hawaii elections. <u>See</u> Exh. 42 (residency rules

for voting in Hawaii).  Nonresident military are not disenfranchised.  They can

petition the representatives of their home state and vote in their home state

elections.  There are voting assistance officers on military bases to help service

members get absentee ballots to vote in their home state. <u>See</u> Declaration of

---

[5] While exclusion of military due the nature of their employment would be
discriminatory, the Supreme Court said that "[t]he difference between exclusion of
all military and military-related personnel, and exclusion of those not meeting a
State's residence requirements is a difference between an arbitrary and a
constitutionally permissible classification." <u>Burns</u>, 384 U.S. at 92, n.21.

Madge Schaefer ("Schaefer"), ¶ 13.  They can petition Hawaii legislators and

testify on bills at the State legislature.  They are not precluded from fully

participating in the political process.

As shown in the history of Hawaii's reapportionment base, the point of the

permanent resident population base is not to discriminate against or disenfranchise

the military; it is to prevent distortions in representation that would occur if the

once-in-every ten year reapportionment had to include large and fluctuating

populations such as transient military and students.

> d.     The Commission Properly Determined the Permanent Resident
> Population Base

As shown in the declarations of Marks, Rosenbrock and Moran, the

Commission was careful in determining the permanent resident population used for

reapportionment.  It was advised as to what prior commissions had done. It sought

the advice of the Advisory Councils of each basic island unit - three of which

opposed the inclusion of nonresident military and their dependents and two of

which opposed the inclusion of nonresident students.  See Exhs. 2, 4 and 5.  It

heard public testimony - much of which was strongly against the inclusion of non-

permanent resident military, military dependents and students.  See Exh. 15.  It had

Commission staff get information from the military and Hawaii colleges that: (a)

identified military, military dependents, and students who were non-permanent

residents and counted as of the Census Date; and (b) located those non-permanent

residents to census blocks so that they could be properly extracted for reapportionment and redistricting.

The non-permanent resident military were properly identified by their state of legal residence.  For state tax purposes, the military is required to keep track of a military member's state of legal residence.  See Exhs. 8 and 17.  Military personnel can establish or change their state of legal residence by filing a Certificate of State of Legal Residence Form.  The form says "legal residence" and "domicile" are interchangeable; "they are used to denote that place where you have your **permanent home** and to which, whenever you are absent, you have the intention of returning."  See Exh. 17 (emphasis added).  The form states:

> The formula for changing your State of legal residence is simply stated as follows:  <u>physical presence in the new State with the simultaneous intent of making it your permanent home and abandonment of the old State of legal residence/domicile</u>.

Id. (emphasis in original).

Plaintiffs' disclosures show that they generally did not declare Hawaii to be their state of legal residence while they were in active service and moving from place to place.  See Exhs. 44-2, 44-7, 44-13, and 44-15.  Military and their dependents are not subject to Hawaii income taxes unless their domicile or permanent residence is here.  See Exh. 41 - Hawaii Administrative Rules ("HAR") § 18-235-1.09.

The Commission's basing a military dependents' permanent residence on their military sponsor was also proper.  That military dependents travel with their military sponsors and will have the same legal residence as they do is a matter of experience and common sense.  A 2012 Department of Defense paper on the problems that military spouses have with state occupational licensing laws states that military spouses were ten times as likely as their civilian counterparts to move across state lines in the past year.  See Exh. 43, pp. 3-4.  This is because they are moving with their military sponsors.  See e.g. Exh. 44-12 (Plaintiff Veray) and 44-15 (Plaintiff Laster).

Non-permanent resident students were properly identified by the UH by payment of non-resident tuition during Spring 2010.  To qualify for resident tuition, UH students must show that they are a "bona fide resident" of the State for at least 12 consecutive months and have not been claimed as a dependent by parents or guardians who are not legal residents of the State.  See HRS § 304A-402; Exh. 40 - HAR §20-4-6.  The determination of residence requires a finding of intent to establish "domicile" in Hawaii; "domicile" being defined as "the place where an individual has a true, fixed, and **permanent home** ...."  Exh. 40 - HAR §§ 20-4-7 and 20-4-2 (emphasis added).  Other Hawaii colleges properly identified non-permanent resident students by whether they had a home address outside of Hawaii during the school term that included the 2010 Census Date.

