IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH KOSTICK, KYLE MARK TAKAI, DAVID P. BROSTROM, LARRY S. VERAY, ANDREW WALDEN, EDWIN J. GAYAGAS, ERNEST LASTER, and JENNIFER LASTER,<br><br>        Plaintiffs,<br><br>   vs.<br><br>SCOTT T. NAGO, in his official capacity as the Chief Election Officer of the State of Hawaii, STATE OF HAWAII 2011 REAPPORTIONMENT COMMISSION; VICTORIA MARKS, LORRIE LEE STONE, ANTHONY TAKITANI, CALVERT CHIPCHASE IV, ELIZABETH MOORE, CLARICE Y. HASHIMOTO, HAROLD S. MASUMOTO, DYLAN NONAKA, and TERRY E. THOMASON, in their official capacities as members of the State of Hawaii 2011 Reapportionment Commission; and DOE DEFENDANTS 1-10,<br><br>        Defendants.<br>_____ | CIVIL NO. 12-00184 JMS-LEK-MMM (THREE-JUDGE COURT)<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; APPENDIX "A" |

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Before:    M. Margaret McKeown, Circuit Judge; J. Michael Seabright and
Leslie E. Kobayashi, District Judges.

The Hawaii Constitution specifies the use of permanent residents as the relevant population base in apportioning state legislative seats.  In a 2012 decision, the Hawaii Supreme Court laid out the appropriate method for determining permanent residents by extracting non-resident military personnel and their dependents, and non-resident students from the base count.  The Reapportionment Commission adopted a new plan to comply with that directive.

This electoral challenge asks us to consider the constitutionality of the reapportionment under the Equal Protection Clause of the United States Constitution.  We do so here in the context of a motion for a preliminary injunction requesting that we enjoin implementation of the 2012 Reapportionment Plan and enjoin conducting the upcoming elections under that plan.  This challenge raises an issue of significant importance to Hawaii residents.  Following a hearing on this matter on May 18, 2012, we conclude that the request for an injunction should be denied.  In light of *Burns v. Richardson*, 384 U.S. 73 (1966), at this preliminary stage of the proceedings, the plaintiffs have not established a likelihood of success on the merits of their claim that the permanent resident population basis violates equal protection.  Nor do the equities and public interest weigh in favor of an injunction that risks jeopardizing the primary election scheduled for August 11, 2012, and even the general election scheduled for November 6, 2012.  Although

we recognize that the right to representation is fundamental, "a federal court cannot lightly interfere with or enjoin a state election." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam).

## I.  INTRODUCTION

Hawaii reapportions its state legislative and federal congressional districts every ten years, after the decennial United States Census ("the Census"), based upon changes in population. *See* Haw. Const. art. IV, § 1.  The Hawaii Constitution as amended in 1992 requires reapportionment of Hawaii's legislative districts to be based upon "permanent residents," *id.* § 4, as opposed to the Census' count of "usual residents."  And to pass constitutional muster, any resulting reapportionment must comply with the principles of "one person, one vote." *Reynolds v. Sims*, 377 U.S. 533, 558 (1964) (quoting *Gray v. Sanders*, 372 U.S. 368, 381 (1963)).

In this action, Plaintiffs Joseph Kostick, Kyle Mark Takai, David P. Brostrom, Larry S. Veray, Andrew Walden, Edwin J. Gayagas, Ernest Laster, and Jennifer Laster (collectively, "Kostick") challenge aspects of the March 30, 2012 Supplement to the 2011 Reapportionment Commission Final Report and Reapportionment Plan ("the 2012 Reapportionment Plan"), which Hawaii has begun implementing for its 2012 primary and general elections.  The 2012

3

Reapportionment Plan -- upon direction from the Hawaii Supreme Court in *Solomon v. Abercrombie*, 126 Haw. 283, 270 P.3d 1013 (2012) -- "extracted" 108,767 active-duty military personnel, military dependents, and university students from Hawaii's reapportionment population base. Kostick claims that this extraction by itself, or the 2012 Reapportionment Plan's subsequent apportionment of the resulting population base, violates the Equal Protection Clause of the Fourteenth Amendment and "one person, one vote" principles.

Kostick moves for a preliminary injunction, seeking:

(1) to enjoin Defendant Scott T. Nago, in his official capacity as the Chief Election Officer of the State of Hawaii ("Nago"), from "further implementation" of the 2012 Reapportionment Plan, and thus to enjoin conducting the upcoming elections in accordance with that Plan;

(2) to order the 2011 Hawaii Reapportionment Commission ("the Commission") to formulate and implement a reapportionment plan using the 2010 Census' count of "usual residents" of Hawaii as the population base; and

(3) to order the use of an August 2011 proposed reapportionment plan, which utilized a population base that *includes* the now-extracted 108,767 people.

Secondarily, Kostick seeks an order requiring an apportionment of state

legislative districts that are "substantially equal in population."[1]

We pause to emphasize what is *not* before us. To begin, we are not making any final determination of the merits of Kostick's challenge, a decision that must await further proceedings. Further, this Order addresses only the legal considerations underlying the challenged actions -- not whether extracting certain "non-permanent" residents from Hawaii's reapportionment population base is good public policy, and not whether Hawaii could or should use "usual residents" as that base. Hawaii has long-debated these questions and Hawaii's legislature considered them again in its just-completed session. *See* Doc. No. 50-7, Pls.' Ex. AAAA (S.B. No. 212, 26th Leg. Sess. 2012) (proposing to define "permanent resident" as a "usual resident" under the Census). These are important and difficult questions, involving political judgments and requiring consideration and balancing of competing interests -- tasks for which courts are not suited. *See, e.g.*, *Perry v. Perez*, 565 U.S. __, 132 S. Ct. 934, 941 (2012) ("Experience has shown the difficulty of defining neutral legal principles in this area, for redistricting ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment.") (citations omitted).

---

[1] The First Amended Complaint also asserts a claim under state law, which is not at issue in the Motion for Preliminary Injunction.

In short, we express no opinion as to how Hawaii should define its reapportionment base, but instead examine only the challenged aspects of the 2012 Reapportionment Plan itself.  And we certainly do not pass on what no one here disputes:  Hawaii's military personnel constitute a significant and welcome presence in Hawaii's population.

For the reasons that follow, we conclude it is unlikely Kostick will succeed on the merits of the constitutional claim regarding the population base.  The equities and public interest weigh heavily against Kostick.  We do not consider the likelihood of success on Kostick's mal-apportionment claim, as he acknowledged there is no realistic or effective remedy that could be accomplished before the primary election.  Accordingly, Kostick's Motion for Preliminary Injunction is DENIED.

## II.  BACKGROUND[2]

This reapportionment challenge raises issues that are best understood by first examining the historical context.  We begin by reviewing some of the historical and legal factors that the Commission faced in crafting the 2012 Reapportionment Plan.  We then set forth specific details -- many of which are stipulated facts -- of

_____

[2]  This background is based on the parties' Stipulated Facts in the Motion for Preliminary Injunction, which is attached as Appendix A, the exhibits and filings related to the preliminary injunction motion, and Nago's testimony at the preliminary injunction hearing.

Kostick's challenge to the Plan, and recount the procedural posture of the current Motion.

**A.      The Basic Historical and Legal Context**

The Census counts the "usual residents" of a state.  *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 804-05 (1992) ("'Usual residence' . . . has been used by the Census Bureau ever since [the first enumeration Act in 1790] to allocate persons to their home States.").  The 2010 Census counted people at their usual residence as of April 1, 2010.  Doc. No. 26, Parties' Stipulated Facts re: the Motion for Preliminary Injunction ("Stip. Facts") ¶ 2.  According to the 2010 Census, Hawaii has a population of 1,360,301 usual residents.  Doc. No. 32, First Am. Compl. ("FAC") ¶ 30; Stip. Facts ¶ 32.

The Census defines "usual residence" as "the place where a person lives and sleeps most of the time" and "is not necessarily the same as the person's voting residence or legal residence."  Stip. Facts ¶ 1.  The definition thus excludes tourists or business travelers.  *Id*. ¶ 5; Doc. No. 28-16, Pls.' Mot. Ex. H ("Ex. H"), at 3.  Active duty military personnel who were usual residents of Hawaii on April 1, 2010 were or should have been counted by the 2010 Census as part of its count for Hawaii.  Stip. Facts ¶ 3; Ex. H, at 8-9.  Similarly, students attending college away from their parental homes are counted where they attend school (*i.e.*, where they

"live and sleep most of the time").  Ex. H, at 5.  Students enrolled at a Hawaii

university or college who were usual residents of Hawaii on April 1, 2010 were or

should have been counted by the 2010 Census as part of the 2010 Census count for

Hawaii.  Stip. Facts ¶ 4.

After each Census, Hawaii establishes a Reapportionment Commission to

implement a reapportionment.  *See* Haw. Const. art. IV, § 2; Haw. Rev. Stat. § 25-

1.  The Defendants in this action are the members of the Commission in their

official capacities; the Commission itself; and Nago, who serves as secretary of the

Commission in addition to his duties as Hawaii's Chief Election Officer.  *See* Haw.

Const. art. IV, §§ 2, 3; Haw. Rev. Stat. § 11-2.  Where appropriate, we refer to all

Defendants as "the Commission," although we sometimes refer to Nago separately.

The Commission uses the Census' "usual residents" figure as Hawaii's total

population for purposes of apportioning Hawaii's federal congressional districts.

*See* Haw. Const. art. 4, § 9; Haw. Rev. Stat. § 25-2(b) (requiring use of "persons in

the total population counted in the last preceding United States census" as the

relevant population base).  But the Commission does not necessarily use the

Census figure as the population base for State legislative reapportionment.  Instead,

Hawaii uses a count of "permanent residents" as the relevant population base.

Specifically, the current Hawaii Constitution provides:

The commission shall allocate the total number of members of each house of the state legislature being reapportioned among the four basic island units, namely: (1) the island of Hawaii, (2) the islands of Maui, Lanai, Molokai and Kahoolawe, (3) the island of Oahu and all other islands not specifically enumerated, and (4) the islands of Kauai and Niihau, using the total number of *permanent residents* in each of the basic island units[.]

Haw. Const. art. 4, § 4 (emphasis added). After such allocation, the Commission is then required to apportion members of the Hawaii Legislature within those "basic island units" as follows:

Upon the determination of the total number of members of each house of the state legislature to which each basic island unit is entitled, the commission shall apportion the members among the districts therein and shall redraw district lines where necessary in such manner that for each house the average number of *permanent residents* per member in each district is as nearly equal to the average for the basic island unit as practicable.

In effecting such redistricting, the commission shall be guided by the following criteria:

1. No district shall extend beyond the boundaries of any basic island unit.

2. No district shall be so drawn as to unduly favor a person or political faction.

3. Except in the case of districts encompassing more than one island, districts shall be contiguous.

4. Insofar as practicable, districts shall be compact.

5. Where possible, district lines shall follow permanent and easily recognized features, such as streets, streams and clear geographical features, and, when practicable, shall coincide with census tract boundaries.

6. Where practicable, representative districts shall be wholly included within senatorial districts.

7. Not more than four members shall be elected

9

from any district.

>8. Where practicable, submergence of an area in a larger district wherein substantially different socio-economic interests predominate shall be avoided.

Haw. Const. art. IV, § 6 (emphasis added).[3] The "basic island units" correspond to

Hawaii's Counties: Hawaii County (the island of Hawaii or "the Big Island");

Kauai County (the islands of Kauai and Niihau); Maui County (the islands of

Maui, Molokai, Kahoolawe, and Lanai); and the City and County of Honolulu (the

island of Oahu).

