1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF HAWAII

3    JOSEPH KOSTICK; KYLE MARK      )
     TAKAI; DAVID P. BROSTROM;      )
4    LARRY S. VERAY; ANDREW         )
     WALDEN; EDWIN J. GAYAGAS;      )
5    ERNEST LASTER; and JENNIFER    )
     LASTER,                        )
6                                   )    Civil No. 12-00184 JMS-LEK-MMM
                 Plaintiffs,        )    (Three-Judge Court)
7                                   )    Honolulu, Hawaii
          vs.                       )    May 18, 2012
8                                   )    10:00 a.m.
     SCOTT T. NAGO, in his          )
9    official capacity as the       )
     Chief Election Officer State)
10   of Hawaii; STATE OF HAWAII     )
     2011 REAPPORTIONMENT           )
11   COMMISSION; VICTORIA MARKS,    )
     LORRIE LEE STONE, ANTHONY      )
12   TAKITANI, CALVERT CHIPCHASE    )
     IV, ELIZABETH MOORE, CLARICE)
13   Y. HASHIMOTO, HAROLD S.        )
     MASUMOTO, DYLAN NONAKA, and )
14   TERRY E. THOMAS, in their      )
     official capacities as         )
15   members of the State of        )
     Hawaii 2011 Reapportionment )
16   Commission; and DOE            )
     DEFENDANTS 1-10,               )
17                                   )    Plaintiff's Motion for
                 Defendants.        )    Preliminary Injunction [28]
18   _____)

19                      TRANSCRIPT OF PROCEEDINGS
              BEFORE M. MARGARET McKEOWN, CIRCUIT JUDGE;
20    J. MICHAEL SEABRIGHT and LESLIE E. KOBAYASHI, DISTRICT JUDGES

21
     APPEARANCES:
22
     For the Plaintiffs:        ROBERT H. THOMAS, ESQ.
23                              ANNA H. OSHIRO, ESQ.
                                MARK M. MURAKAMI, ESQ.
24                              Damon Key Leong Kupchak Hastert
                                1003 Bishop Street, Suite 1600
25                              Honolulu, Hawaii 96813

1    APPEARANCES CONTINUED:

2    For the Defendants:        DAVID M. LOUIE
                                Attorney General of Hawaii
3                               BRIAN P. ABURANO
                                JOHN F. MOLAY
4                               SARAH R. HIRAKAMI
                                Deputies Attorney General
5                               Department of the Attorney General
                                State of Hawaii
6                               425 Queen Street
                                Honolulu, Hawaii 96813
7

8
     Court Reporter:           Katherine Eismann, CSR, CRR, RDR
9                              United States District Court
                               300 Ala Moana Boulevard, C-338
10                             Honolulu, Hawaii 96850
                               (808)541-2062 ke@hid.uscourts.gov
11

12   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (Friday, May 18, 2012, 10:00 a.m.)

2                          --oOo--

3            COURTROOM MANAGER:  Civil Number 12-00184, Joseph

4    Kostick, et al., versus Scott T. Nago in his Official Capacity

5    as the Chief Election Officer of the State of Hawaii, et al.

6            This hearing has been called for Plaintiff's Motion

7    for a Preliminary Injunction.

8            Your appearances, please.

9            MR. THOMAS:  Good morning, Judge McKeown, Judge

10   Seabright, Judge Kobayashi.  Robert Thomas on behalf of the

11   plaintiffs who, may the record reflect, are present in the

12   courtroom today standing behind us.  With me at counsel table

13   is Anna Oshiro and Mark M. Murikami.

14           JUDGE KOBAYASHI:  Good morning.

15           MR. ABURANO:  Your Honor, Brian Aburano, John Molay,

16   Sarah Hirakami, and Attorney General David Louie representing

17   Scott Nago as the Chief Election Officer 2011 Reapportionment

18   Commission and its individual members, many of whom are in the

19   audience, Mr. Nago who is here at table.

20           JUDGE KOBAYASHI:  Good morning.

21           JUDGE McKEOWN:  Good morning.  You may be seated.

22           MR. ABURANO:  Thank you.

23           JUDGE McKEOWN:  We are here on a three judge court to

24   hear the preliminary injunction in the motion filed for

25   preliminary injunction by Kostick.

 1               So the procedure that I think we all agreed on and

 2     that you have had notice in advance is that we would begin with

 3     any live testimony.  And my understanding at this stage is,

 4     Mr. Thomas, that it's only the plaintiff's side that would be

 5     presenting any live cross-examination; is that correct?

 6               MR. THOMAS:  That's correct.  We asked Mr. Nago, who

 7     is the one witness for cross-examination.  We expect that to be

 8     under 20 minutes.

 9               JUDGE McKEOWN:  Fine.

10               MR. THOMAS:  Thank you.

11               JUDGE McKEOWN:  And following the testimony then we

12     will hear argument on the motion, obviously with plaintiff

13     going first, reserving some time, I presume, for rebuttal, and

14     then we will hear of course from the State.

15               There's one small housekeeping matter related to

16     exhibits.  We have in front of us two binders of exhibits that

17     have been helpfully cataloged and provided to us.  But in

18     reviewing those, it appears that there may be a small number of

19     exhibits that -- in our binders that haven't come previously

20     through the pleadings.

21               And so on those, I also assume, like everything else

22     to date, that there won't be any objection to the admission of

23     those exhibits but that we would ask counsel to confer with

24     each other and to make a supplemental filing of any -- I want

25     to call them orphan exhibits or additional exhibits to make

 1   sure that they are also part of the record.

 2              MR. THOMAS:  We will do that, Your Honor.  Thank you.

 3              JUDGE McKEOWN:  You may proceed.

 4              MR. THOMAS:  The plaintiff's call Mr. Nago, Scott

 5   Nago to the stand.

 6                           SCOTT T. NAGO,

 7   having been duly sworn, was examined and testified as follows:

 8              COURTROOM MANAGER:  State and spell your name for the

 9   record.

10              THE WITNESS:  Scott Nago, N-A-G-O.

11                         CROSS-EXAMINATION

12   BY MR. THOMAS:

13   Q.   Good morning, Mr. Nago.  You are the Chief Election

14   Officer for the State of Hawaii; is that correct?

15   A.   Correct.

16   Q.   And you testified in this case by declaration on paper;

17   isn't that correct?

18   A.   Correct.

19   Q.   And when you submitted your testimony, did you write the

20   declarations yourself?

21   A.   I helped in the writing, yes.

22   Q.   So, is the -- you didn't -- so you didn't write them

23   yourself completely?

24   A.   No.

25   Q.   Okay.  Thank you.  I want to discuss or ask you some

```
 1    questions about the election process, because I think that's

 2    going to be very important in this case and what has happened

 3    in order for the election to go forward with minimal

 4    disruption.

 5              And so the first thing I want to do is talk about or

 6    ask you some questions about the due dates leading up to the

 7    scheduled election.  So let's start with the primary -- or, I

 8    am sorry -- the general election.  Do you know what date that's

 9    scheduled for?

10    A.    That is November 6th.

11    Q.    And the primary is August 11th?

12    A.    Correct.

13    Q.    2012.  Okay.  Well, let's review what has to happen

14    between say now and then and how the reapportionment plan fits

15    into that process.  So first of all I'll talk about

16    precincting.

17              In order to go forward with the election, you need to

18    pick precinct officials; right, just generally speaking?

19    A.    Are you talking about if we have to redistrict -- or

20    reapportion?

21    Q.    No, let's start at the sort of broader level.  Just to

22    have staff people or have people at precinct places, you need

23    to have -- they are not all your staff; are they?

24    A.    I'm not following that question.

25    Q.    Precinct officials.
```

1    A.    They are not my staff.

2    Q.    They are not your staff.  And in fact that's already done

3    and completed for this year?

4    A.    No, it's not.

5    Q.    It's not?

6    A.    It's an ongoing process, recruitment.  We have to recruit

7    roughly 4,000 precinct officials statewide.  They get paid a

8    very minimal honorarium for 12 hours of work, so it is a

9    process that is ongoing to this day.

10   Q.    Okay.  But you started that process; is that correct?

11   A.    Correct.

12   Q.    And that doesn't have anything to do with districting or

13   it's not triggered by districting?

14   A.    No, it's not.

15   Q.    So you don't have to wait, for instance, until districting

16   is done to start that process?

17   A.    No.

18   Q.    So the process that you have already started, if the Court

19   orders a new plan or a different plan to be implemented, you

20   can still go forward with the people that you have in progress

21   already?

22   A.    Correct.

23   Q.    Okay.  You also need to pick polling places; isn't that

24   correct, to go forward with an election?

25   A.    Yes.

 1   Q.   Those were set a long time ago?

 2   A.   The facilities, yes.

 3   Q.   Okay.  So let's -- the first key date after districting is

 4   when the candidates -- I don't know if this is exactly the

 5   right term -- but pull papers, pull nomination papers; is that

 6   right, and start collecting signatures?

 7   A.   Correct.

 8   Q.   And they can't do that until districts are set; correct?

 9   A.   Yes.

10   Q.   And because they don't know really what district they run

11   in or where to get their 15 or 25 signatures; is that correct?

12   A.   Yes.

13   Q.   And Hawaii law, in most case -- or Hawaii law itself,

14   Hawaii Revised Statutes requires a four-month window to collect

15   those signatures?

16   A.   Well, it gives the start date and an end date.

17   Q.   Right.  And that's roughly four months; right?  So it's

18   the first -- the first business day in February; is that

19   correct?

20   A.   Correct.

21   Q.   That the window opens, and then it closes on what date?

22   A.   June 5th.

23   Q.   Okay.  And that's by statute; correct?

24   A.   Yes.

25   Q.   Okay.  But the 2012 plan, that wasn't filed until after

1  the opening of that window; is that correct?

2  A.   Correct.

3  Q.   And that was -- it was filed or submitted to your office

4  on March 8th; is that right?

5  A.   Yes.

6  Q.   And was it also filed by you that same day?

7  A.   What do you mean by filed?

8  Q.   Well, you tell me.  The statute says that you have to file

9  the reapportionment plan once it's given to you.  Did you file

10  it?

11  A.   We have to publish the reapportionment plan, and I believe

12  we have 10 days to do that.

13  Q.   Okay.  And did you do that?

14  A.   Yes.

15  Q.   Okay.  Do you have any understanding what the term "filed"

16  means under Hawaii law?

17  A.   Not what you are --

18  Q.   When that was filed, did you begin the -- did you tell --

19  or how did you inform candidates that the -- the date to pull

20  windows or -- I am sorry -- the window to pull their papers was

21  open?

22  A.   We did it via a press release.

23  Q.   Okay.  At that point, the window was already technically

24  five weeks late; is that correct, under state law?

25  A.   Approximately.

1    Q.   Right.  Approximately, right?  Because it -- the window

2    technically under the statute started on February 1st and this

3    was already March 8th; correct?

4    A.   Correct.

5    Q.   Well, what day did you publish that notification?

6    A.   I believe the -- are you talking about the press release?

7    Q.   Yeah, when you informed people who were interested in

8    pulling papers when they can come down and pull the papers.

9    A.   It went out on March 8th right after the plan was filed

10   with our office, and they could start pulling papers on

11   March 9th.

12   Q.   Right.  So you did that the day, essentially, that you got

13   the reapportionment plan --

14   A.   Correct.

15   Q.   -- from the Commission; is that correct?

16   A.   Yes.

17   Q.   Even so -- but so you are going forward under what, I

18   think you characterize, as a compressed time window.  Even

19   understanding that the window technically had already been

20   opened, there was nothing that you could do, for instance, to

21   the fact that the Reapportionment Commission delivered you the

22   plan on March 8th; right?

23   A.   We can't change the deadline, no.

24   Q.   Right.  So did you operate under a compressed timeframe

25   given the deadline when the window closed in June?

1    A.    We operate -- yes.

2    Q.    Okay.  Thank you.  For the state offices a candidate or

3    a -- someone who wants to pull nomination papers and submits

4    them to you needs to submit 15 signatures; is that correct?

5    A.    15 signatures of valid voters.

6    Q.    I am sorry.  I didn't hear that second part.

7    A.    15 signatures of voters who are eligible to vote for that

8    candidate.

9    Q.    Right.  But it's a 15 signatures -- it's 15 signatures;

10   correct?

11   A.    Yes.

12   Q.    And is there anything that prevents a candidate or someone

13   who is interested in running from pulling papers and then -- in

14   different districts, and then deciding which of those to --

15   gathering signatures, for instance, and which of those to

16   submit on the -- on the day?

17   A.    No, you can pull nomination papers for more than one

18   district.  You can just only file for one district.

19   Q.    Okay.  Moving on a little bit, the closing of that

20   nomination process or the nomination period, which was June 5;

21   correct?

22   A.    Correct.

23   Q.    And did that set up -- did that give you a measure or does

24   that give you a measure for the proclamation date?

25   A.    I believe it's 10 days prior to the close of the filing.

1  Q.   Okay.  And can you explain to the Court what is the

2  proclamation and what that -- what that requires you to do?

3  A.   The proclamation is something that needs to be published

4  that says the date and time of the election and the polling

5  place locations.

6  Q.   Where does that proclamation go?  Is it something you put

7  on the web?  Is it -- where, how -- I mean, I imagine, you

8  know, when you think of proclamation, we think of the town

9  crier.  But for our benefit what -- in today's world, what does

10  a proclamation -- where do you proclaim this?

11  A.   We publish that in the daily newspapers.

12  Q.   All right.  Thank you.  State law, there's also a time for

13  someone to pro -- someone, a registered voter to protest a

14  candidate's qualification; correct?

15  A.   Correct.

16  Q.   And that is what?  Do you know offhand what time that is?

17  A.   Not off the top of my head, but there is -- there is a

18  deadline for them, too.

19  Q.   All right.  If I told you it was roughly a week, would

20  that sound about right?

21  A.   Yeah.

22  Q.   Okay.  So, once that passes -- so, in other words, once

23  the whatever time that is passes for people to challenge the

24  qualification of candidates, is that when you can start the

25  process of producing ballots?

1    A.    We start the process -- yes.

2    Q.    Okay.  What date right now do you have to mail the

3    absentee ballots?

4    A.    45 days prior to the primary election which is August 11.

5    I don't have the date and time.

6    Q.    So that would make it June 27th, would that, roughly?

7    A.    Correct.

8    Q.    Okay.  And that's the date provided to you by federal law;

9    is that correct?

10   A.    Correct.  Federal law requires it.

11   Q.    Right.  That's what we shorthand call the Move Act?

12   A.    Correct.

13   Q.    Or the Uniformed Overseas Citizens Absentee Voting Act; is

14   that correct?  And are you aware that that law allows a state

15   that can't meet the deadlines or finds it very hard to meet

16   those deadlines can ask for a time waiver from the federal

17   government?

18   A.    Yes.

19   Q.    And are you aware that there's been -- in the case of a

20   legal contest, that the Department of Justice must give a

21   waiver?  Is that --

22   A.    I don't know if they must, but I know that you can ask for

23   one.

24   Q.    Right.  And in fact in 2010, the State and the Department

25   of Justice entered into a memorandum of understanding that

```
 1   allowed the State to not quite adhere to those deadlines; isn't
 2   that -- is that correct?
 3   A.   Correct.
 4   Q.   Okay.  Let's sort of move back a little bit to another
 5   area.  I think that we've heard the term, but I think for the
 6   Court's benefit, it would help for them to hear it from you.
 7   What is precincting?
 8   A.   Precincting is the process of establishing precinct
 9   districts.  Those are the voters that vote in that particular
10   precinct.
11   Q.   Right.  So is that -- that's different than apportionment;
12   isn't that correct?
13   A.   Correct.
14   Q.   And that's different than districting?
15   A.   Correct.
16   Q.   And this is done by your office and not the
17   Reapportionment Commission; is that correct?
18   A.   Correct.
19   Q.   I am going to try to characterize it in the way I
20   understand it, and I'd like you to, if it's not correct,
21   correct me, if you would, please.
22           But as I understand it, you take the various maps or
23   the various apportionment plans, both from all the way from the
24   congressional races, the State, both state houses as well as
25   county races, and you take those, and you essentially overlay
```

 1   each map on top of itself; is that fair to say?

 2   A.   That's part of the process, yes.

 3   Q.   Yes.  And the goal is so that a person who lives in a

 4   particular location gets one ballot for all the races and goes

 5   to one place to vote; is that correct?

 6   A.   I don't -- that doesn't sound right.  The goal -- the goal

 7   is to create a precinct with one ballot type in it, but not for

 8   a particular person to have one ballot.

 9   Q.   Okay.  So let's step back a bit.  So the goal is so you

10   don't have to go -- would it be fair to say the goal is so that

11   one voter doesn't have to go to more than one place to vote?

12   A.   No.

13   Q.   No?

14   A.   That's not fair.

15   Q.   Would it be fair to say that the goal of precincting is to

16   have a place where someone can go and pick up all the ballots

17   that they need to vote for that day?

