# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH KOSTICK; KYLE MARK TAKAI; DAVID P. BROSTROM; LARRY S. VERAY; ANDREW WALDEN; EDWIN J. GAYAGAS; ERNEST LASTER and JENNIFER LASTER<br><br>    Plaintiffs,<br><br> vs.<br><br>SCOTT T. NAGO, in his official capacity as the Chief Election Officer State of Hawaii; STATE OF HAWAII 2011 REAPPORTIONMENT COMMISSION, VICTORIA MARKS, LORRIE LEE STONE, AN THONY TAKITANI, CALVERT CHIPCHASE IV, ELIZABETH MOORE, CLARICE Y. HASHIMOTO, HAROLD S. MASUMOTO, DYLAN NONAKA, and TERRY E. THOMASON, in their official capacities of members of the State of Hawaii 2011 Reapportionment Commission; and DOE DEFENDANTS 1-10,<br><br>    Defendants. | Civil No. CV 12-00184 JMS-RLP-MMM<br><br>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    The Underlying Facts Support Defendants' Motion ..................................... 1

II.   Count I:  Equal Protection (Equal Representation) ........................................ 9

      A.    Federal Courts Have Approved Reapportionment Population Bases
            That Excluded Military and Their Dependents .................................... 9

      B.    Federal Courts Have Not Required States to Use the Usual Resident
            Population Base ..................................................................................... 11

      C.    Use of the Permanent Resident Base Does Not Discriminate
            Against or Disenfranchise the Military ............................................... 15

      D.    The Commission Properly Determined the Permanent Resident
            Population Base ..................................................................................... 18

III.  Count II: Equal Protection (Malapportionment) ........................................... 21

      A.    The Supreme Court Has Not Set An Upper Limit On Deviations ..... 21

      B.    Protecting Political Subdivisions is a Legitimate State Interest ......... 23

      C.    Hawaii Has History of Protecting Basic Island Units ........................ 24

            (1)   The State Constitution ............................................................... 24

            (2)   The Constitutional Convention of 1968 .................................... 25

            (3)   Local Governments in Hawaii Have Limited Powers ............. 27

            (4)   Canoe Districts Do Not Provide Meaningful Representation .. 31

      D.    The Reapportionment Commission Minimized Deviations Within
            Basic Island Units Subject To Other Legitimate Criteria For
            Redistricting ........................................................................................... 34

            (1)   Kauai Basic Island Unit ............................................................ 38

        (2)     Hawaii Basic Island Unit-Senate Districts ................................. 38

        (3)     Hawaii Basic Island Unit-House Districts ............................... 40

        (4)     Maui Island Unit ...................................................................... 44

        (5)     Oahu Island Unit ..................................................................... 50

    E.     Plaintiffs' Reliance on *Travis v. King* Is Misplaced ........................... 56

    F.     Hawaii's Unique History Created a Sense of Place as to Each Island .......................................................................................................... 58

V.    Conclusion ................................................................................................. 60

## TABLE OF AUTHORITIES

CASES

*Brown v. Thompson,*
    462 U.S. 835 (1983) ................................................................... 22, 56

*Burns v. Gill,*
    316 F.Supp. 1285 (D. Haw. 1970) .............................. 4, 10, 17, 29, 30, 31, 34

*Burns v. Richardson,*
    384 U.S. 73 (1966) ........................................................ 9, 10, 13, 15, 17, 18

*Carrington v. Rash,*
    380 U.S. 89 (1965) ................................................................... 16

*Citizens for Equit. & Resp. Gov't v. County,*
    108 Hawai'i 318, 120 P.3d 217 (2005) ........................................ 15

*Daly v. Hunt,*
    93 F.3d 1212 (4th Cir. 1996) ................................................... 13, 14

*Fortson v. Toombs,*
    379 U.S. 621, 625 (1965) ......................................................... 12

*Gaffney v. Cummings,*
    412 U.S. 735 (1973) ................................................................. 14

*Garza v. County of Los Angeles,*
    918 F.2d 763 (9th Cir. 1991) ............................................. 12, 1314

*Holt v. Richardson,*
    238 F.Supp. 468 (D. Hawaii 1965) ................................... 9, 11, 12, 17

*Kirkpatrick v. Preisler,*
    394 U.S. 526 (1969) ................................................................. 22

*Mahan v. Powell,*
    410 U.S. 315 (1973) ................................................................. 22

*Matsukawa v. State of Hawaii 2011 Reapportionment Commission, et al.,*
SCPW 11-0000741 .................................................................... 11, 15

*Reynolds v. Sims,*
377 U.S. 533 (1965).................................... 10, 12, 13, 21, 23, 27, 57

*Swann v. Adams,*
385 U.S. 440 (1967) ................................................................... 22

*Travis v. King,*
552 F.Supp. 554 (D. Haw. 1982) ........................... 1, 2, 11, 17, 56

*WMCA v. Lomenzo,*
377 U.S. 633 (1964) ................................................................... 12

*Wells v. Rockefeller,*
394 U.S. 542 (1969)................................................................... 22

## STATUTES & RULES

HAR § 18-235-1.09 ..................................................................... 19

HAR §20-4-2 .............................................................................. 19

HAR §20-4-6 .............................................................................. 19

HAR §20-4-7 .............................................................................. 19

HRS § 11-12 ............................................................................... 16

HRS § 25-2 .............................................................................. 8, 36

HRS Chapter 279E ................................................................. 28, 29

HRS § 304A-402 ........................................................................ 19

CONSTITUTION

1968 and 1978 Constitutions ........................................................................... 1

1968 Constitutional Convention ............................................................. 3, 5, 24

1992 Hawaii Constitution ................................................................................ 3

Art. IV, § 4, of the Hawaii Constitution ........................................... 8, 24, 26

Art. IV, § 6 of the Hawaii Constitution ............................................ 9, 36, 57

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.      The Underlying Facts Support Defendants' Motion.

The Hawaii Constitution initially provided for the State House of Representatives to be apportioned on the basis of the "registered voter" population. The 1968 and 1978 Constitutions retained the use of registered voters as its population base.

After the 1981 reapportionment, a federal lawsuit challenged, in part, the State's registered voter base. *Travis v. King*, 552 F.Supp. 554 (D. Haw. 1982). The Court held the registered voter base could no longer be used because it did not produce substantially the same distribution of legislators as a permissible population base. It appointed Special Masters to prepare an interim plan for the 1982 elections. The reapportionment base recommended was "total population less non-resident military and dependents" which was an approximation of the state citizen base.

The Court accepted the plan with the reapportionment base that excluded non-resident military and their dependents. Following the 1982 elections, the 1981 Reapportionment Commission was reorganized to write a permanent plan of reapportionment. The reorganized 1981 Commission examined a comprehensive analysis of possible reapportionment bases. The Schmitt Report said use of the Census population "may result in a distortion of representation in certain areas of

Hawaii where there may be a high concentration of temporary residents (military and civilian Federal employees, or others such as students and aliens)." It said "state citizen" has commonly been defined as all legal residents of a state, with certain categories of residents excluded; "residents" included all people with an intent to make a particular state their legal residence. It noted that military personnel are required to declare a state of residency for income tax reporting purposes, and such a "process of declaring residency for the purposes of taxation is a strong indication of an intent to participate in the political processes of that same jurisdiction." It stated a reasonable definition of state citizen was "the permanent population of a state, thus excluding aliens and residents of other states." It noted the federal court in *Travis* had approved an equivalent of the "state citizen base."

Ultimately, the reorganized 1981 Commission adopted a "state resident" base which was the Census population, less the non-resident military and their dependents.

The 1991 reapportionment commission decided to use a permanent resident base - total population less transients. The 1991 Commission hired experts who determined that non-resident military were the one large, census-block-identifiable group of nonresidents included in the Census who could be excluded from the permanent resident population base.

2

In 1992, the Hawaii Constitution was amended to change the reapportionment base from registered voters to permanent residents. A Fact Sheet indicated that the permanent resident base would not include nonresident military and their dependents.

The 2001 Reapportionment Commission initially decided that the permanent resident population base would be determined by subtracting non-resident military and non-resident students from the Census population. The 2001 Commission received public testimony against inclusion of non-resident military dependents in the reapportionment base. Ultimately, the 2001 Commission reconsidered its decision and voted to exclude the dependents of non-resident military from the reapportionment base.

The Hawaii Constitution initially insured meaningful representation for the neighbor islands in the State legislature by mimicking the U.S. Congress, i.e., the Senate being based on geographic areas while the House was based on population.

The State's 1968 Constitutional Convention established new apportionment standards. One criteria the Convention used was that no district shall extend beyond county boundaries to preserve "the integrity of political subdivisions." The Convention recommended that the Hawaii Constitution be amended to allocate state legislators among the four basic island units via the method of equal proportions and to provide for minimum representation of the basic island units.

3

The term "basic island unit" was adopted "to reflect more clearly the fact that these areas are not only basic but are historical, geographical and political units with a strong identity of interest." It said rigid adherence to the one-man, one-vote principle "may result in depriving substantial elements of our population in the state legislature in matters of government" due to two factors unique to Hawaii: (1) Hawaii's geographical structure - islands or groups of islands separated by 30-70 miles of open ocean; and (2) Hawaii's highly simplified and centralized government structure. The Convention said "[n]o other state in the union possesses either of these characteristics and, of course, no other state even remotely approaches the situation resulting from a combination of both."