While Plaintiffs claim that the Commission was arbitrary because it did not exclude aliens, the Commission staff advised that this could not be reliably done. See Rosenbrock, ¶¶ 8 and 15 and Exh. 10, p. A-192.  There is also no evidence that aliens are not "permanent residents" of Hawaii; they are likely to want to make Hawaii their permanent home.[6]

The purpose of the permanent resident population base is to avoid distortions to representation that would be caused by including large and fluctuating transient populations that are identifiable and locatable such as the military and their dependents.  There is no indication that aliens or other groups are large enough to distort Hawaii's reapportionment base.

    3.      Count II : Equal Protection (Malapportionment)

          a.      The Supreme Court Has Not Set an Upper Limit on Deviations and Even Large Deviations Can Be Justified by Legitimate State Interests

The Supreme Court has never set an upper limit on the amount of deviation permitted in a state reapportionment plan.  It has not said that deviations beyond a specific percentage can never be justified by a rational state policy or legitimate state interests.  In Mahan v. Howell, 410 U.S. 315, 329 (1973), the Supreme Court said: "[n]either courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the Equal Protection Clause of

---

[6] As Hawaii is an exporter not an importer of prisoners, convicted felons in Hawaii are also highly likely to be "permanent residents."

the Fourteenth Amendment the mathematical formula that establishes what range

of percentage deviations is permissible, and what is not."

As noted in Gaffney v. Cummings, 412 U.S. at 745, "population deviations

among districts may be sufficiently large to require justification but nonetheless be

justifiable and legally sustainable." The Court noted that achieving fair and

effective representation for all citizens is the basic aim of legislative

apportionment. Id. at 748. It said:

> . . . Fair and effective representation may be destroyed by gross population variations among districts, but it is apparent that such representation does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of. [Citations omitted.] An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement.
>
> Nor is the goal of fair and effective representation furthered by making the standards of reapportionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts which themselves must make the political decisions necessary to formulate a plan or accept those made by reapportionment plaintiffs who may have wholly different goals from those embodied in the official plan. From the very outset, we recognized that the apportionment task, dealing as it must with fundamental "choices about the nature of representation," Burns v. Richardson, 384 U.S. at 92, 86 S. Ct. at 1297, is primarily a political and legislative process.

Id. at pp. 748-749.

Indeed, in Brown v. Thomson, 462 U.S. 835 (1983), the Supreme Court

upheld a state reapportionment that provided a single representative to a very small

county - resulting in a maximum deviation of 89%. The Court noted that the Equal Protection Clause only requires a state to make an "honest and good faith effort" to construct districts as nearly equal in population as practicable, and noted that "it is a practical impossibility to arrange legislative districts so that each one had an identical number of residents, citizens, or voters." Id. at 842. The Court said it had recognized that some deviations from population equality may be necessary to permit states to pursue other legitimate objectives such as "maintain[ing] the integrity of various political subdivisions" and "provid[ing] for compact districts of contiguous territory." Id. In Brown, the Court found that Wyoming's constitutional policy of using counties as representative districts and ensuring that each county had one representative was supported by substantial and legitimate state concerns. Id. at 844.

To the extent that Travis v. King, supra, held that there was an upper limit on permissible deviations in a state reapportionment plan without considering the State's rational justifications for such deviations, Defendants believe that that decision is mistaken. As shown above, the Supreme Court has not made such a ruling. Rather, it has looked at the particular facts and circumstances of each case.

     b.    The Deviations in the 2012 Plan are Justified by a
           Rational State Policy and Legitimate State Interests

The maximum deviations in the 2012 Plan are mainly due to the Hawaii Constitution's requirements that legislative seats be allocated to basic island units

by the method of equal proportions, and that district lines not extend beyond the boundaries of any basic island unit. See Art. IV, §§ 4 and 6, Hawaii Constitution. Both of these requirements are intended to provide fair and effective representation to and to protect the integrity of political subdivisions, i.e., the basic island units. The Supreme Court has held that large deviations in a state reapportionment plan may be justified by a state's policy of maintaining the integrity of political subdivisions. Mahan v. Howell, supra.