Defining the reapportionment population base for Hawaii's legislative

---

[3] The Hawaii Constitution's apportionment provisions were changed in 1992, when Hawaii voters approved a constitutional amendment substituting the phrase "the total number of permanent residents" for "on the basis of the number of voters registered in the last preceding general election" in Article IV, § 4, as the relevant apportionment population base for Hawaii's legislative districts. *See* 1992 Haw. Sess. L. 1030-31 (H.B. No. 2327); *Solomon*, 126 Haw. at 285, 270 P.3d at 1015.

Prior applications of a "registered voter" population base were the subject of litigation and, as analyzed further in this Order, ultimately entail many of the same fundamental questions that arise in this action. *See, e.g.*, *Burns*, 384 U.S. at 97 (upholding a Hawaii apportionment plan based on registered voters that approximated a plan based on population); *Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982) (three-judge court) (striking a Hawaii apportionment plan based on registered voters, primarily because of insufficient justifications for wide disparities in allocation). Indeed, in Hawaii's 1991 reapportionment, the 1991 Reapportionment Commission utilized a population base of "permanent residents" (extracting -- similar to the present action -- 114,000 non-resident military members and their families), despite the requirement of the Hawaii Constitution (pre-1992 amendment) to use "the number of voters registered in the last preceding general election" as the base. This approach was apparently adopted at least in part because of equal protection concerns. *See* Doc. No. 34-20, Defs.' Ex. 30, at 3-6 (State of Hawaii 1991 Reapportionment Comm'n, Final Report and Reapportionment Plan, at 21-24); *Solomon*, 126 Haw. at 284-85, 270 P.3d at 1014-15. Likewise, the 2001 reapportionment (after the 1992 State Constitutional amendment) extracted non-resident military personnel, their dependents, and non-resident college students as "non permanent." *Solomon*, 126 Haw. at 286, 270 P.3d at 1016.

districts has long-presented a dilemma, primarily because Hawaii's population has historically contained a large percentage of military personnel -- many of whom claim residency in other States and do not vote in Hawaii elections. *See, e.g.*, *Burns*, 384 U.S. at 94 (referring to "Hawaii's special population problems" stemming from "the continuing presence in Hawaii of large numbers of the military"). *Burns* noted that "at one point during World War II, the military population of Oahu constituted about one-half the population of the Territory." *Id.* at 94 n.24. More recently, well after statehood, the 1991 Reapportionment Commission found that non-resident military constituted "about 14% of the population of Hawaii" with "[a]bout 114,000 nonresident military and their families resid[ing] in this state, primarily on the Island of Oahu." Doc. No. 34-20, Defs.' Ex. 30, at 5 (State of Hawaii 1991 Reapportionment Comm'n, Final Report and Reapportionment Plan, at 23); *Solomon*, 126 Haw. at 285, 270 P.3d at 1015.[4] The vast majority of military and their families live on Oahu because of its many

---

[4] The percentage of the population of military and military families in Hawaii in 2010 is not clear from the record, but some data indicates as many as 153,124 military and military dependents. Doc. No. 28-12, Pls.' Mot. Ex. D, at 13; Stip. Facts ¶ 6. This figure includes military members who are deployed -- and thus are not counted as "usual residents" -- and their dependents who live here (and thus may indeed have been counted as "usual residents"). As detailed below, the Commission eventually "extracted" 42,322 active duty military personnel, and 53,115 of their associated dependents as "non-permanent" Hawaii residents. Stip. Facts ¶¶ 8, 10. Regardless of the percentage, the military continues to constitute a significant and important presence in Hawaii's population.

military installations including Joint Base Pearl Harbor-Hickam, Schofield

Barracks, and Kaneohe Marine Corps Air Station.  But, whatever their percentage,

Hawaii elected officials still represent them -- it is a fundamental Constitutional

principle that elected officials represent all the people in their districts, including

those who do not or cannot vote.  *See, e.g.*, *Garza v. Cnty. of L.A.*, 918 F.2d 763,

774 (9th Cir. 1990).

A dilemma thus arises because imbalances of potential constitutional

magnitude are created whether or not Hawaii's non-resident military and family

members are factored into the apportionment base.

If they are *included* in the population base but vote elsewhere, Oahu voters

potentially have greater "voting power" than residents of other counties.  *See, e.g.*,

*Reynolds*, 377 U.S. at 568 ("[A]n individual's right to vote for state legislators is

unconstitutionally impaired when its weight is in a substantial fashion diluted when

compared with votes of citizens living in other parts of the State[.]").  That is, a

vote of an Oahu voter could count more than that of a non-Oahu voter.  *See, e.g.*,

*Bd. of Estimate of City of N.Y. v. Morris*, 489 U.S. 688, 698 (1989) ("[A] citizen is

. . . shortchanged if he may vote for . . . one representative and the voters in another

district half the size also elect one representative."); *Chen v. City of Houston*, 206

F.3d 502, 525 (5th Cir. 2000) ("If total population figures are used in an area in

which potentially eligible voters are unevenly distributed, the result will necessarily devalue the votes of individuals in the area with a higher percentage of potentially eligible voters.").

But if this group is *excluded*, then Oahu residents (and residents in an Oahu district with large concentrations of non-resident military) may have diluted representation. *See, e.g.*, *Garza*, 918 F.2d at 774 ("Residents of the more populous districts . . . have less access to their elected representative. Those adversely affected are those who live in the districts with a greater percentage of non-voting populations[.]"); *Chen*, 206 F.3d at 525 ("[T]he area with the smaller number of voters will find itself relatively disadvantaged. Despite the fact that it has a larger population -- and thus perhaps a greater need for government services than the other community -- it will find that its political power does not adequately reflect its size.").

There are also political dimensions. Excluding large numbers of non-residents, most of whom live on Oahu, from the population base can -- as it did in this instance -- result in a gain or loss of legislators between the basic island units (here, the Big Island gained a State senate seat that Oahu lost). Stip. Facts ¶ 40. Thus, including or excluding non-resident military and dependents could contribute to a subtle shift in power among the Counties. Historically, residents of

each basic island unit "have developed their own and, in some instances severable communities of interests" resulting in "an almost personalized identification of residents of each county -- with and as an integral part of that county." *Burns v. Gill*, 316 F. Supp. 1285, 1291 (D. Haw. 1970). Forty-two years after *Gill*, many individuals still identify themselves in relation to their Island. County residents "take great interest in the problems of their own county because of that very insularity brought about by the surrounding and separating ocean." *Id. See, e.g.*, Doc. No. 39-12, M. Solomon Decl. ¶ 9 ("There were also socio-economic and cultural differences between the two parts of my canoe district [on Maui and the Big Island] that predated statehood.").[5]

---

[5] The integrity of "basic island units" reaches far back. A three-judge court explained in 1965:

> Hawaii is unique in many respects. It is the only state that has been successively an absolute monarchy, a constitutional monarchy, a republic, and then a territory of the United States before its admission as a state. Because each was insulated from the other by wide channels and high seas and historically ruled first by chiefs and then royal governors, after annexation the seven major, inhabited islands of the State were divided up into the four counties of Kauai, Maui, Hawaii and the City and County of Honolulu. All this resulted in a strongly centralized form of government.

*Holt v. Richardson*, 238 F. Supp. 468, 470-71 (D. Haw. 1965), *vacated*, *Burns*, 384 U.S. 73. Likewise, at the 1968 Hawaii Constitutional Convention when implementing apportionment provisions in the State Constitution, committee members took into account the concept that:

> (1) Islands or groups of islands in Hawaii have been separate and distinct fundamental units since their first settlement by human beings in antiquity. . . . The first constitution of the nation of Hawaii granted by King Kamehameha III in 1840, provided that there would be four governors "over these Hawaiian Islands - one for Hawaii - one for Maui and the islands adjacent - one for Oahu, and one for Kauai and the adjacent islands." . . . Thereafter in every constitution of the

(continued...)

Notably, the Hawaii Constitution in Article IV, § 6, "recognizes the geographic insularity and unique political and socio-economic identities of the basic island units."  Doc. No. 28-3, Pls.' Mot. Ex. A, at 35 (2012 Reapportionment Plan, at 23).  And thus the Hawaii Constitution requires that in apportioning a population base "[n]o district shall extend beyond the boundaries of any basic island unit."  Haw. Const. art. IV, § 6.  The Commission articulated this interest as a justification for population deviations among state districts -- avoiding bi-County districts (often referred to as "canoe districts" because they are separated by water) where a legislator represents people in different Counties.  Doc. No. 28-3, Pls.' Mot. Ex. A, at 33 (2012 Reapportionment Plan, at 21).[6]

---

[5](...continued)
nation, the territory and the state, the island units have been recognized as separate political entities.
(2)  . . . Each of the islands has had its unique geographic, topographic and climatic conditions which have produced strikingly different patterns of economic progress and occupational pursuits.  Thus each unit of government has its own peculiar needs and priorities which in some instances may be quite different from any other county.

Doc. No. 35-6, Defs.' Ex. 37 at 261-62.  *See also* Doc. No. 39-15, D. McGregor Decl. ¶¶ 5-11 (explaining belief that each basic island unit's history indicates each was a separate society or community with unique identities, and indicating that by the year 1700 each unit was a separate kingdom).

[6]  Besides considering the long history of the basic island units in addressing apportionment, the 1968 Constitutional Convention also considered political factors -- Hawaii's centralized state government, which performs many functions that other states have delegated to local government units.  The apportionment committee explained:
In every other state in the union there are numerous minor governmental units -- town, cities, school districts, sewer districts and the like -- which exercise power

(continued...)

The Commission considered these and other factors in creating the 2012

Reapportionment Plan, the specifics of which we turn to next.

## B. Steps Leading to the 2012 Reapportionment Plan

### 1. *The August 2011 Plan*

The Commission was certified on April 29, 2011, and promptly began the

2011 reapportionment process. The Hawaii Supreme Court in *Solomon* describes

in exacting detail the process the Commission took in formulating initial and

revised apportionment plans. *Solomon*'s description conforms to the record before

this court, and we thus draw extensively from *Solomon* here:

> The Commission, at its initial organizational meetings, adopted "Standards and Criteria" that it would follow for the 2011 reapportionment of the congressional and state legislative districts. The "Standards and Criteria" for the state legislative districts stated:
>
> *Standards and criteria that shall be followed:*

---

[6](...continued)
and in which the people may obtain local representation for local matters. Hawaii has none of these. Although Hawaii has major political units called counties, these units have substantially less power and authority over local affairs than in most other states. The result is that Hawaii's legislature deals exclusively with, or at least effectively controls, many matters which are normally considered typically local government services.

Doc. No. 35-6, Defs.' Ex. 37 at 262. The committee gave examples of centralized services such as (1) public education; (2) highways, harbors, and airports; (3) administration and collection of taxes; (4) health and welfare activies; (5) the judicial system; (6) land use districts; (7) fishing, forestry, minerals, agriculture, and land; and (8) labor and industrial relations. *Id.*

The committee's conclusion was "obvious and inescapable: if a voter of the State of Hawaii is to have meaningful representation in any kind of government, he must have effective representation from his own island unit in the state legislature." *Id.* at 263.

The population base used shall be the "permanent resident" population of the State of Hawaii. The permanent resident population is the total population of the State of Hawaii as shown in the last U.S. census less the following: non-resident students and non-resident military sponsors.