18   A.   No.  I would say the goal would be so that all the voters

19   in that precinct vote on the same ballot type.

20   Q.   Okay.  And you do this -- thank you.  You do this -- this

21   comes after districting; correct?

22   A.   Correct.

23   Q.   So for instance the Reapportionment Commission -- I am

24   sorry.  I talked over you.  The Reapportionment Commission

25   gives you the plan that has the districts for a particular

1    plan; correct?

2    A.   Correct.

3    Q.   And at that point you start the precincting process;

4    correct?

5    A.   Yes.

6    Q.   What's the acronym GIS or is it GIS or do you say GIS?

7    A.   GIS.

8    Q.   And what does that stand for?

9    A.   Geographical Information System, I believe.

10   Q.   And is that a -- that's a computer program essentially;

11   right, or software?

12   A.   I don't know what the term -- I mean it is -- my

13   understanding is it is software.

14   Q.   And it helps you produce the precincts; is that correct?

15   A.   Yes.  It's a tool.

16   Q.   I am sorry?

17   A.   It's a tool to help us with precincting.

18   Q.   And is it fair to say that what the program does is -- I

19   don't -- I am not exactly sure how you go about doing it or --

20   I am sorry.  Let's step back.

21        Is it accomplished by your office and your personnel

22   or is it done through a vendor?

23   A.   It's done through both.

24   Q.   Part --

25   A.   Part our office, part vendor.

1    Q.   And again, forgive me if this is a sort of

2    overgeneralization, but you input the data you have with

3    respect to where the maps are or where the districts are with

4    the various apportionment plans.  So federal, county, state,

5    and then you input that into the computer, and it produces

6    precinct maps?

7    A.   No, it produces maps with the various lines on it, and

8    from there we go and we precinct.

9    Q.   So you make the final call with respect to precincting?

10   A.   Correct.

11   Q.   But it actually -- it gives you essentially, would it be

12   fair to say, a draft of what you should start with or

13   something --

14   A.   It's a --

15   Q.   -- a plan to start with?

16   A.   It's a tool to help us with the precincting process.

17   Q.   And so it outputs, what, a map with boundaries?

18   A.   It out -- well, from there it goes to the vendor who has

19   to produce the maps, and we get all kind of data from that

20   precinct such as how many registered voters are in that

21   precinct, and it also produces the metes and bounds.

22   Q.   Right.  And you check those against, what, your own maps?

23   A.   Yes.

24   Q.   Okay.  And then for the 2012 election, in other words,

25   right now your office has five people assigned to it?

 1   A.   I believe so.

 2   Q.   Yeah, and that's not including you and some other

 3   technical staff; isn't that correct?

 4   A.   No, it doesn't include me or the vendor.

 5   Q.   Okay.  So would you say it -- five people are assigned to

 6   the precincting process?

 7   A.   Five people were assigned to the precincting process, yes.

 8   Q.   Okay.  In the 2012 Plan, you are done with precincting for

 9   this year; right?  Under -- or I should say you are done with

10   precincting for the 2012 Supplemental Plan; is that correct?

11   A.   Correct.  We still have to produce maps though that we are

12   waiting for from the vendor.

13   Q.   Okay.  And did that -- you started that process after you

14   received -- of course you couldn't start the process until you

15   received the 2012 Plan in March 8th, I believe; is that

16   correct?

17   A.   We could not start until we received the final district,

18   right.

19   Q.   And in fact you started about a week later as I understand

20   it?

21   A.   Correct.

22   Q.   And you completed the process roughly around April 5; is

23   that accurate?

24   A.   Correct.

25   Q.   Okay.

1    A.   But we have not yet produced maps.  We are waiting for the

2    vendor to produce the maps, the metes and bounds, and all the

3    statistical reports.

4    Q.   So this lawsuit was filed April 6, 2012; correct?

5    A.   I am not exactly sure about that.

6    Q.   It was.  Since then though you have only been implementing

7    the 2012 Plan; is that correct?

8    A.   Correct.

9    Q.   Right.  And you didn't, for instance, input -- go back and

10   input the September 2011th Plan into the GIS system?

11   A.   No.

12   Q.   All right.  And when you testified in your deposition a

13   month ago, you hadn't then made any plans to, in the event the

14   Court today orders you to not continue to implement the 2012

15   Plan but to go to some other plan, has that changed since the

16   time your deposition was taken?

17   A.   No, we have not come up with any contingency plans.

18   Q.   So from the date the complaint was filed till today,

19   essentially, or today, you have not made any other plans as

20   contingencies in case the Court orders some other plan but 2012

21   to be used?

22   A.   Correct.

23   Q.   Okay.  Now reapportionment plans are -- when they are

24   produced are subject to challenge in state courts; aren't they?

25   A.   I believe so.

1    Q.    Right.  And in fact an earlier version, the August or

2    September 2011 plan was in fact challenged in state court;

3    correct?

4    A.    Correct.

5    Q.    And struck down?  Do you make any contingencies when a

6    plan is filed that it might be challenged in state or federal

7    courts, or do you just go forward with precincting and other

8    things without regard to whether the Court might or might not

9    uphold or strike down the plan?

10   A.    Do we make contingency as to if the Court is going to

11   strike down the plan?

12   Q.    Yes.

13   A.    No, we just continue with the election process.

14   Q.    Okay.  So you understand as of the process that we are in

15   right now, that the Court may order you to use a different plan

16   than the 2012 Plan; is that correct?

17   A.    Yes.

18   Q.    And you understand that the Court may do so on an

19   expedited or relatively short timeframe; isn't that correct?

20   A.    Correct.

21   Q.    Okay.  And you have already asked -- I think the vendor

22   is -- I am not sure what the initials stand for, but it's ESRI?

23   A.    That is correct.

24   Q.    Right.  Is it ESRI?

25   A.    Yeah, and I, too, am not sure what those --

1    Q.   But you have asked them to give you some proposals in the

2    event the Court today does do something; haven't you?

3    A.   Yes.

4    Q.   And they submitted a bid or a proposal to -- in the event

5    the Court orders you to do something else but implement the

6    2012 Plan; right?

7    A.   They submitted us a quote, yes.

8    Q.   A quote.  And in that -- so you got that quote and with

9    that you went to the legislature recently; correct?

10   A.   We wrote a letter to legislature, yes.

11   Q.   And you asked them -- you asked the legislature for money?

12   A.   Correct.

13   Q.   In the event that the Court -- this Court orders some

14   other plan but 2012?

15   A.   In the event that, yes, the plan needs to be redone and

16   there needs --

17   Q.   Right.

18   A.   And the commission needs to meet to redraw maps or

19   redraw -- come up with a new plan.

20   Q.   Sure.  The legislature approved your request; correct?

21   A.   Yes.

22            MR. THOMAS:  Okay.  No further questions, Your Honor.

23            JUDGE McKEOWN:  Did you have anything in the nature

24   of redirect examination?

25            MR. MOLAY:  Yes, I do, Your Honor.

1              JUDGE McKEOWN:  All right.

2              MR. MOLAY:  Thank you, Your Honor.

3                        REDIRECT-EXAMINATION

4    BY MR. MOLAY:

5    Q.   Mr. Nago, let's start off with talking about the last

6    thing that you were asked about, the money that you asked for

7    from the State Legislature.  What was the purpose of that money

8    or what's that money to be used for?

9    A.   That money was to be used by the Commission so that they

10   could utilize the services of ESRI, so that they could, in the

11   event the Court strikes down the plan, come up with a new plan.

12   Q.   That money wasn't for the Office of Elections?

13   A.   No, I believe it's proviso-ed, and it can only be used for

14   reapportionment.

15   Q.   Okay.  And so if you had to implement or have a new plan

16   implemented, would the Office of Elections need additional

17   funds?

18   A.   If we had to do a new plan?  It just depends on the nature

19   of the plan.

20   Q.   Okay.  You were also asked about implementing other plans.

21   Would it be possible to implement more than one plan at one

22   time?

23   A.   I -- I don't see how you can implement more than one plan,

24   because you would have candidates who need to know what the

25   district they are running in is.  And if there's two plans out

 1   there, I just don't see how that's possible.

 2   Q.   And in fact if you had to guess as to what plan to

 3   implement, you might be guessing wrong, and all your work would

 4   be wasted?

 5   A.   Correct.

 6   Q.   Okay.  We talked about new election dates or the

 7   possibility of a new election dates.  Would you need to obtain

 8   new election precinct officials?

 9   A.   If the dates were to change, yes, we would need to recruit

10   4,000 precinct officials, because not all of them may be

11   available on the new dates.  Yes, we would need.

12   Q.   All right.

13   A.   We also would need to find polling places, because our

14   polling places are all -- all reserved for August 11th and

15   November 6th.  So the facilities may or may not be available.

16   It just depends.

17   Q.   Okay.  And the last thing is regarding the filing of the

18   plan, what's your understanding as to what you and the office

19   of elections is to do once you get the plan from the

20   Reapportionment Commission?

21   A.   Our job is to publish the plan.  So we receive the plan

22   that the Commission filed, and we publish it.

23   Q.   Okay.  So the filing then would be what -- what the

24   Commission gives you?

25   A.   Correct.

1   Q.   Okay.  And then you did everything you were supposed to do

2   once you got the plan?

3   A.   Yes.

4              MR. MOLAY:  Okay.  Thank you, I have no further

5   questions.

6              JUDGE McKEOWN:  The panel have any questions?

7              JUDGE KOBAYASHI:  No, thank you.

8              JUDGE SEABRIGHT:  No.

9              JUDGE McKEOWN:  You may step down.  Thank you.

10             Did you have anything further?

11             MR. THOMAS:  No, Your Honor.  Thank you.

12             JUDGE McKEOWN:  Thank you, Mr. Nago.

13             So we'd like to ask Mr. Nago to stay in the event

14   questions come up as to specific issues during the hearing,

15   because --

16             MR. MOLAY:  We had arranged --

17             JUDGE McKEOWN:  -- he obviously is the individual

18   most attuned to the nuances of the implementation of any plan.

19             MR. MOLAY:  Yes.  The Court had expressed that, and

20   we arranged for Mr. Nago to stay here as long as the Court

21   needs to.

22             JUDGE McKEOWN:  Thank you.

23             You may proceed with argument.

24             MR. THOMAS:  Thank you very much, Your Honor.

25             Your Honor, we have one demonstrative or visual aid,

1    and with your indulgence I will hand -- these are paper copies

2    of what this is, and we are not going to refer to it expressly,

3    but it does give the Court some of the key numbers, I think,

4    that we will be continuing to talk about over the next course

5    of the -- over the course of argument.

6           But may it please the Court.  The men and women who

7    defend our nation are entitled to be represented in Hawaii's

8    legislature, but they are not.  And for all the nuances, the

9    command of the Equal Protection Clause to the states is

10   actually quite simple.  It tells them to apportion your state

11   legislatures so that the population of each district is roughly

12   equal to other districts across the state.

13          Hawaii, however, holds itself to different standards.

14   For more than 50 years we found a way to count everyone but the

15   men and women serving in the armed forces who live here and

16   their families.

17          So we count aliens.  We count minors.  We count

18   prisoners.  But Hawaii singles out the military people, because

19   it assumes they are transients even though the census counts

20   them as usual residents.  Which means, according to the U.S.

21   Supreme Court, that they have an element or allegiance or

22   enduring tie here, which is absolutely correct.  Meaning that

23   they are here.  They are not simply passing through on the way

24   someplace else.  Because, of course, the census excludes such

25   people, tourists in Waikiki, people passing through on their

1    way somewhere else, a military in transit to a duty station

2    elsewhere, or in the case as we see in many of reported cases,

3    to war zones in Vietnam and the Pacific.

4            Hawaii, however, says that the people excluded can

5    buy into the system by registering to vote or by changing their

6    tax forms.  But Hawaii demands this of nobody else.  We

7    automatically count people who don't pay taxes, we

8    automatically count people who don't register to vote, and we

9    automatically count people who don't vote at all.

10           But service members are essential and integrated

11   members of our community.  And as *Burns* explained in detail and

12   as *Travis*, the case from this Court, the three judge case --

13   three judge panel from this Court the last time Hawaii's

14   reapportionment procedures were challenged in federal court,

15   applied *Burns* to the un-- and if you apply those two cases to

16   the undisputed facts of this case, it shows that not -- we are

17   very likely to succeed on the merits when we assert that

18   Hawaii's use of the permanent resident standard and its efforts

19   to extract military families, military people and students from

20   their communities, and also when we assert that the 2012

21   Reapportionment Plan, as a separate matter, doesn't even come

22   close to statewide population equivalency, we are likely to

23   succeed on the merits because both of those deny equal

24   representation in the legislature to everyone under the Equal

25   Protection Clause.

1           So *Burns*, first of all, is the most important case.

2     And it tells us -- it gives us the framework by which this

3     Court will analyze the reapportionment plans to test whether it

4     will succeed on the merits.  It sets out a three-part test to

5     measure the constitutionality of an alternative population

6     basis, and the 2012 Plan fails each of them.

7           So with your indulgence, I'd like to walk the Court

8     through what those tests are in *Burns* and how the 2012 Plan on

9     any basis, any one of the three will fail.

10          By way of background, it's a little ironic that the

11    State's briefs rely on *Burns*, the very case that damages its

12    case so badly, because it cherry picks out particular language

13    in there that seems favorable.

14          But a careful reading of *Burns*, as we will walk the

15    Court through, will leave the reader with an understanding of

16    what that Court actually requires; puts the burden on the State

17    to do.

18          So there's three parts to this test.  It's what I

19    call the identity provision; second, the substantial similarity

20    provision; and then finally the close constitutional scrutiny

21    requirement.

22          And in *Burns*, the Court held, of course, that states

23    may use an alternative population basis.  And in *Burns* and

24    *Travis*, this was the time when Hawaii used registered voters as

25    its population basis.  In this present case, of course, it's

1    permanent resident.

2              And there -- and the Court held in *Burns* that there's

3    no obligation on the part of a state to always use the census

4    population.  And of course they may, and in fact most states,

5    Hawaii being essentially the sole outlier in that regard, they

6    do.

7              So 48 other states use the census population

8    expressly as their population basis.  One state uses the

9    population minus military, but since they have no data, they

10   extract virtually no one, and it has no effect on their

11   reapportionment plan.  So we imagine nobody has standing to

12   challenge that, even though it's probably technically illegal.

13             But literally Hawaii is the only state that extracts

14   anybody from its population, and in the last 50 years it's

15   always been military folks.

16             So the Court said that you don't have to use -- you

17   may use census population, but you don't have to.  But -- and

18   here is the critical part.  But if a state chooses something

19   else but what is called a -- what the Court uses, a very

20   technical term, a permissible population basis, essentially a

21   basis that's already constitutional, the State has an

22   obligation.  The State has an obligation to adhere to a certain

23   process to ensure the Court, a court reviewing that -- that

24   challenge or reviewing that plan, that that is constitutional.

25   And it must --

1          JUDGE McKEOWN:  Let me --

2          MR. THOMAS:  -- adhere to a process that ensures --

3    yes, Your Honor.

4          JUDGE McKEOWN:  Let me interject here just to have a

5    clarification from you.  Because we are talking in *Burns*, of

6    course, of registered voters, and we are talking of a

7    circumstance that addressed Hawaii's plan.

8          But in *Burns* -- and then you go on and continue to

9    talk about other permissible population basis.  But *Burns* makes

10   the following statement, and I would appreciate your

11   elaboration on how it fits in in your view.

12         It says -- in speaking to the voter registration as a

13   base, it says, "It is enough if it appears that the

14   distribution of registered voters approximates distribution of

15   state citizens or another permissible population base."

16         So my question is hasn't the Supreme Court implicitly

17   endorsed a state citizen basis for -- as a permissible

18   population base?

19         MR. THOMAS:  The short answer to that question is

20   yes, it has, but it also puts the burden on the State to make

21   that choice and to expressly tell us in the reapportionment

22   plan or in the legislative history -- in our case, it's

23   constitutional history of 1992 -- when you adopt an alternative

24   population base, tell us what you are measuring it against.

25         And that's the first part of the *Burns* standard.  It

1    says you can't just pick something out of air.  We choose --

2    you can choose population.  You don't have to.  But if you are

3    going to choose something else, if you are going to choose

4    registered voters, you, state, has an obligation to tell us

5    what you are measuring that against.

6            Because we can't just trust that a plan that looks at

7    registered voters is going to give us the two things that the

8    Equal Protection Clause says we have to look at, either

9    representation equality or voting equality.

10           In fact in *Burns*, the Court quite clearly had some

11   reservations about registered voters simply because it was one

12   of those methods measurements that could be manipulated.  If

13   you could keep people from registering to vote, you could

14   manipulate districts through the population.