The Convention gave details about the unique role of the State legislature - how it controls many matters which in other states would be local government matters, e.g., the State's administration and control of the entire public education system, entire judicial system, all natural resources, boat harbors and airports, hospitals and health and welfare activities, administration and collection of all major taxes, etc.

Following the 1968 Convention, the method of equal proportions was challenged in federal court. *Burns v. Gill*, 316 F.Supp. 1285 (D. Haw. 1970). The Court said that the 1968 Convention had studiously and with due deliberation determined that "the best means of apportioning its legislative representatives

4

among its peoples in order to secure practical equality of suffrage was again to
divide the State into its four basic political (county) units and use the two-tiered
method of equal proportions ...."

Judge Pence described the unique geography, characteristics, and economies
of the various islands; noted that each island was separated by open ocean channels
with public transportation between them only by air; noted that each of the basic
island units had geographies that had led to insulating groups of citizens into
severable communities of interest; and that this insular life had caused residents to
personally identify with their own counties. The Court described how the State
controlled public offices, programs and facilities with the counties having few of
the normal municipal powers.

The Court concluded that the 1968 Convention was justified in concluding
that if voters were to have functional representation in the State legislature each
basic island unit must be given meaningful representation. It cited testimony from
the State statistician that it was impossible to set up legislative districts of absolute
numerical equality without conjoining areas on two islands that "had no
fundamental community of interests" and creating an expensive and difficult
campaign problem for the candidates of those districts and stultifying
communication for those so elected.

In 1982, a District Court held that the deviations statewide in the State's 1981 reapportionment plan exceeded the limitations allowable under the Equal Protection Clause. The Court appointed Special Masters who created a plan that straddled election districts between two islands; the rationale being that unlike legislative-drafted plans, court-drafted plans were self-limited in terms of allowable deviations. The public and legislature disliked these "canoe districts." Even the Special Masters, as residents of this multi-island State, indicated that they would have preferred a plan with no canoe districts.

The reorganized 1981 Commission was provided a report on the role of county integrity in Hawaiian politics and the impacts of split counties. Among other things, the Smith Report said: (a) the geographic separateness of the basic island units made it natural for them to have developed as separate political entities; (b) due to their separation, Hawaii's counties had developed a strong sense of identity and community which could be violated by districts that cut across basic island units, producing voter indifference and reducing voter participation; (c) Kauai had expressed outrage by being submerged in a canoe district after the 1982 elections; (d) Hawaii's uniquely centralized governmental structure means that ignoring county boundaries in districting severely disadvantages local representation in the State legislature; (e) ignoring county integrity severely hampers legislator-constituent relations; and (f) focusing only on percentage

6

numbers increased gerrymandering.  While the reorganized 1981 Commission

wanted to maintain county integrity, it eventually adopted a plan that used canoe

districts despite public animosity to them.

The 2001 Commission's initial proposed plan included a Senate canoe

district between Kauai (North Shore) and Oahu (Waimanolo) and a House canoe

district between Kauai (North Shore) and Oahu (Wailua/Schofield Barracks).  Due

to much public testimony against canoe districts, the 2001 Commission revised its

final plan to do away with the canoe district even though that led to high statewide

deviations.

The 2011 Commission had until September 26, 2011 to complete the

reapportionment plan.  The Commission was briefed on what groups of persons

had been considered for extraction from the Census population by the 2001

Commission to establish the "permanent resident" population base, and what data

had been available in 2001 for those groups, i.e., military sponsors and their

dependents, university students, sentenced felons, and aliens.  The 2011

Commission obtained residence information for non-permanent resident military,

military dependents, and students so that they could be accurately extracted from

census blocks for reapportionment and redistricting purposes.

By August 3, 2011, the Commission had not received all the information

requested from the military and colleges.  Due to the pending deadline for filing

the final plan, the Commission accepted a proposed plan that extracted no one

from the Census population for the purpose of holding the public hearings required

under HRS § 25-2 ("August 2011 Plan").  At the hearings, a major complaint was

that the Commission had failed to extract non-permanent residents.  By September

2011, the military and some colleges had still not provided all the requested

information.  As such, on September 26, 2011, the Commission approved a final

reapportionment plan that extracted only some military and students ("September

2011 Plan").

The September 2011 Plan was challenged in the Hawaii Supreme Court.  On

January 4, 2012, the Court found the September 2011 Plan invalid because it

included non-permanent residents in violation of Art. IV, § 4 of the Hawaii

Constitution, and ordered the Commission to prepare a new plan.

Commission staff renewed efforts to the military and colleges to provide all

of the information that the Commission had previously requested; eventually, the

military and colleges provided the requested data.  Based on this data, Commission

staff was able to extract the following from the Census population to establish the

permanent resident population base:  (1) 42,332 military sponsors (47,082 - 4,750

deployed); (2) 53,115 military dependents; and (3) 13,320 students.  The

Commission did not extract any active duty military identified as Hawaii residents;

the Commission actually included 52,927 military dependents who were <u>not</u> linked

to a non-permanent resident military sponsor.

The Commission's final plan was adopted on March 8, 2012 ("2012 Plan").

In accordance with Art. IV, § 6 of the Hawaii Constitution, the intra-basic island

unit deviations in the 2012 Plan are under 10%.  On an average population per

legislative seat basis the statewide deviation among all seats is 5.62%.

II.     Count I:  Equal Protection (Equal Representation)

      A.     Federal Courts Have Approved Reapportionment Population Bases
            That Excluded Military and Their Dependents.

Plaintiffs wrongly claim that the Equal Protection Clause **requires** the State

to use the Census population as the base for reapportioning the State's legislature.

The Supreme Court said: "the Equal Protection Clause does not require the States

to use total population figures derived from the federal census as the standard by

which this substantial population equivalency is to be measured."  *Burns v.*

*Richardson*, 384 U.S. 73, 91 (1966).

Federal courts have uniformly approved the use of population bases that

have excluded the military and their dependents.  In *Holt v. Richardson*, 238

F.Supp. 468 (D. Hawaii 1965) the court held that although the Hawaii

constitutional provision relating to apportionment of senators was unconstitutional,

the apportionment based upon registered voters, and excluding the military, was

not invidiously discriminatory.  The *Holt* Court stated that "the fluctuating military

population of the State make[s] representation on the basis of total population

politically suspect…" *Id.* at 475.

Hawaii's decision to exclude the military was again approved the following

year in *Burns v. Richardson, supra.*: "The difference between exclusion of all

military and military-related personnel, and exclusion of those not meeting a

State's residence requirements is a difference between and arbitrary and a

constitutionally permissible classification." *Id.* at 92, n. 21.

The Supreme Court went on to say:

> Neither in nor in any other decision has this Court suggested that the States
> are required to include aliens, transients, short-term or temporary residents,
> or persons denied the vote for conviction of a crime in the apportionment
> base by which their legislators are distributed and against which compliance
> with the Equal Protection Clause is to be measured. The decision to include
> or exclude such group involves choices about the nature of representation
> with which we have been shown no constitutionally founded reason to
> interfere.

*Id.* at 92.

Citing the large and fluctuating military in Hawaii, the Court said "Hawaii's

special population problems might well have led it to conclude that state citizen

population rather than total population should be the basis for comparison…[t]otal

population figures may thus constitute a substantially distorted reflection of the

distribution of state citizenry." *Id* at 94.

In *Burns v. Gill, supra*, the court upheld the use of a population base which

did not include the military: "Neither then [referring to the previous

reapportionment] nor now have the military or tourists been excluded improperly from the apportionment base." *Id.* at 1294.

*Travis, supra.* found that Hawaii's decision to use registered voters as the basis for a proposed reapportionment plan did not pass constitutional muster because it used registered voters as the basis, as opposed to "voter blind populations, either total **or** state citizen populations, [which] adequately serves the requirement of 'one person, one vote.'" *Id.* at 566 (emphasis added).

It was against this legal backdrop, and the decisions in *Solomon et al. v. Abercrombie, et al*, SCPW 11-0000732 and *Matsukawa v. State of Hawaii 2011 Reapportionment Commission, et al.,* SCPW 11-0000741, that the Commission began its work in January 2012 to prepare a reapportionment plan based on a population base of permanent residents.

    B.    Federal Courts Have Not Required States to Use the Usual Resident Population Base.

As Plaintiffs are claiming here, in *Holt* the Plaintiffs claimed that the **only** basis upon which apportionment could be constitutionally based was on "total population." *Id.* at 472. The *Holt* Court rejected this: "This court is not prepared at this time to accept plaintiff's premise that total population is the only basis upon which apportionment of state legislatures can constitutionally be based." *Id.* It noted that the Supreme Court had previously approved New York's use of "citizen

11

population" instead of total population (*WMCA v. Lomenzo*, 377 U.S. 633, 641

(1964)).

> If total population were to be the only acceptable criteria upon which
> legislative representation could be based, in Hawaii, grossly absurd
> and disastrous results would flow from a blind adherence to 'the
> elusive 'one-person-one-vote' aphorism.' (quoting Justice Harlan in
> *Fortson v. Toombs*, 379 U.S. 621, 625 (1965)).