From the beginning, the Hawaii has sought to protect the integrity of its basic island units ("BIU") and provide them with fair and effective representation via apportionment of the State legislature. The rationales for this policy include: (a) the history of the BIU being separate and distinct units; (b) the physical separation of the BIU from each other by wide ocean channels; (c) the differing economies, identities, needs and interests of the BIU; (d) the lack of knowledge by people in one BUI of the problems of other BIU; (e) the highly centralized State government that controls many functions important to the BIU; and (f) the problems of submergence and representation that result from districts that combine parts of two BIU, i.e., "canoe districts."

The problems of submergence and representation that result from canoe districts are not merely theoretical. Because of the mistaken ruling in Travis v. King and a fear of similar lawsuits by later reapportionment commissions, the State

was forced to endure canoe districts from about 1982 to 2001. People who had to endure those districts and the legislators who tried to service those districts criticized their use. See Exh. 12. In 2001, legislators reported that they could not truly be available to and represent the basic island unit that they didn't live in. It was said that incumbents were unduly favored by such districts because it was harder for challengers to campaign on two islands. See Exh. 12-7. Legislators and the public said that residents' interests aren't fairly represented in a canoe district - particularly residents on the island with the lesser population. See Exh. 12-1, 12-9 and 12-11. Canoe districts were called "unfair, unpopular, unworkable, unconstitutional, and, worst of all, unnecessary". See Exh. 12-15. The outcry of testimony against canoe districts was so great that the 2001 Commission withdrew its first plan and promulgated a second one without canoe districts. See Exh. 31, p. 25.

2001 Commission member Masumoto remembers that people were against canoe districts because: (a) they don't feel that they would be well represented by legislators who come from a different island; (b) legislators will favor the BIU that they reside on or that has the most population; and (c) their interests aren't or won't be well represented by legislators trying to serve multiple differing and possible conflicting interests from two separate communities. See Masumoto, ¶¶ 9-11.

Defendants expect to provide testimony from legislators who served in canoe districts before 2001. For example, Senator Malama Solomon (who represented a canoe district comprised of portions of the islands of Maui and Hawaii) is expected to testify that: capital improvement project ("CIP") funds are allocated on a per legislator basis and not a per island basis - leading to disappointment among her separate island constituents; two islands in her "canoe district," Maui and Hawaii, both wanted an astronomy super-computer, which led to a difficult choice as to which island to lobby in favor of; similarly, both Maui and Hawaii competed for limited airport expansion funds from the State. Senator Solomon is also expected to testify that there were several differences between the two island communities she represented and constituents approached her to express their disappointment that she was unable to fully represent *them*.

Former Representative Hermina Morita (who formerly represented a canoe district comprised of portions of the islands of Kauai and Maui) is also expected to testify that it is difficult to create a presence on, or foster strong community ties on, an island other than your primary residence. She was able to visit her non-residential island maybe once every four weeks, and it was difficult to visit the remote areas of her non-residential island. Morita was also forced to allocate CIP funds among her two separate island communities. Morita will further testify as to the difficulty caused by having to split her time, resources, and loyalty among two

separate island communities, with differing views of such things as windmill farms, water allocation, and GMO taro.

As in <u>Brown</u>, the large deviations in the 2012 Plan are justified by rational State policies of protecting the integrity of political subdivisions (BIU). As in <u>Brown</u>, the large deviations are mainly due to providing a very small county with fair and effective representation. Kauai is responsible for +33.44% of the 44.23% statewide Senate deviation and -11.02% of the 21.57% House deviation in the 2012 Plan. <u>See</u> Exh. 33, pp. 19-21. The method of equal proportions gives it a fair representation of average population per legislator (-2.74% deviation). <u>Id.</u>, p. 23. The Kauai testimony in 2001 and 2011 show that they don't want canoe districts.