At meetings on May 11 and 24, 2011, the Commission was briefed on Hawaii's population growth since the 2001 reapportionment, the history of Hawaii's reapportionment, and the constitutional and statutory provisions governing reapportionment. It was provided with data from the 2010 Census showing a 12% increase in the state's total population consisting of increases of 24% in Hawai'i County, 21% in Maui County, 15% in Kauai County, and 9% in Oahu County. It was informed of article IV, section 4 and 6's permanent resident basis for apportioning the state legislature and informed -- by counsel to the 2001 Reapportionment Commission -- that the 2001 Commission computed the permanent residence base by excluding nonresident military personnel and their dependents, and nonresident college students. It was informed by Commission staff that data on Hawaii's nonresident military population had been requested from the Defense Manpower Data Center (DMDC) through the U.S. Pacific Command (USPACOM) and that Hawaii's nonresident student population would be identified by their local addresses and assigned to specific census blocks. The Commission, at the conclusion of the May meetings, solicited advice from the apportionment advisory councils as to whether nonresident military and nonresident students should be excluded from the permanent resident base.

126 Haw. at 286, 270 P.3d at 1016 (internal footnote omitted).

The data obtained in May and June 2011 from the military on Hawaii's non-resident military population was apparently deemed insufficient. "The Commission, at its June 28, 2011 meeting, voted 8-1 to apportion the state legislature by using the 2010 Census count -- without exclusion of nonresident

military and dependents and nonresident students -- as the permanent resident base." *Id.* at 287, 270 P.3d at 1017.

> Commission staff provided the following explanation as to "permanent and non-permanent military residents."

>> The non-permanent resident extraction model used in 1991 and 2001 [reapportionments] relied on receiving location specific (address or Zip Code) residence information for the specific non-permanent residents to be extracted.

>> In 2011, the data received from DMDC does not provide residence information for military sponsors nor does it provide specific breakdowns of permanent and non-permanent residents by location.

>> This lack of specific data from DMDC does not allow the model used previously to be used at this time.

*Id.* at 288, 270 P.3d at 1018 (square brackets in original).

And so, an initial apportionment plan was developed and accepted by the Commission on or before August 3, 2011 that was based on 2010 Census figures. The parties have stipulated that "[t]he State legislative reapportionment plan accepted by the Commission for public hearings and comment on August 3, 2011 ('August 2011 Plan') did not extract from the 2010 Census count, any active duty military personnel, military dependents, or students."  Stip. Facts ¶ 27.  The Chair of the Commission explains that this August 2011 Plan was "preliminarily accepted for the purpose of public hearings and comment," because of the

impending September 26, 2011 statutory deadline for a final plan and the statutory requirement of conducting public hearings. Doc. No. 39-6, V. Marks Decl. ¶ 7. This plan is apparently the August 2011 proposed reapportionment plan that Kostick seeks to have implemented.

## 2. *The September 26, 2011 Plan*

Further proceedings followed the Commission's June 28, 2011 decision to use 2010 Census figures, and its corresponding development of the August 2011 Plan. The Commission was provided with additional data from military sources on Hawaii's "non-permanent military resident population and from Hawaii universities on non-permanent student resident population." *Solomon*, 126 Haw. at 287, 270 P.3d at 1017.

> Commission staff thereafter developed its own "model" for the "extraction of non-permanent residents" for the 2011 reapportionment. Commission staff operated on the premise that non-permanent residents -- active duty military who declare Hawaii not to be their home state and their dependents, and out-of-state university students -- were to be identified according to the specific location of their residences within each of the four counties. Because the 2010 Census data and the university data did not include the residence addresses for all of the non-permanent active duty military residents and their dependents and the out-of-state university students, Commission staff identified three groups of non-permanent residents: Extraction A, Extraction B, and Extraction C. The groups were based on the level of "certainty in determining [the residents'] non-permanency and location." Extraction A were residents whose specific locations were certain and included out-of-state university students with known addresses and active duty military, with "fairly

certain non-permanent status," living in military barracks. Extraction
B included all residents in Extraction A, plus active duty military and
their dependents, with "less certain non-permanent status," living in
on-base military housing. Extraction C included all residents in
Extraction A and Extraction B, plus out-of-state university students
with addresses identified only by zip code.

*Id.* at 288, 270 P.3d at 1018. The Commission staff's "Extraction A" listed 16,458

active duty military, their dependents, and out-of-state university students (mostly

on Oahu); its "Extraction B" listed 73,552; and its "Extraction C" listed 79,821.

*Id.* Additionally, an "August 7, 2011 'Staff Summary' showed a state population

of 47,082 non-permanent active duty military residents, 58,949 military

dependents, and 15,463 out-of-state university students" totaling 121,494 "non-

permanent" residents. *Id.* at 289, 270 P.3d at 1019.

The Commission held a September 13, 2011 public hearing in Hilo, Hawaii.

It received testimony on behalf of State Senator Malama Solomon ("Solomon")

and three members of the Hawaii County Democratic Committee, advocating

extraction of the 121,494 "non-permanent" residents from the apportionment

population base. Such an extraction would increase Hawaii County's senate seats

from three to four. *Id.* Hawaii Governor Neil Abercrombie also supported that

extraction, indicating that based upon the State Attorney General's preliminary

view, "counting nonresidents is not warranted in law." *Id.*[7]

On September 19, 2011, after much debate, "[t]he Commission adopted a final apportionment plan that computed the permanent resident base by excluding 16,458 active duty military and out-of-state university students from the 2010 census population of 1,330,301." *Id.* at 290, 270 P.3d at 1020; Stip. Facts ¶ 32. That is, it chose "Extraction A," primarily because of the certainty of that data. The resulting apportionment allocated "as to the senate 18 seats to Oahu County, 3 seats for Hawaii County, 3 seats for Maui County, and 1 seat for Kauai County." *Solomon*, 126 Haw. at 290, 270 P.3d at 1020. The Commission filed this plan on September 26, 2011 ("the September 26, 2011 Plan"). *Id.*; Stip. Facts. ¶ 32.

---

[7] *Solomon* also references a letter from the Attorney General to Hawaii County legislator Robert Herkes opining that "the Hawaii Supreme Court would likely hold that to the extent they are identifiable, nonresident college students and nonresident military members and their families *cannot* properly be included in the reapportionment population base the Commission uses to draw the legislative district lines this year." 126 Haw. at 287, 270 P.3d at 1017.

> The [Attorney General] opinion was based on the legislative history of the 1992 'permanent resident' amendment to article IV, section 4, and the Hawaii Supreme Court's interpretation [in *Citizens for Equitable & Responsible Gov't v. County of Hawaii*, 108 Haw. 318, 120 P.3d 217 (2005)] of 'resident population,' as used [in] the Hawaii County Charter, as excluding nonresident college students and nonresident military personnel and their dependents from the population base for purposes of apportioning county council districts. The opinion was forwarded to the Commission.

*Id.* (footnote omitted).

### 3. *The September 26, 2011 Plan is Challenged:* **Solomon v. Abercrombie;** *and* **Matsukawa v. State of Hawaii 2011 Reapportionment Commission**

On October 10, 2011, Solomon and the three members of the Hawaii County Democratic Committee filed a petition in the Hawaii Supreme Court, challenging the September 26, 2011 Plan. The next day, Hawaii County resident Michael Matsukawa filed a similar petition in the Hawaii Supreme Court. Stip. Facts ¶ 33. Among other claims, these petitions asserted that the Commission violated the State Constitutional requirement to base a reapportionment on "permanent residents" by failing to extract all non-resident military, their dependents, and non-resident students. Solomon's petition asserted that the Commission knew that extracting only 16,000 non-residents would not trigger the loss of an Oahu-based senate seat, and that "the fear of Oahu's loss of this senate seat was the driving force" for the extraction. *Solomon*, 126 Haw. at 290, 270 P.3d at 1020. They sought an order requiring the Commission to prepare and file a new reapportionment plan for the State legislature that uses a population base limited to "permanent residents" of the State of Hawaii. Stip. Facts ¶ 33. As far as we can discern, however, the parties did not raise constitutional equal protection arguments.

On January 4, 2012, the Hawaii Supreme Court issued orders in the *Solomon*

and *Matsukawa* proceedings that invalidated the September 26, 2011 Plan as having disregarded Article IV, § 4 of the Hawaii Constitution. The Hawaii Supreme Court, among other things, ordered the Commission to prepare and file a new reapportionment plan that allocates members of the State legislature among the basic island units using a permanent resident population base. Stip. Facts ¶ 34. On January 6, 2012, the Hawaii Supreme Court issued *Solomon* -- an opinion covering both the *Solomon* and *Matsukawa* proceedings. *Id.* ¶ 35.

As for the requirement in Article IV, §§ 4 and 6, for the Commission to apportion the state legislature by using a "permanent resident" base, *Solomon* held that the requirement "mandate[s] that only residents having their domiciliary in the State of Hawaii may be counted in the population base for the purpose of reapportioning legislative districts." *Solomon*, 126 Haw. at 292, 270 P.3d at 1022 (quoting *Citizens for Equitable & Responsible Gov't*, 108 Haw. at 322, 120 P.3d at 221). To determine "the total number of permanent residents in the state and in each county," the Commission was required "to extract non-permanent military residents and non-permanent university student residents from the state's and the counties' 2010 Census population." *Id.* It directed that

> [i]n preparing a new plan, the Commission must first --pursuant to article IV, section 4 -- determine the total number of permanent residents in the state and in each county and use those numbers to allocate the 25 members of the senate and 51 members of the house of

23

representatives among the four counties.  Upon such allocation, the Commission must then -- pursuant to article IV, section 6 -- apportion the senate and house members among nearly equal numbers of permanent residents within each of the four counties.

*Id.* at 294, 270 P.3d at 1024.

### 4.    The 2012 Reapportionment Plan

Soon after *Solomon* was issued, the Commission commenced a series of public meetings and obtained additional information regarding military personnel, their family members, and university students.  The Commission eventually extracted 42,332 active duty military personnel, 53,115 military dependents, and 13,320 students from the 2010 Census population of "usual residents."  Stip. Facts ¶¶ 8, 10, 14, 36.  This extraction totaled 108,767 persons, resulting in an adjusted reapportionment population base of 1,251,534.  *Id.* ¶ 37.

The active duty military were extracted if they "declared a state other than Hawaii as their home state for income tax purposes," and if they were included in the 2010 Census.  Doc. No. 28-12, Pls.' Mot. Ex. D, at 2-2.  That is, they were extracted "based on military records or data denoting the personnel's state of legal residence."  Stip. Facts ¶ 8.

The extracted military family members were identified by associating them with their active duty military sponsor.  In other words, the Commission extracted military dependents who were associated with or attached to an active duty military

person who had declared a state of legal residence other than Hawaii. Stip. Facts ¶ 10. The military did not provide the Commission with any data regarding the military dependents' permanent or non-permanent residency other than their association or attachment to an active duty military sponsor who had declared a state of residence other than Hawaii. *Id.* ¶ 12.

The students were extracted solely on the basis of (a) payment of non-resident tuition, or (b) a home address outside of Hawaii. *Id.* ¶¶ 14, 18-19. The students were from the University of Hawaii System, Hawaii Pacific University, Chaminade University, and Brigham Young University ("BYU") Hawaii. *Id.* ¶ 15. No other Hawaii universities provided data to the Commission. *Id.* ¶ 16.

After extraction, the Commission reapportioned the adjusted population base of 1,251,534 "permanent residents" by dividing the base by 25 Senate seats and 51 House seats. *Id.* ¶ 37. This resulted in an ideal Senate district of 50,061 permanent residents, and an ideal House district of 24,540 permanent residents. *Id.* The Commission then reapportioned within the four basic island units as set forth in Article IV, § 6 of the Hawaii Constitution, and as guided by the criteria set forth in that provision.