15           JUDGE McKEOWN:  Do you equate citizenship and

16   permanent residency for purposes of how they are used in the

17   Supreme Court cases and also used in your briefs?

18           MR. THOMAS:  The Court has -- the answer to that,

19   Your Honor, is the Court has never settled that question.  And

20   it's -- the smoke trails are there that if a state decided to

21   use citizenship as its metric, that it's likely to pass

22   constitutional review, but it still has to go through the *Burns*

23   process, which is the process that we are talking about here.

24           The first step being the State has an obligation,

25   when it uses something other than population, to identify what

1    that's measured against.  So for instance in *Burns*, which was a

2    registered voter case or registered voter population base, the

3    Court specifically pointed out the State of Hawaii, in its 1950

4    consti -- well, it's the convention in anticipation of Hawaii

5    statehood to -- to create the first Hawaii constitution.  The

6    delegates expressly said, and this is set out in *Burns*, that

7    they are going to choose registered voters, but they believed

8    that it would be the equivalent -- it would result in the same

9    plan as if we measured citizens or total population, either/or.

10       And in *Travis* it was again -- the population basis in

11   that case was registered voters.  And the Reapportionment

12   Commission there, in their report, said that we think a count

13   of registered voters will give us the equivalent plan of one

14   based on eligible voters.

15       Again, if you look at both citizen, total population

16   and eligible voters, those are all principles which the Equal

17   Protection Clause supports; right, either voter equality or

18   representational equality by counting all people.

19       And this is the 2012 Plan's glaring first fatal

20   defect is it doesn't identify what the permissible population

21   base is to which permanent resident is -- should be compared

22   to.  So we don't know what to measure the 2012 plan's choice of

23   permanent resident against to see if it's constitutional.

24       So, you look at the 2012 Plan to figure out, well,

25   did they do what they did in *Burns* and say, "Well, we think

 1    this is a measurement to give us equivalency of some other

 2    plan, citizen, total or eligible voters."  There is nothing

 3    there in the 2012 Plan at all.

 4           JUDGE SEABRIGHT:  Well, an argument can certainly be

 5    made, and one the State, I think, makes, that you are skipping

 6    a very preliminary step, which is what is a permissible base?

 7    What is that permissible base?

 8           And in *Burns* the Court says that we've never said

 9    that a state is required to include aliens, transients,

10    short-term or temporary residents, et cetera, et cetera.  And

11    the decision to include or exclude those groups is of no

12    constitutional magnitude to us the Court says.

13           MR. THOMAS:  Yes, Judge Seabright.

14           JUDGE SEABRIGHT:  Now you say in your brief, in your

15    brief you say several times that that's true as long as this

16    approximates the permissible population base.

17           MR. THOMAS:  That's correct.

18           JUDGE SEABRIGHT:  But I see nothing in *Burns* that

19    links those two together.  I see *Burns*, at least it appears

20    this way, to make a stand-alone statement.  Because if you see

21    how *Burns* developed, they first talk about *Reynolds*.

22           MR. THOMAS:  Yes.

23           JUDGE SEABRIGHT:  And just two years earlier what the

24    Supreme Court had said in creating this essentially new

25    doctrine of representation equality using the Equal Protection

 1   Clause, and they say but *Reynolds* doesn't talk about what that

 2   base is.  It doesn't get near talking about that.  And we have

 3   never said that a state is required to include all of these

 4   various individuals.

 5         But then they go on and say but there could be a

 6   problem, as you point out, with the voter rolls because that

 7   might be manipulated.

 8         MR. THOMAS:  Yes.

 9         JUDGE SEABRIGHT:  But in this case we have no

10   problem, because we have that approximation between the voter

11   rolls and a permissible base.

12         MR. THOMAS:  Well, actually --

13         JUDGE SEABRIGHT:  So what in *Burns* says, links up the

14   need, if you exclude the group that the Court said you can

15   exclude, to approximating a permissible population base?

16         MR. THOMAS:  If I understand the Court's question,

17   first of all I think it's a mistake for the State to have

18   essentially plucked out great language for them in *Burns*

19   without looking -- I mean, you need to start reading at about

20   Page 90 for the next four pages to figure out exactly what the

21   Court was saying.

22         And it doesn't -- and the Court, as you correctly

23   point out, Judge Seabright, has never -- to this day, it has

24   studiously avoided defining what does it mean by a permissible

25   population basis, something that they have been asked to do

 1  several times.  And, in fact, we have a split of circuits on

 2  that.  We have two circuits saying, "Well, we don't have to

 3  define it," and the Ninth Circuit in *Garza*, contrasting with

 4  that saying, "Well" --

 5          JUDGE McKEOWN:  We will come back to *Garza*, but let's

 6  stick with *Burns* for now, because that's the focus.

 7          MR. THOMAS:  Yes, Your Honor.  But to answer

 8  Judge Seabright's question, the Court has never told us

 9  expressly that here are five things, five -- five population

10  bases that are permissible population bases against what you

11  can measure everything else.

12          JUDGE SEABRIGHT:  But they seem to say you can

13  extract, exclude, not count certain groups, and they list some

14  groups.

15          MR. THOMAS:  Right, aliens, transients.

16          JUDGE SEABRIGHT:  Temporary residents.

17          MR. THOMAS:  Right, temporary residency.

18          JUDGE SEABRIGHT:  Which sounds like the reverse of

19  permanent resident; correct?

20          MR. THOMAS:  Right.

21          JUDGE SEABRIGHT:  But what you try to do in your

22  briefing, and this is a difficult concept, but what you try to

23  do is you try to tie that then to the ultimate holding in *Burns*

24  that the voter roll -- the use of voter rolls doesn't violate

25  equal protection, because that sort of approximates the

1    permissible population base.  They meld up somewhat.

2            MR. THOMAS:  Because, Your Honor, in that case, first

3    of all we knew to what to compare registered voters, because

4    the State told us or the State told the Court.  It said you

5    compare it either to total population, or you compare it to

6    citizen population, whatever that was.

7            And we think, as a legislative judgment, the State of

8    Hawaii said that we think that our plan of choosing registered

9    voters will approximate a plan of citizen or total votes.  And

10   the Court said, Well, okay.  If that's -- both of those could

11   be -- we know total population is certainly a permissible

12   population basis, because there's a zero margin of error on

13   that by definition.  Citizen, well, it very well could be.

14           And if you -- and some of the subsequent cases to

15   *Burns* certainly intimate or at least you can -- they approve

16   of, if not directly citizen population bases, would approve

17   of -- have approved of apportionment plans that rely on

18   citizens.  So I think we can presume --

19           JUDGE McKEOWN:  So if you can do a citizen plan, then

20   you go back to *Burns*, and it talks very specifically that with

21   reference to this state and military population.  Because they

22   don't just stick with, Okay.  You might want to exclude aliens

23   and convicted individuals.  It says, "Total population figures

24   may thus constitute a substantially distorted reflection of the

25   distribution of state citizenry."

1          And they make that statement immediately following

2     the discussion about large numbers of the military and not

3     necessarily following within -- being more transient and not

4     necessarily falling within the citizen base.

5          As I hear your argument, we would almost have to

6     ignore the Supreme Court's language there in order to strike

7     down a permanent resident citizen base.

8          MR. THOMAS:  Respectfully, Your Honor, I think

9     actually *Burns* supports our case.  And you would not need to --

10    you would cite *Burns* in your opinion -- in your -- in your

11    ruling, you would rely upon *Burns*, because it is the most

12    important case showing why we are entitled to relief.

13         JUDGE McKEOWN:  But let me just step back then.  As I

14    heard you earlier, I thought I understood you to say that a

15    permanent resident base could be a permissible base.

16         MR. THOMAS:  It very well could be.

17         JUDGE McKEOWN:  Okay.  And that permanent resident

18    base could also be substantially equivalent to a citizen base

19    as far as semantics.

20         MR. THOMAS:  There are factual -- I want to make

21    my -- my answer to Your Honor quite clear that we are not

22    suggesting at all in this case that it is.

23         What we are suggesting, in answer to Your Honor's

24    question, there are -- there might be circumstances in which

25    the State could prove that permanent resident would produce a

1    plan of an equivalent plan measuring state citizens, but it

2    hasn't -- one, it hasn't even made that first link what to --

3    they haven't picked one, like they did in *Travis*, like they did

4    in *Burns*.  They haven't picked anything.

5              And second, they haven't made the substantial --

6              JUDGE McKEOWN:  If you stop there, I understood the

7    foundation to be permanent residents.

8              MR. THOMAS:  Yes, although that's the second --

9    that's the second step in the process.  They can identify their

10   choice, their metric, the State's metric to measure some

11   constitutional basis.

12             Permanent resident standing alone isn't.  They have

13   to identify against some other basis against which they are

14   supposed to measure for substantial equivalency.

15             JUDGE SEABRIGHT:  Give me an example of what they

16   should have done, because I am drawing flat as to what you are

17   saying.

18             JUDGE McKEOWN:  What are they benchmarking it

19   against?

20             MR. THOMAS:  Well, that's exactly the question.  We

21   don't know.

22             JUDGE McKEOWN:  No, no.  What should they?

23             MR. THOMAS:  What should they have done?  They should

24   have done the same thing they probably did in *Burns*, the same

25   thing they tried to do in *Travis*, but the Court struck down.

1  The reapportionment plan in both of those cases said, "We are

2  going to choose registered voters as our population base, and

3  we are offering that it's constitutional, because we think it

4  approximates a citizen population base in *Burns*, a total

5  population base in *Burns*, and in *Travis*, an eligible population

6  base."

7           And the Court -- all three of those would likely

8  sustain -- sustain or be sustained against a challenge, because

9  both of those have their roots within Equal Protection's two

10 primary guarantees; the right of equal representation, which is

11 count people, versus -- and also the right of equal voting

12 power, the one-person-one-vote standard, both of which are --

13          JUDGE SEABRIGHT:  So you are saying they should have

14 come forward with an approximation as to total population for

15 instance and measured that against the extraction that actually

16 occurred.  That's what you are saying?

17          MR. THOMAS:  Yes.

18          JUDGE SEABRIGHT:  Okay.  So, it gets back to what I

19 said earlier then.  What the heck is a permissible population

20 base?

21          And if the extraction of temporary residents is

22 appropriate in the first instance to create a permissible

23 population base, then why is that comparison necessary?  That's

24 my point, and that's what -- I am reading *Burns* more in line

25 with that theory.  That you can create a permissible population

1   base by extracting out certain individuals.  But, ultimately,

2   when you have a permissible base, whatever you are using, that

3   permissible base must approximate.

4           MR. THOMAS:  We suggest the analysis is slightly

5   different, Your Honor.  And first of all, the term "permissible

6   population base", as the Court uses it in *Burns*, is quite a

7   term of art.  And by that they essentially mean a

8   constitutional population basis.

9           JUDGE SEABRIGHT:  Right.  And they said

10  constitutionally you can extract out all these various groups.

11  So I don't know why you can't do that first.  That's what I am

12  getting at.  And say, "So here is the permissible population

13  base," which is, as your chart shows, 1,251,000 people.

14          MR. THOMAS:  Correct.

15          JUDGE SEABRIGHT:  Then from there there may be, in a

16  particular type of case, an issue as far as approximation, but

17  we don't get that -- we don't get to that here.

18          MR. THOMAS:  I think, Your Honor, that the process --

19  the process envisioned by *Burns* is actually one step higher.

20          And in that case, we know, for instance, the

21  population -- total population, census population is a

22  permissible -- constitutionally permissible population base,

23  because it upholds the right or the equal protection guarantee

24  of representation equality.  So we know for a fact that that

25  is.

```
1              But when the State decides to use some other metric
2    to measure its reapportionment base, something else that has
3    already been approved as constitutional, it's got some
4    obligation to not only identify what metric it is using but
5    then to match that up against some constitutional metric.
6    So when the --
7              JUDGE McKEOWN:  But what -- that is abstract mumbo
8    jumbo.  I mean because we got a total population of 1.25, and
9    you are saying, but we have to have -- you can have a
10   permissible population, but you have to benchmark it against
11   something.
12             Well, the only -- we do know that you could have
13   voter registration.  The Supreme Court already said that.  But
14   we've moved -- or Hawaii has moved past that.  So what are you
15   benchmarking it against?
16             MR. THOMAS:  That's the issue.  It's not our burden.
17   It's the State's burden, and they haven't.  And that's exactly
18   what it is.
19             JUDGE McKEOWN:  No, but you haven't articulated, as a
20   practical matter -- I am not saying whether they would meet
21   your burden, but you haven't articulated in a way that I am
22   understanding.  And I am trying to understand your argument so
23   that I can filter the evidence through the argument.
24             But we know what the total population of Hawaii is.
25             MR. THOMAS:  Yes, 1.3 million.
```

1    JUDGE McKEOWN:  That's easy.  And we even know what

2    certain segments of it are.  So this plan takes the total

3    population, and then it takes out certain groups, which we can

4    kind of -- they may pose other problems, which we can look at,

5    but they take out certain groups.

6         So in doing that, what is the benchmark of the,

7    quote, "permissible population" that the State should be

8    bearing the burden with?

9         MR. THOMAS:  Total population.

10        JUDGE McKEOWN:  Well, but you would -- but that's

11   like being in a Mobius strip.  You are right back where you

12   started.  In other words, now you are backing off from what I

13   thought you said, and your argument would lead to the

14   conclusion that the only permissible population is total

15   population.  Is that your position?

16        MR. THOMAS:  No, that's not our position --

17        JUDGE McKEOWN:  Okay.

18        MR. THOMAS:  -- that the only - I mean, the Supreme

19   Court has told us in *Burns*.  It's not the only one.

20        JUDGE McKEOWN:  Okay.

21        MR. THOMAS:  It's a very good one, and if you want to

22   make it easy on yourself --

23        JUDGE McKEOWN:  So now they say you don't have to

24   have total population.  Everybody agrees on that.  We now have

25   this other way we are going to do it which is permanent

1    residents.  But you are saying under *Burns* there is some

2    further burden that they need to meet.  And I'm trying to --

3               MR. THOMAS:  Yes.

4               JUDGE McKEOWN:  -- understand the foundation of that

5    burden.

6               MR. THOMAS:  Yes.

7               JUDGE McKEOWN:  What are they going to benchmark

8    permanent residents against?

9               MR. THOMAS:  Remember, it's not the total numbers

10   that we are talking about.  It's the resulting plan.  So the

11   resulting plan -- I mean in a -- in sort of an abstract

12   hypothetical, the State could choose as its reapportionment

13   basis New York Yankees fans if it can show that the resulting

14   plan would equal the plan that resulted from some permissible

15   population basis.

16              So, if the State finds it administratively convenient

17   and easy to go out, and we know, for instance, that the

18   distribution of New York Yankees fans in Hawaii is

19   substantially similar to the total population, the Court -- the

20   Supreme Court would have no problem with using that metric.

21              JUDGE McKEOWN:  So what you are saying is if you look

22   at all the districts under the total population plan, and then

23   you look to see what it is under this 2012 Plan.

24              MR. THOMAS:  Correct.

25              JUDGE McKEOWN:  And then you see if they are

 1  substantially equivalent?

 2          MR. THOMAS:  That's correct, Your Honor.  And here

 3  they appear --

 4          JUDGE SEABRIGHT:  So a couple points.  You say you

 5  can use something other than total population.  So you could --

 6          MR. THOMAS:  Yes.

 7          JUDGE SEABRIGHT:  -- use the Yankees fans.

 8          MR. THOMAS:  Yes, anything that's not

 9  unconstitutional.

10          JUDGE SEABRIGHT:  As long as it's not facially

11  unconstitutional, obviously.

12          MR. THOMAS:  Civilians is no good.  Military.  I

13  mean, in days of yore, you could see only, you know, white

14  citizens or something like that.  The Court -- of course those

15  are just out.

16          JUDGE McKEOWN:  You could have white shirts, although

17  that might not be rational.

18          MR. THOMAS:  Yes.  I mean, but essentially it's a

19  separate test.  Because the Court says, "Okay.  Even if you

20  could prove, for instance, that a test or a measurement of

21  white citizens would approximate total population, you still

22  can't use white citizens" --

23          JUDGE McKEOWN:  Right.

24          MR. THOMAS:  -- "because that's on its own bad."

25          JUDGE SEABRIGHT:  Right.  That seems pretty clear.

1              MR. THOMAS:  Yes.

2              JUDGE SEABRIGHT:  And *Burns* lays that out, and it

3   says that.

4              MR. THOMAS:  Right.

5              JUDGE SEABRIGHT:  But if I understand what you are

6   saying -- I just want to make sure I understand this -- that

7   you can use a base other than total population.  But if you go

8   that route, whatever that other base is, as long as it's not

9   per se unconstitutional.

10             MR. THOMAS:  Yes.

11             JUDGE SEABRIGHT:  Put that aside.  Then you have to

12  justify.  And it would be the State's burden to show that there

13  is this approximation between that -- those Yankee fans or

14  whatever it is --

15             MR. THOMAS:  Yes.

16             JUDGE SEABRIGHT:  -- and the permissible population

17  base.