*Holt, supra*, at 474.

The next year, the Supreme Court confirmed the *Holt* Court's holding that

"total population" was not the only basis upon which reapportionment could be

based:

> We start with the proposition that the Equal Protection Clause does
> not require the States to use total population figures derived from the
> federal census as the standard by which this substantial population
> equivalency is to be measured. Although total population figures were
> in fact the basis of comparison in that case [*Reynolds v. Sims*, 377
> U.S. 533 (1965)] and most of the others decided that day, our
> discussion carefully left open the question what population was being
> referred to.

*Burns, supra*, at 91.

The Supreme Court has consistently refused to set forth any specific

population base that must be used by the states to reapportion their state

legislatures, despite having had ample opportunities to do so.

Plaintiffs' have previously relied heavily on *Garza v. County of Los Angeles*,

918 F.2d 763 (9th Cir. 1991).  There, Hispanic residents of Los Angeles County

sought redrawing of county supervisor districts based, *inter alia*, on total

population rather than number of voting age citizens. The *Garza* Court ruled that

basing the districts on voting population rather than total population would

disproportionately affect the rights of those living in districts with a large Hispanic

(and non-voting) population. *Id.* at 775. The *Garza* Court noted that the Supreme

Court in *Burns v. Richardson, supra,* had expressly stated "[t]he decision to

include or exclude [aliens or other nonvoters from the apportionment base]

involves choices about the nature of representation with which we have shown no

constitutionally founded reason to interfere." *Garza, supra,* at 774, quoting *Burns,*

*supra.* As noted by the *Garza* Court "California state law requires districting to be

accomplished on the basis of total population. [citing] California Elections Code §

350000." Id.

Garza does not stand for the proposition that total population **must** be the

basis for reapportionment. As noted by one court, in commenting on the import of

*Burns* and *Garza:* "The more important lesson that may be gleaned from *Burns* is

that courts should generally defer to the state to choose its own apportionment

base, provided that such method yields acceptable results." *Daly v. Hunt,* 93 F.3d

1212, 1225 (4th Cir. 1996).

The *Daly* Court expanded on this pointing out:

> The decision to include or exclude any such group involves choices
> about the nature of representation with which we have been shown no
> constitutionally founded reason to interfere. Unless a choice is one the
> Constitution forbids, [footnote omitted] the resulting apportionment

base offends no constitutional bar, and compliance with the rule
established in *Reynolds v. Sims* is to be measured thereby…. The
[*Burns*] Court's general deference to the state's choice of
apportionment base is also illustrated by the Court's statement that
"Hawaii's special population problems *might well have led it to
conclude* that state citizen population rather than total population
should be the basis for comparison."

*Id.* (emphasis in original)

Garza is not controlling here.  Hawaii state law mandates that

reapportionment be based on the number of permanent residents, which

approximates a state citizen base.  Defendants believe that Hawaii's choice of

population base is entitled to deference from this Court because "[t]he decision to

include or exclude any such group involves choices about the nature of

representation with which we have been shown no constitutionally founded reason

to interfere." *Burns, supra*, at 92.  As noted by the *Daly* Court:  "This is

quintessentially a decision that should be made by the state, not federal courts, in

the inherently political and legislative process of apportionment." *Daly, supra*, at

1227.  To do otherwise would cause federal courts to "become bogged down in a

vast, intractable apportionment slough, particularly where there is little, if anything

to be accomplished by doing so." *14.*

Garza does not mean that total population **must** be used for

reapportionment. *Garza* only means that the Equal Protection Clause does not

preclude a court from imposing a reapportionment plan based on total population

where that is required by applicable state law.

In this case, the Hawaii Constitution requires use of a "permanent resident"

base not the Census population base.  See order and opinion in *Solomon et al. v.*

*Abercrombie, et al, supra.,*and *Matsukawa v. State of Hawaii 2011*

*Reapportionment Commission, et al., supra.*[1]  *Garza* does not apply to this case

since the applicable state law **requires** use of the permanent resident population

not the Census population for reapportionment.

C.     Use of the Permanent Resident Base Does Not Discriminate Against
       or Disenfranchise the Military.

Hawaii's permanent residence reapportionment base does not discriminate

against the military.  Military and their dependents are not excluded from the

reapportionment base because they are part of the military; rather, they are

excluded if they are not permanent residents of the State.[2]  The Commission

included in the reapportionment base service members whose military records

showed that Hawaii was their state of legal residence; it included 52,927 military

---

[1] *See also Citizens for Equit. & Resp. Gov't v. County*, 108 Hawai'i 318, 120 P.3d
217 (2005).
[2] While exclusion of military due the nature of their employment would be
discriminatory, the Supreme Court said that "[t]he difference between exclusion of
all military and military-related personnel, and exclusion of those not meeting a
State's residence requirements is a difference between an arbitrary and a
constitutionally permissible classification." *Burns*, 384 U.S. at 92, n.21.

dependents in Hawaii who were <u>not</u> linked to a service member who claimed a state of legal residence other than Hawaii.  Ex. N, ¶ 27.

Service members may change their state of legal residence by filing a Certificate of State of Legal Residence form.  Ex. FF.   As is evident from the form and the website cited by the military, a service member's state of legal residence is supposed to be what they consider as their "permanent home."  See Exs. BB, FF.

The State places no impediment to military and their dependants becoming permanent residents or to vote in Hawaii elections.  See HRS § 11-12, *et. seq.* (residency rules for voting in Hawaii).  *Compare Carrington v. Rash*, 380 U.S. 89 (1965) (Texas statute prohibiting service member from ever voting in a Texas election).  Nonresident military are not disenfranchised.  They can petition the representatives of their home state and vote in their home state elections.  There are voting assistance officers on military bases to help service members get absentee ballots to vote in their home state.  Ex. HH, ¶ 13.  They can petition Hawaii legislators and testify on bills at the State legislature.  They are not precluded from fully participating in the political process.  They are not "disenfranchised" simply because they are not counted for the purposes of reapportionment in Hawaii, and their home states chooses to not count them there.  It is equally valid to inquire whether the service members' home states are acting to disenfranchise the service

member who chooses to not be a permanent resident of Hawaii and intends to return home. The information the Reapportionment Committee used to determine the residency of the service members is available to other states as well. There is no directive from the Supreme Court that Hawaii, or any other state, has to ensure a service member is counted for purposes of a state legislative reapportionment, where the service member's home state chooses to not do so.

As shown in the history of Hawaii's reapportionment base, the point of the permanent resident population base is not to discriminate against or disenfranchise the military; it is to prevent distortions in representation that would occur if the once-in-every ten year reapportionment had to include large and fluctuating populations such as transient military and students.

In *Holt* and *Burns*, this Court and the Supreme Court upheld Hawaii reapportionment plans that had the effect of excluding nonresident military from the reapportionment bases. In fact, the courts' opinions show that Hawaii's special problems with a large and fluctuating military presence was the reason for approving a reapportionment base other than Census population. *See also Burns v. Gill, supra.*

In *Travis*, the Court adopted a court reapportionment plan that excluded nonresident military. There the Court ordered Special Masters to prepare reapportionment plans for the Court's consideration. Ex. C at 2. The Court said it

preferred a plan based on citizen population as defined in *Burns v. Richardson* -
total population minus nonresident military and their dependents. *Id.*, at 3, 6. The
Special Masters recommended and the Court adopted Plan 2 which used as a
population base, "total population minus nonresident military and their
dependents." *Id.*, at 24, 27; Ex. E.

Plaintiffs have cited no federal court decision that holds that the Equal
Protection Clause precludes a state from using a reapportionment base that
excludes non-permanent resident military, military dependents and/or students.

D.   The Commission Properly Determined the Permanent Resident
     Population Base.

As shown in the declarations of Marks, Rosenbrock and Moran, (Exhibits N,
P, and R) the Commission was careful in determining the permanent resident
population used for reapportionment.  It was aware what prior commissions had
done and sought the advice of the Advisory Councils of each basic island unit -
three of which opposed the inclusion of nonresident military and their dependents
and two of which opposed the inclusion of nonresident students. Exs. CC, DD,
and EE. It heard public testimony - much of which was strongly against the
inclusion of non-permanent resident military, military dependents and students.
Ex. O. It had Commission staff obtain information from the military and Hawaii
colleges that: (a) identified military, military dependents, and students who were
non-permanent residents and counted as of the Census Date; and (b) located those

non-permanent residents to census blocks so that they could be properly extracted
for reapportionment and redistricting.

The non-permanent resident military were properly identified by their state
of legal residence.  For state tax purposes, the military is required to keep track of a
military member's state of legal residence.  Exs. BB, FF.  Military personnel can
establish or change their state of legal residence by filing a Certificate of State of
Legal Residence Form which says "legal residence" and "domicile" are
interchangeable; "they are used to denote that place where you have your
**permanent home** and to which, whenever you are absent, you have the intention
of returning."  Ex. FF (emphasis added).  The form states:

> The formula for changing your State of legal residence is simply stated as
> follows:  <u>physical presence in the new State with the simultaneous intent of
> making it your permanent home and abandonment of the old State of legal
> residence/domicile.</u>

*Id.* (emphasis in original).

Military and their dependents are not subject to Hawaii income taxes unless
their domicile or permanent residence is here.  HAR § 18-235-1.09.