Some of the statewide deviations in the 2012 Plan are due to applying the method of equal proportions to other BIU, i.e., Hawaii House 5 (+10.55%) and Hawaii Senate 1 (-10.78%). <u>Id.</u>, pp. 19-21. Outside of those BIU, statewide deviations are generally below 5%. <u>Id.</u> Since Hawaii is small, a 1% deviation in the House is only 245 residents and a 1% deviation in the Senate is only 501 residents.

The remaining statewide deviations, including those on Oahu, are due to: (a) the geography of each of the BIU and uneven distribution of population on each island; (b) the unusual shapes of census blocks and varied populations in them; and (c) other plan criteria in the Hawaii Constitution and statutes, e.g., keeping districts

compact and contiguous, having district lines follow geographic features, and avoiding submergence of different socio-economic interests (not splitting intra-island communities).  This is shown in the Declaration of Dylan Nonaka.[7]  These factors are rational state policies which can justify district deviations.  <u>Karcher v. Daggett</u>, 462 U.S. 725, 740-741 (1983).

C.    It is Questionable Whether and How Much Irreparable Harm Plaintiffs Will Suffer

Only the Laster Plaintiffs have suffered injury sufficient to have standing to sue under Count I claim.  As noted previously, non-permanent military residents such as the Lasters are not disenfranchised by being excluded from the reapportionment base.  They can register to vote in Hawaii or their state of legal residence.  <u>See</u> Exh. 44-15.  They can petition their Hawaii legislative representatives.  While Plaintiffs claim that the exclusion on non-permanent residents caused Oahu to lose a Senate seat to Hawaii, there is no allegation that Plaintiffs will suffer any personal harm from this.  They are still represented by a Senator, and Oahu will continue to dominate the Senate with 17 of the 25 Senators.

Only three Plaintiffs have standing to raise Count II.  These Plaintiffs have not shown that their alleged dilution of representation will cause them real or significant harm.  Veray's House 34 district is larger than average but by only 561

---

[7] Defendants reserve the right to provide additional written testimony addressing deviations issues whether by Mr. Nonaka or others.

residents.  See Exh. 33, p. 20.  Kostick's and Walden's Senate 11 district is larger

than average but only by 1,839 residents.  Id.  They have not shown that they

would have significantly greater voting power or representation if the alleged

malapportionment was remedied, i.e., if canoe districts were instituted.  All

Plaintiffs reside on Oahu, and there is no evidence that the districts on Oahu would

be significantly affected by the requirement of canoe districts.  See Exhs. 25 (canoe

districts probable for neighbor islands).

D.    The Balance of Equities or Hardships Favors Defendants

The balance of equities or hardships definitely favors not granting Plaintiffs'

requested injunction.

Granting Plaintiffs' requested injunction means that the State will not be

able to hold the primary election for State and county offices that by law is

scheduled for August 11, 2012.  See Declaration of Scott Nago ("Nago"), ¶¶ 15-20

and 87-88.  The only reapportionment plan that will permit the primary election to

go forward on that date is the 2012 Plan.  Any other plan, including the August

2011 Plan or the September 2011 Plan, would require the Office of Elections

("OE") to redo precincting which takes months.  Id., ¶¶ 31-35, 42-43, and 87-88.

Then, OE would have to find suitable polling places for the new precincts and print

new voter ballots.  Id., ¶¶ 38-41 54-57.  Then, the counties would have to assign

the 600,000+ voters to the new precincts and mail postcards to them informing

them where to vote. Id., ¶¶ 44-46 and 61. Overseas ballots would have to be mailed out no later than 45 days before the election if there is a federal office on the ballot. Id., ¶¶ 66-67 and 75-76. The foregoing work cannot be done in time for an August 11 primary election. Id., ¶ 88.