Under the 2012 Reapportionment Plan: (a) the largest Senate District (Senate District 8, Kauai basic island unit) contains 66,805 permanent residents

which is 16,744 (or 33.44 percent) higher than the ideal Senate district of 50,061 permanent residents; and (b) the smallest Senate District (Senate District 1, Hawaii basic island unit) contains 44,666 permanent residents which is 5,395 (or 10.78 percent) less than the ideal. *Id.* ¶ 38. Thus, the range for the Senate Districts is 44.22 percent. The 2012 Reapportionment Plan resulted in one Senate seat moving from the Oahu basic island unit to the Hawaii basic island unit. *Id.* ¶ 40.

As for the House districts, under the 2012 Reapportionment Plan: (a) the largest House District (House District 5, Hawaii basic island unit) contains 27,129 permanent residents which is 2,589 (or 10.55 percent) higher than the ideal House district of 24,540 permanent residents; and (b) the smallest House District (House District 15, Kauai basic island unit) contains 21,835 permanent residents which is 2,705 (or 11.02 percent) less than the ideal. *Id.* ¶ 39. The range for the House districts is 21.57 percent.

The extent of the deviations is driven largely by a Commission decision to continue to avoid canoe districts. *See* Doc. No. 28-3, Pls.' Mot. Ex. A, at 33 (2012 Reapportionment Plan, at 21). Canoe districts were eliminated in the 2001 reapportionment, after being imposed in 1982 when, as noted earlier, a three-judge court in *Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982), found a 1981 reapportionment plan to be unconstitutional, and ordered use of an interim plan

that utilized canoe districts as recommended by special masters. *See* Doc. No. 34-17, Defs.' Ex. 27 (April 27, 1982 Final Report and Recommendations of Special Masters, *Travis v. King*). The 2001 Reapportionment Commission did away with canoe districts, concluding after experience and public input that such districts were ineffective. *See, e.g.*, Doc. No. 34-21 at 10 (2001 Reapportionment Plan, at 25); *id.* at 13 (2001 Reapportionment Plan, at A-209).

The 2012 Reapportionment Plan was adopted and filed on March 8, 2012, with notice published on March 22, 2012. Stip. Facts ¶ 36. It was presented to the Legislature on March 30, 2012. Doc. No. 32, FAC ¶ 45.

## C.    Procedural History

Soon after the 2012 Reapportionment Plan was presented to the Legislature, this action was filed on April 6, 2012. The Complaint requested a three-judge district court pursuant to 28 U.S.C. § 2284. On April 10, 2012, Judge J. Michael Seabright granted the request for a three-judge district court, determining that the constitutional claims are "not insubstantial," as necessary for such a court. *See, e.g.*, *Goosby v. Osser*, 409 U.S. 512, 518 (1973). On April 17, 2012, the Chief Judge of the Ninth Circuit Court of Appeals appointed the present panel, Ninth Circuit Judge M. Margaret McKeown, and District Judges J. Michael Seabright and Leslie E. Kobayashi.

Kostick filed the Motion for Preliminary Injunction on April 23, 2012. An Amended Complaint was filed on April 27, 2012, which added two Plaintiffs to the action, Ernest and Jennifer Laster, but otherwise did not substantially differ from the original Complaint. An Opposition was filed on May 3, 2012, and a Reply on May 8, 2012. We heard the Motion on May 18, 2012, and admitted evidence without objection, most of which had previously been submitted as exhibits already entered on the court's docket. We also heard live testimony from Nago, and considered extensive oral argument from the parties. We have considered the evidentiary record, and oral and written argument of counsel, and rule as follows.

### III. STANDARD OF REVIEW

There are two types of preliminary injunctions -- a prohibitory injunction "preserve[s] the status quo pending a determination of the action on the merits," whereas a "mandatory injunction orders a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations and quotations omitted). "A mandatory injunction 'goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Id.* (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)). The remedies Kostick seeks here include both types of preliminary injunction.

A preliminary injunction "'is an extraordinary remedy never awarded as of right.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A decisive showing as to all factors is not required: under the "sliding scale" or "serious questions" approach to preliminary injunctions, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Alliance for the Wild Rockies*, 632 F.3d at 1131 (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). However, the Supreme Court emphasized in *Winter* that a preliminary injunction is not appropriate when there is only a "possibility of some remote future injury." *Winter*, 555 U.S. at 22 (citations omitted). Kostick must show that the conduct of the Commission is *likely* to cause him constitutional harm. *Id.*

Where a plaintiff seeks a mandatory injunction, "courts should be extremely

cautious about issuing a preliminary injunction," and "should deny such relief 'unless the facts and law clearly favor the moving party.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319-20 (9th Cir. 1994) (quoting *Anderson*, 612 F.2d at 1114). Generally, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Anderson*, 612 F.2d at 1115; *see also Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (describing that "the movant must make a heightened showing of the four factors" (citation and quotation signals omitted)). "The burden of proof at the preliminary injunction phase tracks the burden of proof at trial." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011). The parties challenging state apportionment legislation bear the burden of proving disparate representation. *Karcher v. Daggett*, 462 U.S. 725, 730-731 (1983). It falls on Kostick to show that he is likely to establish a constitutional violation at trial.

## IV. DISCUSSION

Kostick makes a bifurcated equal protection challenge to Hawaii's reapportionment plan. He first protests the extraction of non-resident military personnel, their dependents, and non-resident students. He argues that using a population base that does not include the extracted individuals violates equal

protection.  Next, even if such an extraction is allowed, Kostick argues that

deviations in the 2012 Reapportionment Plan's subsequent reapportionment of the

resulting population base are constitutionally problematic.  We now turn to these

claims.

## A.    Count One (Equal Protection Challenge: Population Basis)

We first address the overriding question of constitutional injury, and

conclude that Kostick has not demonstrated that he is likely to succeed on the

merits.  Even if Kostick were able to make this threshold showing, we find that the

equities tip decisively in the Commission's favor.  The record shows that the

remedy Kostick seeks would require postponement of the state primary election, an

integral part of the electoral process, and even put the general election in jeopardy.

### 1.    *Likelihood of Success on the Merits*

Kostick argues that by seeking to apportion based only on a permanent

resident basis, and extracting non-resident military, their dependents, and non-

resident students from the apportionment population base, Hawaii violated the

principle of equal representation.  On this record, Kostick fails to meet his

preliminary injunction burden.  To begin, the Supreme Court has explicitly

affirmed that a state may legitimately restrict the districting base to citizens, which

in this case, corresponds to permanent residents.  Discriminating *among* non-

resident groups in the course of extraction may be problematic -- yet, the record reveals that Hawaii extracted all non-resident populations that exist in sufficient numbers to affect the apportionment of districts, and regarding which it could obtain reliable data without discriminating among them. Kostick does not show that Hawaii attempted to single out non-resident servicemembers, servicemember dependents, or non-resident students for any reason other than their lack of permanent residency. Finally, the record shows that the means Hawaii chose to achieve the result were rational and, even using the standard urged by Kostick, pass close constitutional scrutiny. There is no indication that Hawaii's methods resulted in the exclusion of state residents from the population basis sufficient to affect legislative apportionment.

### a) *Use of Permanent Resident Population Base*

In considering Kostick's claim, we have the benefit of longstanding Supreme Court precedent, including the 1966 case stemming from Hawaii's earlier apportionment plan -- *Burns v. Richardson*. Just two years earlier, in *Reynolds v. Sims*, the Court decided a seminal case on the "right of a citizen to equal representation." Elaborating on that principle, *Reynolds* explained that under the Equal Protection Clause, "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when

compared with votes of citizens living in other parts of the State." 377 U.S. at 568, 576. *Reynolds* held that "the seats . . . of a . . . state legislature must be apportioned on a population basis," *id.* at 568, but "carefully left open the question what population was being referred to." *Burns*, 384 U.S. at 91.

This question did not remain unaddressed for long. In *Burns*, the Court considered whether it was permissible for Hawaii to use  registered voters rather than a broader population as the basis for districting. In discussing *Reynolds*, the Court "start[ed] with the proposition that the Equal Protection Clause does not require States to use total population figures derived from the federal census as the standard by which . . . substantial population equivalency is measured." *Id.* Although the Court had concerns over the use of only registered voters as the population basis, it held that "on [the *Burns*] record . . . [the] distribution of legislators" using the registered voter basis was "not substantially different from that which would have resulted from the use of a permissible population basis." *Id.* at 93.

Importantly for our purposes, the Court set out guidelines for this "permissible population basis." One such permissible population basis, discussed in *Reynolds*, was the total population. Had *Burns* left the matter there, Kostick might have a different case. However, in *Burns* the Court went on to acknowledge

33

the power of states to "[ex]clude aliens, transients, short term or temporary residents" from "the apportionment base," noting that "[t]he decision to exclude any such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere." *Id.* at 92.

Although Hawaii earlier chose to use the registered voter base, the Court foreshadowed Hawaii's later decision to shift to a permanent resident base: "Hawaii's special population problems might well have led it to conclude that state citizen population rather than total population should be the basis for comparison." *Id.* at 93. And the Court went on to quote the district court's finding that "[i]f total population were to be the only acceptable criterion upon which legislative representation could be based, in Hawaii, grossly absurd and disastrous results would flow." *Id.* Specifically, the Court was solicitous of "Hawaii's special population problems" caused by "large numbers of the military" as well as "tourists" both of which "tend to be highly concentrated in Oahu, and indeed are largely confined to particular regions of that island." *Id.* at 94. Accordingly, "[t]otal population figures may thus constitute a substantially distorted reflection of the distribution of *state citizenry*" and "[i]t is enough if it appears that the distribution of registered voters approximates distribution of state citizens or another permissible population base." *Id.* (emphasis added). In light of the failure

of the total population distribution to track state citizens, the Court specifically sanctioned the use of an "approximate[] distribution of state citizens" as a "permissible population base." *Id.* at 95.

Kostick conceded at oral argument that a citizen population basis is permissible under *Burns*. However, for the first time, he sought to distinguish a permanent resident population basis from a citizen population basis, and argued that *Burns*'s approval of a citizen population basis was therefore irrelevant. According to Kostick, if the state does not use total population as identified in the Census, then the state bears the burden to prove that the population base that it does use -- for example, registered voters in *Burns* -- tracks apportionment under a permissible population base.

This argument claims too much. To start, the Court approved a citizen base as a permissible base and its opinion is clear that a state could achieve such a base through extracting various groups -- such as temporary residents -- from the total population. Ultimately, Kostick's argument regarding benchmarks is one of nomenclature rather than substance. He makes no showing that the extraction of non-permanent residents is anything other than a *Burns*-sanctioned extraction to determine a citizen base. *Burns* explicitly benchmarked the registered voter population basis against a "state citizen population" which was extrapolated by

considering the "military population of Oahu" against the "total population," effectively deducting the former from the latter. 384 U.S. at 95. And the Commission's plan before us tracks Hawaii permanent residents in a manner more finely tuned than the plan considered in *Burns* -- it deducts, not the entire "military population" but only *non-resident* military personnel and dependents, as well as non-resident students, to approximate the permanent resident base. *Travis* sanctioned a similar approach: the special masters appointed by the *Travis* court recommended a "total population less non-resident military and dependents" as an approximation of the state "citizen population." Doc. No. 34-17, at 13, 31 (Final Report and Recommendations of Special Masters Submitted Pursuant to Order of Court, at 6, 24); Doc. No. 34-18 (Order implementing Special Masters' recommendations).