18             MR. THOMAS:  That's it.

19             JUDGE SEABRIGHT:  Which in this case is total

20  population.  So you're inserting into the *Burns* decision

21  "permissible".  You are plucking that word out and essentially

22  putting in "total".

23             In other words, the permissible population base, that

24  phrase that's used in *Burns*, to you means total population

25  base.

1              MR. THOMAS:  No, Your Honor, and let me explain.  Let

2    me --

3              JUDGE SEABRIGHT:  I can't get there though based on

4    what you said so far.

5              MR. THOMAS:  Not completely.  The first -- Your

6    Honor, the first part of your statement to me was absolutely

7    our position.  That is absolutely correct.

8              If the State uses some population measurement other

9    than something that is, quote, unquote, "permissible", then the

10   State has the obligation to show that the resulting plan is

11   going to be roughly the same as one that resulted from a

12   permissible population basis.

13             Now there is no question that population --

14             JUDGE McKEOWN:  Whoops, stop right there.  But now

15   you inserted the word "permissible" back in there.

16             MR. THOMAS:  Right.

17             JUDGE McKEOWN:  Which the Supreme Court already told

18   us you could take people out to get a permissible base.

19             JUDGE KOBAYASHI:  See, that's the problem I'm having,

20   is that you are equating permissible with total population, and

21   I think that's why we are losing you.

22             MR. THOMAS:  Respectfully, I am sorry.  Let me make

23   myself much more -- let me try to make myself a little more

24   clear.  That is actually not my position.

25             JUDGE KOBAYASHI:  Okay.

1          MR. THOMAS:  That total population is one of the

2    possible permissible population bases, and clearly 49 and 48

3    other states think that's the easy way to go.

4          The Court said there may be others.  And the Supreme

5    Court has not identified what they might be.  And in fact it

6    looks at things like, Okay.  Let's look at citizens.  Let's

7    look at eligible.  Those are potentially permissible population

8    bases.

9          And the way you determine what could be permissible

10   is you go back to the two principles that the Equal Protection

11   Clause guarantees, because the Court always says that we are

12   looking -- the Equal Protection Clause requires states to treat

13   people equally.

14         It requires to treat voters equally, so that gives

15   you the one-person-one-vote equality of voting power.  So you

16   can exclude aliens or people who don't vote or are not

17   qualified to vote.  It also protects representational equality,

18   and that protects all people.  You know, people who are here.

19         But it doesn't allow -- and you try to figure out

20   what resi -- permanent resident, and that takes us to the last

21   part of what I suggest *Burns* stands for, is that when you

22   choose something that's not obviously within one of those two,

23   and permanent resident really isn't, and when it's examined

24   under the close constitutional scrutiny we give to these type

25   of choices, these type of classifications, the State's

 1   rationale for saying essentially that permanent resident is the

 2   same -- will uphold the equal protection principle of equal

 3   representation, well, it pretty clearly doesn't.

 4          It doesn't meet even perhaps a rational basis

 5   standard, because look at the way that the State says that

 6   those people who are extracted can buy their way back into

 7   the -- to representation in the legislature.  Well, they can

 8   register to vote.

 9          Well, that's not the standard anymore.  Or they can

10   pay taxes.

11          JUDGE McKEOWN:  They don't have to register to vote;

12   right?

13          MR. THOMAS:  I am sorry, Your Honor?

14          JUDGE McKEOWN:  It's not required that they register

15   to vote.

16          MR. THOMAS:  Well, the State has taken --

17          JUDGE McKEOWN:  They need to be a permanent -- they

18   need to be a citizen of the state; correct?

19          MR. THOMAS:  No, not according to the State.

20   According to the State --

21          JUDGE McKEOWN:  We just got done -- because in the

22   cases and in the briefing, there is quite voluble exchange

23   where permanent resident and citizen of Hawaii are used in an

24   equivalent manner.  So maybe just to be clear we should use the

25   word "permanent resident" here?

 1               MR. THOMAS:  Yes, Your Honor, I think so.  I mean the

 2    State seems to mash them together without any basis for doing

 3    that.

 4               JUDGE McKEOWN:  Do you need to vote to be a permanent

 5    resident?

 6               MR. THOMAS:  Well, on one hand, the State says if --

 7    if you are anybody but military, their family, and a student

 8    who is not here for a year, yeah, you do.  That's the State's

 9    position.  You do.

10               JUDGE McKEOWN:  Well, you don't have to be a

11    registered voter if you -- you can decide that you declare

12    Hawaii to be your residence, and you pay taxes here, and you

13    have -- because that is an indicia of being a resident, a

14    permanent resident; correct?  You don't have to be a voter.

15               MR. THOMAS:  No, you don't have to be a voter to be a

16    citizen.

17               JUDGE SEABRIGHT:  You sort of -- your last discussion

18    sort of starts to segue into *Garza* --

19               MR. THOMAS:  Yes.

20               JUDGE SEABRIGHT:  -- it seems to me.  And I think

21    given the time that's run on, I think it would be helpful if we

22    turn to *Garza* and have a discussion about it and what it really

23    says and doesn't say.

24               MR. THOMAS:  Sure.

25               JUDGE SEABRIGHT:  And how we should look at the

1   Fourth and Fifth Circuit's decisions in *Daly* and *Chen* in

2   relation to *Garza*.

3           MR. THOMAS:  Certainly, Your Honor.  *Garza* stands

4   ultimately -- I mean, it's circuit law.  It's the principle

5   that equality of representation is on an equal plane as

6   equality of voting.  And that when a state is formulating its

7   reapportionment plan, it must consider both.

8           And at least the majority opinion in *Garza*, the two

9   judge majority believed that if there was a direct conflict

10  between the two -- for instance, you could not reconcile the

11  population base, I believe, that the District Court imposed,

12  which was total population, with the County's suggestion that

13  it was registered voters.  When the two principles of the Equal

14  Protection Clause ran irreconcilably into each other, at least

15  the majority in that case suggested that the principal -- the

16  primary concern of the Equal Protection Clause is equal

17  representation.

18          JUDGE SEABRIGHT:  Well, I mean you say that, but

19  Judge Schroeder said "coequal".  And so when she uses that term

20  "coequal", I assume she means coequal.

21          MR. THOMAS:  Yes.

22          JUDGE SEABRIGHT:  And at the very end of that

23  discussion, when she says, "Judge Kozinski's view, if applied,

24  would be unconstitutional," smells like dicta to me.  So if

25  that's not binding, then all *Garza* really says is that we are

```
1    looking at a judge-imposed plan, not a political entity, but a

2    judge-imposed plan, which a court is going to review,

3    obviously, with less discretion -- giving less discretion to,

4    and saying that what they came up with -- the judge came up

5    with was okay.  Using total population is permissible.

6            The Fourth and Fifth Circuit cases, it seems to me,

7    have a more meaningful discussion then that followed that, that

8    says so what do we do when we have these irreconcilable

9    differences?  Not when a judge has come up with a plan, which

10   makes it much more difficult, because courts aren't going to

11   give leeway to a judge plan at all.

12           But when it's the political entity that comes up with

13   a plan, those cases say, "That's their decision.  That's not

14   our decision.  We as judges shouldn't be inserting ourselves

15   into that process where you do have this tension between voting

16   equality and representational equality."  So why is that wrong?

17           MR. THOMAS:  I don't think it is, Your Honor.  And I

18   think the lesson or the -- the narrow application of *Garza* to

19   this case is that a reapportionment plan must take into account

20   representational equality.  And if it doesn't, there's got to

21   be something on the other side looking at voting equality.

22           JUDGE McKEOWN:  But they were looking there -- first

23   they found this intentional discrimination, which was -- kicked

24   off the whole thing.  And then they are looking at a state law

25   in California that required a total population.
```

1          So they are really looking -- they are being driven,

2     it seems to me, in *Garza* -- the Ninth Circuit is driven in part

3     by the state law, but it's then benchmarking it against a voter

4     population, not as we have here, a permanent resident

5     population.

6          So it's pretty hard to draw -- I am having trouble

7     drawing some parallels, and maybe you can help me on that.

8          MR. THOMAS:  Certainly.  Thank you for the

9     opportunity, Your Honor.

10          Again, I think *Garza* stands for the principle that in

11    formulating a reapportionment plan, the resulting plan must

12    take into account representational equality.  You can't simply

13    ignore it.

14          I don't think, Your Honor, that we are in the same,

15    of course, factual pattern as *Garza*.  So we are not driven by

16    the Court's narrow holding however we might view it in that

17    case.  But that it really does say that representational

18    equality must be considered.

19          Now, there might be a difference between other

20    circuits or Judge Kozinski who said, Well, if it runs head long

21    into voting equality, well, there's probably still some debate

22    over which one -- is any one more equal than the other.

23          And I don't think you need to make that decision or

24    take a -- go down that path in order to reach the decision here

25    that this doesn't, because we know that 108,000 people were not

1    given any representational equality whatsoever.  And in fact

2    the people who in the -- who weren't extracted end up in

3    districts of grossly unequal actual population size.

4              JUDGE SEABRIGHT:  But if you include them, you have

5    other problems; right, on the voting equality.  Assuming the

6    State's position that most of these people who pay taxes

7    elsewhere and claim residence elsewhere don't vote here, which

8    seems pretty rational to me as far as an assumption to make,

9    then you are skewing those districts where there are a lot of

10   service members in voting equality.

11             So, you are never going to get the right balance.

12   You can't.  And so why isn't it just up to the State to make

13   that call?  Why should we be involved in that process?

14             MR. THOMAS:  Well, Your Honor, because the Court said

15   when -- or when you are impacting fundamental rights, and --

16             JUDGE SEABRIGHT:  But you are going to impact a

17   fundamental right.  That's the problem.  No matter what, you

18   are going to impact a fundamental right.  You just can't help

19   it.  Sometimes life isn't perfect, and this sure ain't perfect.

20   So you are going to impact a fundamental right.  And why

21   shouldn't the State be able to say who gets impacted?  Why

22   should it be us?

23             MR. THOMAS:  Because the Equal Protection Clause, the

24   State has to follow the mandates of the constitution.  And as

25   unique as we are here in Hawaii, we do have to follow the

1  constitution here.  And the constitution says that you have to

2  take into account both voter equality and representational

3  equality.

4           JUDGE SEABRIGHT:  But you make it sound as if you can

5  split the baby and everyone will be happy in the end.  You

6  can't do that.  It's impossible.

7           MR. THOMAS:  Yes, and the question is do we leave

8  those -- is that a completely political choice?

9           JUDGE SEABRIGHT:  Why not?

10          JUDGE McKEOWN:  That's the question.  It's a question

11  of, you know, you are saying, Well, the service members, one of

12  the difficulties is they don't vote here.  And that's not

13  required for them to be excluded.  It needs to be determined

14  are they a resident or not a resident.

15          But nothing precludes a service member from voting

16  here if that person follows the same rules as anyone else,

17  which is intent.

18          You know, if I come over here as a tourist and fall

19  in love, which is easy to do, I could become a resident.  I

20  could vote here if I decided to declare this -- under this

21  little certificate of legal residence, then I could vote here;

22  right?

23          MR. THOMAS:  Sure.

24          JUDGE McKEOWN:  As well as a service member.  So no

25  one is being excluded from being counted on that basis; are

1    they?

2              MR. THOMAS:  Excluded from voting, no.  They are

3    being excluded from being counted.

4              JUDGE McKEOWN:  Being counted as residents or being

5    counted as just being here?  In other words, are tourists

6    also -- why don't we add tourists to the mix?

7              MR. THOMAS:  They are not usual residents of Hawaii.

8    They are transients.

9              JUDGE McKEOWN:  Okay.

10             MR. THOMAS:  They can't register to vote.

11             JUDGE McKEOWN:  But it seems almost that you are --

12   you are always back then to saying that even though the Supreme

13   Court left some options open, the only realistic option is

14   total population.

15             MR. THOMAS:  The only realistic option is total

16   population given the 2012 Plan.  We are not here to second

17   guess and try to think of what the Reapportionment Commission

18   or the 1992 amendments to the Hawaii Constitution should have

19   done.  Should have told us when they adopted their plan.

20             We have to look -- we are stuck with what they told

21   us they did.  And you pick up that 2012 Plan, and you look

22   through it for any kind of equivalency.  What are you measuring

23   permanent resident against?  And we simply don't know.

24             We can hypothesis that they were choosing or that

25   they matched it up against permanent resident -- or, I am

1    sorry -- against census population, but we know that's a bust

2    because it's substantially different.  Right?  We end up with

3    the Senate being skewed because of -- if you use population.

4              But I think, Your Honor -- and forgive me if I am

5    not -- have not made myself clear.  It really goes back to the

6    burden of proof on this.  It's up to the State to tell us, and

7    they have essentially -- the reason I sense that we are having

8    this frustration is the State has deprived us of the tools by

9    which to analyze their choice.

10             And I had the same frustration, is, well, if

11   permanent resident is a permissible population base, we end up

12   back in that same logical loop.  And I suggest the way out of

13   that logical loop is to give *Burns* a very careful reading to

14   see what the Court did.

15             And it said, Well, in this case, the State has

16   identified its choice, which is registered voter, the State has

17   identified against what population count they want us to

18   measure that.  And in that case they chose citizen in total as

19   the --

20             JUDGE McKEOWN:  Let me ask you -- we are running

21   through your time, and of course our questions have taken up a

22   great deal of it.  I am going to give you some rebuttal time.

23             MR. THOMAS:  Thank you, Your Honor.  I appreciate

24   that.

25             JUDGE McKEOWN:  If we were to disagree with you on

 1    Count 1.

 2              MR. THOMAS:  Yes.

 3              JUDGE McKEOWN:  But we were -- and just

 4    hypothetically -- and we found a more serious question on

 5    Count 2, for example, which poses some different challenges in

 6    terms of putting the election together.

 7              MR. THOMAS:  Yes.

 8              JUDGE McKEOWN:  Would it be realistically possible,

 9    if one were to invalidate these drawing of the districts under

10    Count 2, the malapportionment from your challenge, how would it

11    be realistically possible to put this in place with any

12    assurance that we hadn't really just compounded the problem by

13    the time of the election?

14              MR. THOMAS:  It's realistic, Your Honor.  I mean

15    the -- first of all, I mean I think that -- if I might jumped

16    forward ahead a bit to the -- I mean, that goes to the, you

17    know, balancing of harms that the Court will do in the course

18    of evaluating this preliminary injunction.

19              And we think there's actually very little harm to the

20    State in going forward.  We have heard from Mr. Nago today

21    saying he can precinct in three weeks.

22              JUDGE SEABRIGHT:  Well, no.  Wait, wait.  But there's

23    a different issue, I think.

24              MR. THOMAS:  Certainly, Your Honor.

25              JUDGE SEABRIGHT:  Okay.  If you were to prevail on

1   Count 1 -- and this is always very hypothetical, but we are

2   always trying to run through the scenarios and figure out

3   what's what.

4           MR. THOMAS:  I understand, yes, Your Honor.

5           JUDGE SEABRIGHT:  So if you were to prevail on Count

6   1, there is already a plan in place.

7           MR. THOMAS:  Yes.

8           JUDGE SEABRIGHT:  And you have offered different

9   ideas on what plan.

10          MR. THOMAS:  Correct.

11          JUDGE SEABRIGHT:  But the office can get on top of it

12  immediately.

13          MR. THOMAS:  Yes.

14          JUDGE SEABRIGHT:  There's a plan.  The Court wouldn't

15  have to appointment a special master.  The Court wouldn't have

16  to order the Commission to go back to the drawing table.

17  Whatever it is, we have a plan in place.

18          MR. THOMAS:  Correct.

19          JUDGE SEABRIGHT:  Some of which you think aren't

20  perfect, but are better, and you are willing to accept; right?

21          MR. THOMAS:  Yes, we are, Your Honor.

22          JUDGE SEABRIGHT:  Okay.  That's one issue.  Move to

23  Count 2.  If you don't prevail on Count 1, but you were to

24  prevail on Count 2, that would require new plans.

25          MR. THOMAS:  Yes.

1          JUDGE SEABRIGHT:  There is no old plan that can work.

2          MR. THOMAS:  That's correct.

3          JUDGE SEABRIGHT:  No one has given us any idea of how

4    long that would take to draw up that new plan.  And under the

5    normal course, the Court would appoint a special master.  And

6    as far as I know, it could take months.  It could take a year.

7    I don't know.

8          And it seems to me that we really would face the

9    possibility of throwing into chaos the system.  Something this

10   Court certainly won't do.

11         MR. THOMAS:  No.

12         JUDGE SEABRIGHT:  And I am sure you are not asking us

13   to do.

14         MR. THOMAS:  Absolutely not, Your Honor.

15         JUDGE SEABRIGHT:  To throw the system into chaos and

16   create a lot of uncertainty that would undermine the integrity

17   of the election process.