The Commission's basing a military dependents' permanent residence on
their military sponsor was also proper.  That military dependents travel with their
military sponsors and will have the same legal residence as they do is a matter of
experience and common sense.  A 2012 Department of Defense paper on the
problems that military spouses have with state occupational licensing laws states

that military spouses were ten times as likely as their civilian counterparts to move across state lines in the past year.  Ex. MM, at 3-4.  This is because they are moving with their military sponsors.

Non-permanent resident students were properly identified by the UH by payment of non-resident tuition during Spring 2010.  To qualify for resident tuition, UH students must show that they are a "bona fide resident" of the State for at least 12 consecutive months and have not been claimed as a dependent by parents or guardians who are not legal residents of the State.  HRS § 304A-402; HAR §20-4-6.  The determination of residence requires a finding of intent to establish "domicile" in Hawaii; "domicile" being defined as "the place where an individual has a true, fixed, and **permanent home** ...."  HAR §§ 20-4-7 and 20-4-2 (emphasis added).  Other Hawaii colleges properly identified non-permanent resident students by whether they had a home address outside of Hawaii during the school term that included the 2010 Census Date.

While Plaintiffs claim that the Commission was arbitrary because it did not exclude aliens, the Commission staff advised that this could not be reliably done.  Ex. N, ¶¶ 8, 15 and Ex. J at A-192.  There is also no evidence that aliens are not "permanent residents" of Hawaii; they are likely to want to make Hawaii their permanent home.

20

The purpose of the permanent resident population base is to avoid distortions to representation that would be caused by including large and fluctuating transient populations that are identifiable and locatable such as the military and their dependents. There is no indication that aliens or other groups are large enough to distort Hawaii's reapportionment base.

III.     Count II: Equal Protection (Malapportionment)

A.     The Supreme Court Has Not Set An Upper Limit On Deviations.

The Supreme Court, in *Reynolds v. Sims*, held that "the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." 377 U.S. 533, 577 (1964); further, "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to apportionment of seats in either or both of the two houses of a bicameral state legislature." *Id.* at 579. While the Court held that "Considerations of area alone provide an insufficient justification for deviations from the equal-population principle" (*Id.* at 580), it further held:

> A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. . . . Local governmental entities are frequently charged with various

responsibilities incident to the operation of state government.  In many
states, much of the legislature's activity involves the enactment of so-called
local legislation, directed only to the concerns of particular political
subdivisions.  And a state may legitimately desire to construct districts along
political subdivision lines to deter the possibilities of gerrymandering.

*Id.* at 580-81 (emphasis added).  This principle was reaffirmed in *Mahan v. Powell*,

410 U.S. 315, (1973), where the court upheld Virginia's reapportionment statutes

maintaining the integrity of traditional county and city boundaries while

reapportioning House of Delegates districts in a manner resulting in a percentage

variation of 16.4% from the ideal district.[3]  The Court held that Virginia's policy of

maintaining the integrity of political subdivision lines is a rational one; that the

plan can be reasonably said to advance that policy; and that population disparities

were within tolerable limits.  *Id.* at 329.[4]

Later, in *Brown v. Thompson*, 462 U.S. 835 (1983), the Court upheld

Wyoming's policy of using counties as legislative districts and ensuring that each

county had at least one representative, even though the plan had a maximum

deviation of 89%, where the policy had been followed since statehood, was

---

[3] The Court reasoned that application of the "absolute equality" test of *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), and *Wells v. Rockefeller*, 394 U.S. 542 (1969), to state legislative redistricting may impair the normal functioning of state and local governments.

[4] The Court distinguished *Swann v. Adams*, 385 U.S. 440 (1967), where a scheme having a maximum deviation of 26% was disapproved because the state offered no evidence to support the challenged variations.

supported by substantial and legitimate state concerns, and had been applied in a

manner free from any taint of arbitrariness or discrimination. *Id.* at 483-86. While

the appellants only challenged a single county's representative rather than the

state's overall 89% deviation, the Court nevertheless chose <u>not</u> to throw out the

whole plan and order redistricting without consideration of county lines. Rather,

the Court found that the challenged county was "de minimis" and because even if

that county had been relieved of its representative, the overall deviation would

reduce to 66%.

Accordingly, the Supreme Court has not set an upper limit on deviations;

rather, evaluation depends on the specific facts and circumstances on an individual

case and that deviations over 10% may be justified by legitimate state interests.

B.      Protecting Political Subdivisions is a Legitimate State Interest.

As discussed above, the Supreme Court in *Reynolds* held that a

"consideration that appears to be of . . . substance in justifying some deviations

from population-based representation in state legislature is that of insuring some

voice to political subdivisions, as political subdivisions." 377 U.S. at 580. It

reaffirmed this principle in *Mahan*, upholding reapportionment statutes that

maintained the integrity of traditional county and city boundaries resulting in a

percentage variation of 16.4% from the ideal district. And in *Brown*, the Court

upheld Wyoming's policy of using counties as legislative districts and ensuring

that each county had at least one representative, even though the plan had a maximum deviation of 89%.

C.   Hawaii Has History of Protecting Basic Island Units.

(1)   The State Constitution.

Hawaii has a history of protecting basic island units and county lines, as reflected in Article IV, section 4, of the Hawaii State Constitution.  The State Constitution provides that the State senate shall be composed of twenty-five members, and the State house of representatives shall be composed of 51 members; in reapportioning and redistricting the State legislative districts, Article IV provides a two-step process: the first step is the apportionment of the total number of members of each house of the State legislature among the four basic island units, using the total number of permanent residents in each of the basic island units and computed by the method of equal proportions; the second step is apportioning the members allocated to each basic island unit among districts within that basic island unit and redrawing district lines where necessary so that the average number of permanent residents per member is as nearly equal as practicable to the average for the basic island unit.  See Article IV, section 6, of the Hawaii Constitution.

The basic island units described in Article IV of the Hawaii Constitution are also the State's political subdivisions, i.e., the four counties that comprise the State.

24

(2)   The Constitutional Convention of 1968.

Article IV, section 4, of the Hawaii Constitution was the result of the 1968

Constitutional Convention of Hawaii.  The Standing Committee on Legislative

Apportionment and Districting explained that apportioning seats among basic

island units using the method of equal proportions was used because it

incorporated then-present apportionment methods found in the Hawaii

Constitution, and to "reflect more clearly the fact that these areas are not only basic

but are historical, geographical and political units with a strong identity of

interest."  (Ex. K at 261).  The Committee further explained that the heavy

concentration of population on the island of Oahu means that a strict adherence to

the "one-man, one-vote" principle would result in "depriving substantial elements

of our population of any effective representation in the state legislature in matters

of government."  *Id* .  As discussed in the factual background of this Memorandum,

the Committee explained Hawaii's unique geographical characteristics, centralized

government, and unique political history.  The Committee thus concluded:

> It is not possible, given Hawaii's geography and its history, to manufacture
> tenable senatorial or representative districts by combining any parts of two
> counties.  The result in any such case would always be the submergence and
> effective disenfranchisement of the voters in that county which constituted
> the lesser number.  Consequently people living in any given Neighbor Island
> unit can attain effective representation only from persons elected within that
> unit.

*Id.* at 262.

25

As set forth in his declaration (Ex. II), in 1968, Richard P. Schulze, Jr. was elected from the Eighth District (Oahu) to serve as one of the 82 delegates to the 1968 Constitutional Convention, and was appointed the Chairman of the Committee on Legislative Apportioning and Districting ("Committee"), by the President of the Convention, D. Hebden Porteus. He was also a member of the Committee on Legislative Powers and Functions.

He state that with respect to the Committee's adoption and use of the term "basic island unit," as used throughout its proposed amendment of what is now Article IV of the State Constitution, the Committee was unanimous in its conclusion that "if a voter of the State of Hawaii is to have meaningful representation in any kind of government, he must have effective representation from his own island unit in the state legislature." *Id.* at p. 263.

The Committee adopted the term "basic island units" because it concluded that what real representation meant in our Pacific Island circumstances was that each island unit had to have its own representatives. There was no other way to square each island's "geography" of islands and separate "insular" units, each with distinctive "topographic and climatic conditions" that "produced strikingly different patterns of economic and occupational pursuits," There is no easy transport between island units; the channels are deep and open to the Pacific Ocean; crossing one of them can be a dangerous undertaking for small to medium

26

size boats; there is no ferry service, and so no regular contact or intercourse

between the residents of one island unit and another. Under Hawaii's system of

government, the State legislature deals significantly with local issues. The local

issues in any island unit are unique and typically bear very little similarity to those

in the next island unit. The Committee's conclusion was that for an island resident

in Hawaii to have meaningful representation in the State Legislature, the

representative must be from that resident's island unit.

The Committee was aware of the tension this created with the *Reynolds*

"one-man, one-vote" principle because it understood that the numerical population

of an island unit was not necessarily going to be precisely divisible by the

numerical average state district population.  There would be deviations that, in the

apportionment of a contiguous state whose counties are connected by highways,

would be deemed excessive.  The Committee had concluded, however, that real

representation in Hawaii required adherence to the "basic island units."

(3)     Local Governments in Hawaii Have Limited Powers.