If the primary election can't go forward on August 11, 2012, there is an unsettled question as to what the State may do: (a) delay the primary elections to a later date; or (b ) hold two primary and maybe two general elections - one for federal offices on August 11 and one for state offices at a later date. As testified by Mr. Nago, both alternatives would cause a great deal of hardship to Defendants. Id., ¶¶ 89-113. In particular, holding a second primary election for state offices would require suspending state laws, possible require the State to buy new voting machines, and create many legal and logistical problems. Id., ¶¶ 93-113.

In upholding a district court's refusal to enjoin an impending election, the Ninth Circuit cited the material hardship that the state of California and its citizens would suffer by virtue of the enormous resources already invested in the election proceeding on the announced date and the time and money spent to prepare for the election. S.W. Voter Registration Educ. v. Shelley, 344 F.3d 914 (9th Cir. 2003). Granting Plaintiffs' motion would result in the same, maybe even greater, material hardship to the State and its counties.

The Supreme Court has long disapproved postponing elections, even under an invalid reapportionment plan, and has approved a district court allowing the election to proceed under the invalid plan while ordering that a new plan be prepared before the following election. Reynolds v. Sims, 377 U.S. 533, 585 (1965); see also Holt v. Richardson, supra.

Against Defendants' hardship, the Laster Plaintiffs claim hardship because they were not counted as part of the reapportionment base and three Plaintiffs claim that their vote has been diluted due to malapportionment. As shown above, the fact and severity of these "injuries" is questionable. Further, the Court should note that Plaintiffs could have filed a federal lawsuit on Counts I and II back in October 2011. The September 2011 Plan excluded non-permanent resident military and students and had high statewide deviations - Senate 32.91% and House 23.27%. Had they filed a lawsuit in October 2011, the issues in this lawsuit could have been decided in a way that wouldn't delay the pending elections, as well as possibly saving everyone a lot of time and work. Plaintiffs also failed to intervene in the Hawaii Supreme Court proceedings - the results of which they are now complaining about. See Marks, ¶ 13. Plaintiffs' failures amount to laches and they should be estopped from seeking an injunction now. At the least, it shows that the balance of equities or hardships favors not granting Plaintiffs' untimely motion for injunctive relief.

E.    The Public Interest Favors the State

The Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008). "[Where] an injunction is asked which will adversely affect a public interest...the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the Plaintiffs." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312-13 (1982).

The public interest favors denying Plaintiffs' motion and allowing the pending election to proceed. As shown in the Nago Declaration, delaying the pending election or trying to hold two primary elections would be a nightmare for the State, candidates and voters. Mr. Nago cannot even predict when a delayed primary election would be held. The costs and logistics of a second primary election would cause delay, disruption, and confusion. Voter disaffection would be high and turnout adversely affected.

## IV.   CONCLUSION

The Court should find that Plaintiffs are not likely to succeed on the merits and deny their motion for injunctive relief.[8] Even if the Court feels that Plaintiffs have raised substantive questions, given the hardship to Defendants and the public

---

[8] Even if Plaintiffs' motion can be turned into one for summary judgment, this Memorandum shows that summary judgment should not be granted to Plaintiffs.

interest, the proper course is to allow the pending elections to go forward under the 2012 Plan and have this matter heard at a later date when the parties and the Court have more time to fully develop and litigate the issues.  An important matter such as this should not be decided on a hurried schedule with truncated briefing. Finally, even if the Court feels that Plaintiffs are likely to succeed, the Court should still allow the pending elections to go forward under the 2012 Plan - giving the Defendants time to develop another reapportionment plan for the next election cycle.

DATED:     Honolulu, Hawaii, May 3, 2012.

STATE OF HAWAII

DAVID M. LOUIE
Attorney General of Hawaii

BRIAN P. ABURANO
JOHN F. MOLAY
SARAH R. HIRAKAMI
Deputy Attorneys General

Attorneys for Defendants