Thus *Burns* -- involving the same equal protection challenge to a redistricting base, the same state, and a similar excluded group of individuals -- speaks presciently to the issue we face here. There is no indication that the numbers of military personnel, or the other excluded groups in this case, are no longer "large" or "concentrated," such that a basis which included these groups would reflect the distribution of Hawaii's "state citizenry." *Id.* As noted in *Burns*, the vast majority of these individuals remain concentrated on Oahu. *See Solomon*,

126 Haw. at 288, 270 P.3d at 1018.

Next, Kostick relies heavily on *Garza*, 918 F.2d 763, to argue that the Commission should have redistricted using the total population basis without exclusions. Doc. No. 28-1 at 28-32, Mot. at 21-25. Kostick misreads the import of *Garza*. In *Garza*, Hispanic residents challenged Los Angeles County supervisor districts. The district court found that the county's plan intentionally discriminated against Hispanic individuals, ruled in favor of the challengers, and ordered redistricting based on the total population of the county, rather than on eligible voter population. 918 F.2d at 766, 773. The Ninth Circuit affirmed the district court's decision to use a total population rather than an eligible voter districting base.

Although *Garza* approved the district court's use of a total population, it did little more. *Garza* provides limited foundation for Kostick's argument. Nothing in *Garza* compels a state to adopt a total population base rather than a different permissible population base. Importantly, *Garza* noted at the beginning of its analysis that *Burns* was permissive. *Burns* "seems to permit states to consider the distribution of the voting population as well as that of the total population in constructing electoral districts. It does not, however, require states to do so." 918 F.2d at 774. *Garza* acknowledged the "latitude" the Supreme Court had

"afford[ed] state and local governments to depart from strict total population equality . . . in light of 'significant state policies,'" but noted that California law required the use of a strict total population basis. *Id.* Although in responding to the dissent, *Garza* suggests in dicta that "requir[ing] districting on the basis of voting capability" would create equal protection problems, its analysis ultimately begins with, and stands upon, the proposition that *Burns* permitted use of either the total population *or* the citizen population. *Id.* at 776. Nothing in *Garza* is at odds with the Commission's approach.

In recent years, various courts have considered whether the citizen population is an acceptable districting basis and have held that under *Burns*, the matter is a political question best left to states. *See Daly v. Hunt*, 93 F.3d 1212, 1227 (4th Cir. 1996)*; Chen*, 206 F.3d at 526. It is hardly up to us to meddle in a state choice with which the Supreme Court as well as circuit courts have deemed "no constitutionally founded reason to interfere." *Burns*, 384 U.S. at 92.[8]

---

[8] Kostick's Reply relies heavily on *Evans v. Cornman*, 398 U.S. 419 (1970), for the argument that "all persons" who were counted as Hawaii residents in the Census are entitled to be counted as part of the population basis. Doc. No. 36 at 13-14, Reply at 8-9. *Evans*, however, addressed a different issue. In *Evans*, the Court rejected the argument that the residents of a National Institutes of Health ("NIH") enclave, who were denied the right to vote, were non-residents of Maryland. *Evans* did not sub silentio overrule *Burns*'s determination that permanent residents or citizens are a permissible districting basis. The NIH employees were concededly residents of the enclave, which the Court held was part of the state and therefore the employees could not be forbidden from voting as state residents. *Evans*, 398 U.S. at 421-22. Contrary to

(continued...)

### b) *Discrimination Among Non-Resident Groups*

To be sure, if Hawaii's exclusion was carried out with an eye to invidiously targeting only certain non-resident groups, it could raise serious constitutional concerns. *Carrington*, 380 U.S. at 95 (holding that discrimination against the military in provision of the right to vote is unconstitutional); *Burns*, 384 U.S. at 95 & n.25 (suggesting that *Carrington* required equal treatment of the military for the purpose of reapportionment). Kostick provides no evidence that Hawaii's exclusion of non-resident servicemembers, their dependents, and non-resident students was carried out with any aim other than to create a population basis that reflects the state citizenry, or state permanent residents. Notably, the Hawaii Supreme Court's decision, which prompted the current plan, faulted the Commission, not for failing to exclude certain groups in the redistricting effort, but for failing to exclude all "[n]on-[p]ermanent [r]esidents" for which the State had data. *Solomon*, 126 Haw. at 291, 270 P.3d at 1021.

The Commission's reapportionment efforts over the years reflect its primary

---

[8](...continued)
Kostick's reading of the case, the Court also reaffirmed prior holdings that permit the imposition of bona fide residency requirements to permit voting, and explained that the right to be counted existed "'if [NIH employees] are in fact residents, with the intention of making [the State] their home indefinitely.'" *Id.* (quoting *Carrington v. Rash*, 380 U.S. 89, 96 (1965)). Similarly, Hawaii permissibly seeks to count all of those -- and only those -- who have "the intention of making [the State] their home indefinitely."

concern with excluding non-permanent residents from the population basis, rather than with invidiously targeting certain groups. For example, in 1991, the Commission initially excluded minors as well as the military and their dependents. Doc. No. 34-20, Defs.' Ex. 30, at 3 (1991 State of Hawaii Reapportionment Comm'n, Final Report and Reapportionment Plan, at 21). The Commission also sought to exclude aliens, but was informed that no data was available to do so. *Id.* at 22. Similarly, the Commission noted that "[o]ther groups, such as nonresident students, are statistically insignificant and cannot be easily placed in specific census blocks. Therefore, the Commission decided to eliminate those transients which could be identified to a particular census block and which constituted the vast majority of transients included in the census counts: nonresident military." *Id.* at 23.

Since the efforts of the 1991 Commission, the state has diligently considered how and whether other non-permanent resident groups could be removed from the population base. Subsequent commissions have considered excluding aliens, but have been unable to do so because of lack of data. *See* Doc. No. 34-21, Defs.' Ex. 30, at 22 (2001 State of Hawaii Reapportionment Comm'n Reapportionment Plan, at A-226); Doc. No. 33-5, D. Rosenbrock Decl. ¶ 15 (discussing 2011 Commission). Although data regarding aliens was in short supply, the

Commission in 2011 conscientiously renewed contacts with university officials and successfully obtained data to exclude non-resident students. Doc. No. 33-6, V. Marks Decl. ¶¶ 18, 20.

Kostick nonetheless raises concerns that the state extracted military personnel, their dependents and students, but not illegal aliens, minors, federal workers, prisoners, institutionalized persons, and even the unemployed. Doc. No. 28-1 at 36-38, Mot. at 29-31. Several of these comparator groups are not relevant: Kostick does not seriously suggest that minors, the unemployed, and prisoners are not generally Hawaii residents who lack the "present intention of establishing [their] permanent dwelling place" in Hawaii. Haw. Rev. Stat. § 11-13(2).[9] The Commission tried -- but was unable -- to get information regarding aliens, as discussed above. Kostick's single, passing argument with reference to federal workers is unavailing: he presents no evidence as to the number of federal workers in Hawaii, nor does he seriously contend that the vast majority of these workers are anything but bona fide permanent residents.

---

[9] The Commission explains that because it does not import prisoners from elsewhere, non-resident prisoners are not included because "convicted felons in Hawaii are highly likely to be 'permanent residents.'" Doc. No. 33, Opp'n at 26 n.6.

### c)    *Implementation of Extraction*

Kostick claims that even if using a permanent resident base is a permissible aim, the extraction mechanism fails because it also eliminates some Hawaii citizens, such as Plaintiff Jennifer Laster, from the reapportionment basis.  Doc. No. 28-1 at 39, Mot. at 32; Doc. No. 36 at 20, Reply at 15.  In implementing redistricting using only permanent residents, Hawaii's methods need not have "'[m]athematical exactitude;'" rather Hawaii must simply employ procedures that "make an honest and good-faith effort to construct . . . districts" in such a way that the number of permanent residents in each district are as "'equal . . . as is practicable.'"  *Gaffney v. Cummings*, 412 U.S. 742, 744 (1973) (quoting *Reynolds*, 377 U.S. at 577).  As noted in *Burns*, using a smaller group of individuals, such as registered voters, as the districting base is problematic -- unless the method is adopted "as a reasonable approximation for," and tracks the distribution of, a permissible population basis.  384 U.S. at 92-93, 95.  In other words, to show that the Commission's methods were problematic, it is not enough for Kostick to show that it excluded some citizens from the reapportionment base:  he must also show that the exclusion was egregious enough to result in an unequal distribution of the citizen population base among the various districts.  At this preliminary injunction stage, Kostick fails to demonstrate that he will be likely to make this showing on

the merits.

Hawaii's 2012 Reapportionment Plan extracts three non-resident groups: non-resident military personnel, their dependents, and non-resident university students.  To extract non-resident military, Hawaii used the servicemember's chosen state for taxation to determine residency.  Doc. No. 28-9, Pls.' Mot. Ex. A at 10-11 (Office of Elections, Non-Permanent Population Extraction for 2011 Reapportionment and Redistricting -- Addendum D-8 to D-9).  This was a reasonable method of identifying a servicemember's state of residence.

Servicemembers are not excluded from residency.  They are given an opportunity to identify their state of residence for the purposes of taxation.  *See* Doc. No. 34-7, Defs.' Ex. 17, at 1 ("Instructions of Certification of State of Legal Residence.").  By designating a state other than Hawaii as their state of taxation, servicemembers avoid paying Hawaii resident state taxes.  Haw. Rev. Stat. § 235-7.  Servicemembers are informed that state residency requires "<u>physical presence . . . with the simultaneous intent of making it your permanent home and abandonment of the old State of legal residence/domicile.</u>"  Doc. No. 34-7, Defs.' Ex. 17, at 1 (emphasis in original).  This language tracks the residency requirements under Hawaii law, that require a "present intention of establishing the person's permanent dwelling place."  Haw. Rev. Stat. § 11-13(2) (setting forth test

for establishing residency).  By indicating a different state for the purposes of

taxation, a servicemember declares that he or she has no present intention of

establishing his "permanent dwelling place" in Hawaii.  Reliance on this

declaration is a rational means of determining a servicemember's residence under

Hawaii law.  *Cf. Dunn v. Blumstein*, 405 U.S. 330, 337 (1972) (stating that it is

permissible for a state to "requir[e] a person who enters the State to make a

'declaration of his intention to become a citizen before he can have the right to be

registered as a voter and to vote in the State.'" (quoting *Pope v. Williams*, 193 U.S.

621 (1904))).  Hawaii does nothing to prohibit members of the military from

establishing residency in Hawaii.  Because, on this record, Hawaii does not resort

to overbroad means to exclude non-resident servicemembers, its means of

excluding servicemembers survive constitutional scrutiny.  *Cf. Burns*, 384 U.S. at

95 (noting that there was no attempt to disenfranchise the military by preventing

them from becoming state residents).

Next, the Commission presumes that all dependents of non-resident

servicemembers are also non-residents.  Kostick points to Jennifer Laster -- and

only to Jennifer Laster[10] -- to argue that this approach improperly eliminates

---

[10] In its opposition, the Commission suggests that the Kostick plaintiffs lack standing.
Doc. No. 22-23, Opp'n at 16-17.  However, the Commission concedes that the Lasters,

(continued...)

residents and registered voters from the population base.  Doc. No. 35-13, Defs.'

Ex. 44, at 15.  This evidence is hardly sufficient to show that Kostick is likely to be

able to demonstrate that Hawaii's exclusion is overbroad.  The record shows

otherwise -- the military informed Hawaii in 1991 that in 98 percent of families of

non-resident servicemembers, dependents had the same residency as that of the

servicemember.  Doc. No. 34-20, Defs.' Ex. 30 at 3 (1991 State of Hawaii

Reapportionment Comm'n, Final Report and Reapportionment Plan, at 21).  *See*

*also* Doc. No. 35-12, U.S. Departments of Treasury and Defense, Supporting our

Military Families: Best Practices for Streamlining Occupational Licensing Across

State Lines at 3-4 (2012) (servicemember spouses are far more likely to relocate

than civilian spouses).  Kostick presents no evidence that the status quo has

changed, or that Jennifer Laster is not a member of a small minority of dependents

who have a different residence from that of the servicemember.  Kostick certainly

fails to show that the resulting districting scheme fails to equally apportion districts

among citizens or permanent residents.