18         MR. THOMAS:  No, and make no mistake that that

19   certainly wasn't what we asked the Court to do.  It's not what

20   we intend to do.

21         JUDGE SEABRIGHT:  Okay.  So there's a big difference

22   between the time that it would take to implement a remedy as to

23   Count 1.

24         MR. THOMAS:  Yes.

25         JUDGE SEABRIGHT:  And implement a remedy solely as to

1    Count 2.

2         MR. THOMAS:  Yes.

3         JUDGE SEABRIGHT:  You agree with that.

4         MR. THOMAS:  We certainly agree with Your Honor that

5    Count 1, see -- the path is quite easier and --

6         JUDGE McKEOWN:  Count 1 is moving the people around

7    the chess board of an existing plan.

8         MR. THOMAS:  Yes.

9         JUDGE McKEOWN:  Count 2 is getting an all new chess

10   board basically.

11        MR. THOMAS:  Essentially, yes, Your Honor.

12        JUDGE McKEOWN:  And as Judge Seabright has

13   foreshadowed, that would pose logistical issues that haven't

14   even been briefed really.  I mean, the issue has been briefed

15   about whether you might be right or wrong, but I don't really

16   see anything in here that would meet the equity part of your

17   argument if we -- if we went that route.

18        MR. THOMAS:  Well, I understand the case is much

19   tougher on Count 2 standing alone than Count 1 simply because

20   we don't have a fallback plan or plans like we do under

21   Count 1.  If you add in back everybody, we'd at least have

22   districting taking place.  And we recognize that, and we

23   certainly wouldn't want the Court to disrupt -- you know, send

24   chaos into the election.

25        And on that, I -- you know, if I might here while I

 1   stand here, on that one, I think, you know, if we -- it's

 2   something that could be dealt with on summary judgment for a

 3   future election, if the Court has such overriding concerns on

 4   that.  But we asked -- I mean, our primary --

 5             JUDGE McKEOWN:  Well, so are you basically saying

 6   that given the record we have in front of us, that should there

 7   be questions on that, it's -- that a preliminary injunction is

 8   not the phase in which they ought to be resolved.

 9             MR. THOMAS:  And of course our clear focus, and I

10   think it's very clear from our briefs, is on Count 1.

11             JUDGE McKEOWN:  That calls for a yes or no answer.

12             MR. THOMAS:  Yes.  Thank you, Your Honor.  The answer

13   is yes.

14             JUDGE SEABRIGHT:  And just procedurally, so I

15   understand.

16             MR. THOMAS:  Yes.

17             JUDGE SEABRIGHT:  Hypothetically, if you were to

18   prevail on Count 1, Count 2 becomes irrelevant as moot at that

19   point.

20             MR. THOMAS:  Yes, absolutely.

21             JUDGE SEABRIGHT:  Because we have new plans and

22   potentially new deviations.

23             MR. THOMAS:  Yes.

24             JUDGE SEABRIGHT:  And that would have to be reviewed

25   all over again.

1          MR. THOMAS:  That's correct.  I mean, I don't want to

2    say we don't care about Count 2, because we certainly do.  But

3    it's more of a long-term issue, I think.  One that's been left

4    unresolved.  And if the Court, you know, can't for other

5    reasons deal with it here, we still have future -- you know,

6    when time isn't a question, that we can delve into the merits

7    of Count 2 much more with -- I won't say leisure, but with much

8    more time afforded to us.

9          But I think Your Honor, Judge Seabright, you hit it

10   quite correctly.  That, you know, if the Court gives us the

11   relief, grants relief on Count 1, then Count 2 for purposes of

12   this motion doesn't even need to be addressed.

13         JUDGE SEABRIGHT:  Right.  Conversely, if you don't

14   get relief on Count 1 for preliminary injunction stage, Count 2

15   probably isn't workable now, but we could come back to it at

16   summary judgment stage.

17         MR. THOMAS:  I think we have essentially been painted

18   into a corner, but, yes.

19         JUDGE McKEOWN:  We used your paint brush.

20         MR. THOMAS:  Yes.

21         JUDGE McKEOWN:  You have exceeded your time.  I do

22   want to give you some time for rebuttal --

23         MR. THOMAS:  I appreciate that, Your Honor.

24         JUDGE McKEOWN:  -- but I would like to hear what the

25   State has to say.

1              MR. THOMAS:  I will reserve whatever of the time I

2      have left.  Thank you very much.

3              JUDGE McKEOWN:  Thank you.

4              JUDGE SEABRIGHT:  Ah, a new chart that we can't read.

5              MR. MOLAY:  Exhibit 17, Your Honor.

6              JUDGE SEABRIGHT:  Exhibit 17?  All right.

7              MR. ABURANO:  May it please the Court, Brian Aburano

8      appearing on behalf of the State defendants.

9              This is obviously a very important case for the

10     State.  What the plaintiffs are seeking would be to nullify a

11     recent Hawaii Supreme Court decision to do away with a 1992

12     constitutional amendment that was voted on by all of the voters

13     of this state, and to do away with the work of the 2011

14     Commission and prior reapportionment commissions that have

15     determined what is the best way to apportion the state's

16     legislature to provide fair and meaningful representation to

17     the state's citizens and its historic political subdivisions,

18     the basic island units.

19             What they are seeking to do is to change the State's

20     reapportionment base, which would cause a state senate seat to

21     be taken away from the Big Island of Hawaii.  And by insisting

22     on strict population equality, they seek to force the State to

23     create canoe districts, which both Hawaiian legislators and the

24     citizens who have had to labor under them say are unfair and

25     adversely affect their fair representation in the State

1    Legislature.

2              And plaintiff's remedy, as I hope I have time to show

3    you today, no matter which scenario it is that they are

4    pushing, would delay the pending elections, would require two

5    sets of elections, both primaries and perhaps general, and

6    would cause a chaotic scene which will affect voter turnout and

7    adversely affect the election.

8              Now the first issue which the Court has been

9    discussing is the substantial likelihood of their success on

10   Count 1, which is the reapportionment base issue.  And

11   plaintiffs claim that State defendants have violated the Equal

12   Protection Clause by failing to use the total census population

13   for reapportionment.

14             And as the Court has pointed out, the main problem

15   with that argument is that in *Burns versus Richardson*, the

16   Court -- the Supreme Court very clearly said that states, such

17   as Hawaii, and it was a case specifically involving Hawaii, do

18   not have to use total census population for reapportionment.

19   That that is not required by the Equal Protection Clause.

20             And the Court moreover went on to say that nothing in

21   its decisions required states like Hawaii to include aliens,

22   transients, short-term or temporary residents, or persons

23   denied the vote for conviction of a crime in an apportionment

24   base.  And that the inclusion or exclusion of such groups

25   involved the nature of representation with which the Court had

 1   been shown no constitutionally founded reason to interfere.

 2           And under *Burns* it is quite clear that exclusion of

 3   short-term or temporary populations, such as nonpermanent

 4   military, is permissible.  And in fact the *Holt versus*

 5   *Richardson* case, which became *Burns versus Richardson*, the main

 6   reason for not using the total census population was the

 7   short-term or temporary military population that was in Hawaii

 8   and which the courts found could distort legislative

 9   representation in Hawaii.

10           And I might add for the very same reasons, in a later

11   case*, Travis versus King*, this Court ordered a plan which

12   specifically excluded military and their dependents from the

13   reapportionment population base for that plan.

14           JUDGE McKEOWN:  I think up to that point, you and

15   Mr. Thomas would be in agreement probably.

16           MR. ABURANO:  Right.

17           JUDGE McKEOWN:  But would you respond to his specific

18   argument which is, in *Burns*, the Court was determining for

19   Hawaii whether a voter population approximated a total

20   population.  And that if you take another alternative

21   measurement, in this case permanent resident, then you have to

22   make that same backwards benchmark, and that the State, in his

23   view, hasn't met its burden to do that.

24           MR. ABURANO:  Well, I think what the Court did in

25   *Burns* -- and it is instructive if you carefully read *Burns*.

 1    That in *Burns* they said that in comparing plans, you would

 2    compare to a permissible population.  And what you were

 3    comparing was whether there was a substantial similarity in the

 4    distribution of the legislators between whatever your plan is

 5    and the permissible population based plan.

 6          And I might add that in *Burns* you can tell that if

 7    you had compared the registered voter base to the total

 8    population, the difference between the plans was that Oahu

 9    would have gotten three more representatives under the total

10    population base than it did under the registered voter base.

11    And obviously that did not bother the Court in *Burns*.

12          And what the Court in *Burns* compared the registered

13    voter base population to was the distribution that would occur

14    under the State's citizen population.  And since that was hard

15    to extrapolate, what they did was they asked -- the District

16    Court had found that if the -- that the military population in

17    Oahu was sufficient to explain the difference between

18    distribution of the registered voter base to the total

19    population.

20          So what they in effect compared the registered voter

21    base result to was what was the distribution of the legislators

22    under a base that excluded military population, the short-term,

23    temporary military population.  And that was the way that they

24    dealt with it in *Burns*.  So I think --

25          JUDGE McKEOWN:  So you would read "permissible base"

1   as referenced in *Burns* to mean total population minus a

2   military exclusion.

3            MR. ABURANO:  Minus --

4            JUDGE McKEOWN:  Or a citizen exclusion.

5            MR. ABURANO:  Yeah.  I mean they equated a state

6   citizen population basically to modify -- they modified that to

7   be kind of a state civilian population.  But I think what we

8   would compare it to is the total population minus the

9   nonpermanent resident part of military populations as well as,

10  in our particular case, student populations.

11           JUDGE McKEOWN:  Would you agree that if Hawaii were

12  to flat out exclude military from the total population base,

13  that that could be unconstitutional?

14           MR. ABURANO:  Yes, if there was just an absolute

15  exclusion of military without any exception.  Yes, that would

16  be a problem.

17           JUDGE SEABRIGHT:  Well, nonresident military.  What

18  about nonresident military?

19           MR. ABURANO:  If we excluded nonresident military

20  from the population base?

21           JUDGE SEABRIGHT:  Right, right.

22           MR. ABURANO:  No, I think that is appropriate.  I

23  mean --

24           JUDGE SEABRIGHT:  So if the constitution read the

25  population is total population less nonresident military and

 1   their dependents, you think that would pass muster?

 2           MR. ABURANO:  Well, I don't think -- I don't know if

 3   that would be, and I don't think that's what Hawaii has done.

 4   Hawaii has chosen a nonpermanent base.

 5           And what we have tried to do is identify -- because

 6   the purpose of this was to avoid problems that would result in

 7   districting because of including large and potentially

 8   fluctuating populations that would distort legislative

 9   districting.

10           And the main segments of that group are military,

11   military dependents, and students.  There's been shown to be no

12   other population of nonpermanent residents that would have that

13   effect.

14           JUDGE McKEOWN:  Has there been such a fluctuation in

15   fact in recent years according to the records?

16           MR. ABURANO:  Yes.  And I think the Court is

17   referring to Plaintiff's Exhibit J, which they say is a page

18   from the State Data Book which they say shows that military

19   populations haven't fluctuated that much.  And I have three

20   things to say about that.

21           First is that even if it was true, the military

22   population is still composed of short-term or temporary

23   residents, they are still concentrated in a few areas of Oahu,

24   and they still would distort representation of the state

25   districts.

1          Secondly, even if the recent history has shown that

2     the fluctuation in military isn't that great, like the stock

3     market, past performance is no guarantee of the future.  And

4     neither this Court nor the plaintiffs can tell whether in the

5     future, during some census year, there might be significant

6     fluctuations of the military due to further Asian crises that

7     may occur.

8          And thirdly, I think if you look at their Exhibit J,

9     there have still been significant fluctuations in military

10    population.  Between 1999 and 2011, the total military

11    population increased in Hawaii by 10,000 or 30 percent, more

12    than 30 percent.  And conversely between 1987 and 1999, it

13    decreased by 15,000, another 30 percent plus change.

14         From 1999 to 2011, the Army population alone

15    increased by 8,000, which is an increase of over 50 percent in

16    the Army population.  And between 2010 and 2011, the Navy

17    population increased by over 50 percent.

18         And we all know from recent news reports that we are

19    going to have a sizable marine contingent arriving in Hawaii as

20    their people -- as the personnel are relocated out of Okinawa.

21    So, one, even if it is stable I think it still is a problem;

22    and, two, I don't think there's any guarantee it will continue

23    to be stable.

24         Going back to *Burns*, I think that, you know, the

25    Court -- as I have mentioned, the problem with a significant

1    military and other nonpermanent resident population is that

2    they are concentrated in a certain number of districts.  And

3    the problem, as evidenced by what was explained in *Holt versus*

4    *Richardson*, and *Burns versus Richardson*, and in the 1968

5    Constitutional Convention proceedings and some of the other

6    documents we filed with you is that you end up having a few

7    districts on Oahu that are composed largely of nonpermanent

8    residents, not very many voters.

9            And, on the other hand, as Judge Seabright pointed

10   out you are going to have other districts impacted in which

11   there will be more permanent residents, more citizens, that

12   their districts will be enlarged, and their rights of

13   representation allegedly diluted.

14           JUDGE SEABRIGHT:  Can we get back to this benchmark

15   issue that Mr. Thomas talked about?  I mean I think he refined

16   that argument a little bit today, more than I understood,

17   certainly, through the briefing.  And so I would just like to

18   hear your view.  I mean both of you say, "Read *Burns*

19   carefully".

20           MR. ABURANO:  Yes.

21           JUDGE SEABRIGHT:  I read it carefully --

22   (laughter) -- carefully the way you want me to read it, I come

23   to one conclusion, I suspect, and read it carefully the way

24   Mr. Thomas wants, and maybe there is a different conclusion.

25           MR. ABURANO:  Right.

 1              JUDGE SEABRIGHT:  So support your reading of *Burns*,

 2   your careful reading, and can the State simply exclude, in your

 3   view, nonpermanent residents, and that creates a permissible

 4   population base, and so you don't need to benchmark in the

 5   manner Mr. Thomas has suggested.  I assume that's your view.

 6              MR. ABURANO:  That's our view, yes.

 7              JUDGE SEABRIGHT:  And tell us how you get there

 8   reading *Burns* carefully.

 9              MR. ABURANO:  I think, one, because total

10   population -- total census population is not required to be

11   used.  Two, what they said can be excluded are short-term

12   temporary residents.  Well, as you said, what is the opposite

13   of a short-term temporary resident?  It's a permanent resident.

14              And thirdly, and this relates perhaps more to the

15   military than others, but that they in fact, as part of their

16   decision, were excluding -- were impliedly affirming the

17   exclusion of the nonpermanent military population in Hawaii as

18   being the reason for why total census population didn't have to

19   be used in this case.

20              JUDGE McKEOWN:  Do we get that from reading *Burns* or

21   would one have to look at the District Court to figure that

22   out?

23              MR. ABURANO:  I think as I recall, and I don't have a

24   photographic memory, but as I recall it certainly does help to

25   read *Holt versus Richardson*.  But I think the *Burns* court does,

1    in some of its footnotes, cite to some of these factors in

2    the -- that were mentioned by the District Court in *Holt versus*

3    *Richardson*.

4            And I mean it is very definitely the case that the

5    *Burns* Court was cognizant of and was sympathetic with the

6    problem that there was this large, fluctuating, concentrated,

7    nonpermanent military population of Hawaii.  And that was very

8    clearly one of their motivations for saying that total census

9    population did not have to be used.

10           JUDGE McKEOWN:  So in your case, your argument would

11   be that the construct Hawaii now has basically matches what the

12   Supreme Court said could be a permissible base.

13           MR. ABURANO:  Correct.

14           JUDGE McKEOWN:  And therefore there's nothing more to

15   compare.

16           MR. ABURANO:  That's correct.  That's our position.

17           JUDGE KOBAYASHI:  Really aren't you telling us that

18   what we should look at, rather than population base, is what

19   they said in *Burns*, and this is at Page 95.

20           "Total population figures may thus constitute a

21   substantially distorted reflection of the distribution of state

22   citizenry.  If so, a finding that registered voters

23   distribution does not approximate total population distribution

24   is insufficient to establish constitutional deficiency.  It is

25   enough if it appears that the distribution of registered voters

1    approximate distribution of state citizens or another

2    permissible population base."

3          So what I understand the plaintiffs argue is the

4    permissible population base that you have to compare it to is

5    the total population base, the census.  But what you are really

6    saying is, "Hey, *Burns* is saying you look at the distribution

7    of state citizens."  They compared state citizens to total

8    population base and found that basically the military presence

9    skews representation, and so when you take a look at that.

10         On the other hand, if the facts were different and

11   the military and out-of-state student base were more evenly

12   distributed throughout the islands, then you would make a

13   comparison.  There wouldn't potentially be this skewing.  But

14   that's not the situation that we find ourselves in.