Moreover, unlike almost every other state, Hawaii does <u>not</u> have a network

of local governmental agencies such as townships, cities, school districts, and

sewer districts through which local residents can exercise control over local issues.

Ex. D at 182.  There are only four counties which, relative to other states, have

considerably less powers over local matters; the State legislature, therefore, has

27

substantial control over areas that are more commonly within the purview of local

government in other states. *Id.*

The Standing Committee on Legislative Apportionment and Districting of

the 1968 Constitutional Convention recognized this as a factor in apportioning

among basic island units:

> In addition, in Hawaii and unlike other states, all of the major taxes are
> centrally administered and collected by the state government. . . . [T]he
> neighbor island counties are not self-supporting even for the limited county
> services they provide, and each county government depends on grants-in-aid
> from the legislature in order to support its own activities.

Ex. K at 261.

Additionally, the Hawaii Legislature, in enacting described Hawaii's unique

government:

> Hawaii's state government differs markedly from most mainland states.
> Hawaii has a two-tier government: the State and the various counties. The
> state government functions as a general purpose government having the
> responsibility for many programs, such as public education, health, welfare
> and judiciary, which are usually controlled by local government in mainland
> states. In addition, land use, through the state land use commission, is
> generally determined by the State rather than by the counties as is usually
> the case on the mainland. In transportation, the state government has
> responsibility for such normally local government programs as airports,
> bikeways, harbors and waterways.
>
> Hawaii's two-tier government did not come about by accident; it was the
> result of careful consideration and study of Hawaii's unique geographic
> configuration. As a state comprised of islands, Hawaii has four counties,
> each consisting of separate islands and consequently not contiguous.
>
> Because the State of Hawaii is comprised of islands, much of the
> transportation planning done by the State is designed to facilitate

transportation solely within the county in which the project is built. Obviously, a state highway built on the island of Oahu will only serve that island. Hence, for example, the State's three major defense highways, H-1, H-2 and H-3, which are all located on Oahu, while designated as state highways, serve only the transportation needs of the residents of Oahu. However, this is entirely consistent with the present delineation of roadway functions in Hawaii. The State is generally responsible for providing highway facilities that facilitate inter-community transportation, with the counties primarily responsible for local intra-community streets and roads. As a result, the State has by design a major portion of the responsibility for transportation in each county, and more importantly for that part of the transportation network most closely related to and impacting on planning in general and transportation planning in particular.

HRS § 279E-1.

In *Burns v. Gill*, 316 F. Supp. 1285 (D. Hawaii 1970), the court found the

following:

Just as the kings of Hawaii organized the political structure of these islands and ruled thereunder for a hundred years, just as was approved and adopted thereafter by the Congress of the United States when it enacted Hawaii's Organic Act in 1900, and just as was again reaffirmed and adopted by Hawaii's Constitutional Convention of 1950, so too did the Constitutional Convention of 1968 studiously and with due deliberation determine that the best means of apportioning its legislative representatives among its peoples in order to secure practical equality of suffrage was again to divide the State into its four basic political (county) units and use the two-tiered method of equal proportions to distribute its State legislators therein.

* * *

Unique geographic, geological and climatic conditions within each basic island unit have produced markedly different patterns of economic development and occupational pursuits.

* * *

29

> Each of the four basic island units of Hawaii is divided from its nearest
> counterpart by miles of open ocean channels. . . islands of Hawaii, Maui,
> Molokai, Oahu, and Kauai are each quite mountainous, with sharp mountain
> ridges and small valleys with sheer cliff walls, creating geographical areas
> within each island separated by natural barriers[.]
>
> * * *
>
> No other state has such a simplified and centralized governmental structure
> as Hawaii.  Hawaii has but two levels of government: county and state.  The
> Hawaiian "county" is in fact but a municipality, with the counties having but
> few of the normal municipal powers[.] . . . Hawaii is the only state giving the
> State government statewide zoning authority. . . . Capital improvements
> programs are budgeted by the State with funds allocated to the counties for,
> e.g., highways, airports, harbors, schools, colleges, hospitals, health
> facilities, and all facilities for the judiciary.
>
> All welfare programs, prison and correctional programs, and housing
> authority are exclusively State administered. . . . There are no municipal
> courts in Hawaii; all are State.  All judges are appointed either by the
> Governor or the Chief Justice of the State Supreme Court.

*Id.* at 1290-92 (internal footnotes and citations omitted).  That court was "satisfied

that Hawaii's uniquely centralized governmental structure, together with the other

insular factors stated above, justifies the Convention's conclusion that if its voters

are to have functional representation in their State legislature each basic island unit

must be given meaningful recognition therein." *Id.* at 1292.  The court further

held:

> [I]n Hawaii the rigid implementation of the one-man, one-vote principle at
> the State legislative level, an end which could be achieved only by
> deliberately and artificially chopping up communities with mutuality of
> political interest and attaching them to other areas with no basic mutuality
> between the two whatsoever, would result in a complete loss of meaningful
> representation to a multitude of island voters. . . . [T]he two-tier

30

apportionment plan adopted by the Constitutional Convention, i.e., initially apportioning all representatives and senators among basic island units and thereafter drawing district lines within the island units themselves, now gives fuller and more meaningful representation to the voters of the several districts within each basic island unit than they could possibly have under any other scheme of apportionment.

*Id.* at 1293.

(4)   Canoe Districts Do Not Provide Meaningful Representation.

Commissioner Masumoto explains in his Declaration (Ex. V) that his experience on the 2001 Reapportionment Commission was that people in Hawaii are against the idea of "canoe districts"[5] – particularly those who would be in a canoe district. The 2001 Commission's advisory councils that represented the basic island units affected were against the use of canoe districts; a large number of people from the affected districts testified against the use of canoe districts. Prior to 2001, there were canoe districts that included the Hanalei or northern area of the island of Kauai and the Hana or eastern area of the island of Maui; those two areas are in different counties, are far apart in terms of distance, and electorates of each appeared to be significantly different; and that it was difficult and expensive for legislators to campaign and represent the disparate areas. Among the reasons expressed as to why people do not like canoe districts are (a) they don't feel they are or would be well represented by a legislator who came from or resided on a

---

[5]  A "canoe district" is a state legislative district that is partially on one island of Hawaii and partially on another island of Hawaii. Ex. V.

different island than they do; (b) they feel the legislator has or would favor the

basic island unit that he or she resides on or that has the most voters in the district;

and (c) their interests aren't or won't be well represented since their legislator is or

would be trying to represent multiple differing and perhaps conflicting interests

from two separate communities.

The Hawaii Advisory Council, at its June 9, 2011, meeting, voted against the

use of canoe districts for redistricting purposes, after public testimony and

discussion.  (Ex. W, p.2 para. 5).  Similarly, the Kauai Advisory Council, after

public testimony and discussion, voted against the use of canoe districts.

(Ex. X, p.2 para. 5).

The legislators who represented canoe districts in the past had difficulty

representing all of their constituents to the best of their abilities, due to the cultural

and political differences among basic island units.  For example, Senator Malama

Solomon (who formerly represented a "canoe district" comprised of portions of the

islands of Maui and Hawaii) states that Capital Improvement Project (CIP) funds

are awarded to legislators; however, those representing canoe districts had to split

the funds among two islands.  (Ex. Y) As another example, two islands in her

"canoe district," Maui and Hawaii, both wanted an astronomy super-computer,

which led to a difficult choice as to which island to lobby in favor of; another

example was the airport expansion project, funded by the State, that both the

islands of Maui and Hawaii wanted. *Id.* Senator Solomon also states will that

constituents approached her to express their disappointment that she was unable to

fully represent *them. Id.*

Similarly, former Representative Hermina Morita (who formerly represented

a "canoe district" comprised of portions of the islands of Kauai and Maui), states

that it is difficult to create a presence on, or foster strong community ties on, an

island other than your primary residence. (Ex, Z) Representative Morita was able

to visit her non-residential island maybe once every four weeks; additionally, she

represented remote areas of her non-residential island, which were especially

difficult to visit due to limited visitor accommodations. *Id.* Similar to Senator

Solomon, Ms. Morita's experience was that she was forced to split CIP funds

among two separate and distinct communities, and that she received approximately

25 letters or phone calls per week from disappointed constituents. *Id.* Ms. Morita

further explains the difficulties caused by having to split her time, resources, and

loyalty among two different county communities. *Id.* As specific examples, Ms.

Morita points to the differing views among basic island units regarding such

important issues as windmill farms, water allocation, and GMO taro. *Id.*

D.   The Reapportionment Commission Minimized Deviations Within Basic Island Units Subject To Other Legitimate Criteria For Redistricting.

The elimination of canoe districts resulted in a difficult situation regarding the basic island unit of Kauai. Given the size of Kauai's population, providing Kauai with two senate seats would result in overrepresentation by -33.28%, and providing one senate seat would result in underrepresentation by +33.44% (Ex, T). Mindful of this, the Commission assigned three House seats to Kauai for an overrepresentation of -10.20% in the House, to balance the underrepresentation in the Senate by +33.44%. *See Reynolds*, 377 U.S. at 577 ("apportionment in one house [of a bicameral legislature] could be arranged so as to balance off minor inequities in the representation of certain areas in the other house"); *Burns*, 316 F. Supp. at 1298.