Turning to the extraction of students, Hawaii extracted students from BYU

---

[10](...continued)
consisting of a non-resident servicemember and his resident wife, have standing with respect to
Count One, and certain other Plaintiffs have standing with respect to Count Two.  *Id.*  This
concession dooms this standing argument.  The "presence of one party with standing assures that
[the] controversy before [the] Court is justiciable."  *Dep't of Commerce v. United States House
of Representatives*, 525 U.S. 316, 328 (1999).

Hawaii, Hawaii Pacific, Chaminade and the University of Hawaii System. Doc. No. 33-5, D. Rosenbrock Decl. ¶ 9. Other than noting that students from other universities were not included, the record is bereft of evidence to suggest that the number of students at any remaining universities was substantial enough such that the resulting plan disproportionately allocated permanent residents. Rather, the evidence indicates that these universities are the four "major colleges in Hawaii." *Id.* As *Gaffney* suggests, the Commission need not have considered small institutions which are attended by too few non-resident students to affect the allocation of state residents.

Next, the two tests established for excluding non-resident students within the four universities were reasonably designed to meet the goals of identifying non-residents. For BYU Hawaii, Hawaii Pacific, and Chaminade, a student is considered a non-resident if the student lists a "home address" outside Hawaii. It falls within the state's discretion to use this method to determine which individuals are transient residents. *See, e.g.*, *Pope*, 193 U.S. 621 (permitting a declaration of residency requirement).

In the University of Hawaii System, any student paying out-of-state tuition is considered a non-resident. The essential requirements for establishing residency for tuition purposes in the University of Hawaii System are (1) bona fide

residency, shown by various methods, most importantly, registering to vote and paying state taxes, (2) for a period of twelve months. Haw. Admin. R. § 20-4-6. Kostick appears troubled by the year-long residency requirement: a student is not counted as a Hawaii resident for the purposes of redistricting unless he has been a resident for one year. Doc. No. 36 at 20, Reply at 15 & n.5. He reminds us that in *Dunn*, the Supreme Court held that imposing a year long durational requirement for the purposes of *voting* was constitutionally impermissible. 405 U.S. at 360.

Had Kostick provided even some evidence that Hawaii's mechanism unfairly excluded Hawaii resident students from the population base, however *long* they had been residents, he would be on more solid ground. Kostick points to not a single student who has become a resident of Hawaii, but who has not been counted as part of the population base.

Accordingly, Kostick has not shown a likelihood of succeeding on his claim that use of a permanent resident base, coupled with extraction of military personnel, their dependents, and students, constitutes an equal protection violation.

///

///

///

## 2.     *Irreparable Harm and Other Equitable Considerations*

Having failed to establish the first factor of the preliminary injunction standard, likelihood of success on the merits, Kostick likewise "fail[s] to establish that irreparable harm will flow from" the denial of a preliminary injunction.  *Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986).  Although these determinations doom Kostick's motion for a preliminary injunction, we discuss the other equitable factors because of the public significance of the challenge.

In considering the equities and the public interest, we balance Kostick's constitutional concerns against the consequences of the remedy he seeks.  Though Kostick does not explicitly ask to postpone the primary election, we find that postponement is the practical result of Kostick's proposed remedies.[11]  Any effort to implement an alternative plan at this stage would result in significant delay, grave confusion and potential chaos at the polls.  Such a result is directly contrary to the powerful public interest in avoiding disruption of the primary election, which "is an integral part of the entire election process."  *Burdick v. Takushi*, 504 U.S. 428, 439 (1992).

Even if Kostick could establish the likelihood of a constitutional violation --

---

[11] In oral argument Kostick explicitly indicated that he does not seek a bifurcated election where state and local elections would be held on a separate date from the federal election.

which he has not -- a federal court preliminary injunction that has the net effect of interrupting the election would be ill advised. According to the Supreme Court,

> under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds*, 377 U.S. at 585. "The decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation." *Sw. Voter Registration Educ. Project*, 344 F.3d at 918 (citing *Ely v. Klahr*, 403 U.S. 108, 113, 115 (1971); *Whitcomb v. Chavis*, 396 U.S. 1055 (1970); *Kilgarlin v. Hill*, 386 U.S. 120, 121 (1967) (per curiam)). We find Nago's explanation of the drastic consequences of a preliminary injunction to be persuasive, particularly in the absence of any evidence to the contrary. The equities and the public interest tip decisively against Kostick.

Hawaii's electoral timeline is constrained by statutory and practical

considerations.  The state and federal primary elections, as well as special county elections, are scheduled for August 11, 2012.  Haw. Rev. Stat. § 12-2.  The general election is scheduled for November 6, 2012.  Haw. Const. art. II, § 8; 3 U.S.C. § 1; 2 U.S.C. §§ 1, 7.  A critical part of the election process is precincting, which is both staff and time intensive.  Doc. No. 33-9, Nago Decl. ¶ 34-35.  This year, because of the late breaking *Solomon* decision, the Office of Elections completed the precincting process on an expedited basis in approximately five weeks.  Doc. No. 28-11, Nago Depo. 30.  Nago testified at the May 18 hearing that it would be difficult, if not impossible, to do it any faster should the court order a revision of the apportionment process.  Five weeks from the date of the hearing is June 22.  Only after the precincting process is complete can the county clerks begin the process of assigning each of the individual 600,000 or so voters to a polling place.  Doc. No. 33-9, Nago Decl. ¶¶ 44-46.  This process takes approximately ten weeks.  Defs.' Ex. 66.  Ten weeks from the optimistic June 22 estimate would extend the process to August 31.

In fact, there are numerous other crucial deadlines that inevitably would be interrupted by a preliminary injunction.

- May 26:  Office of Elections publishes the precincts.  Haw. Rev. Stat. § 11-91.
- June 5:  Candidate nomination papers for state offices due.  *Id.* § 12-6(a).

- June 12: Written objections to candidate nomination papers due. *Id.* § 12-8.

- June 13: Printing of voter ballots begins and counties start assigning voters to precincts. Doc. No. 28-11, Nago Depo. 41-43.

- June 27: Last date to mail overseas ballots. 42 U.S.C. § 1973ff-1(a)(8).

- July 2: Counties mail postcards to voters indicating their registration status and polling location. Doc. No. 28-11, Nago Depo. 45. (Not a legal requirement, but a standard practice that is a valuable part of ensuring an orderly election.)

- July 30: Absentee polling places open. Haw. Rev. Stat. § 15-7(b).

Nago also explained at the hearing that his office needs to sequester and recycle the voting machines following the primary election, a process that takes one to two months. Thus, a court-ordered districting plan would, at a bare minimum, make the August 11 primary impossible and spill over to disrupt the general election. Not surprisingly, in the face of the practical mechanics of running the machinery of an election, Kostick offered no suggested timetable to accomplish these tasks.

Although Kostick's counsel opined at the hearing that the task would be "mission difficult, not mission impossible," we disagree. The above chronology leaves little doubt that, at this late date,[12] there is no room for judicial intervention

_____

[12] The timing of this suit and request for relief also weigh against an injunction. Kostick could have brought his basic challenge after the September 2011 Plan was published. Although the number of people extracted from the total population was significantly lower under the September 2011 Plan than under the 2012 Plan, Kostick's core constitutional claim was cognizable at least at that early date, when there would have been time for a full consideration of

(continued...)

without significantly interrupting the election process.  Spawning chaos rather than confidence in the election process is a result we cannot endorse.  Absent compelling evidence that the election will not be interrupted, we find that the equities and public interest weigh decisively against granting the preliminary injunction.

## B.      Count Two (Equal Protection Challenge: Mal-Apportionment)

Count Two contends that the Commission violated the Equal Protection Clause by apportioning the State's legislative districts unequally -- a total deviation of over 44 percent off the ideal population for Hawaii's Senate districts and over 21 percent for the House -- after extracting the 108,767 military personnel, military dependents, and students.  Kostick contends that the high deviations are inconsistent with the constitutional principle that "representative government in this country is one of equal representation for equal numbers of people."  *Reynolds*, 377 U.S. at 560-61.

This question is not new.  The Commission has always acknowledged that complying with the Hawaii Constitution's criteria that "no district shall extend beyond the boundaries of any basic island unit" as provided in Article IV, § 6 --

_____

[12](...continued)
the issues.

i.e., avoiding canoe districts -- may not be possible without relatively high deviations from a mathematical ideal. The issue has been "ever present in [Hawaii's] reapportionment cases." *Gill*, 316 F. Supp. at 1288. And the parties appear to agree that the choice is straightforward: Either keep Kauai as a single district (but cause large deviations) or require canoe districts (to balance populations equally). *See* Doc. No. 28-3, Pls.' Mot. Ex. A, at 33 (2012 Reapportionment Plan, at 21).

But we need not evaluate the merits of this claim now. It is undisputed that if preliminary relief were granted on Count Two -- that is, even assuming that the 2012 Reapportionment Plan's statewide deviations exceed constitutional limits -- then redistricting must begin anew. Kostick conceded at the May 18 hearing that there are no existing plans such as the August 2011 Plan or the September 26, 2011 Plan that we could order Nago to begin implementing. The Commission would be required to start from scratch, creating canoe districts and re-balancing populations. Given this backdrop, Kostick forthrightly admitted during the hearing that if we denied the preliminary injunction as to Count One, the Commission and Nago would not have sufficient time to implement a remedy as to Count Two. That is, Kostick concedes that it is too late to re-draw districts and implement that new plan for the 2012 election cycle.

Again, it bears emphasizing that we face a Motion for Preliminary Injunction, and are applying preliminary-injunction standards. We are not tasked with making final decisions on the merits. Given Kostick's admission that the relief he seeks as to Count Two (after having not prevailed on Count One) is impossible at this preliminary injunction stage, it follows that the Motion for Preliminary Injunction must be denied. In short, we need not reach the question whether there is a likelihood of success on the merits as to Count Two, and this Order should not be read as any preliminary indication of our views as to the merits of Count Two.

## V.  CONCLUSION

Kostick has failed to show likelihood of success on the merits on Count One, and has conceded that, absent success on Count One, we need not reach Count Two. Further, the equities and public interest tip overwhelmingly in the Commission's favor. Any preliminary relief at this stage would significantly upend the election process, delay the primary election scheduled for August 11,

///

///

///

2012, and even jeopardize the November 6, 2012 general election. The Motion for Preliminary Injunction is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 22, 2012.