15         MR. ABURANO:  That's correct.  I mean particularly

16   with respect to the military.  And the plaintiff's didn't

17   produce it as a visual aid, but there is a visual aid that

18   shows where people were extracted from Oahu -- mainly from Oahu

19   for purposes of forming in permanent resident population.

20         And it's kind of colored coded, and you can see where

21   it's very dark brown is where the most people were --

22         JUDGE SEABRIGHT:  What is the exhibit?

23         MR. ABURANO:  Golly.  That would be --

24         JUDGE KOBAYASHI:  I think it's a separate booklet,

25   right, with the color coding for the districts.  Is that what

1   you are referring to?

2               MR. ABURANO:  Yes.

3               JUDGE SEABRIGHT:  M.

4               MR. ABURANO:  M, the oversized version of M.  And

5   anyway that shows that -- well, people are extracted pretty

6   generally.  And most of the extractions occurred, quite

7   frankly, around military bases, around Pearl Harbor, around

8   Scofield Barracks, around the Kaneohe Marine Corps Base, and a

9   little bit around the University of Hawaii.

10              I mean there are others who were, in terms of the

11  staff, disaggregated.  When you had a student who had given an

12  incorrect address, they disaggregated whatever students gave an

13  incorrect address, and so spread the -- spread the extractions

14  throughout the populated districts in a fair way.

15              I am going to move a little bit to the *Garza* case.  I

16  think, as the Court said, there's some problems that we have

17  with *Garza*.  First of all, *Garza* cannot overrule *Burns* or what

18  *Burns* said.  *Burns* said you don't have to use a total census

19  population, and *Garza* cannot overrule that.

20              JUDGE SEABRIGHT:  Well, *Garza* came after *Burns*

21  though; right?

22              MR. ABURANO:  That's right.

23              JUDGE SEABRIGHT:  We are sitting as a District Court.

24  If *Burns* is -- if *Garza* is interpreting *Burns*, but we think

25  it's wrong, I'm not sure it's our place to say that.

1          MR. ABURANO:  Well, *Burns* is still a United States

2   Supreme Court case.

3          JUDGE SEABRIGHT:  You have better arguments than

4   that.

5          JUDGE McKEOWN:  You would still be stuck with --

6          MR. ABURANO:  The other thing about *Garza*, as was

7   brought up, there is a narrow and very broad reading that one

8   could make of *Garza*.  And I think the State thinks that the

9   narrow reading is the best one.  Which is, as the Court said,

10  that *Garza* should only stand for the proposition that a Court

11  does not violate the Equal Protection Clause when it uses total

12  census population for a reapportionment base when that is

13  otherwise required by applicable state law.

14         And in the *Garza* case, the applicable state law,

15  California Election Code, clearly provides that the total

16  census population was used, and so that is all that is

17  necessary for the decision in *Garza* to go forward.

18         And I do recognize that the *Garza* majority did talk

19  about the need for noncitizens to have legislative

20  representation.  But what I would say about that is that

21  nonpermanent residents here in Hawaii do have legislative

22  representation.  They can petition.  They can appear in front

23  of Hawaii legislature.  And I can say, quite frankly, as an

24  observer of the State Legislature for the past 10 years, they

25  are very welcoming.  And I am surprised at how much they listen

1   to the public who comes in to testify.

2           JUDGE McKEOWN:  That argument wouldn't go far.  You

3   can say, "Well, we don't count Blacks in our population base,

4   but it's okay.  They can come on down to the legislature and

5   make a petition."  So that, if it's an unconstitutional

6   exclusion --

7           MR. ABURANO:  Well, that --

8           JUDGE McKEOWN:  -- the fact that you can get in your

9   car and drive over to the Legislature and talk to them wouldn't

10  exactly solve the problem; would it?

11          MR. ABURANO:  No, it wouldn't exactly solve the

12  problem.  But what I am trying to say is I think that in this

13  particular case, the claim of lack of representation is more

14  academic and theoretical than practical and real.

15          I think they can come and make their needs known to

16  the Legislature, and the Legislature will react to it.  I can't

17  imagine any legislature telling a military person, who came in

18  to testify, that we are not going to listen to you, because you

19  are not part of our reapportionment base.

20          JUDGE SEABRIGHT:  Well, it's not about testimony

21  necessarily.  It's about that district's representative or

22  senator and the dilution of the person's voice in relation to

23  that one person.  I mean it all is very theoretical at some

24  level.

25          MR. ABURANO:  Right.  But as you say the converse is

1    true, too.  If you are going to give representation or more

2    representation supposedly to one district under one theory, you

3    are taking it essentially away from another district.

4           And as we know, if you overturn the State's plan and

5    say that we must use a total census, we are going to be taking

6    away one Senate seat from the Island of Hawaii, which would

7    only have three then, and bring it back over to Oahu.

8           JUDGE SEABRIGHT:  Let me ask you one question.  It

9    sort of bothers me, but I am not sure where it fits into the

10   scheme, which is the plaintiff's briefing points out that other

11   than Kansas, I suppose, we are the only state that counts in

12   this manner; and, therefore, these service members and their

13   dependents, who are nonresidents of Hawaii, don't get counted

14   anywhere.

15          MR. ABURANO:  Okay.

16          JUDGE SEABRIGHT:  How does that play into the

17   analysis if at all?  I mean, it's sort of a statement that I

18   think would bother a lot of people at a sort of instinctual

19   level, but I am not sure legally where that comes into the mix

20   if at all.

21          MR. ABURANO:  You know, again, I don't think -- as

22   far as it legally goes, I think you would have to assume that

23   somebody has a constitutional right to be included in a

24   reapportionment base somewhere, which is not something that I

25   think the Supreme Court has decided at any rate.

1          And the fact that other states do it one way does not

2    necessarily mean that Hawaii is wrong in doing it the way it

3    has been.  I mean Hawaii has been trying to follow federal law,

4    as it understands it from *Burns*, in formulating what it feels

5    is the best way to provide fair and meaningful representation

6    for its citizens.

7          JUDGE SEABRIGHT:  But there is something rather

8    distasteful, at some level, about the people who put on the

9    uniform to protect all of us not being counted anywhere.

10         MR. ABURANO:  And I recognize that, but I think that,

11   to some extent, is a policy issue.  And it's an issue which has

12   been presented to the Legislature, and the Legislature might

13   act on it.  It's an odd view which I imagine that there are

14   some sympathetic ears at the legislature to hear.

15         One thing I wanted to point out, since we have this

16   nice exhibit here, is that in formulating the permanent

17   resident base, the State has taken reasonable measures to try

18   and identify the permanent residents of the state.

19         And with respect to active duty military, what we

20   have relied upon are the records of the military as to what

21   their state of legal residence is.  And this is -- Exhibit 17

22   is a copy of the form that the military uses for military

23   members to establish or change their state of legal residence.

24         And as pointed out on the form itself, the military

25   says that this form -- on this form that your legal residence

1    and your domicile are essentially interchangeable.  They are

2    the same.  They are the place that you think is your permanent

3    home where you intend to return whenever you are absent.  And

4    it requires physical presence in the state plus some evidence

5    of the intent to reside there permanently.

6              And I would just point out that this is the same kind

7    of test which is used both for voting, for tax purposes, and

8    even for student tuition.  I mean they all are focused on

9    domicile, which is your permanent home.  So that is what the

10   State has tried to do, and we feel that's a reasonable way to

11   do it.

12             With respect to military dependents, what we did is

13   that the military does keep two sets of data.  They keep data

14   on the military dependents, because they have to know that for

15   purposes of health benefits and other benefits that military

16   dependents are entitled to.

17             They have another system which keeps track, just as

18   here, which military members have stated a state of legal

19   residence in Hawaii or somewhere else.  And what happens is

20   they have to merge the two and give the 2011 Commission and the

21   other reapportionment commissions a chart or a spreadsheet that

22   says, "Here are all the military dependents who are connected

23   to these military service members who have declared a state of

24   legal residence outside of Hawaii."

25             And that does involve a presumption, but I think it's

1    a very reasonable presumption that a military dependent, a

2    spouse or child, is going to have the same state of legal

3    residence as their military sponsor.  I recognize it won't

4    always be the case, but it is almost certainly the general rule

5    of the case.

6            And in fact if you look at the plaintiff's

7    information that they provided us, in Exhibit 484, Colonel

8    Bostrom, Mr. Veray, Mr. Laster, their dependents did follow

9    them while they were in active duty from place to place and

10   from tour of duty to tour of duty.

11           And I think one of the interesting parts is that

12   Plaintiff Veray, I think, did things correctly.  He was –- he

13   had a state of legal residence outside of Hawaii until 1989,

14   when he bought a home here during his last tour of duty.  He

15   filed, apparently, state of legal resident to became Hawaii,

16   registered to vote the same year, started paying taxes the same

17   year.

18           I mean that just shows that these are all equivalent.

19   They all show what is your permanent home or not.  And the same

20   thing is true with nonresident students.  There is a durational

21   requirement, which the plaintiffs have said is unfair, but I

22   think a one-year durational requirement is reasonable indicia

23   of intent to establish permanent residence here, because it's

24   not a purely subjective type of test.

25           JUDGE SEABRIGHT:  But with the military dependents,

1    there was a large number that weren't extracted though.

2            MR. ABURANO:  Correct.  There were --

3            JUDGE SEABRIGHT:  Explain that to me.  What's that?

4            MR. ABURANO:  What the military did is they gave us a

5    long spreadsheet or list.  And I think it had something over

6    100,000 military dependents; all the military dependents who

7    are in Hawaii.  And then there was a little checkmark by all of

8    the ones who had -- who were related to, tied to a service

9    member who claimed a state of legal residence outside of

10   Hawaii.

11           And the rest of those where there was no checkmark,

12   you know, we presumed they were permanent residents.  And so we

13   have affirmatively included 52,927 military dependents as

14   permanent residents under the 2012 Reapportionment Plan.  So, I

15   mean --

16           JUDGE McKEOWN:  There's some passing reference that

17   there's nothing really to support the not having some alien

18   exclusion, and you harken back to -- I think it's a 1991

19   statement saying it's hard to -- you don't really have any data

20   to do that.  Is there a more recent?

21           MR. ABURANO:  Well, in 2001, the Reapportionment

22   Commission staff was asked to go.  And as I understand it, the

23   staff member plus, I think it was the Chair of the Commission,

24   went to meet with Immigration and Naturalization Service.  And

25   they said, "You know, we don't keep track of all of the aliens

1  that are in Hawaii."  And obviously they really only keep track

2  of the legal aliens in Hawaii.

3          And from what I understand, they said, "The only ones

4  we really know information about are -- is naturalized.  People

5  who have applied for naturalization.  Well, that's exactly the

6  group who is probably the most likely to be permanent

7  residents, those who are trying to naturalize and live in

8  Hawaii.  But as far as illegal aliens, there is no information.

9          JUDGE McKEOWN:  What about the civilian federal

10 employees who also are here who may or may not be residents?

11 There was also a suggestion that if you are going to extract,

12 then you have to do it on a fair basis, and that there hadn't

13 been any extraction for those nonpermanent residents.

14         MR. ABURANO:  Well, in that case, we -- I mean, they

15 did try to talk -- they are mostly military-related federal

16 contractors.  And they -- staff did talk to the military about

17 do they keep numbers or track of these people.

18         And the information was, "No, they are private

19 citizens.  We don't keep track of private citizens.  We

20 certainly don't keep track of where they live."  And

21 unfortunately or fortunately, keeping track of where their

22 residence is is a very important part of being able to extract

23 them, because if you don't have their residence, you don't know

24 which district to extract them from in order to form these

25 populations, which gets me to Count 2, which is the

1   malapportionment claim.

2            And the U.S. Supreme Court has held that deviations
3   larger than 10 percent can be justified by rational state
4   policies.  And they have held that protecting the integrity of
5   political subdivisions is just the type of rational state
6   policy which can justify deviations in excess of 10 percent.

7            And as we have shown in our memos and exhibits, the
8   State has a unique and compelling interest in protecting the
9   integrity of its basic island units.

10           And in the cases I have read anyway, and I haven't
11  read all of them, but I don't think there has been any case
12  which has presented as strong or compelling a case for
13  protecting the integrity of its political subdivisions than we
14  have presented before you in this case.

15           I mean, after all, Hawaii is the only state composed
16  of only four counties, which are separated by hundreds of miles
17  of deep ocean water, and that have a very unique history of the
18  development as separate insular communities.

19           I mean if you have a -- have a -- if you try to split
20  the districts, as has been done in the past -- one on the
21  Hanalei side of Kauai, one on the Hana side of Maui -- that is
22  an extremely hard district to represent.  It's not just flying
23  directly from one to the other.  You have to fly --

24           JUDGE SEABRIGHT:  I think the question really is the
25  Supreme Court has certainly suggested, regardless of what

1   justification -- and I am not disputing for purposes of this

2   hearing right now anything you are saying as far as the

3   legitimacy of the justification.  That it's real.  It's

4   legitimate.  It's substantial.  It's not arbitrary.  It's not

5   discriminatory.

6          Accepting all of that, the question is what is that

7   cutoff mark at which that doesn't matter anymore?  That you

8   have hit a mark where it's just too big of a deviation.

9          And the Court hasn't set that marker down yet, but

10  this case does sort of present that question as to -- as to

11  whether or not that mark has been hit or not.  And so what are

12  your thoughts on that?

13          MR. ABURANO:  Well, my thought on that is that you

14  are quite right.  The Court has never set an upper limit that

15  it says can never be justified.

16          And in fact I think the Court has said -- and you can

17  argue, because courts sometimes have said things that are

18  contradictory.  But I think that the Court has said that there

19  is no uniform formula, and it is neither practicable nor

20  desirable to establish a rigid mathematical standard for

21  evaluating the constitutional validity of a state legislative

22  apportionment scheme under the Equal Protection Clause.  Rather

23  each apportionment should be analyzed -- each case should be

24  analyzed separately.

25          And that was in the *Roman versus Sincock* case that

1    they decided the same year as *Reynolds*.  And in *Gaffney versus*

2    *Cummings*, they said, "You shouldn't place an unrealistic

3    emphasis on raw population figures and a mere nose count may

4    submerge other considerations important to an acceptable

5    representation of an apportionment arrangement."

6           Which I take to mean that they quite rightly don't

7    want to set an absolute number, because that would be too

8    rigid.  They would like to look at each individual scheme, see

9    what the State has proposed as rational justifications for it,

10   and to make a determination based on the particular case.

11          JUDGE KOBAYASHI:  I think in particular what

12   concerns, at least for me, is Kauai.

13          MR. ABURANO:  Yes.

14          JUDGE KOBAYASHI:  The numbers clearly are -- they are

15   huge.  And, you know, when you get down to the bottom line is

16   it -- is it okay if they are underrepresented in the Senate but

17   overrepresented in the House?  Is that enough of a

18   justification?

19          Or that Hanalei and Hana are so far apart and the

20   difficulty of -- as we had in some of the declarations, you

21   know, "I don't get to see my constituents when I go shopping at

22   Big Save, or whatever, and they don't have that kind of

23   accessibility to me."

24          Is that something that we should take more in

25   consideration than the nose count?  I mean --

1              MR. ABURANO:  Yeah, I think you should.  Because

2      after all, the goal, according to some of the Supreme Court

3      language, is to provide fair and meaningful representation.

4              JUDGE KOBAYASHI:  Yes.

5              MR. ABURANO:  And I think all of these things we

6      filed show that fair and meaningful representation is adversely

7      affected by what we call "canoe districts" where there's a

8      district on one part of an island and one part of another.

9              And just to clear up something that I think is

10     incorrect, the State has not purposely, for example with Kauai,

11     purposely given Kauai more House representation in order to

12     make up for its lack of Senate representation.

13             JUDGE McKEOWN:  Do you think that if that were -- if

14     it were determined they had done that, which is sort of the

15     trade-off proposition, that that would be a rational,

16     legitimate basis given the population disparities?

17             MR. ABURANO:  I think it's a rational basis in the

18     sense that it shows why the method of equal proportions is a

19     fair method for the State to use to allocate whole seats.  And

20     that is the reason, quite frankly, why Kauai has the

21     representation it has.  It's simply a matter of using the

22     method of equal proportions, which is the same methodology used

23     to apportion or allocate Congressional seats in the U.S.

24     Congress.

25             It's a fair method.  It's a mathematical.  It's an

1    unbiased method for allocating a limited number of seats among

2    different political subdivisions of differing populations.

3           And I put up Exhibit 47 which shows you what is the

4    amount of the deviation in the 2012 Plan that is due solely to

5    the method of equal proportions.  And what it shows is that --

6    the number of Senate and House seats, the total, and then as

7    they are allocated by the method of equal proportions, dividing

8    that into the population of permanent residents per island, and

9    then what is the deviation from the statewide average.

10          And looking at that, you can see that 41.76 percent

11   of the approximate 44,000 deviation in the 2012 Plan is due

12   solely to applying the method of equal proportions.  And

13   similarly under the House, 16.14 percent, I think, of the 21

14   plus percent deviation is due again to applying the method of

15   equal proportions.