Using the method of measuring legislative representation in *Burns*, the maximum statewide percentage deviation in the apportionment among basic island units is 5.62%. Ex. T at 22-23.

As explained below, the districts were drawn to serve the rational State policy of recognizing the geographic insularity and unique political and socio-economic identities of the basic island units, as well as addressing concerns of the public who have historically opposed canoe districts, and the over-all fairness in representation of each basic island unit when measured by the Huntington-Hill

Method of Equal proportions, and the nature of U.S. Supreme Court decisions to date. *Id.* at 23.

The 2012 Supplement further describes the Commission's process in developing the Plan, including the Technical Committee's recommended proposed plan of February 15, 2012, which transferred one Senate seat from Oahu basic island unit to the Hawaii basic island unit; shifts in the House district boundaries on Oahu due to a revised distribution of population growth around that island; the public hearings that were held; the Technical Committee's revision of the proposed plan in response to public testimony concentrated on the particular areas of Newtown communities, Makakilo/North Shore, Kahaluu/Waikane, Ewa/Ewa Beach/Ocean Pointe, Moiliili/Makiki/Tantalus, and Akilua/Maunawili/Olomana; further tweaking of the proposed plan; and the Commission's adoption of the revised final Plan. *Id.* at 5-9.

Dylan Nonaka was appointed to the 2011 Commission's Technical Committee which was responsible for preparing proposed reapportionment and redistricting plans for the 2011 Commission's review and adoption and was intimately involved in the drawing and placement of district lines for the reapportionment and redistricting plans and maps that the Technical Committee prepared for the Commission's review and adoption. (Ex. AA).

35

The drawing and placement of district lines for State of Hawaii ("State") legislative districts is complicated by the unique geography of the State. The State is made up of a number of islands, were formed by volcanic activity, and have one or more mountain ranges that divide areas of the island. In addition, there are many valleys, streams, and a complicated coastline. The drawing and placement of district lines for State legislative districts is also complicated by the unusual sizes, shapes, and populations of census blocks and by the demands or requests of communities within each island to be kept together and not divided into multiple districts. At several public meetings and hearings, the Commission heard testimony from particular communities who complained about being divided into two or more districts and wanted to be put back together.

The inter-island and intra-island deviations among State legislative districts that are present in the reapportionment plan that the 2011 Commission ultimately adopted are due to the Technical Committee and 2011 Commission seeking to comply with the criteria in Art. IV, § 6 of the Hawaii Constitution and HRS § 25-2 and seeking to keep intra-island communities intact. This was particularly true with respect to Oahu in which population growth from 2000 to 2010 had shifted dramatically to west and central Oahu requiring considerable adjustments to district lines. The drastic growth required that two State House seats and one State Senate seat shift from urban Honolulu to west Oahu. Due to geographic features,

census block characteristics, and to minimize disruption to existing district and

community boundaries, the Technical Committee and 2011 Commission in certain

circumstances needed to deviate from the target district population per district.

The Technical Committee tried to keep deviations from the target population as

low as reasonably possible but in places like Ewa Beach where residents have a

strong community identity, we needed to increase the number of residents per

district to keep as much of those communities together as possible.  Conversely

there are areas like Waikiki where leaving the district with a population lower than

the target district population better kept the community together.

Having the ability to deviate from the target district population by no more

than ten percent allowed the Technical Committee and 2011 Commission to best

serve the communities affected by reapportionment.  If the Technical Committee

and 2011 Commission had followed a stricter standard, they would have been

forced to divide longstanding communities in several areas of the State.

The various district lines were drawn pursuant to the Hawaii Constitution's

criteria favoring contiguous districts, compact districts, and drawing district lines

to follow recognized features such as streets, streams and clear geographical

features, as well as coinciding with census tract boundaries, not unduly favoring

any person or political faction, and not submerging an area into a larger district that

has substantially different socio-economic interests.  Additionally, the Committee

took into consideration the recommendations of the island advisory councils. The following are specific examples:

(1)    Kauai Basic Island Unit.

The deviations on Kauai are due to the Hawaii Constitution's mandate that no district shall extend beyond the boundaries of a basic island unit. Given the size of the basic island unit of Kauai's population, providing Kauai with two senate seats would have resulted in overrepresentation by -33.28%, and providing one senate seat resulted in underrepresentation by +33.44%. With respect to the House seats, the Committee accepted the recommendations of the Kauai Advisory Council, which resulted in little deviation from existing district lines.

(2)    Hawaii Basic Island Unit-Senate Districts.

All of the Hawaii Senate Districts are separate areas with distinct characteristics, needs, and socio-economic interests. Senate District 1 is comprised of the Hilo area. It abuts Senate District 4 to the north, and Senate District 2 to the south. However, Hilo is more urbanized relative to the neighboring districts. Hilo is the county seat and major urban, commercial, and industrial area of east Hawaii. It deviates from the statewide average or target senatorial district by -10.78%. As a practical matter, the only way of increasing the population of Hawaii Senate District 1 would be to take population away from the adjacent Hawaii Senate District 2, which is the Puna/Volcano area. As described elsewhere in this

38

Memorandum, the characteristics and socio-economic interests of the Puna area

and community are quite different from the urban Hilo area and community.   The

socio-economic interests of any area split off from the Puna area would be

submerged in the larger population of Hilo.   At the public hearings on Hawaii in

2011, people from the Puna area made it very clear that they did not want their

community split up into multiple districts.  Also, it would be hard to find

permanent and easily recognized geographic features for a new southern boundary

of Senate District 1 if that district had to be increased in population and size at the

expense of Senate District 2.

Senate District 2 is comprised of the Puna area.  Puna is a unique district

containing relatively underdeveloped communities.  Infrastructure is lacking in

many areas; there are numerous dirt roads; some residences don't have water

service; there is one delete single 2-lane highway going into and out of the Puna

area.  The Committee felt there would have been substantial community opposition

if it had carved out blocks from the Puna area to add them to the Hilo district.

Senate District 3 is comprised of the Kona area.  Kona tends to have larger

developments than its neighboring districts.   The Committee chose to keep the

Kona area intact rather than parcel out blocks to combine with neighboring

districts.

Senate District 4 is comprised of the Kohala and northern area of the island of Hawaii. There is a natural stream boundary separating Districts 1 and 4 in the Hamakua area. Furthermore, District 4 is less developed and much more rural than the Hilo or Kona areas, with distinct concerns and culture. It is mostly a rural area compared with the urban and commercial areas of Hilo and the resort and commercial areas of Kailua-Kona. Hawaii Senate District 4 deviates from the statewide average or target senatorial district by -10.30%.

As a practical matter, the only way of increasing the population of Hawaii Senate District 4 would be to take population away from the adjacent Hawaii Senate District 3, which contains the urban and commercial areas of Kailua-Kona. The socio-economic interests of the area split off from Kailua-Kona would be submerged in the larger population of the Kohala/North Hawaii area. Also, it would be difficult to find permanent and easily recognized geographic features for the new boundary line between Senate District 4 and Senate District 3 - given the census blocks and streets in the area that would be transferred between those districts. That area contains somewhat isolated residential developments.

(3)    Hawaii Basic Island Unit-House Districts.

All of the Hawaii House Districts are separate areas with distinct characteristics, needs, and socio-economic interests.

40

The starting point for drawing the House District boundary lines was the north edge of House District 1, Waipio Valley. The drawing of district boundary lines progressed around the island in a counter-clockwise direction. The district boundary lines from the 2001 Reapportionment were adjusted to reflect the change in population distribution. The intent was to keep the House District boundary lines as similar as possible to the 2001 district boundary lines.

With respect to the House seats, the district lines were drawn for similar reasons. House District 1 is comprised of the north-east portions of Hawaii, including Honokaa, Paauilo, Ooakala, Laupahoehoe, Onomea, and Kaumana. These are rural communities, including the isolated and compact Honokaa area in the northern portion of the district. It is the outskirts of urban Hilo and deviates from the statewide average or target house district by +8.2%. As a practical matter, the only way of reducing the population of this district would be to transfer some of its area to either House District 2 (urban Hilo) or House District 3 (Volcano). However, both of these areas are also overpopulated - House District 2 (+4.53%) and House District 3 (+5.68%).

House District 2 is comprised of the compact urban district of Hilo. It was not feasible to reduce the deviation in House District 1 by taking population away from House District 1 and adding to House District 2, because that population

would be disenfranchised by becoming a minority in an urban district that has

substantially different socio-economic interests.

As to House District 3, the new boundary line did not change significantly

from the 2001 boundary lines.  House District 3 is sparsely populated and large.

The new lines shrunk the size of House District 3.

House District 4 is comprised of the Puna area.  As mentioned above, Puna

is a unique district containing relatively underdeveloped communities, and

therefore has unique interests.  The Committee felt that the area should remain

intact, for the reasons set forth above. It deviates from the statewide average or

target house district by +9.98%.  The only practical way of reducing the population

of House District 4 would be to transfer some areas of Puna to the only adjacent

district, Hawaii House District No. 3, which contains Volcano and the populations

on the main road from Hilo to Volcano.  As noted above, the Puna community

made it clear to the 2011 Commission that they did not want their community split

up into multiple districts.  Further, it would be hard to find permanent and easily

recognized geographic features to bound House District 4 if that district had to be

reduced in population and size.   Finally, only so much of the population from

House District 4 could be transferred to House District 3 since House District 3 is

also over the statewide average by +5.68%.