/s/ M. Margaret McKeown
——————————————————
M. Margaret McKeown
United States Circuit Judge

/s/ J. Michael Seabright
——————————————————
J. Michael Seabright
United States District Judge

/s/ Leslie E. Kobayashi
——————————————————
Leslie E. Kobayashi
United States District Judge

*Kostick et al. v. Nago et al.*, Civ. No. 12-00184 JMS-LEK-MMM, Order Denying Plaintiffs' Motion for Preliminary Injunction; Appendix "A

DAVID M. LOUIE            2162
Attorney General of Hawaii

BRIAN P. ABURANO   3154
JOHN F. MOLAY         4994
SARAH R. HIRAKAMI 6919
Deputy Attorneys General
Department of the Attorney
  General, State of Hawaii
425 Queen Street
Hnonolulu, Hawaii 96813
Telephone:  (808) 586-1494
Facsimile:  (808) 586-1369
E-Mail:     John.F.Molay@Hawaii.gov

Attorneys for Defendants
SCOTT T. NAGO, STATE OF HAWAII 2011
REAPPORTIONMENT COMMISSION,
VICTORIA MARKS, LORRIE LEE STONE,
ANTHONY TAKITANI, CALVERT CHIPCASE IV,
ELIZABETH MOORE, CLARICE Y. HASHIMOTO,
HAROLD S. MASUMOTO, DYLAN NONAKA, and
TERRY E. THOMASON

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH KOSTICK; KYLE MARK TAKAI; DAVID P. BROSTROM; LARRY S. VERAY; ANDREW WALDEN; and EDWIN J. GAYAGAS,<br><br>          Plaintiffs,<br><br>   vs.<br><br>SCOTT T. NAGO, in his official capacity as the Chief Election Officer State of Hawaii; STATE OF HAWAII | Civil No. CV 12-00184 JMS-RLP<br><br>PARTIES' STIPULATED FACTS RE: THE MOTION FOR PRELIMINARY INJUNCTION IN RESPONSE TO COURT ORDER [DOCKET 16]; EXHIBIT "A";  CERTIFICATE OF SERVICE |

# Appendix A

2011 REAPPORTIONMENT
COMMISSION, VICTORIA MARKS,
LORRIE LEE STONE, ANTHONY
TAKITANI, CALVERT CHIPCASE
IV, ELIZABETH MOORE, CLARICE
Y. HASHIMOTO, HAROLD S.
MASUMOTO, DYLAN NONAKA,
and TERRY E. THOMASON, in their
official capacities of members of the
State of Hawaii 2011 Reapportionment
Commission; and DOE DEFENDANTS
1-10,

                    Defendants.

PARTIES' STIPULATED FACTS RE: THE MOTION FOR PRELIMINARY
INJUNCTION IN RESPONSE TO COURT ORDER [DOCKET 16]

The parties have stipulated to the following facts with respect to the Motion

for Preliminary Injunction:

1.    The U.S. Census ("Census") counts people at their "usual residence."
      "Usual residence" is defined by the Census as the place where a person lives
      and sleeps most of the time.  It is not necessarily the same as the person's
      voting residence or legal residence.  A true and correct copy of information
      from the Census about how it counts people at their "usual residence" is
      attached as Exhibit A.

2.    The 2010 Census counted people at their "usual residence" as of April 1,
      2010 ("Census Date").

3.    All active duty military personnel who on the Census Date were usual
      residents of the State of Hawaii ("Hawaii" or "State") under the Census'
      usual residence definition, were or should have been counted by the 2010
      Census as part of the Hawaii population.

4.    All students who on the Census Date were enrolled at a Hawaii university or
      college and were usual residents of Hawaii under the Census' usual

residence definition, were or should have been counted by the 2010 Census as part of the Hawaii population.

5.   Tourists who on the Census Date were in Hawaii but away from their place of usual residence were not or should not have been counted by the 2010 Census as part of the Hawaii population.

6.   All active duty military personnel who on the Census Date were deployed outside of Hawaii were not or should not have been counted as usual residents of Hawaii for the purpose of State legislative reapportionment.

7.   In the data that the Commission received from the military, active duty military personnel who were deployed on or about the Census Date were identified on a spread sheet.

8.   To establish the permanent resident population base used for the 2012 Reapportionment Plan[1] that is being challenged in this lawsuit, the Commission extracted 42,332 active duty military personnel from the 2010 Census count based on military records or data denoting the personnel's state of legal residence.

9.   The Commission received testimony and documents during its public meetings and hearings regarding active duty military in Hawaii. Commission staff reviewed Census data regarding active duty military in Hawaii. Commission staff also reviewed the State Data Book regarding active duty military in Hawaii. The State Data Book does not contain information regarding the permanent or non-permanent residency of active duty military in Hawaii.  Other than the foregoing and the information and data provided to the Commission by the military, the Commission did not perform any independent investigation regarding the permanent or non-permanent residency of the active duty military personnel extracted from the 2010 Census count.

10.  To establish the permanent resident population base used for the 2012 Reapportionment Plan that is being challenged in this lawsuit, the Commission extracted 53,115 military dependents from the 2010 Census count who, according to data provided by the military, had an active duty military sponsor who had declared a state of legal residence other than

---

[1] The 2012 Reapportionment Commission is defined in Stipulated Facts No. 36.

Hawaii. In other words, the Commission extracted military dependents who were associated or attached to an active duty military person who had declared a state of legal residence other than Hawaii.

11.   The Commission received testimony and documents during its public meetings and hearings regarding military dependents in Hawaii. Commission staff contacted the State of Hawaii Department of Commerce and Consumer Affairs ("DCCA") to obtain the number of persons in regulated occupations and professions who were military dependents. DCCA staff said that the DCCA does not collect this type of information. Commission staff contacted the State of Hawaii Department of Education ("DOE") to obtain the number of teachers who were military dependents. DOE staff said that the DOE does not collect this type of information. Commission staff conducted research on how many students attending Hawaii schools were military dependents and reviewed the State Data Book regarding military dependents in Hawaii, but these efforts did not assist the Commission in determining how many military dependents were permanent or non-permanent residents of Hawaii. Other than the foregoing and using military data to identify whether a military dependent was associated or attached to an active duty military person who had declared a state of legal residence other than Hawaii, the Commission did not conduct any independent investigation into the permanent or non-permanent residency of military dependents.

12.   The military did not provide the Commission with any data regarding the military dependents' permanent or non-permanent residency other than their association or attachment to an active duty military sponsor who had declared a state of legal residence other than Hawaii.

13.   The Commission's technical contractor informed the Commission that the military did not provide data that could identify military dependents as permanent or non-permanent residents, aside from their association or attachment to an active duty military sponsor that had declared a state of legal residence other than Hawaii.

14.   To establish the permanent resident population base used for the 2012 Reapportionment Plan that is being challenged in this lawsuit, the Commission extracted 13,320 students from the 2010 Census count on the basis of: (a) payment of non-resident tuition; or (b) a home address outside of Hawaii.

15.  The universities that provided data regarding non-resident students consisted of the University of Hawaii system-wide ("UH"), Hawaii Pacific University ("HPU"), Chaminade University ("Chaminade"), and BYU Hawaii ("BYUH").

16.  Other than the universities identified above, no other Hawaii universities, private or public, provided data to the Commission.

17.  The Commission did not seek data from universities other than the schools identified above.

18.  The Commission relied upon information provided by UH regarding which students paid non-resident tuition. Other than this information, the Commission did not have any other information regarding non-permanent residency of the UH students who were extracted from the 2010 Census count as being non-permanent residents of the State.

19.  The Commission relied upon information provided by HPU, Chaminade, and BYUH regarding the home address of their students. Other than this information, the Commission did not have any other information regarding non-permanent residency of the HPU, Chaminade, and BYUH students who were extracted from the 2010 Census count as being non-permanent residents of the State.

20.  Other than active duty military and their dependents and university students, the Commission did not receive data from any source regarding any other potential non-permanent residents residing in the State who may have been counted in the 2010 Census as having their usual residence in the State. The Commission did receive information from Commission staff about what had been done in prior reapportionments to try and obtain data about aliens and other potential non-permanent residents residing in Hawaii.

21.  Commission staff unsuccessfully tried to obtain data from the military about non-permanent military contractors and Department of Defense personnel in Hawaii. Aside from this, the Commission did not investigate or promulgate any investigation into whether any other potential non-permanent residents residing in the State may have been counted in the 2010 Census as having their usual residence in the State.

22. Other than active duty military and their dependents and university students, the Commission did not extract from the 2010 Census count any other non-permanent residents who may have been residing in the State.

23. The 2010 Census count may have included legal and illegal aliens whose usual residence was in Hawaii as of the Census Date. The Commission did not extract people from the 2010 Census count because they were legal or illegal aliens.

24. The 2010 Census count included convicted felons whose usual residence was in Hawaii as of the Census Date. The Commission did not extract people from the 2010 Census count because they were convicted felons.

25. The 2010 Census count included non-registered voters whose usual residence was in Hawaii as of the Census Date. The Commission did not extract people from the 2010 Census counts because they were non-registered voters.

26. All persons extracted by the Commission were counted as part of the Hawaii population by the 2010 Census.

27. The State legislative reapportionment plan accepted by the Commission for public hearings and comment on August 3, 2011 ("August 2011 Plan") did not extract from the 2010 Census count, any active duty military personnel, military dependents, or students.

28. No definition of "permanent residents" as that term is used in article IV of the Hawaii State Constitution is provided by the Hawaii State Constitution.

29. The Commission has recommended that the State legislature initiate changes in the Hawaii Constitution and statutes to clarify the definition of permanent residents for the reapportionment population base.

30. Residence locations could not be determined for some persons identified as non-permanent residents and the Commission, therefore, could not place those persons in particular census blocks for purposes of redistricting. These non-permanent residents were allocated proportionally to census blocks in their basic island unit, using a disaggregation method. The Commission then extracted those non-permanent residents from the census block to which they had been allocated.

31. For purposes of the disaggregation method referred to above, the following proportions were used:

One person was extracted per 19.12 persons on Oahu

One person was extracted per 137.8 persons on Hawaii

One person was extracted per 337 persons on Maui)

One person was extracted per 300 persons on Lanai

One person was extracted per 185 persons on Molokai

One person was extracted per 131 persons on Kauai

32. On or about September 26, 2011, the Commission adopted and filed a reapportionment and redistricting plan for the State legislature ("2011 Final Reapportionment Plan") that extracted 16,458 people from the 2010 Census count or population of 1,360,301 persons. An amended version of the 2011 Final Reapportionment Plan (amending staggered terms portion) was filed on October 13, 2011.

33. On October 10, 2011 and October 11, 2011, two original proceedings were filed in the Hawaii Supreme Court challenging the 2011 Final Reapportionment Plan. See Solomon et al. v. Abercrombie, et al, SCPW 11-0000732 ("Solomon") and Matsukawa v. State of Hawaii 2011 Reapportionment Commission, et al., SCPW 11-0000741 ("Matsukawa"). The Petitions in the Solomon and Matsukawa proceedings sought: a judicial determination that the 2011 Final Reapportionment Plan was constitutionally defective and invalid; an order to the Chief Elections Officer to rescind public notice of the Plan; and an order to the Commission to prepare and file a new reapportionment plan for the State legislature that uses a population base limited to "permanent residents" of the State of Hawaii.

34. On January 4, 2012, the Hawaii Supreme Court issued an Order Granting Petition for Writ of Mandamus and Judicial Review in the Solomon and Matsukawa proceedings that: (a) concluded that the 2011 Final Reapportionment Plan was constitutionally invalid; (b) concluded that the 2011 Final Reapportionment Plan disregarded article IV, section 4 of the

Hawaii Constitution by including non-permanent residents in the population base that the Commission used to allocate members of the State legislature among the basic island units; (c) invalidated the 2011 Final Reapportionment Plan; (d) ordered the Commission to prepare and file a new reapportionment plan that allocates members of the State legislature among the basic island units by using a permanent resident population base and then apportions the members among the districts as provided by article IV, section 6 of the Hawaii Constitution; and (e) ordered the Chief Election Officer to rescind publication of the 2011 Final Reapportionment Plan for the State legislature.

35. On January 6, 2012, the Hawaii Supreme Court issued an opinion in the *Solomon* and *Matsukawa* proceedings.

36. On March 8, 2012, the Commission adopted and filed a reapportionment and redistricting plan for the State legislature ("2012 Reapportionment Plan") that: (a) was designed to conform to the Hawaii Supreme Court's rulings in the *Solomon* and *Matsukawa* proceedings; and (b) extracted 108,767 active duty military personnel, military dependents, and university students from the 2010 Census population of 1,360,301. The Chief Election Officer published notice of the 2012 Reapportionment Plan on March 22, 2012.