16          Now, there's a -- I know there's language in some

17   cases that applying the method of equal proportions will not

18   always result in a constitutional apportionment.  And that's

19   why I am going to show you Exhibit 48, which I know the

20   plaintiffs don't like, because they think we are trying to use

21   it as a substitution for the federal methodology of measuring

22   deviations, but we are not.

23           We are just showing this as evidence as to why we

24   feel that using the method of equal proportions is permissible

25   and constitutional in this particular case, because this does

1    just what you were talking about.

2             This shows adding up both Senate and House seats and

3    dividing it by the population to each island under the method

4    of equal proportions what is the deviation per legislature per

5    permanent resident of each of the basic island units.

6             And because they do, largely -- and I don't know

7    exactly why -- but because the way it works out is there are

8    offsetting deviations between the Senate and the House for

9    Kauai and some of the other basic island units, what it comes

10   out to is that there's really only a 5.41 percent deviation

11   overall.

12            And there's one other -- sorry.  One other thing I

13   wanted to say about the deviations.

14            JUDGE SEABRIGHT:  It's not your argument that that

15   is -- you are not arguing that fully corrects the problem.  You

16   are arguing that is part of the analysis.  That's part of the

17   puzzle.

18            MR. ABURANO:  Right.  Part of the problem occurs

19   because -- again, it's partially due to the method of equal

20   proportions, because it's not all Kauai's fault.  Part of it

21   has to do with the Big Island of Hawaii.  I mean there are very

22   limited districts.  Maui also.

23            And the rest of it is largely due to the Commission

24   doing some of the other things that are called for in the state

25   constitutional criteria, which is keeping districts contiguous,

1    trying to follow geographic boundaries, of which there are many

2    here in Hawaii, and also trying to avoid the submergence of

3    certain groups within districts of larger different

4    socioeconomic populations, which we read to be trying to avoid

5    splitting up communities.

6         And we filed the declarations of Dylan Nonaka, who

7    was one of commissioners on the Technical Committee, trying to

8    explain why those deviations weren't made smaller.  And it was

9    mainly because you were trying to avoid splitting up

10   communities.

11        And the one that comes to my mind is Maui, because

12   it's very easy.  It's got four zones.  And in order for them to

13   try and expand part of one district into another, because the

14   centers of population are relatively -- I mean, you have one

15   down in Wailea.  You have another one up in Lahaina.  You end

16   up going very far into another district to find enough

17   population to measure things out.  And then you start getting

18   complaints, when you go to the public hearings, that you are

19   splitting my community up, or you are crossing this boundary.

20        As the 1968 Constitutional Convention delegates said,

21   it's not a very -- it's a thankless process.  It's a very hard

22   and difficult process to get exact mathematical certainty.

23        JUDGE McKEOWN:  You get string bean districts instead

24   of canoe districts in some of those.

25        MR. ABURANO:  Yes.  I mean you would have to reach

```
 1    down -- I think we were looking at one, and you would have to
 2    reach down from Wailuku down towards somewhere into Kihei to
 3    make that district work.  And it becomes a real problem.  And
 4    quite frankly it's a problem, if the Court wanted to get into
 5    it, that is far beyond the confines of this hearing to go -- I
 6    mean, you -- I mean, basically, the best way you do it is you
 7    get these huge computer screens up, and we show you all the
 8    maps, and then we start showing you where you have to go to
 9    get -- to add population here, or what boundary do you have to
10    cross to go here to try and explain why these deviations are
11    the way they are.
12              JUDGE McKEOWN:  So if you were to fix, if you will,
13    the Kauai situation, does the record suggest the only way to
14    fix that would be to put in place a canoe district?
15              MR. ABURANO:  Yes.  We -- well, we did provide some
16    exhibits, which are -- after we put them in, I decided they
17    weren't as easy to read as I thought they would be.
18              But essentially Kauai has -- is too big for one
19    Senate seat.  It's about, oh, 14, 15,000 people too big for one
20    Senate seat.  So you would have to attach that or some portion
21    of that to another island.
22              And probably just based on numbers, you would
23    probably do it with the Big Island, because I think they are a
24    little on the other end of things.  They are a little low.
25    So -- but, you know, you are trying to match neighboring
```

1    communities.  You are trying to match a rural community with

2    another rural community.

3            And it's like putting a prison in your backyard.

4    Whichever community you say we are going to canoe you with some

5    portion of Kauai, they immediately start screaming that they

6    are nothing like Kauai, and why are you putting us together

7    like that?  And it would be.  Quite frankly, I think there

8    would have to be more than just one canoe district.  There

9    would have to be at least two to try and make that work.

10           JUDGE KOBAYASHI:  So your argument is not only the

11   geographic distance, because there are other states, like

12   Montana, whatever.  People who have to drive very far to see

13   their representative or whatever.  But in addition, you are

14   referring to, I think, your declarations with regard to the

15   historical, and cultural, and social specific needs, and that's

16   why --

17           MR. ABURANO:  Yeah, they are very different

18   communities.  They are very different communities.  And I have

19   to say myself, I mean it's kind of dumb, but, you know, there

20   are -- when I go to the neighbor islands and I read the Garden

21   Island Press, or the Hawaii Harold Tribune, I have no idea

22   what's going on over there being here in Oahu.

23           I mean there are lots of people who grow up here in

24   Oahu who never go to a neighbor island.  And so, I mean, they

25   do have very different problems and concerns.  And it's not

 1   safe to assume that we -- that a legislator or any person here

 2   will be sufficiently apprised of them to provide them with some

 3   effective representation.

 4          And as Representative Morita and Representative

 5   Solomon testified, you know, we have a very centralized state

 6   government which doles out CIP funds, and there was only --

 7   they got it by legislators.  So all of a sudden they have two

 8   districts that they are representing competing for the same

 9   amount of funds, and sometimes that can lead to conflicts.  So

10   I mean there are problems when we have these type of canoe

11   districts.

12          I think, in the interest of time, I am not sure where

13   I am time-wise, but I did want to move a little bit to the

14   balance of hardships and equities in this case, because I do

15   want to explain the problems that are going to occur for the

16   pending elections if any kind of relief is granted other than

17   allowing us to continue with the plan we have today.

18          And this is a chart of election deadlines.  It's not

19   all of the deadlines.  I wanted to get it to fit on one page,

20   so I have excluded a lot of deadlines.  The other thing that we

21   have on here is some of the -- some of the components that

22   would need to be redone if there's a new plan.

23          JUDGE SEABRIGHT:  Mr. Aburano, I am sure the record

24   won't pick you up well if you are away from that mike.

25          MR. ABURANO:  I am sorry.

1           JUDGE SEABRIGHT:  If you want, we have one you can

2     put on and stand by that to talk to us.  If you want to move

3     away from --

4           MR. ABURANO:  That's all right.  I will try to do it

5     from here.

6           JUDGE SEABRIGHT:  I know the court reporter will be

7     suffering and the record probably as well.

8           MR. ABURANO:  I am sorry.  It has some of the time

9     frames that would need to be done if a new plan is ordered.

10    And by plan, I mean any plan other than the 2012 Plan.

11          It doesn't matter if it's the current districting.

12    It doesn't matter if it's the August 2011 Plan.  It doesn't

13    matter if it's the September 2011 Plan.  All of them are going

14    to require the Office of Elections to start over with the

15    re-precincting.

16          So if we look, we are at a May 18th hearing.  We are

17    coming up to the date for the deadline for state office

18    candidates to complete their filing.  We are -- so, if any plan

19    has to be instituted other than the 2012, then the Office of

20    Elections has to start over with re-precincting.

21          And again as Mr. Nago explained, it will have to take

22    whatever plan is picked up, all those boundaries, put it into

23    the machine, and then it's not as easy as just the machine

24    spitting out a plan.  They have to go through and draw the

25    districts and determine, if this district is too big, whether

 1    there's going to be an couple of polling places or not.

 2            And it took -- after March 8th, which was already

 3    late.  I mean Mr. Nago came to the Commission back in January

 4    and said he didn't know if he could safely have an election

 5    unless we gave him a plan by the end of February.

 6            Well, because of a last minute kerfuffle, we didn't

 7    give him one until March 8th.  And even then, with a compressed

 8    timeframe, and he knew he had to do it quickly, it took roughly

 9    four to five weeks for them to come out with the basic

10    re-precincting.

11            And as Mr. Nago intimated a little bit, it wasn't the

12    complete re-precincting, because it didn't include printing the

13    maps and printing the metes and bounds.  But let's be

14    optimistic, and we will say it takes about five weeks.  Well,

15    that takes us to June 22nd.

16            Then, like I said, there probably is additional time

17    after that that you have to do for mapping and metes and

18    bounds.  But the next step is what the counties do.  And what

19    the counties do is they assign all of the voters, 600,000 plus

20    voters, to these new precinct and update their voter

21    registration lists for that purpose.

22            And as Mr. Nago explained, each precinct or most of

23    the precincts have an individual ballot type.  And that's

24    what's the importance of the voter registration list in that

25    you have to -- if you are like me and you go to City Hall and

1    you vote, they have to know which kind of ballot to give you.

2    What is the unique set of candidates that's on your ballot.

3           And then they have to print voter cards, which they

4    send out to tell the voters where do you go for your polling

5    place.  And they have told me that in a compressed schedule, it

6    takes about 10 plus weeks.  And so if that's true, and we will

7    ignore the fact that it probably short changes the precincting

8    process, to do the precincting and the assignment of voters, we

9    are already to August 31st.

10          Then you have to print the ballot types, and there

11   are about 100 plus different ballot types.  They have to be

12   translated in different languages.  They have to be proofed and

13   checked, and I understand that process takes about three weeks.

14          So, by that point, we are up to September 21.  Now I

15   know Mr. Thomas says that the federal government can or will

16   waive the overseas ballot time line, but I'm not that

17   optimistic.  So if you have to have 45 days after the ballots

18   are printed to mail them --

19          JUDGE McKEOWN:  Assume that there would be a waiver

20   if the Court issued an order.  How would that affect things?

21          MR. ABURANO:  Well, even if that were.  I mean, like

22   I said, by the time we are at the printing of ballot types, and

23   we are at the end of that, which you need to do to have the

24   election, you are already at September 21.  So we are already

25   past the primary election.  And that doesn't include the fact

1    that I have been told after the ballots are printed, it takes

2    them about two weeks to pack them, check them, deliver them to

3    all of the polling places.

4              So, we are -- we are already well past the election

5    date, August 11 election.  So it means the primary is either

6    going to have to be delayed or, more likely, you would have to

7    have dual primaries.

8              But just to complete my thought, I mean even if we

9    were able to mail an overseas ballot at September 21, the 45

10   days would run out on November 5.  So by that time we are

11   almost to the date of the general election.

12             So the alternative is that we would have dual

13   elections.  You would have one election for federal offices and

14   you would have one election for state and perhaps county

15   offices.  It's a little unclear if the counties could go with

16   the federal or whether they would have to be decided with the

17   state.

18             And the problem, as I have intimated by this, is that

19   even if you have a federal election in August and you are going

20   to have a federal election in November, if you can't have a

21   state primary until October, which is how I calculate it's all

22   going to work out, you don't have enough time between the

23   October state primary and the November federal to recycle the

24   voting machines.

25             The voting machines take about one to two months to

1    be recycled for an election.  And that's because as soon as the

2    election occurs, they have to be locked down.  Carted back.  If

3    there's a voter challenge, you can't do anything with them

4    until the voter challenge is resolved or the election challenge

5    is resolved.

6            Then they have to be maintained.  They have to have

7    their memory wiped.  They have to be reprogrammed for the next

8    election.  That cannot occur in time to use that.  So what does

9    that mean?  That means the State would have to lease or buy new

10   set of machines for these dual elections.

11           The other problem is, if you have one set of federal

12   or federal and county elections, and then you have another set

13   of state elections, that means that the counties are going to

14   have to maintain dual voter register lists, one for the

15   federal/county election, one for the state election.  It is

16   very unclear that the counties can maintain dual voter

17   registration lists at this point.

18           The other problem intimated by Mr. Nago when he

19   testified today is that we don't -- if we have a later primary

20   date, we have precinct officials being trained and recruited

21   for August 11, November 6.  There is no guarantee those same

22   people can show up for another set of election dates, which

23   means they are going to have to recruit and train other people.

24           And there's also no guarantee we can have the same

25   polling places for a later set of election dates, which means

1   you might have voters going to one polling place for the

2   federal election and then having to go to a different place for

3   the state and county election.

4          And that leads to the fact that there's going to be

5   confusion.  Things never work out perfectly.  There's going to

6   be an adverse effect on turnout.  And I think in other cases of

7   a similar nature, federal courts, such as yourself, have held

8   that under those circumstances, the best alternative is to have

9   the election under the plan even if it would be somewhat

10  invalid, and then have -- if the Court did determine the plan

11  wasn't valid, to have either the Commission or whatever the

12  designated entity is to draft up a new plan for the next

13  election cycle.

14         And though I don't agree with the result of the case,

15  I could refer the Court to *Cosner versus Dalton*, 522 Federal

16  Supplement 350, which is a Virginia case.  And in that case the

17  Court did exactly -- went through the same analysis that I

18  talked about today.  They found that that plan there was

19  invalid, but they didn't want to -- and they didn't feel they

20  could get a plan in place in time for the next election.

21         They were afraid that the election would be delayed,

22  and there would be adverse voter turnout, and so they decided

23  to allow the election to go ahead and simply ordered the state

24  in that case to come up with a plan in about five months, so

25  that they could review that and then look at the next election

1    cycle.

2              And I think there's other reasons why that route is

3    advisable if the Court were to find any part of the 2012 Plan

4    invalid.  One, first of all, I think you should give the

5    Commission or the State the chance to draft up the plan since I

6    think the federal court law is generally that the Court doesn't

7    want to draw a plan.  They want to have the Legislature or the

8    State draw the plan.

9              I think hurrying and trying to meet a schedule is the

10   surest way to have a bad plan and to have a plan that people

11   don't like.  And the other reason is that if you look at our

12   constitutional convention history and the history of our

13   statutes on reapportionment, there's been a very big premium

14   put on letting the public have some say in these

15   reapportionment plans.  That's why we are required to have

16   public hearings.

17             And obviously if we rush through or we have a

18   court-ordered plan, the public is going to have no say about

19   it.  And I can tell you from having been there, the public has

20   a lot to say about these plans.  And some of it is very

21   valuable.  And I think that that's something that if you -- if

22   you can have, it's definitely a benefit.

23             And the 2012 Commission, even after the Supreme Court

24   found their first plan invalid and even though there was a

25   restrained amount of time, they found that a compelling reason

1    to go to the public and let the public have their comments.

2    And there were some valuable comments.

3            I want to also mention one thing about the balance of

4    equities, which is that I really don't understand the

5    plaintiff's position about why they didn't bring this lawsuit

6    much earlier.  The September 2011 Plan was filed September

7    26th, and it has the same defects they are now complaining

8    about.  That plan did not -- also extracted nonresident

9    military and students.  That plan also had fairly high --

10           JUDGE SEABRIGHT:  Well, it extracted very few though;

11   right?

12           MR. ABURANO:  16,000, but I mean the principle is

13   what they are supposedly arguing about.

14           JUDGE SEABRIGHT:  Could they have intervened in the

15   State Supreme Court?  I don't know the rules well enough on the

16   original proceeding that you held before the Supreme Court.

17           MR. ABURANO:  They could have intervened, and there

18   were intervenors in that case.  And it was obviously a case

19   where it wasn't going to get any better for the plaintiffs.  I

20   mean we were talking about extracting more military and

21   students.  That's what the petitioners in that case wanted.

22   So --

23           JUDGE SEABRIGHT:  But no one came before the Supreme

24   Court and said, "There might be an equal protection problem if

25   you go down this road."  That wasn't before the Supreme Court

1   at all as I understand it.

2          MR. ABURANO:  Well, I think it was.  I think it was.

3   I mean I can't remember all of the pleading in that case,

4   because I wasn't involved at that point.

5          JUDGE McKEOWN:  Did the Supreme Court make any

6   determination with respect to constitutionality?  I didn't see

7   it, but maybe I am --

8          MR. ABURANO:  At the, you know, as I stand up here, I

9   can't recall.  But I do know that they -- they made some

10  comment about how mathematical preciseness is not required by

11  federal decisions, so I think it would be presumptuous to say

12  that they didn't take into account --

13         JUDGE McKEOWN:  It seems to me that it was more of a

14  counting decision, in other words, what should be in and what

15  should be out.  And that the Supreme Court wasn't really asked

16  to address what we are looking at here which is the potential

17  constitutionality.

18         MR. ABURANO:  Well, again, I mean it's a little bit

19  complicated in the sense that at that time the Commission filed

20  something which the Court rejected the filing.  But I know in

21  that -- in what was presented, at that point, and certainly in

22  the Commission's materials on the website, which were part of

23  the record or were made part of the record, the Court -- there

24  was discussion of federal principles.