Hawaii House District 5 is the area that is south of the major urban and commercial areas of Kailua-Kona, stretching down to the more rural area of South Hawaii - an area that contains many of the Kona coffee farms.  Hawaii House District 5 deviates from the statewide average or target house district by +10.55%. House District 6 is comprised of Kailua-Kona, which is a compact, well-defined urban area, which experienced significant population growth between 2000 and 2010.  While at first glance it may seem that population from House District 5 should be taken out and given to House District 6, these areas have very different socio-economic interests, and result would be to disenfranchise the rural population that is added to the urban Kailua-Kona district.

As a practical matter, the only way to decrease Hawaii House District 5 would be to transfer some of its population to Hawaii House District 6, which is the main part of Kailua-Kona.  The boundary line between House Districts 5 and 6 was established to follow highly traveled and easily recognized main streets below or makai of Mamaloa Highway.  In addition, the 2011 Commission heard testimony from one or more residents in this area asking that boundaries be established so that they would not have to travel outside of their district in order to vote.  It would be difficult to establish an easily recognized boundary line for a reduced House District 5 that met this request, given the streets, communities, census blocks, and populations in this area.

House District 7 is comprised of the north and north-west areas of Hawaii, including Waimea. These are geographically distant communities that are isolated and distinct (for example, Waipio Valley separates House District 1 from House District 7).

In summary, the deviations on Hawaii are the result of following the Hawaii Constitution's criteria favoring contiguous districts, compact districts, and drawing district lines to follow recognized features such as streets, streams and clear geographical features, and not submerging an area into a larger district that has substantially different socio-economic interests.

(4) Maui Island Unit.

Residents of the island of Maui are traditionally identified as being a resident of one of the following geographic areas:  Upcountry; South Maui; Central Maui; East Maui; and West Maui.  With respect to the basic island unit of Maui, the bulk of the population growth since the 2001 census occurred in the areas of Wailuku and Kahului.  (Ex. LL)

House District 8 is comprised primarily of the Wailuku area of Maui ("Central Maui").  House District 9 is comprised primarily of the Kahului area of Maui ("Central Maui").  House District 10 is comprised primarily of the Lahaina, Kaanapali, Kapalua and Maalaea areas ("West Maui").  It is separated from House District 8 by the West Maui mountains, and from House District 9 by a main road,

44

Waiko Rd/E.Waiko Rd.  House District 11 is comprised primarily of the Kihei and Wailea areas ("South Maui").  House District 12 is comprised primarily of the areas of Pukalani, Makawao, Olinda, Pulehu, Kula, Ulupalakua, and Keokea areas ("Upcountry").  House District 13 is comprised primarily of the Paia and rural Hana areas of Maui, as well as the islands of Molokai, Lanai, and Kahoolawe ("East Maui").  These areas have a rural character in common.  *Id.*

In deciding where the district lines should be drawn, the Commission was required to draw the district lines using permanent and easily recognizable features such as streets, streams and clear geographical features.  The Commission was also aware it was to attempt to keep the overall deviation within the State at 10% or less.  Given strong opposition to "canoe districts" expressed by the Advisory Council for Maui residents, and the requirements of the Hawaii state constitution, the decision was made to draw all district lines within a single basic island unit. *Id.*

Some of the deviations between the House Districts in Maui, are due to keeping the Maui representative districts wholly within the Maui senatorial districts.  The Commission understood that the benefits of this are to have communities represented by the same core group of legislators, thereby concentrating and improving representation, and improving constituent communications and relations.

45

All of the Maui Senate Districts are separate areas with distinct characteristics, needs, and socio-economic interests.

Maui Senate District 5 is composed of the Wailuku and Kahului areas. These are urban and commercial areas with few hotels and no major tourist resort areas. Wailuku is the county seat with all the county government offices, courts, and health facilities. Kahului contains most of the island's commercial and industrial areas, including Maui's one major airport.

Senate District 5 is comprised of the Wailuku and Kahului areas. Senate District 6 is comprised of the Lahaina and Kihei areas. There is a large, natural separation between the two districts in the "Maui Plains" lowland area in the middle of the island of Maui. Additionally, there is a main road, East Waikoo Road, separating the districts. The Committee felt that the area of Wailuku was much closer in District 5 than District 6 in terms of character, in that Wailuku is an older community, unlike Kihei or Lahaina, which are newer or "resort" communities with generally higher incomes. The Committee chose to keep "like" communities together. Accordingly, this is the reason for the deviations in the Senate districts on Maui.

Maui Senate District 5 deviates from the statewide average or target senatorial district by +7.53%. This cannot be reduced without splitting some of the urban, commercial and/or industrial parts of Senate District 5 off to either the

tourist-oriented Senate District 6 or the rural-oriented Senate District 7.  This
would result in a submergence of the socio-economic interests of the split-off parts
of the current Senate District 5.

Currently, it is bounded by the West Maui mountains, Waikapu stream, and
major Maui highways and roads.  It would be hard to find permanent and easily
recognized geographic features to bound Senate District 5 if the district had to be
reduced in population and size.

Maui Senate District 6 is composed of the Lahaina/Kaanapali and
Kihei/Waimea areas.  These areas are largely tourist oriented areas, containing all
of Maui's major resort areas and most of its tourist-oriented businesses.

Maui Senate District 7 is composed of the "upcountry" Maui communities,
the Hana area, and the islands of Molokai, Lanai, and Kahoolawe.  While these
areas contain some tourist facilities, they are primarily natural areas (coasts,
mountains and forests) or rural areas with agricultural and local business concerns.

The Maui House Districts are also separate areas with distinct
characteristics, needs, and socio-economic interests.

Maui House District 8 is composed of the Wailuku area, which as noted
above is the island's government center; it deviates from the statewide average or
target house district by +9.44%.  As a practical matter, the only way to reduce the
population of Maui House District 8 would be to transfer some of its population to

the neighboring Maui House District No. 10, which is the tourist-oriented area of Lahaina/Kaanapali. This would result in a splitting of the Wailuku community and submergence of the socio-economic interests of the part of House District 8 split off to House District No. 10. It would also be difficult to find permanent and easily recognized geographic features for the new border of a reduced House District 8.

Maui House District 9 is composed of the Kahului area, which as noted above is the island's commercial/industrial center; it deviates from the statewide average or target house district by +9.93%. As a practical matter, the only way to reduce the population of Maui House District 9 would be to transfer some of its population to either the adjacent Maui House District 11, which is the tourist-oriented area of Kihei/Wailea, or Maui House District 12, which is the rural area of upcountry Maui. Either would result in a splitting of the Kahului community and submergence of the socio-economic interests of the part of House District 9 that was split off. It would also be difficult to find permanent and easily recognized geographic features for the new border of a reduced House District 9.

To address the population growth in Wailuku and Kahului, House district lines were revised to shift portions of the Kahului area population to House District 12 and House District 13. The boundary between the districts is major highway

Haleakala Hwy on the north-east border of House District 9, and Lowrie Ditch on the south-east border of House District 9.  Ex. LL

Within House Districts 10 and 11 are resort areas with different socio-economic interests from the urban and suburban areas of Kahului and Wailuku. Additionally, House District 12, comprised of "upcountry" Maui has a very distinct character and socio-economic interests from the rest of Maui. *Id.*

The lines were drawn using a computer program.  This computer program allowed the Commission to identify the location, physical size, and population of each census block on the island of Maui.  Various permutations of the district lines could be drawn and the results examined to determine whether or not the permutation complied with Hawaii law and were as equal in population as was practicable.  A limitation on the Commission's ability to draw lines was that census blocks could not be split.  *Id.*

Given the characteristics of the different areas on Maui, the Committee drew the House District lines to follow recognized features such as major streets, and clear geographical features such as mountains or ditches, as well as not submerging portions of Kahului or Wailuku into a larger district that has substantially different identity, economy, history, and socio-economic interests; in short, to keep intra-island communities intact.  This accounts for the deviations in the House districts on Maui.  *Id.*

One guiding principle followed by the Commission was that the district lines should be drawn to give meaningful representation to the residents of each district. The interests of the residents of the Upcountry, South Maui, Central Maui, East Maui, West Maui, districts are different.  To simply move a small census block located on the edge of a district to another for the purpose of achieving numerical equality, I believe would have been a disservice to the residents placed into a district with which they historically identified.  Doing so would have had the practical effect of disenfranchising the residents of that census block, in that their interests would become submerged into the interests of the new district. *Id.*

The Commission's draft district lines were presented to the public and open to public comment.  On the island of Maui we had 2 public hearings concerning the proposed re-districting plan.  Less than 5(five) people attended the public hearing.  None in attendance objected to the proposed re-districting plans.  On the island of Molokai, no one showed up at the hearing to comment or object to the proposed re-districting lines.  The Advisory Council for the Maui Basic Island Unit ("BIU") fully supported the Commission's lines for Maui BIU. *Id.*

       (5)   <u>Oahu Island Unit</u>.