37. The permanent resident population used by the Commission to reapportion the members of each house of the State legislature in the 2012 Reapportionment Plan was 1,251,534. Dividing 1,251,534 by 25 Senate seats or districts equals approximately 50,061 permanent residents per Senate seat or district ("Senate statewide ideal or target district"), and dividing 1,251,534 by 51 House seats or districts equals approximately 24,540 permanent residents per House seat or district ("House statewide ideal or target district").

38. Under the 2012 Reapportionment Plan: (a) the largest Senate District (Senate District 8, Kauai basic island unit) contains 66,805 permanent residents which is +16,744 permanent residents or +33.44% more than the Senate statewide ideal or target district; and (b) the smallest Senate District (Senate District 1, Hawaii basic island unit) contains 44,666 permanent residents which is -5,395 or -10.78% less than the Senate statewide ideal or target district.

39.   Under the 2012 Reapportionment Plan: (a) the largest House District (House District 5, Hawaii basic island unit) contains 27,129 permanent residents which is +2,589 permanent residents or +10.55% more than the House statewide ideal or target district; and (b) the smallest House District (House District 15, Kauai basic island unit) contains 21,835 permanent residents which is -2,705 permanent residents or -11.02% less than the House statewide ideal or target district.

40.   The 2012 Reapportionment Plan resulted in one Senate seat moving from the Oahu basic island unit to the Hawaii basic island unit.

DATED:   Honolulu, Hawaii, April 20, 2012.

STATE OF HAWAII

DAVID M. LOUIE
Attorney General of Hawaii


_____/s/  Brian P. Aburano_____
BRIAN P. ABURANO
JOHN F. MOLAY
SARAH R. HIRAKAMI
Deputy Attorneys General

Attorneys for Defendants
SCOTT T. NAGO, STATE OF HAWAII
2011 REAPPORTIONMENT
COMMISSION, VICTORIA MARKS,
LORRIE LEE STONE, ANTHONY
TAKITANI, CALVERT CHIPCASE IV,
ELIZABETH MOORE, CLARICE Y.
HASHIMOTO, HAROLD S.
MASUMOTO, DYLAN NONAKA, and
TERRY E. THOMASON

# How We Count America

## The census numbers tell us who we are and what we need.



### Where You Are Counted Is Important

### The Concept Of Usual Residence

Planners of the first U.S. decennial census in 1790 established the concept of "usual residence" as the main principle in determining where people were to be counted. This concept has been followed in all subsequent censuses and is the guiding principle for the 2010 Census. Usual residence is defined as the place where a person lives and sleeps most of the time. This place is not necessarily the same as the person's voting residence or legal residence.

Determining usual residence is easy for most people. Given our Nation's wide diversity in types of living arrangements, however, the usual residence for some people is not as apparent. A few examples are people experiencing homelessness, snowbirds, children in shared custody arrangements, college students, live-in employees, military personnel, and people who live in workers' dormitories.

Applying the usual residence concept to real living situations means that people will not always be counted at the place where they happen to be staying on Thursday, April 1, 2010 (Census Day). For example, people who are away from their usual residence while on vacation or on a business trip on Census Day should be counted at their usual residence. People who live at more than one residence during the week, month, or year should be counted at the place where they live most of the time. People without a usual residence, however, should be counted where they are staying on Census Day.

### The Residence Rule

### People Away From Their Usual Residence On Census Day

### Visitors On Census Day

### People Who Live In More Than One Place

### People Without A Usual Residence

### Students

### Movers On Census Day

### People Who Are Born Or Die On Census Day

## EXHIBIT A

# How We Count America

## The census numbers tell us who we are and what we need.



### Where You Are Counted Is Important

### The Concept Of Usual Residence

### The Residence Rule

The residence rule is used to determine where people should be counted during the 2010 Census. The rule says:

- Count people at their usual residence, which is the place where they live and sleep most of the time.
- People in certain types of facilities or shelters (i.e., places where groups of people live together) on Census Day should be counted at the facility or shelter.
- People who do not have a usual residence, or cannot determine a usual residence, should be counted where they are on Census Day.

The following sections describe how the residence rule applies for people in various living situations.

### People Away From Their Usual Residence On Census Day

### Visitors On Census Day

### People Who Live In More Than One Place

### People Without A Usual Residence

### Students

### Movers On Census Day

### People Who Are Born Or Die On Census Day

### Nonrelatives Of The Householder

### U.S. Military Personnel

### Merchant Marine Personnel On U.S. Flag Maritime/Merchant Vessels

# How We Count America

## The census numbers tell us who we are and what we need.



**Where You Are Counted Is Important**

**The Concept Of Usual Residence**

**The Residence Rule**

**People Away From Their Usual Residence On Census Day**

*People away from their usual residence on Thursday, April 1, 2010 (Census Day), such as on a vacation or a business trip, visiting, traveling outside the U.S., or working elsewhere without a usual residence there (for example, as a truck driver or traveling salesperson)* - Counted at the residence where they live and sleep most of the time.

**Visitors On Census Day**

**People Who Live In More Than One Place**

**People Without A Usual Residence**

**Students**

**Movers On Census Day**

**People Who Are Born Or Die On Census Day**

**Nonrelatives Of The Householder**

**U.S. Military Personnel**

**Merchant Marine Personnel On U.S. Flag Maritime/Merchant Vessels**

**Foreign Citizens In The U.S.**

**U.S. Citizens And Their Dependents Living Outside The U.S.**

**People In Correctional Facilities For Adults**

**People In Group Homes And Residential Treatment Centers For Adults**

# How We Count America

## The census numbers tell us who we are and what we need.



**Where You Are Counted Is Important**

**The Concept Of Usual Residence**

**The Residence Rule**

**People Away From Their Usual Residence On Census Day**

**Visitors On Census Day**

*Visitors on Thursday, April 1, 2010 (Census Day) who will return to their usual residence* - Counted at the residence where they live and sleep most of the time.

*Citizens of foreign countries who are visiting the U.S. on Thursday, April 1, 2010 (Census Day), such as on a vacation or a business trip* - Not counted in the census.

**People Who Live In More Than One Place**

**People Without A Usual Residence**

**Students**

**Movers On Census Day**

**People Who Are Born Or Die On Census Day**

**Nonrelatives Of The Householder**

**U.S. Military Personnel**

**Merchant Marine Personnel On U.S. Flag Maritime/Merchant Vessels**

**Foreign Citizens In The U.S.**

**U.S. Citizens And Their Dependents Living Outside The U.S.**

**People In Correctional Facilities For Adults**

# How We Count America

## The census numbers tell us who we are and what we need.



**Where You Are Counted Is Important**

**The Concept Of Usual Residence**

**The Residence Rule**

**People Away From Their Usual Residence On Census Day**

**Visitors On Census Day**

**People Who Live In More Than One Place**

**People Without A Usual Residence**

**Students**

*Boarding school students living away from their parental home while attending boarding school below the college level, including Bureau of Indian Affairs boarding schools-* Counted at their parental home rather than at the boarding school.

*College students living at their parental home while attending college -* Counted at their parental home.

*College students living away from their parental home while attending college in the U.S. (living either on-campus or off-campus) -* Counted at the on-campus or off-campus residence where they live and sleep most of the time.

*College students living away from their parental home while attending college in the U.S. (living either on-campus or off-campus) but staying at their parental home while on break or vacation -* Counted at the on-campus or off-campus residence where they live and sleep most of the time.

*U.S. college students living outside the U.S. while attending college outside the U.S. -* Not counted in the census.

*Foreign students living in the U.S. while attending college in the U.S. (living either on-campus or off-campus) -* Counted at the on-campus or off-campus residence where they live and sleep most of the time.

**Movers On Census Day**

# How We Count America

## The census numbers tell us who we are and what we need.



<u>**Where You Are Counted Is Important**</u>

<u>**The Concept Of Usual Residence**</u>

<u>**The Residence Rule**</u>

<u>**People Away From Their Usual Residence On Census Day**</u>

<u>**Visitors On Census Day**</u>

<u>**People Who Live In More Than One Place**</u>

<u>**People Without A Usual Residence**</u>

<u>**Students**</u>

<u>**Movers On Census Day**</u>

<u>**People Who Are Born Or Die On Census Day**</u>

<u>**Nonrelatives Of The Householder**</u>

<u>**U.S. Military Personnel**</u>

*U.S. military personnel living in military barracks in the U.S.* - Counted at the military barracks.

*U.S. military personnel living in the U.S. (living either on base or off base) but not in barracks* - Counted at the residence where they live and sleep most of the time.

*U.S. military personnel on U.S. military vessels with a U.S. homeport* - Counted at the onshore U.S. residence where they live and sleep most of the time. If they have no onshore U.S. residence, they are counted at their vessel's homeport.

*People in military disciplinary barracks and jails in the U.S.* - Counted at the facility.

*People in military treatment facilities with assigned active duty patients in the U.S.* - Counted at the facility if they are assigned there.

***U.S. military personnel living on or off a military installation outside the U.S., including dependents living with them*** - Counted as part of the U.S. overseas population. They should not be included on any U.S. census questionnaire.

***U.S. military personnel on U.S. military vessels with a homeport outside the U.S.*** - Counted as part of the U.S. overseas population. They should not be included on any U.S. census questionnaire.

**Merchant Marine Personnel On U.S. Flag Maritime/Merchant Vessels**

**Foreign Citizens In The U.S.**

**U.S. Citizens And Their Dependents Living Outside The U.S.**

**People In Correctional Facilities For Adults**

**People In Group Homes And Residential Treatment Centers For Adults**

**People In Health Care Facilities**

**People In Juvenile Facilities**

**People In Residential School-Related Facilities**

**People In Shelters**

**People In Transitory Locations (e.g., RV parks, campgrounds, marinas)**

**People In Religious-Related Residential Facilities**

**People In Workers' Residential Facilities**

# How We Count America

## The census numbers tell us who we are and what we need.



<u>**Where You Are Counted Is Important**</u>

<u>**The Concept Of Usual Residence**</u>

<u>**The Residence Rule**</u>

<u>**People Away From Their Usual Residence On Census Day**</u>

<u>**Visitors On Census Day**</u>

<u>**People Who Live In More Than One Place**</u>

<u>**People Without A Usual Residence**</u>

<u>**Students**</u>

<u>**Movers On Census Day**</u>

<u>**People Who Are Born Or Die On Census Day**</u>

<u>**Nonrelatives Of The Householder**</u>

<u>**U.S. Military Personnel**</u>

<u>**Merchant Marine Personnel On U.S. Flag Maritime/Merchant Vessels**</u>

<u>**Foreign Citizens In The U.S.**</u>

<u>**U.S. Citizens And Their Dependents Living Outside The U.S.**</u>

<u>**People In Correctional Facilities For Adults**</u>

*People in correctional residential facilities on Thursday, April 1, 2010 (Census Day)* - Counted at the facility.

*People in federal detention centers on Thursday, April 1, 2010 (Census Day)* - Counted at the facility.

*People in federal and state prisons on Thursday, April 1, 2010 (Census Day)* - Counted at the facility.

*People in local jails and other municipal confinement facilities on Thursday, April 1, 2010 (Census Day)* - Counted at the facility.

**People In Group Homes And Residential Treatment Centers For Adults**

**People In Health Care Facilities**

**People In Juvenile Facilities**

**People In Residential School-Related Facilities**

**People In Shelters**

**People In Transitory Locations (e.g., RV parks, campgrounds, marinas)**

**People In Religious-Related Residential Facilities**

**People In Workers' Residential Facilities**