25         And in fact the Commission's plan itself, in the

 1    introductory part, talks about the kind of uncertainties of

 2    federal law, and that was certainly part -- I can't imagine the

 3    Supreme Court wasn't aware of that.

 4            And the Supreme Court had faced a similar decision in

 5    an earlier citizen's case which challenged the reapportionment

 6    on the County of Hawaii.  I think most certainly the Hawaii

 7    Supreme Court --

 8            JUDGE McKEOWN:  I take it your point is though that

 9    once the September Plan came out, it had the same categories

10    and would raise the same --

11            MR. ABURANO:  It raised the same issues.  The

12    deviations in that plan were slightly less, but they were of

13    the 30 plus percent on the Senate and 20 plus percent in the

14    House.

15            And so I really don't understand.  They say something

16    like there's a 45-day statute of repose.  Well, there is no

17    45-day statute of repose.  There's a 45-day statute of

18    limitations if you are going to challenge the plan in front of

19    the Hawaii Supreme Court.  But you can file a lawsuit or claim

20    against the plan the day after it's filed.

21            And in fact in the *Solomon* and *Matsukawa* cases, I

22    think they filed their petition within two weeks of

23    September 26.  And had the plaintiffs filed this suit back

24    then, then we could have been having this hearing in December,

25    and we could have had, perhaps -- if the Court decided there

 1   was a new plan required, we could have had a new plan, you

 2   know, an earlier part of this year in time maybe to institute

 3   it for this election.

 4            But, no, instead we didn't get something filed until

 5   April, and here we are at May 18th.  And as I have shown you,

 6   it's next to impossible to have this election in a timely

 7   manner without potential chaos.

 8            JUDGE McKEOWN:  Thank you.

 9            MR. ABURANO:  Thank you, Your Honor.

10            JUDGE McKEOWN:  One point I take it that this exhibit

11   from which you have been talking is derived from the other

12   evidence that's in your exhibits with respect to specific

13   dates?

14            MR. ABURANO:  Yes.  I think Mr. Nago has testified

15   about some of these, and we have other exhibits, particularly

16   on the -- it was a relatively recent exhibit, but on about the

17   10 weeks that it would take for the counties to do that

18   assignment process.

19            JUDGE McKEOWN:  But just to make sure that the record

20   is matching up with the exhibits, this should be marked as an

21   exhibit.  You can provide the Court with a small

22   eight-and-a-half-by-11 version.  I think it would be Exhibit 67

23   so that we would have the exhibits --

24            MR. ABURANO:  Okay.

25            JUDGE McKEOWN:  -- correlating with your argument.

 1            MR. ABURANO:  All right.  Very well.  Thank you very

 2   much, Your Honor.

 3            JUDGE McKEOWN:  Thank you.

 4            You have used all your time, but I know you have a

 5   lot to say.  So I would like to give you 10 minutes for

 6   rebuttal.

 7            MR. THOMAS:  Thank you, Your Honor.  And I will try

 8   to keep it shorter if possible.  I think the Court understands

 9   what the motion's about, so I won't rehash.  I would just like

10   to point some things that my friend Mr. Aburano pointed out.

11            JUDGE SEABRIGHT:  Can I ask one question, and you can

12   answer very quickly, and move on to what you want.

13            MR. THOMAS:  Yes, Your Honor.

14            JUDGE SEABRIGHT:  Mr. Aburano talked about the

15   problems with the split election, you know, having a federal

16   election one day --

17            MR. THOMAS:  Yes.

18            JUDGE SEABRIGHT:  -- and the state and the county

19   election another.  Are you asking for that, or is it your view

20   we can all move this along and have it done in one election?

21            MR. THOMAS:  That, Your Honor, we think this may be

22   mission difficult.  It is not mission impossible.

23            JUDGE SEABRIGHT:  Okay.  So you are not asking for a

24   bifurcated election.

25            MR. THOMAS:  Not at all.  Not at all.

1      JUDGE SEABRIGHT:  Okay.

2      MR. THOMAS:  To some degree we are limited, because

3  we don't do elections, so we can't -- there's three things that

4  will determine the remedy:  Time, money and desire.  We can get

5  time.  We got the money.  We can't supply the desire.  So let

6  me move on to that.

7      Again my friend Mr. Aburano argues that you don't

8  need a benchmark under *Burns versus Richardson*.  We suggest

9  otherwise; that you do need a benchmark.  That you do need

10  to -- that the State does need to designate a basis that

11  might -- you know, what they are saying is the only benchmark

12  we need is we need to go look at *Burns* and pick out a benchmark

13  that might be like one of those, and that's enough.  And then

14  we don't have to make a comparison of what the plan would look

15  like if we used that and the plan that we got.  So that alone.

16      So it's not enough that their --

17      JUDGE SEABRIGHT:  Well, is he right that the

18  permissible population base *Burns* used was in fact one that had

19  extracted military?  And do you dispute that?

20      MR. THOMAS:  No, I think the Court itself says that.

21  The Court itself says that.

22      JUDGE KOBAYASHI:  Yes.

23      JUDGE McKEOWN:  So it was then looking at voter --

24      MR. THOMAS:  Actually, I am sorry.

25      JUDGE McKEOWN:  -- registrations against the

1   permissible population base which had carved out military.

2          MR. ABURANO:  And here is why that matters, Your

3   Honor, if I might answer that question.

4          Why that matters is the next thing the -- so they

5   passed sort of part one of the test.  They said, "Okay.  You

6   are within there.  You have identified citizens.  You have

7   identified total voters, and you have told us, the Court, that

8   your choosing of a -- of registered voters will approximate one

9   of those plans, and we don't have any evidence to show

10  otherwise."

11         And in this case, we do.  So, that's the huge

12  difference between us and *Burns*.  Even assuming we get past the

13  benchmark issue and we get to the second level of *Burns*, is

14  there evidence to show, and the Court has expressly said so.

15  And it's been -- it's been referred several times where they

16  said that's sort of the lesson of *Burns*, is that there has to

17  be some evidence in the record.

18         And the Court -- you get the distinct flavor that the

19  Court is not exactly happy with registered voters as a

20  population basis, but says we're-- there is nothing we can do,

21  because we don't have the evidence to show that it was -- it's

22  not a good basis; and, therefore, we are going to kind of hold

23  our nose and let it go.

24         JUDGE SEABRIGHT:  No, no.  Didn't they go further

25  than that though?  Didn't they say the record establishes,

1    essentially.  I can look at the case, but I thought they said

2    maybe "based on the record before us".  I mean, it may have

3    been a little more nuanced, that there is no substantial

4    difference between the voter registration base and a

5    permissible population base in the districting.

6         MR. THOMAS:  I think the word "not".  I think that

7    language you quote -- and, again, I am sorry.  Like

8    Mr. Aburano, I don't have a photographic memory on that.  But

9    the Court said, "There isn't a record before us to show us that

10   it's not good."

11        JUDGE SEABRIGHT:  Well, let's just look at the

12   language.

13        JUDGE McKEOWN:  What language are you referring to

14   when it makes the inverse?

15        JUDGE KOBAYASHI:  I think you are looking at right

16   after footnote 27 -- what page is this -- Page 96, I think.

17   "We hold that with view to its interim use, Hawaii's registered

18   voter basis does not on this record fall short of

19   constitutional standards."

20        MR. THOMAS:  Right, "does not fall short", and that's

21   the language I am focusing on.  So, in other words, there is

22   not enough evidence to show that it does fall short.

23        JUDGE McKEOWN:  What do we take then from the Supreme

24   Court's following language?  "In these circumstances, we find

25   no demonstrated error in the District Court's conclusion that

1    the apportionment achieved by use of a registered voters basis

2    substantially approximated that which would have appeared had

3    state citizen population been the guide."

4              MR. THOMAS:  Sorry.  I am trying to pick that up,

5    Your Honor.

6              JUDGE McKEOWN:  And that would be at 1299 in the

7    Supreme Court edition or Page 96 in the Supreme Court edition.

8              MR. THOMAS:  Yes.  Remember in that case the District

9    Court had before it the State's -- the State identified the

10   benchmark, and the State said, "Here it is.  It's two in fact.

11   It's population.  It's state citizen -- or citizenship."  I

12   think it was resident -- I don't remember what it was offhand.

13             JUDGE McKEOWN:  State citizenship.

14             MR. THOMAS:  State citizenship, right.  And in that

15   case, the District Court said, "Well, now that the State has

16   provided us the thing we are supposed to measure, we can make

17   the measurement."

18             And what that is, is they've apparently fulfilled

19   their burden of proof.  At that point, it goes to the Supreme

20   Court, and the Supreme Court says, "Well, we don't have

21   anything to show otherwise; therefore, we are not going to

22   strike this down."

23             Because, A, they identified the benchmark.  Two, they

24   put the substantial relationship, as that passage Your Honor

25   quotes is -- they make that connection, and then there's no

 1  evidence from the challengers to show that that's not correct;

 2  therefore, it seems okay to us.

 3       JUDGE SEABRIGHT:  But the benchmark had extracted

 4  military, nonresident military.

 5       JUDGE McKEOWN:  To obtain --

 6       JUDGE SEABRIGHT:  So if that's the case, then here we

 7  are comparing benchmark to benchmark, the extraction of

 8  nonresident military to the extraction of nonresident military,

 9  a permissible basis, which suggests there is absolutely no

10  problem with this plan.

11       MR. THOMAS:  The only -- the only -- I mean, the

12  problem is that the only common ground between the extraction

13  in that case and the extraction in this case are an

14  unconstitutional classification of they're military people as

15  opposed to they are not permanent residents.

16       In that case they were looking at military people to

17  extract as opposed to permanent residents.  Or actually, they

18  were.  They were looking at people who didn't registered to

19  vote.  I am sorry.  Excuse me.

20       JUDGE McKEOWN:  They were looking at voter

21  registration.

22       MR. THOMAS:  I am sorry.  Registered voters, yes.

23  There we go.

24       Anyway, I would like to sort of hit two more points,

25  and I really would like to wrap that up at that point.  First

1  of all, *Travis* really is the case.  It's a case from this Court

2  looking at -- they struck down the -- the registered voter

3  basis on the grounds of *Burns*.

4         So there's the case of how *Burns* was applied by this

5  Court in the last time a Hawaii reapportionment was challenged

6  here in Federal Court, and their only answer to that is that

7  *Travis* is wrong.  Don't follow it.

8         Well, we suggest otherwise.  We know it's not a

9  precedential case for this Court as a -- as a fellow District

10  Court, you are not obligated to follow it.  But we suggest that

11  it really does provide the guidepost for this Court to analyze

12  how at least that Court approached *Burns*, and we suggest it's

13  completely in line with the way we do.

14         And, you know, we love Hawaii.  Hawaii is unique.

15  And in fact we love Hawaii so much that we want to be included

16  in the population base.  But, you know, you look at -- I think

17  a lot of states would probably say the same thing.  That they

18  are geographically diverse.

19         Alaska sort of jumps to mind.  It has greater

20  percentages of military in Alaska, a land base that, if it's

21  not separated by water in some parts, it's at least as far

22  apart as New York and Los Angeles.  Diverse populations,

23  essentially islands of population within there, and a huge

24  number of military.  And yet they went away from extracting

25  military personnel.  And they have gone to the -- to that

1    solution.

2           So uniqueness alone is not drive -- does not drive

3    the result.  And in fact in *Travis*, the Court imposed canoe

4    districts as a remedy and said, "We understand that's what's

5    going on, but, you know, I am sorry.  The population count is

6    more -- it's the overriding concern when you reach deviations

7    of this high."

8           And the deviations in *Travis* were roughly similar.  A

9    little -- just a touch less than we have here, and the Court

10   said, in that case, that they are per se.  They are just too

11   far to be constitutionally tolerated.  And if the only way we

12   can remedy those is by imposing canoe districts, then that's

13   what the constitution requires.

14          JUDGE SEABRIGHT:  But if there's an experiment, and

15   that experiment failed -- that's the evidence before us right

16   now.  We don't have any evidence before us other than the canoe

17   district experiment failed.

18          MR. THOMAS:  We have evidence --

19          JUDGE SEABRIGHT:  Can't we take that -- doesn't that

20   hurt you?  I mean, doesn't that suggest that it is a validation

21   of the State's basis for avoiding the canoe districts?

22          MR. THOMAS:  No, because in *Travis* the Court didn't

23   reject canoe districts or didn't impose canoe districts because

24   it thought it was a better idea.  It thought it was

25   constitutionally required.

1          JUDGE SEABRIGHT:  Well, but if there is no

2   mathematical test you apply.  So if the 44 percent, 41 percent,

3   however you look at it is the greatest deviation, and that

4   isn't, per se, a violation, then you start to weigh that

5   against the State's interest in avoiding the canoe districts.

6   Because the issue is a very clear one here.  It's -- right --

7   to canoe or not to canoe.  I mean there is no --

8          MR. THOMAS:  We can't split people.

9          JUDGE McKEOWN:  You can't split people.

10          MR. THOMAS:  Right.

11          JUDGE SEABRIGHT:  You can't really go to --

12          JUDGE McKEOWN:  You can't split islands.

13          MR. THOMAS:  Either politicians or the populous.

14          JUDGE SEABRIGHT:  And we are looking at sort of the

15   limited population in Kauai and telling people to move.  So

16   it's either we canoe or don't canoe as a state; right?

17          MR. THOMAS:  Right.  And may I remind the Court -- I

18   am sorry.  I don't want to interrupt, Your Honor, but may I

19   remind the Court that canoe districts are not, per se, banned.

20   Maui County -- or the County of Maui is a canoe district at

21   least in one part.

22          JUDGE KOBAYASHI:  Right.  Molokai and Lanai.

23          MR. THOMAS:  And technically, I suppose, Kauai could

24   be considered a canoe district because it includes Niihau.

25   But, you know.

```
 1              JUDGE McKEOWN:  I don't think the suggestion is canoe
 2   districts are unconstitutional.  The question is not having
 3   them, in this geographic configuration that Hawaii finds itself
 4   in, with the fact that you went back through a whole
 5   redistricting commission, which the State did, does that
 6   configuration somehow violate the constitution, not that they
 7   are required or not required.
 8              MR. THOMAS:  Yes.
 9              JUDGE McKEOWN:  It's just that whether the current
10   configuration, whether that violates the constitution.  Isn't
11   that really the ultimate question?
12              MR. THOMAS:  I think that is, Your Honor.  And I will
13   sort of wrap up on that note.  You know, you look through the
14   records in the 1992 convention, and it really doesn't say
15   anything about why we are switching from registered voter to --
16   or, yes, from registered voter to permanent resident.
17              All it does is it incorporates by reference the 1991
18   Reapportionment Commission report.  And in there there is no
19   talk about permanent resident.  It's all about how do we get
20   rid of the military.  Take a look at the -- at the submissions
21   that were submitted by the State in this one from the various
22   advisory committees.
23              And they don't talk about how do we -- how do we
24   figure out who is permanent resident.  They all talk about how
25   do we get rid of military.  That's really what they get down
```

1   to.

2            And the last thing I will say is *Travis*, it was the

3   law in the district.  And there is no explanation at all in

4   those documents of why the State, in 1992, you know, seven

5   years or so after *Travis* was issued in this Court, simply

6   ignored it.  Said, "Okay.  Well, we know the Court ordered us

7   to us do canoe districts.  We are just not going to do it

8   anymore."  So on that, unless the Court has any more questions.

9            JUDGE McKEOWN:  No.

10            MR. THOMAS:  Thank you very much, Your Honors.

11            JUDGE McKEOWN:  Thank you.  I would like to thank

12   both counsel and your associated counsel both for your

13   arguments and also for the briefing.  It's very, very well

14   briefed and highly documented, as we can see by the very heavy

15   books that are up here.

16            We are cognizant, of course, as a result of the

17   discussions today and the obvious issues, that there is an

18   importance here of a timely decision.  We recognize the

19   importance of the election to the citizens of Hawaii, and we

20   will provide a decision in an expeditious manner.

21            MR. THOMAS:  Thank you very much, Your Honor.

22            JUDGE McKEOWN:  We will take the case under

23   submission.

24            JUDGE SEABRIGHT:  Thank you.

25         (Recess, 12:30 p.m.)

1                              --oOo--

2                  COURT REPORTER'S CERTIFICATE

3

4       I, KATHERINE EISMANN, Official Court Reporter, United

5  States District Court, District of Hawaii, Honolulu, Hawaii, do

6  hereby certify that the foregoing is a true, complete, and

7  correct transcript of the proceedings had in connection with

8  the above-entitled matter.

9

10  Date:  May 30, 2012.

11                            /s/ *Katherine Eismann*

12                         Katherine Eismann, CSR CRR RDR

13

14

15

16

17

18

19

20

21

22

23

24

25