The deviations in the legislative districts on the Oahu basic island unit are the result of following Hawaii constitutional criteria, including, having district lines follow permanent and easily recognized geographical features, census tract

boundaries, and avoiding the submergence of areas in larger districts with different socio-economic interests.  Some of the deviations also resulted from trying to maintain existing district boundaries.  Maintaining existing district boundary lines avoids disruption and confusion by keeping voters and candidates within districts that are familiar to them and by keeping historical communities with the same interests together.

Some of the deviations in the Oahu House Districts, particularly in East and urban Honolulu, were due to trying to maintain existing district boundary lines.  It made sense to try to keep these district lines as they follow permanent and easily recognized geographical features (mountain ridge lines, streams, highways, and major streets) that separate different communities such as Palolo (House District 20), Manoa (House District 23), and Makiki (House District 24).  These districts are smaller than average in population, but it would have been difficult to increase their population without crossing existing district lines and/or geographical features such as mountain ridge lines or the H-1 freeway which we generally used as a border.  The foregoing is also true for House Districts 25, 27, and 28.

Some of the deviations in East and urban Honolulu are also due our taking two House Districts out of this area and moving them to West Oahu.  Since the 2000 Census, the population grew dramatically in some of the legislative districts of West Oahu while the districts of East and urban Honolulu did not grow very

much.  Recognizing this growth required shifting districts to West Oahu from East and urban Honolulu.  Thus, one House District was lost between Makapuu Point and Kaimuki, and another House District was lost from Moilili and downtown Honolulu.  Losing these districts while trying to keep existing district boundaries caused the remaining districts in East and urban Honolulu to be somewhat smaller than average in population.

The deviations in some Oahu House Districts were caused by trying to keep communities together.  For example, House District 32 is composed of two communities (Salt Lake and Moanalua) that historically have been together in one district.  While the district is smaller than average in population, increasing its size would have required taking population from a neighboring district with a different community.  Such a transfer of population would be complicated by: (a) the highly populated census blocks in this area (condominiums) which make it difficult to transfer just the right amount of population to avoid over-population or under-population; and (b) the fact that the surrounding districts, House Districts 31 and 33, are also both smaller than average in population already.

Similarly, House District 42 is composed of two isolated communities (Kapolei and Makakilo) that have been kept together in one district.  While House District 42 is somewhat larger than average, reducing its populations would require transferring part of the Kapolei/Makakilo communities to a district where they

would be submerged.  Further, the surrounding districts, House Districts 39 and 43, are larger than average in population already.

As with the Oahu House Districts, some of the deviations in Oahu Senate Districts were caused by trying to maintain existing district lines.  For example, the Commission followed the existing district boundaries for Senate Districts 25, 9, and 10.

As with the Oahu House Districts, some of the deviations among the Oahu Senate Districts was due to keeping communities together that historically been in one district.  For example, Senate District 17 is composed of Pearl City and Waipahu.  It is somewhat smaller in population than average.  However, trying to increase its size would require taking population from the Waipio/Mililani community (Senate District 18), submerging the population taken in the larger Pearl City/Waipahu community.  The other neighboring district (Senate District 16) is smaller than average in population and could not provide the population needed to increase the size of Senate District 17.

Similarly, Senate District 19 (Ewa Beach) is somewhat smaller than average in population.  Increasing its size would require taking part of the neighboring Kapolei/Makakilo community (Senate District 20).  Senate District 20 is already smaller than average in population and taking population away from it would result in further under-population.

As noted above, Senate District 20 (Kapolei/Makakilo) is smaller than average in population. The surrounding districts are similarly small in population except Senate District 18 (Royal Kunia/Mililani). Taking population from Senate District 18 would require splitting part of the Royal Kunia development off and submerging it into the Kapolei/Makakilo community. It would also require crossing the current easily recognized district boundary line of Kunia Road/Fort Weaver Road. It is not clear that we could find another easily recognized boundary line in Royal Kunia were we to enlarge Senate District 20.

Some deviations in Oahu Senate Districts were caused by using easily recognized geographic features as boundary lines. For example, we used the H-1 freeway as the boundary line between Senate Districts 15 and 14. The H-1 freeway is one of the main geographic features of urban Honolulu and is a natural boundary between communities. Senate District 15 is larger than average in population, while Senate District 14 is smaller than average in population. To even them out would require having Senate District 14 go past the freeway into Senate District 15.

As shown above, the drawing of district lines on Oahu was complicated and required a constant balancing of many factors including: dealing with population changes that had occurred on Oahu since 2000 while trying to keep population deviations low; trying to maintain existing district lines where possible; trying to

have district boundaries follow easily recognized geographic features such as

mountain ridges, streams, and major streets; and trying to keep communities

together that had historically been together or asked to be kept together.

### Report of Technical Committee

At the Commission's public meeting on March 6, 2012, Commissioner

Nonaka, member of the Technical Committee, reported on revisions to the

proposed plan following previous public testimony: that the Committee's goal was

always to draw the best plan possible, and the Committee made adjustments that

resulted in a lower deviation for Oahu House districts, lowering it from 9.94

percent to 8.89 percent by taking a second look at the plan.  (Minutes of March 6,

2012 meeting, Ex. JJ).

Following discussion, the Commission adopted district lines in accordance

with Article IV, section 6, of the Hawaii Constitution (*Id.* at 21), preserving basic

island units, responding to input from the public and the advisory council, and

achieving a statewide maximum deviation of 5.62% when both houses of the

legislature are considered under the *Burns* analysis. *Id.*

Accordingly, for the reasons discussed above, the two-tier apportionment

plan adopted by the Commission (i.e., initially apportioning all representatives and

senators among basic island units and thereafter drawing district lines within the

island units themselves), gives fuller and more meaningful representation to the

voters of the several districts within each basic island unit than they could possibly have under any other scheme of apportionment. *See Burns* at 1293.

E.    Plaintiffs' Reliance on *Travis v. King* Is Misplaced.

Previously, In their Memorandum in Support of Motion for Preliminary Injunction, the Plaintiffs relied heavily on *Travis v.King*, 552 F. Supp. 554 (D. Hawaii 1982).  However, *Travis* involved a reapportionment plan that unconstitutionally used "registered voters" rather than population as its base; additionally, all but six Senate and House districts were represented by more than one senator or representative; furthermore, the court reasoned that the state's "apparent unwillingness" to minimize population deviations among the legislative districts within the basic island unit of Oahu showed that a substantial portion of the deviation in each house was totally unrelated to the state's policy of preserving the geographic unity of the four basic island units, and that the state provided "no other reason" for intra-island deviations.  It should also be noted that the court in *Travis* struck down the state's plan because the state was "unable to cite a single persuasive authority for the proposition that deviations of this magnitude can be excused by combining and figuring deviations from both houses; yet, a year after *Travis*, the Supreme Court in *Brown v. Thompson*, 462 U.S. 835 (1983), upheld Wyoming's policy of using counties as legislative districts and ensuring that each county had at least one representative, even though the plan had a maximum

deviation of 89%, where the policy had been followed since statehood, was supported by substantial and legitimate state concerns, and had been applied in a manner free from any taint of arbitrariness or discrimination. Accordingly, *Travis* is not controlling here.

Plaintiffs had further argued that the Plan does not rigidly adhere to the anti-canoe district policy, as shown by Senate 7 and House 13, both of which are multi-island canoe districts encompassing Molokai, Lanai (and uninhabited Kahoolawe) along with the distant east side of Maui. However, Molokai, Lanai, and Maui all belong to the same basic island unit and the same county. The smaller islands within the BIU were kept intact to the maximum extent practicable, in accordance with the requirements of Article IV, sec. 6, of the Hawaii Constitution.

Finally, Plaintiffs had previously argued that the court in *Travis* had already rejected the "combination" approach of achieving substantial equality "per legislator." [6] However, the court had already held that the deviations in *Travis* could not qualify as "minor inequities" and therefore the principle of *Reynolds v. Sims* could not apply in that case. For the reasons discussed above, the holdings in *Travis* are not on point with the present case.

---

[6] "[A]pportionment in one house [of a bicameral legislature] could be arranged so as to balance off minor inequities in the representation of certain areas in the other house." *Reynolds*, 377 U.S. at 577.

F.     Hawaii's Unique History Created a Sense of Place as to Each Island.

As set forth in her declaration (Ex. KK) Professor Davianna Pomaika'i McGregor believes there is support in each basic island unit's history of settlement and development for the proposition that despite their unification by Kamehameha I, each of the basic island units were previously, and continues to this day to be, separate societies or communities, with aspects and identities unique to themselves and distinct from each other.

In summary, Professor McGregor believes it is reasonable to posit that each basic island unit has an innate sense of individuality and separateness that is traceable to antiquity because each was organized independent of each other, in response to each island's geography, resources, and how their communities were governed.  This is reflected in traditional Hawaiian epithets and sayings about the islands and their special places, our references to areas within each of the islands, and how we are governed today.

V.     Conclusion

Defendants request this Court grant their Motion for Summary Judgment on Counts 1 and 2 for the reasons set forth above.

DATED:     Honolulu, Hawaii, October 1, 2012.

STATE OF HAWAII

DAVID M. LOUIE
Attorney General of Hawaii


_____/s/ John F. Molay_____
JOHN F. MOLAY
PATRICIA COOKSON
Deputy Attorneys General
Attorneys for Defendants