Of Counsel:
DAMON KEY LEONG KUPCHAK HASTERT
Attorneys at Law
A Law Corporation

ROBERT H. THOMAS              4610-0
rht@hawaiilawyer.com
ANNA H. OSHIRO               5852-0
aho@hawaiilawyer.com
MARK M. MURAKAMI            7342-0
mmm@hawaiilawyer.com
1003 Bishop Street, Suite 1600
Honolulu, Hawaii  96813
*www.hawaiilawyer.com*
Telephone:  (808) 531-8031
Facsimile:  (808) 533-2242

Attorneys for Plaintiffs
JOSEPH KOSTICK, KYLE MARK TAKAI, DAVID P. BROSTROM,
LARRY S. VERAY, ANDREW WALDEN, EDWIN J. GAYAGAS
ERNEST LASTER, and JENNIFER LASTER

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JOSEPH KOSTIC; et al., | ) | CIVIL NO.  12-00184 JMS/RLP |
| | ) | |
| Plaintiffs, | ) | (THREE-JUDGE COURT (28 |
| | ) | U.S.C. § 2284)) |
| v. | ) | |
| | ) | **PLAINTIFFS' MOTION FOR** |
| SCOTT T. NAGO, in his official | ) | **SUMMARY JUDGMENT ON** |
| capacity as the Chief Election | ) | **COUNTS I AND II OF THE** |
| Officer State of Hawaii; et al., | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT;** |
| Defendants. | ) | **MEMORANDUM IN** |
| | ) | **SUPPORT OF MOTION;** |

| | |
|---|---|
| ) | **CERTIFICATE RE: WORD** |
| ) | **LIMITATION (LR 7.5);** |
| ) | **CERTIFICATE OF SERVICE** |
| ) | |
| ) | Hearing Date: _____, 2012 |
| ) | Time: _____ a.m. |
| ) | Judge: _____ |
| ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II OF THE FIRST AMENDED COMPLAINT

Plaintiffs Joseph Kostick, Kyle Mark Takai, David P. Brostrom, Larry S. Veray, Andrew Walden, and Edwin J. Gayagas, move this court pursuant to Fed. R. Civ. P. 56 for summary judgment on Counts I (Equal Representation) and II (Malapportionment) of the First Amended Complaint for Declaratory and Injunctive Relief (filed Apr. 27, 2012) (CM/ECF doc. 32). Plaintiffs brought this action to challenge the State of Hawaii's Final Report and Reapportionment Plan (2012 Supplement) ("2012 Plan") on the grounds that it violates the U.S. Constitution and Hawaii law, and ask this court to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and 2202 that:

1.     The 2012 Plan violates the Equal Protection Clause because it results in districts that are not substantially equal in population statewide.

175768

2.     The 2012 Plan violates the Equal Protection Clause because the 2012 Plan "extracted" 108,767 persons (military personnel, military families, and university students) from the Census count of 1,360,301 "usual residents" of Hawaii, thereby denying these persons equal representation in the Hawaii legislature.

3.     The Hawaii Constitution's apportionment and districting process, which requires the Commission "allocate the total number of members of each house of the state legislature being reapportioned among the four basic island units" with the requirement that "no basic island unit shall receive less than one member in each house," and requires population equality only within each basic island unit, violates the Equal Protection Clause.

DATED:  Honolulu, Hawaii, October 1, 2012.

Respectfully submitted,

DAMON KEY LEONG KUPCHAK HASTERT

/s/ *Robert H. Thomas*

ROBERT H. THOMAS
ANNA H. OSHIRO
MARK M. MURAKAMI
Attorneys for Plaintiffs
  JOSEPH KOSTICK, KYLE MARK TAKAI,
  DAVID P. BROSTROM, LARRY S. VERAY,
  ANDREW WALDEN, EDWIN J. GAYAGAS,
  ERNEST LASTER, and JENNIFER LASTER

3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH KOSTIC; et al., | ) CIVIL NO.  12-00184 JMS/RLP |
| | ) |
| Plaintiffs, | ) (THREE-JUDGE COURT (28 |
| | ) U.S.C. § 2284)) |
| v. | ) |
| | ) **MEMORANDUM IN** |
| SCOTT T. NAGO, in his official | ) **SUPPORT OF MOTION** |
| capacity as the Chief Election | ) |
| Officer State of Hawaii; et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................iv

I.  INTRODUCTION.........................................................1

II. STATEMENT OF FACTS.............................................6

  A.  Hawaii's Reapportionment Record .........................6

  B.  Hawaii's Reapportionment Process ........................7

  C.  Census: 1,360,301 "Usual Residents" ....................8

  D.  The Military In Hawaii ........................................10

  E.  August 2011 Proposal: Count Everyone;
      September 2011 Plan: "Extract" A Handful ........................13

  F.  September Plan Invalidated: "Permanent
      Resident" Is "Domiciliary" (Physical Presence And
      Intent to Remain).................................................13

  G.  2012 Plan: Extract Usual Residents Of Hawaii
      Deemed To Not Be "Permanent Residents".........................15

    1.  Servicemembers ...........................................15

    2.  Families...................................................17

    3.  Students ..................................................18

  H.  Senate Seat To Hawaii County, Large Deviations...............19

    1.  Senate Deviation: 44.22% ................................19

## TABLE OF CONTENTS — CONTINUED

**Page**

2.   House Deviation: 21.57% ............................................ 20

I.   Commission Ignored Federal Deviation Standards, Acknowledged Presumptive Unconstitutionality ................. 20

III.   SUMMARY JUDGMENT STANDARD ........................................ 20

IV.   ARGUMENT ......................................................... 22

A.   The 2012 Plan Deviations Grossly Exceed 10%, And Is Presumptively Unconstitutional ........................................... 23

B.   Burns Did Not Validate "Permanent Resident" In All Circumstances For All Time ................................................. 25

1.   State Must Identify The "Permissible Population Basis" To Which To Compare Its Count of "Permanent Residents" ................................................ 27

2.   State's Burden To Show The 2012 Plan Is A Substantial "Duplicate" Of A Plan Based On A Permissible Basis ........................................................ 29

3.   Hawaii's 2012 Plan Does Not Survive Close Constitutional Scrutiny ................................................. 33

a.   Equal Representation. ........................................ 34

b.   Hawaii's Assumptions About Military Transience Are Unsupported ............................... 39

ii

## TABLE OF CONTENTS — CONTINUED

**Page**

C.  *Intra*-County Inequality ........................................................51

    1.  People Are Represented, Not Counties .......................52

    2.  Oahu's Ranges Are Excessive .....................................54

    3.  No Approximation Of Population-Based Plan.............55

V.  CONCLUSION ................................................................................57

175768

# TABLE OF AUTHORITIES

**Page**

CASES

*Board of Estimate v. Morris*, 489 U.S. 688 (1989) ................................. 53

*Brown v. Thomson*, 462 U.S. 835 (1983) .......................................... 24, 53

*Burns v. Richardson*, 384 U.S. 73 (1966) ...................................... *passim*

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)

*Citizens for Equitable and Responsible Gov't v. County of Hawaii*, 120 P.3d 217 (Haw. 2005) ......................................... 44, 35

*Chen v. City of Houston*, 532 U.S. 1046 (2001) ...................................... 50

*Davis v. Mann*, 377 U.S. 678 (1964) ...................................... 3, 23, 46, 51

*Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ...................................... 37

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ............................ 3, 8, 42

*Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991) ......................................... *passim*

*Harper v. Virginia Bd of Elections,* 393 U.S. 663 (1966) ........................ 40

*Kirkpatrick v. Preisler*, 394 U.S. 526 (1969) ........................................ 36

*Mahan v. Howell*, 410 U.S. 315 (1972) ...................................... 22, 24, 51

iv

# TABLE OF AUTHORITIES — CONTINUED

**Page**

*Matsukawa v. State of Hawaii 2011 Reapportionment Comm'n*, No. SCPW-11-0000741 ............................................. 13, 19

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ................. 40

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................. 21-22, 34, 36, 52

*Solomon v. Abercrombie*, 270 P.3d 1013 (Haw. 2012) .......... 13-15, 19, 33, 43, 45-46

*Solomon v. Abercombie,* No. SCPW-11-0000732 ................................... 13

*Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982) ......................... *passim*

## CONSTITUTIONS, STATUTES, AND RULES

U.S. CONST. AMEND. XIV ............................................... *passim*

5 U.S.C. § 552a *et seq.* ......................................................... 17

HAW. CONST. ART. IV, § 4 ............................................................. 7

HAW. CONST. ART. IV, § 6 ............................................................. 8

HAW. REV. STAT. § 831-2(a)(1) (1993) ...................................... 48

FED. R. CIV. P. 56 .............................................................. 2, 21

175768

## TABLE OF AUTHORITIES — CONTINUED

**Page**

OTHER AUTHORITIES

Carl Goldfarb, *Allocating the Local Apportionment Pie: What Portion for Resident Aliens?*, 104 YALE L. J. 1441 (1994-1995) ............................................................ 38

*Hawaii Residency Requirements*, *available at* http://manoa.hawaii.edu/admissions/ undergrad/financing/residency.html ............................................... 47

James Hosek, *et al.*, HOW MUCH DOES MILITARY SPENDING ADD TO HAWAII'S ECONOMY? (2011) ................................................. 40

THOMAS K. HITCH, ISLANDS IN TRANSITION: THE PAST, PRESENT AND FUTURE OF HAWAII'S ECONOMY 199 (Robert M. Kamins ed.1993) ....................................................... 10-11

John Manning, *The Equal Protection Clause in District Reapportionment: Representational Equality Versus Voting Equality*, 25 SUFFOLK L. REV. 1243 (1991) ......................... 35

Timothy M. Mitrovich, *Political Apportioning is Not a Zero-Sum Game: The Constitutional Necessity of Apportioning Districts to be Equal in Terms of Both Total Population and Citizen Voting-Age Population*, 77 WASH. L. REV. 1261 (2002) .................................... 50

*Non-Permanent Population Extraction for 2011 Reapportionment and Redistricting—Addendum* (Mar. 2012) ..... 15

*Summaries by Basic Island Units* at 2, 6 (Mar. 8, 2102) ....................... 53

175768

## TABLE OF AUTHORITIES — CONTINUED

**Page**

*Summary of the State of Kansas Adjustment to*
   *Census Figures for Reapportionment* (Sep. 12, 2011)................... 45

U.S. CENSUS BUREAU, STATISTICAL ABSTRACT OF THE UNITED STATES:
   2012 Table 400: P*ersons Reported Registered and*
   *Voted by State: 2010* .................................................................... 45

vii

**MEMORANDUM IN SUPPORT OF MOTION**

## I.    INTRODUCTION

The State of Hawaii cannot meet its burden to show that the 2012 Plan's method of determining which of Hawaii's "usual residents" as counted by the Census are "transients, short-term or temporary residents" that may be excluded equal representation under *Burns v. Richardson*, 384 U.S. 73 (1966). The 2012 Plan has not justified denying representational equality to 108,767 persons who unquestionably have a substantial presence in the state but do not meet the state's criteria for "permanent resident." The state's limited latitude under *Burns* to choose whom to count does not permit the exclusion of nearly 8% of the population based only on a set of irrational assumptions that do not survive close constitutional scrutiny.

*Burns* allowed Hawaii to count registered voters, but only because there was no claim that doing so would result in an apportionment substantially different than one based on a count of a "permissible population basis" such as total population, state citizens, or U.S. citizens. Moreover, the state "need not count aliens, transients, short-term or temporary residents, or persons denied the vote." *Id.* at 92. Hawaii now excludes those whom it determines do not qualify as

"permanent residents," a term it defines as those who have a substantial physical presence in the state and who have exhibited intent to remain. The 2012 Plan denies representational equality to 108,767 servicemembers, military families, and university students who do not meet Hawaii's test. The 2012 Plan is unconstitutional because it is based on three assumptions that do not survive close constitutional scrutiny, or even a rationality test:

- Hawaii assumes servicemembers counted by the Census as "usual residents" of Hawaii, but who designated a different state to withhold taxes from their pay on a military tax form (DD2058) have no intent to remain and may be treated as transients. In effect, this imposes a poll tax on servicemembers, by tying their representation in the Hawaii legislature to their willingness to pay Hawaii income taxes.

- It assumes spouses and dependents of servicemembers have the same intent as their military sponsors, an unwarranted assumption without factual foundation.

- It assumes students who did not qualify for in-state tuition have no intent to remain.

Hawaii's exclusionary policy treats these people as if they did not exist, which grossly distorts the boundaries and actual population of every Oahu district.

The Equal Protection Clause requires states to apportion their legislatures so that the population of each district is roughly equal to

2

other districts across the state. Hawaii, however, holds itself to different standards and for more than half a century, the state has found a way to count nearly everyone *but* the men and women serving in the armed forces who live here, even while it counts aliens, minors, prisoners, those who don't vote, and those who pay no taxes. Carefully avoiding the prohibition on expressly excluding military personnel, *see Davis v. Mann*, 377 U.S. 678, 691 (1964) (states may not refuse to count servicemembers merely because of their occupation), Hawaii achieves the same result by assuming that servicemembers and their families are "transients" even though they qualify as "usual residents," which, according to the Supreme Court, means they have "an element of allegiance or enduring tie" to Hawaii. *See Franklin v. Massachusetts*, 505 U.S. 788, 789 (1992) (any person who is a "usual resident" counted in the Census).

Hawaii asserts that servicemembers and their families have chosen to opt out of being counted because the servicemembers have elected to have another state withhold taxes from their military pay, and may also be counted by registering to vote here. But Hawaii imposes this requirement on no one else: it automatically counts those

3

who are registered to vote elsewhere or indeed, not registered or even eligible to vote; it counts those who do not pay Hawaii state taxes. Everyone but servicemembers, their families, and university students who pay nonresident tuition are automatically included, and no attempt is made to determine whether they are similarly situated to those excluded.

Servicemembers and their families are essential and integrated members of Hawaii's community and body politic. By treating servicemembers, military families, and students as invisible, Hawaii's plan unconstitutionally dilutes their rights and Plaintiffs' rights to equal representation and to petition their government on equal terms. The Hawaii legislature represents everyone, not just those who vote, or who register, or who pay state income taxes, and Equal Protection requires legislative seats to be apportioned so that all persons are represented.

Moreover, the massive overall ranges in ideal district size in both houses (Senate: 44.22%; House: 21.57%) reveal that even if Hawaii may exclude this many people, the 2012 Plan still does not pass muster

4

because these ranges far exceed the 10% deviations the Supreme Court has established for presuming a plan is unconstitutional.

This case presents two issues that have dogged Hawaii since statehood: may the state reapportion its legislature using a count that excludes nearly 8% of the actual population, and may it give priority to representing counties rather persons especially when the resulting apportionment deviates wildly from statewide population equality? The last time the first issue was presented to this court, it did not need to decide the issue, because the overall deviations in the plan were unconstitutionally large (although smaller than presented here). *Travis v. King*, 552 F. Supp. 554, 562 n.19 (D. Haw. 1982). The issue is now squarely presented: by barring military, their families, and students from representation in the legislature, Hawaii has insured they are represented *nowhere*: because they are counted by the Census only as usual residents of Hawaii—and other states base their apportionments on the Census population—they are not counted anywhere else.

## II.   STATEMENT OF FACTS

### A.   Hawaii's Reapportionment Record

Hawaii's bicameral legislative consists of a Senate ("Senate") with 25 seats, and a House of Representatives ("House") with 51. The ink was barely dry on the Admissions Act when Hawaii began excluding servicemembers.[1] In the first challenge to reapportionment, *Burns v. Richardson*, 384 U.S. 73 (1966), the Supreme Court reluctantly approved of Hawaii's use of "registered voters" as the population basis (which resulted in military personnel not being counted), but "only because on this record [the plan was] found to have produced a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis." *Id.* at 93. The Court did not endorse excluding servicemembers, and did not hold that Hawaii's choice to use a population basis that had the effect of excluding the military would always be constitutional; the Court

---

[1] The Statement of Facts in this memorandum is supported by the exhibits and declarations submitted by the parties in their pleadings in the preliminary injunction. For the court's convenience, hard copies of the electronically filed briefs and cited exhibits will be submitted to chambers.

6

rejected the challenge only because there was no evidence the plan varied from one based on a "permissible population basis."

Indeed, in *Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982), this court applied *Burns* and held that a plan based on registered voters was unconstitutional because it resulted in a plan that was materially different from one based on a permissible population basis. *Travis* also details the multiple challenges to Hawaii's reapportionment efforts. *See id.* at 556 & n.2 (citing the "numerous attacks in both state and federal courts").

## B.    Hawaii's Reapportionment Process

In 1992, the State of Hawaii ceased use of "registered voters" as the population basis. Since then, it uses "permanent residents" —

> The [Reapportionment] commission shall allocate the total number of members of each house of the state legislature being reapportioned among the four basic island units, namely: (1) the island of Hawaii, (2) the islands of Maui, Lanai, Molokai and Kahoolawe, (3) the island of Oahu and all other islands not specifically enumerated, and (4) the islands of Kauai and Niihau, *using the total number of permanent residents in each of the basic island units* and computed by the method known as the method of equal proportions; except that no basic island unit shall receive less than one member in each house.

7

175768

HAW. CONST. ART. IV, § 4 (emphasis added). After "extraction" of persons deemed not to be permanent residents, and allocation of legislative seats among the four counties, the constitution requires the Defendant 2011 Reapportionment Commission ("Commission") only to insure population equality *within each county*, and not within each district. It must:

> apportion the members among the districts therein [and] redraw district lines where necessary in such manner that for each house the average number of permanent residents per member of each district is *as nearly equal to the average for the basic island unit* as practicable.

HAW. CONST. ART. IV, § 6 (emphasis added).

## C.   Census: 1,360,301 "Usual Residents"

In April 2010, the U.S. Census Bureau conducted the decennial census ("Census"). The Census has used the standard of "usual residence" since the first Congress. *See Franklin v. Massachusetts*, 505 U.S. 788, 804-05 (1992). Usual resident "can mean more than mere physical presence, and has been used broadly enough to include some element of allegiance or enduring tie to a place." *Id.* at 789. Currently, the Census defines "usual residence" as the "the place where a person lives and sleeps most of the time. It is not the same as the person's

8

voting residence or legal residence." Stip. Facts at 2, ¶ 1 (CM/ECF doc. 26, attached as Exhibit "B". *See* Statement of Fact ("SOF")  ¶ 2). It is the place where "they live and sleep most of the time." *Id.* For military personnel stationed within the United States, they are counted as "usual residents" of the state in which they are stationed. *Id.* at 2, ¶ 3. For military personnel and federal employees deployed or assigned outside the country, they are counted as "overseas population" and are attributed to a state through a different mechanism than Census Day live counts. *See* Exhibit "H," at 6-7. *See* SOF ¶ 4.

Thus, the 2010 Census resident population of Hawaii included servicemembers, their families, university students, children, legal and illegal aliens, and prisoners incarcerated here, all irrespective of whether they pay state taxes, their eligibility to vote in Hawaii, or actual registration to vote. Hawaii's Census count also included deployed servicemembers whose "home of record" is Hawaii. Most critically, persons counted as usual residents of Hawaii were not counted by the Census in any other state. SOF ¶ 3.

The Census excluded transients such as tourists, who are counted in their state of "usual residence." *Id.* at 3, ¶ 5, SOF ¶ 7.

9

Applying the above-referenced standards, the Census reported the total population of persons usually residing in Hawaii as 1,360,301 ("2010 Census population")

### D.   The Military In Hawaii

Fifty years ago, the Supreme Court concluded that Hawaii's military were transients. *Burns*, 384 U.S. at 94-95 ("Hawaii's special population problems, including large concentrations of military and other transients centered on Oahu, suggest that state citizen population, rather than total population, is the appropriate comparative guide."). The Court noted that "the military population in the State fluctuates violently as the Asiatic spots of trouble arise and disappear." *Id.* at 94; *see also id.* at 94 n.24 ("For example, at one point during World War II, the military population of Oahu constituted about one-half the population of the Territory."). But Hawaii's "special population problems" fifty years ago no longer exist. The 25 years prior to *Burns* decision saw massive swings in military populations as draftees flowed into military bases to fight World War II, Korea and the beginnings of the Vietnam conflict. At the peak of World War II, 400,000 military personnel comprised nearly 50% of the population of the Territory of

10

Hawaii. With post-war demobilization, that number shriveled nearly twenty-fold to 21,000 by 1950. It then swelled again during the Korean War. *See* THOMAS KEMPER HITCH, ISLANDS IN TRANSITION:  THE PAST, PRESENT AND FUTURE OF HAWAII'S ECONOMY 199 (Robert M. Kamins ed. 1993), SOF ¶ 9.

Today's military is vastly different. The draft was abandoned in favor of an all-volunteer force at the close of Vietnam.  In contrast to the period preceding the *Burns* decision, the post-Vietnam all-volunteer military has fought in Grenada, Lebanon, Kuwait, Bosnia, Somalia, Afghanistan, Iraq, and several other conflicts with no surge in Hawaii military populations even remotely comparable to the 20-fold population shifts which confronted the *Burns* court.

11



**Figure 2.1**
**Defense Personnel in Hawaii, 1982–2009**

SOURCE: State of Hawaii, "State of Hawaii Data Book," 2009, Tables 10.03, 10.11, 10.14.

RAND TR996-2.1

*See* James Hosek, *et al.*, How Much Does Military Spending Add to Hawaii's Economy 28 (Rand 2011).[2] At the same time that the military has integrated itself into the community, Hawaii's voting participation level has dramatically changed from the levels at the time of Burns. At that time (shortly after statehoood), the cited percentage of registered voters in Hawaii was 87.1%, perhaps the highest in the nation. As of the 2010 census by contrast, the percentage had dropped dramatically to 48.3%—the lowest in the country. U.S. Census Bureau, Statistical

_____

[2] *available at* http://www.rand.org/content/dam/rand/pubs/technical_reports/2011/RAND_TR996.pdf.

12

175768

ABSTRACT OF THE UNITED STATES: 2012 Table 400: P*ersons Reported Registered and Voted by State: 2010,* SOF ¶5.

### E. August 2011 Proposal: Count Everyone; September 2011 Plan: "Extract" A Handful

On August 3, 2011, the Commission proposed a reapportionment plan that used as the population basis all persons determined to be usual residents of Hawaii by the 2010 Census. This plan included maps with district lines, but was not adopted.

On September 26, 2011, the Commission adopted and filed the 2011 Final Report and Reapportionment Plan ("2011 Plan") that "extracted" 16,458 active duty military and university students from the 2010 Census population who were deemed not to be permanent residents, resulting in a "permanent resident" population basis of 1,343,843.

### F. September Plan Invalidated: "Permanent Resident" Is "Domiciliary" (Physical Presence And Intent To Remain)

On October 10, 2011, a Hawaii Island senator instituted an action in the Hawaii Supreme Court to compel extraction of more servicemembers, their families, and university students from the population basis. *Solomon v. Abercombie,* No. SCPW-11-0000732. The action sought to move an Oahu Senate seat to Hawaii. A nearly

13

identical action was filed the following day. *Matsukawa v. State of Hawaii 2011 Reapportionment Comm'n*, No. SCPW-11-0000741.

On January 4, 2012, the Hawaii Supreme Court concluded the 2011 Plan violated the Hawaii Constitution because the Commission had not extracted enough people. The court ordered the Commission to count only "permanent residents." The court defined "permanent resident" as "domiciliary," which under Hawaii law means a person who has both a substantial physical presence in Hawaii, and who has demonstrated an intent to remain here. The court ordered the Commission to extract additional servicemembers, families, and university students who pay non-resident tuition from the 2010 Census population. The court did not require removal of aliens, institutionalized persons, federal civilian workers who were "stationed" in Hawaii, or others who were similarly situated to those who were subject to removal. The parties did not raise Equal Protection arguments, and as a consequence, the court did not consider the effect of federal law.  The court's opinion detailed the meaning of the term "permanent resident" under Hawaii law, and which also specified the Commission's process:

14

1.      First, it was required to "extract non-permanent military residents and non-permanent university student residents from the state's and the counties' 2010 Census population" because they are not "domiciled" in Hawaii. *Solomon v. Abercrombie*, 270 P.3d 1013, 1022 (Haw. 2012).

2.      Next, based on this count of "permanent residents," the Commission was required to apportion Senate and House seats "among the four counties" with each county having at least one seat. *Id*.

3.      Finally, the Commission was required to "apportion the senate and house members among nearly equal numbers of permanent residents within each of the four counties." *Id*. at 1024 (footnote omitted).

### G.      2012 Plan: Extract Usual Residents Of Hawaii Deemed To Not Be "Permanent Residents"

More than two months went by without a plan. Finally, on March 8, 2012, the Commission adopted the 2012 Plan that, in conformity with *Solomon*, removed 108,767 servicemembers, families, and students from the count, nearly 8% of Hawaii's actual Census population. A summary of how they were extracted follows, and is described in more detail in

the *Non-Permanent Population Extraction for 2011 Reapportionment and Redistricting—Addendum* (Mar. 2012) (Exhibit "D". *See* SOF ¶ 19.).

### 1. Servicemembers

The Commission started with the 2010 Census population, which included all Census-counted "usual residents." Stip. Facts at 3, ¶¶7-8, 10; 2012 Plan at B-12. Transient military and tourists had already been excluded from the Census population, and were not counted as "usual residents" of Hawaii. Stip. Facts at 2-3, 5-6, ¶¶3, 5-6, 21-22, SOF ¶ 7.

The Commission asked the U.S. Pacific Command for information on all active duty servicemembers who were not "legal residents" of Hawaii. Pacific Command, using the Defense Manpower Data Center, provided a spreadsheet of servicemembers who had completed form DD2058 denoting a state other than Hawaii as their "legal residence" for state tax purposes. *Id.* at 3, ¶7; Exhibit "I." *See* SOF ¶ 21. This form is used to designate which state should withhold taxes from servicemembers' military pay. *See* Exhibit "E." *See* SOF ¶ 22. Servicemembers are informed that the information they provide may be disclosed to tax authorities in the tax withholding state, but they are not informed that it would be provided to Hawaii to determine

16

"permanent residency" for apportionment purposes. There may be little correlation between the place where a servicemember pays state taxes, and where she is actually located. Nor does the DD2058 form ask the servicemember to declare where they are located, or where they intend to remain. Moreover, there no way to confirm the servicemembers to be extracted based on these forms had actually been in Hawaii on Census Day and thus included in the count of "usual residents."

Even though the DD2058 information was not an accurate process to determine "permanent residency," (where a servicemember had an intent to remain in Hawaii), and indeed, disclosure to the state may have violated the Privacy Act, 5 U.S.C. § 552a *et seq.*, the Commission extracted 42,332 active duty military personnel based solely on the form data. Stip. Facts at 3-4, ¶¶ 8, 9, 10; 2012 Plan at B-47, SOF ¶ 23.

### 2.   Families

The Commission then extracted 53,115 military dependents. Stip. Facts at 3-4, ¶¶10-13; 2012 Plan, Page B-47, SOF ¶ 24. They were not surveyed, nor did the military provide any data about them. 2012 Plan at B-12, B-33, SOF ¶ 24. In the absence of such data, the Commission merely "assumed" that dependents have the same legal residency as

17

their military spouse. 2012 Plan at B-53, B-54, SOF ¶24. The Commission extracted dependents "associated or attached to an active duty military person who had declared a state of legal residence other than Hawaii." Stip. Facts at 3-4, ¶10, SOF ¶26. The Commission was unable to locate any information as to the permanent or non-permanent residence of military dependents. *Id.* at 4, ¶¶11-13. There was no other data with regard to dependents' residency except their "association" or "attachment" to a military sponsor with a declared legal residence elsewhere. *Id.* at 4, ¶¶ 12-13.  SOF ¶ 24.

### 3. Students

The Commission's attempt to extract students was also an inexact process, loaded with assumptions. It relied on data from universities that was not related in any way to data gathered on Census Day, April 1, 2010. *See* Stip. Facts at 2-3, 4-5, ¶¶14, 18, SOF ¶ 27. For example, the University of Hawaii identified students as non-residents based on its count of those enrolled for spring 2010 semester (not necessarily students who were enrolled on Census Day) who paid non-resident tuition. Exhibit "F." *See* SOF ¶ __. BYU Hawaii, Hawaii Pacific, and Chaminade used "home address." Stip. Facts at 4-5, ¶¶14,

18

19, SOF ¶ 25.. Accordingly, the Commission might have extracted persons who were not included in the Census because they were not present or were not usual residents on Census Day. Also, the Commission had data only from the above schools, and did not seek such data for any other of the many public and private colleges in Hawaii, such as Argosy, and Tokai University. *Id.* at 5, ¶¶15-17, SOF ¶ 25, 28.

Using this process, the Commission extracted 13,320 students from the Census. *Id.* at 4, ¶14, SOF 29.

### H.    Senate Seat To Hawaii County, Large Deviations

Excluding 108,767 persons resulted in 1,251,534 "permanent residents" as the population counted for the 2012 Plan. By this measurement, the ideal population of Senate districts statewide was 50,061, and the ideal population for House districts was 24,540. The 2012 Plan shifted one Senate seat from Oahu to Hawaii, the result sought by the *Solomon* and *Matsukawa* lawsuits.

#### 1.    Senate Deviation: 44.22%

Under the 2012 Plan, the largest Senate district (Senate 8; Kauai) contains 66,805 "permanent residents," which is a deviation of +16,744

or +33.44%, more than the statewide ideal; the smallest Senate district (Senate 1; Hawaii) contains 44,666 permanent residents, which is a deviation of -5,395, or -10.78% less than the ideal.  The sum of those deviations (the "overall range" of the plan) is 44.22%. SOF ¶ 31.

### 2.   House Deviation: 21.57%

The overall range in House districts was less, but still extreme. The largest (House 5; Hawaii) contains 27,129 permanent residents, which is a deviation of +2,589, or +10.55%, more than the statewide ideal; the smallest House district (House 15; Kauai) contains 21,835 permanent residents, a deviation of -2,705, or -11.02% less than the ideal. The overall range in the House is 21.57%.  SOF ¶ 32.

### I.   Commission Ignored Federal Deviation Standards, Acknowledged Presumptive Unconstitutionality

The Commission, however, reported that the 2012 Plan's deviations were lower and below the 10% federal invalidity threshold when comparing districts within each county. *See* 2012 Plan at 15-18 (Tables 1-8). SOF ¶ 33. It was able to reach this result only by dismissing the statewide ideal as set out above. It acknowledged its methodology does not comply with federal law. *Id*. at 18 ("The Commission is aware that federal courts generally review reapportionment and redistricting plans

20

under a different methodology than set forth above."). SOF ¶33. It also

recognized that because the statewide deviations exceed 10%, the 2012

Plan is "*prima facie* discriminatory and must be justified by the state."

*Id.*

Plaintiffs instituted this lawsuit, and sought a preliminary

injunction to prohibit Hawaii from implementing the 2012 Plan. On

May 22, 2012, the court issued its Order Denying Plaintiff's Motion for

Preliminary Injunction ("Order") (CM/ECF doc. 52). SOF ¶ 34.

## III. SUMMARY JUDGMENT STANDARD

The Rule 56 standard for summary judgment is well-established

and will not be repeated here in great detail. Suffice it to say that trial

is unnecessary when the material facts are not disputed and the law

can be applied to those facts to render judgment. *See* Fed. R. Civ. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Here, no material

facts are disputed, and the court must correctly identify the controlling

law, including the burden of proof and the standard of review, and

apply the law to the undisputed facts.

## IV. ARGUMENT

Two background principles should be kept in mind as the court considers this motion.

*First*, the touchstone of a state legislative reapportionment plan is "population." *Reynolds v. Sims*, 377 U.S. 533, 560-61 (1964). The Equal Protection Clause protects all "persons"—

> No State shall ... deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. AMEND. XIV. The "person" standard means that both houses of a state legislature must be apportioned substantially on a population basis, and states may not maintain a legislature modeled on the federal system in which one house represents political divisions, while only the seats in the other house are determined by population. *Reynolds*, 377 U.S. at 560-61. The principle of equality is often referred to as the "one person, one vote" standard, but because it applies to all "persons," it also guarantees *representational* equality. *See Garza v. County of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990).[3] This means that persons—

---

[3]   In *Travis*, this court acknowledged these principles: (1) actual population is the "starting point" and "overarching principle." *Travis*, 552 F. Supp. at 559 (citing *Reynolds*, 377 U.S. at 567); (2) "*minor*" deviations may be allowed, provided they are "free from any taint of

22

not "citizens," "registered voters," "taxpayers," "counties," or "basic island units"—are entitled to be counted and represented equally. There is no question that all "usual residents" of Hawaii as reported in the 2010 Census—including everyone extracted by the Commission—are "persons" within the jurisdiction of Hawaii and entitled to the equal protection of the laws, and are not represented in any other state legislature: the Census counts them *only* as residents of Hawaii, which means that because Hawaii does not count them for purposes of apportioning legislative representation, they are not represented anywhere.

*Second*, it is unconstitutional for a state to deny legislative representation to servicemembers merely because they are in the military. In *Davis v. Mann*, 377 U.S. 678 (1964), the Supreme Court rejected the argument that it was constitutional for districts to be

---

arbitrariness or discrimination." *Travis*, 552 F. Supp. at 559 (emphasis original) (quoting *Mahan v. Howell*, 410 U.S. 315, (1972)); (3) even when a state has a clearly rational policy to afford counties "a certain degree of representation *as* political subdivisions," population cannot be "submerged as the controlling consideration." *Travis*, 552 F. Supp. at 559 (quoting *Reynolds*, 377 U.S. at 581); and (4) "extreme deviations" will render a plan void even if the state meets its burden under "this limited exception." *Travis*, 552 F. Supp. at 559.

23

underrepresented because those districts contained large numbers of servicemembers:

> Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible.

*Id.* at 691. *See also Travis*, 552 F. Supp. at 558 & n.13 ("civilian population is not a permissible population base").

With these considerations in mind, we address the issues.

## A.   The 2012 Plan Deviations Grossly Exceed 10%, And Is Presumptively Unconstitutional

The Commission acknowledged the 2012 Plan is "*prima facie* discriminatory and must be justified by the state." 2012 Plan at 9. A plan apportioning seats may make "minor" deviations from the ideal statewide district size. *Mahan v. Howell*, 410 U.S. 315 (1972). A deviation is presumed unconstitutional when an apportionment plan contains an overall range (the difference between the largest and the smallest deviation from the ideal district population) of more than 10%. *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983).

The 2012 Plan results in overall ranges that wildly exceed that threshold. The Senate's overall range of 44.22%, and the House's 21.57% range render the 2012 Plan presumptively unconstitutional,

24

and place the burden squarely on the State to justify (1) excluding "usual residents" from representational equality, and (2) dilution both equal representational power and voting strength based upon "basic island unit."

The Commission supported the deviations with only two justifications: (1) the state may exclude servicemembers and others as long as it does so on the avowed basis of a residence requirement (*id.* at 10), and (2) it argued that preservation of the integrity of political subdivisions can be an overriding concern such that population equality is only required *within each county*, and not statewide (*id* at 9-10).

## B. *Burns* Did Not Validate "Permanent Resident" In All Circumstances For All Time

*Burns* did not resolve the issue presented in the case at bar. In *Burns*, the Court recognized that states are not required to use the Census population as the basis for reapportionment and may employ some other count, but may do so only if the resulting plan is not "substantially different" than one based on a "permissible population basis." *Burns*, 284 U.S. at 91-92. Although most states now use the actual Census population, they are not *required* to do so. Indeed, a state may choose to count nearly any population, with two limitations: *first*, it

25

cannot base its count on prohibited discrimination (counting "white males" or "civilians," for example); and *second*, whatever metric is selected, the result must approximate the plan that would have resulted if the state counted a "permissible population basis." The Court identified several possible permissible population bases: actual population, state citizens, U.S. citizens, and registered voters, but noted it has "carefully left open the question what population was being referred to" when it required substantial "population" equality. *Burns*, 384 U.S. at 91-92.

The state, however, must adhere to a process that insures the resulting plan advances the principles protected by the Equal Protection Clause: voting equality or representational equality. As long as the state's count upholds these principles, decisions about whom to count "involve choices about the nature of representation." *Id.* at 92. The burden is on the state to show that the measure it uses is constitutional. A careful reading of *Burns* reveals that the Court established a three-part test to measure the constitutionality of a state's choice of whom to count, and that the 2012 Plan fails each of them.

### 1. State Must Identify The "Permissible Population Basis" To Which To Compare Its Count Of "Permanent Residents"

The state fails the first step in the *Burns* analysis because it has not identified the "permissible population basis" against which its choice of "permanent resident" is measured. In *Burns*, the state identified both *citizen population* and *total population* as the "permissible population" bases against which the state's choice of registered voters was to be compared for equality. *Id.* at 92. In *Travis*, the state identified *eligible voters*. Here is the 2012 Plan's first fatal defect: it did not identify the "permissible population basis" against which the state's choice of "permanent residents" can be compared.. There is nothing in the 2012 Plan itself, or in the records surrounding the 1992 amendment that settled on "permanent residents" as Hawaii's alternative population basis that even hints of what population "permanent resident" is to be measured against. We simply don't know if the districting that results from the state's choice of "permanent resident" approximates the districting that would have resulted if the state chose to count state citizen population, or eligible voters, for

27

175768

example.[4] Having failed to identify a permissible population basis as required by *Burns*, the 2012 Plan has given the court no tools by which to measure its constitutionality, and the court need go no further.

In the Order, this court concluded that "permanent resident" was simply another way of saying "state citizens," which the Court in *Burns* noted was a "permissible population basis." Order at 31 ("the Supreme Court has explicitly affirmed that a state may legitimately restrict the districting base to citizens, which in this case, corresponds to permanent residents"). The state relies on the statement in *Burns* that it "need not count aliens, transients, short-term or temporary residents, or persons denied the vote," which means that its use of "permanent resident" has already been approved by the Court. *Burns*, 384 U.S. at 92. In the state's view, this statement *ipso facto* validates its count of "permanent residents" and its decision to further define that term as "domiciliary," since the opposite of "temporary" is "permanent." This tautology, however, is insufficient since the state has not met its burden to compare its choice to a permissible population basis, and to show that

---

[4] However, we do know that the 2012 Plan is grossly deviant from the districting that would have resulted if the state had designated *actual population* as the permissible population basis.

175768

the assumptions that it makes about the intent to remain of the persons excluded survive close constitutional scrutiny.

Further, *Burns*, like all reapportionment cases, was a decision driven by the circumstances existing at the time, and the Court's conclusion was based on a factual record vastly different than that presented here. In *Burns*, there was no dispute that Hawaii had "special population problems" due to "large concentrations of military and other transient populations," and that "the military population in the State fluctuates violently as the Asiatic spots of trouble arise and disappear." *Burns*, 384 U.S. at 94. Thus, "[t]otal population figures may thus constitute a substantially distorted reflection of the distribution of state citizenry." *Id.* Here, however, the state has not even attempted to demonstrate that the same conditions exist today. Indeed, the *Burns* facts are no longer true, and the 2012 Plan fails to show that the numbers of servicemembers "wildly fluctuates" as they did 50 years ago during the buildup to the Vietnam war. Today's military population of Hawaii is very stable, and does not "wildly fluctuate," and Hawaii is no longer the major stepping-off point for servicemembers bound from the

mainland to the "Asiatic spots of trouble."[5] Moreover, the trial court in

*Burns* suggested that all tourists, and all military personnel, including

transient military, were *included* in the Census count. *See Holt v.*

*Richardson*, 238 F. Supp. 468, 474, 475 (D. Haw. 1965). This is different

from the situation here, where there is no dispute that only resident

military were counted in the most recent Census, and transient military

were already excluded because they are not "usual residents" of Hawaii.

### 2.    State's Burden To Show The 2012 Plan Is A Substantial "Duplicate" Of A Plan Based On A Permissible Basis

Even assuming the state has identified "state citizens" as the

permissible population basis against which to compare its count of

permanent residents/domiciliaries), it has not met its burden to show

that counting permanent residents results in a plan that is a

substantial "duplicate" of a count of state citizens. *See Travis*, 552 F.

Supp. at 564) of a plan that is the product of a permissible basis. *Burns*

noted that the 1950 Hawaii constitutional convention discussed total

population, citizen population, and registered voter population as the

---

[5] If Plaintiffs are misreading *Burns*, then perhaps the case should be
revisited and overruled or modified. Of course, that task is reserved for
the Supreme Court.

possible baselines. *Burns*, 384 U.S. at 93. The convention rejected total population as too difficult to fit to local boundaries. It rejected state citizens as too difficult to determine. Critically, the convention concluded that counting registered voters would be "a reasonable approximation of both citizen and total populations." At that time, the percentage of Hawaii's population who registered to vote and who actually voted was very high, so there was a high correlation between registered voters, state citizens (however that was defined), and total population. *Burns,* 384 U.S. 73 at 95, n.26. Thus, unlike here, the state satisfied its burden to identify the permissible population basis against which its choice of registered voters was to be measured, and concluded that it would reasonably approximate the districting that would result from applying that basis.

Here, however, the 2012 Plan makes no attempt to relate "permanent resident"/domicile to state citizens, except with the self-proving statement that the opposite of "transient and temporary residents" is "permanent residents," and that "state citizens" is defined as all persons who were not extracted because they do not meet the state's test of "permanent resident." The case at bar is unlike *Burns*,

31

where the Court upheld registered voters despite its clear misgivings
that this standard was subject to manipulation, because the result of
counting registered voters was shown by the state to come close to the
plan that would have resulted from a count of a permissible population.
Registering to vote, after all, is a strong indicia of state citizenship:

> Only because on this record it was found to have produced a
> distribution of legislators not substantially different from
> that which would have resulted from the use of a permissible
> population basis.

*Id.* at 93.

Here by contrast, the state has not produced any evidence to
support its assumption that "permanent residents" is the same as "state
citizens" or some other permissible population basis. We do know that
measuring permanent resident against total population results in
reapportionment plans that are wildly different: a plan based on
population has a distribution of 18 Senators for Oahu and 3 for the Big
Island, while the 2012 Plan resulted in 17 Oahu Senators and 4 for the
Big Island. *Travis* also applied this test, and came to the same result.

### 3.      Hawaii's 2012 Plan Does Not Survive Close Constitutional Scrutiny

The final *Burns* requirement is that a plan that otherwise passes muster, fails if the alternative population basis "is one the constitution forbids." *Burns*, 384 U.S. at 93-94. Even if the court presumes the 2012 Plan satisfied the first two *Burns* requirements, it fails the third. For example, a population basis of "civilians" (as in *Travis*), is prohibited, and the 2012 Plan would be facially unconstitutional if it expressly extracted servicemembers. Here, of course, Hawaii's discrimination is not open and notorious, but lurks behind the seemingly neutral test of "permanent resident." *Evans v. Cornman*, 398 U.S. 419 (1970) explains how to evaluate Hawaii's claim that it is not discriminating against servicemembers and their families (the standard employed over the fifty years since statehood has always had that result): when fundamental rights such as the right to equal representation and the right to petition on an equal basis are impacted, the court reviews the 2012 Plan with "close constitutional scrutiny," and mere "rational basis" analysis is not applicable.

The 1992 history of the adoption of the "permanent resident" standard says little, but incorporates the 1991 report, in which the only

33

consistent theme is a desire to identify and exclude servicemembers. Moreover, in *Solomon*, the Hawaii Supreme Court interpreted "permanent resident" to mean "domicile," and rejected the Commission's attempt to include most servicemembers and their families. Under Hawaii law, "domiciliary" is one who has a physical presence in the state (there is no dispute every one of the "extracted" 108,767 persons was physically present in Hawaii), and "an intent to remain." The 2012 Plan uses a methodology to determine intent to remain, and subjects only selected classes, and no one else, to these tests. Only servicemembers are asked where they pay state taxes. Indeed, they are not "asked" at all; their DD2058 was simply (and wrongfully) disclosed to the state. The families of servicemembers are also the only classification of persons who are subject to the outdated assumption that spouses have the same permanent residence as their servicemember spouse and do not have a separate identity, an assumption that is demonstrably false in the case of Mrs. Laster, one of the plaintiffs. University students who are not eligible to pay resident tuition are also subject to a durational residency requirement, since the

schools do not permit a student to pay resident tuition until they are present in Hawaii for at least one year.

### a.    Equal Representation

The 2012 Plan's unjustifiable defect is that it takes no account of the Equal Protection guarantee of equal representation of all persons to be represented in the legislature, regardless of where they are registered to vote, or where they pay taxes. *Garza*, 918 F.2d at 774 ("the *Reynolds* Court recognized that the people, including those who are ineligible to vote, form the basis for representative government"). The state's categorical exclusion of persons whom the Census recorded as being usual residents of Hawaii cannot be justified.

In *Garza*, the Ninth Circuit held that equal representation is the dominant Equal Protection principle, "holding that total population provides the appropriate basis for reapportionment of the county supervisor districts, because equal representation for all persons more accurately embodies the meaning of the fourteenth amendment." John Manning, *The Equal Protection Clause in District Reapportionment:*

*Representational Equality Versus Voting Equality*, 25 SUFFOLK L. REV. 1243, 1244 (1991) (footnote omitted).[6]

In *Garza,* the Ninth Circuit concluded that Equal Protection requires use of actual population as the population basis to insure that all persons actually present are equally represented, regardless of their voting registration, or even their eligibility to vote. As a remedy for Voting Rights Act and Equal Protection violations, the district court created a county apportionment plan that used total population as the population basis (which included legal and illegal aliens, and children), and created districts of nearly equal numbers of persons, but sharply unequal numbers of citizens. *Id.* at 773, 774 n.4-5. The county appealed, arguing that as a matter of law actual population was an erroneous standard, and that it was entitled to use "voting population" to insure

---

[6] Plaintiffs understand that in the Order, this court viewed *Garza* differently, and concluded that Garza is distinguishable. However, as noted by Justice Thomas in *Chen v. City of Houston*, 532 U.S. 1046 (2001), this remains an open question and the circuits are split on the issue of the "permissible population basis," with the Ninth Circuit differing from the Fourth and Fifth Circuits that "districting based on voting populations instead of the total population would have been unconstitutional." *Id.* at 1046 (Thomas, J., dissenting from denial of cert.). Justice Thomas noted that "[w]e have never determined the relevant 'population' that States and localities must equally distribute among their districts."

36

the "one person, one vote" principle. *Id.* The county argued that *Burns* "seems to permit states to consider the distribution of voting population as well as that of the total population in constructing electoral districts." *Id.* at 774. The Ninth Circuit generally agreed with that statement, but cautioned that Equal Protection protects both the voting power of citizens, *and* the right of equal representation in the legislature for all persons. *Id.* at 775 ("The purpose of redistricting is not only to protect the voting power of citizens; a coequal goal is to ensure 'equal representation for equal numbers of people.'") (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969)). In situations where equal voting power may conflict with equal representation, the Equal Protection principle that "government should represent *all* the people" is dominant. *Id.* at 774 (emphasis original). The court highlighted this "fundamental principle of representative government," and held that *Reynolds* "recognized that the people, including those who are ineligible to vote, form the basis for representative government. Thus population is an appropriate basis for state legislative apportionment." *Id.*

The court reasoned that every person has a right to be represented in the legislature, and "the whole concept of representation depends

37

upon the ability of the people to make their wishes known to their representatives." *Id.* at 775 (quoting *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961)). In addition, the "right to petition is an important corollary to the right to be represented." *Garza*, 918 F.2d at 775. The court recognized that non-citizens have the right to petition the government. *Id.*

Similarly, Hawaii's servicemembers, their families, and university students have the right to petition the state legislature, and to be represented therein. The 2012 Plan, by ignoring their presence and treating them as invisible, grossly distorts districts on Oahu. It is forcing the Plaintiffs, who live in districts in which large numbers of "extracted" military personnel, families, or students reside, to compete with more of their fellow residents to gain the attention of their legislator than others in districts in which persons "extracted" are not concentrated. Discussing *Garza*, one commentator wrote:

> The court-ordered apportionment plan showed how two prized American values, electoral equality and equal representation, can conflict in areas with large noncitizen populations. Electoral equality rests on the principle that the voting power of all eligible voters should be weighted equally and requires drawing voting districts to include equal numbers of citizens. *The slightly different concept of equal representation means ensuring that everyone—citizens and noncitizens alike—is represented equally*

38

> *and requires drawing districts with equal numbers of residents. Equal representation is animated by the ideal that all persons, voters and nonvoters alike, are entitled to a political voice, however indirect or muted.*

Carl Goldfarb, *Allocating the Local Apportionment Pie: What Portion for Resident Aliens?*, 104 YALE L. J. 1441, 1446-47 (1994-1995) (emphasis added) (footnotes omitted). Substitute "permanent residents" for "citizens" and "voters," and you have the situation presented in this case. Hawaii's use of "permanent resident," and its application in a way that excludes only military personnel, their families, and university students completely ignores their right to representation in the state legislature.

This court has already acknowledged the 2012 Plan's representational dilution, *see* Order at 13, but determined the state's interests were more important. Having acknowledged that the 2012 Plan denies equal representation, the state must demonstrate a sufficiently weighty interest to justify the limitation. *Crawford v. Marison Cty Election Bd.*, 553 U.S. 181, 190 (2008) (applying balancing test to identification requirement for voting). Here, Hawaii has denied servicemembers, their families, and students any representation *anywhere*, because they are counted by the Census nowhere but Hawaii

39

and thus are not represented in any state legislature but ours. This burden on their right to representation cannot be justified.

### b. Hawaii's Assumptions About Military Transience Are Unsupported

The state has not shown that its assumptions about the nature of military and student life survive close review, or are even rational. The 2012 Plan assumes that servicemembers, their families, and certain students are not "usual residents," despite the Census concluding that they are. Instead, the state assumes that they are not *really* integrated into Hawaii's community; they are not part of "us" and therefore do not merit counting.

The state cannot meet its burden of showing that a servicemember's declaration on a military tax form about "legal residence" has any relation to whether the servicemember has sufficient ties to the islands to be entitled to be represented in Hawaii's legislature. Limiting the fundamental right to representation to state taxpayers would effectively impose a poll tax, and would be unconstitutional (especially since the State imposes no such burden on other non-taxpayers). *Harper v. Virginia Bd. Of Elections* 393 U.S. 663, (1966). As to military families' supposed lack of connections to Hawaii,

40

the facts refute the state's bias. These families use (and pay for) roads and schools. They pay Hawaii General Excise Tax. Many pay property taxes. They serve on Neighborhood Boards. They live, work, rent, own homes, and patronize businesses in Hawaii. A study prepared for the Secretary of Defense estimated the presence of the military is responsible for injecting $12 billion into the state, or up to 18% of Hawaii's economy. *See* James Hosek, *et al.*, HOW MUCH DOES MILITARY SPENDING ADD TO HAWAII'S ECONOMY? 21 (2011).[7] Local and national politicians run on platforms built on the promise of keeping the military presence in Hawaii strong, and keeping the federal dollars to support them flowing from Washington. Yet, even as Hawaii aggressively pursues the massive benefits their presence brings, it keeps finding ways to exclude them. Hawaii cannot choose to exclude persons who are admittedly "usual residents" and who are not transients, and whom no one disputes have substantial physical and continuing presences here.

Finally, neither can the state argue that military personnel do not register to vote in sufficient numbers to warrant their being counted for legislative apportionment: census figures for 2010 indicate that only

---

[7] *available at* http://www.rand.org/content/dam/rand/pubs/technical_reports/2011/RAND_TR996.pdf.

41

48.3% of Hawaii's voting age population is registered to vote, the lowest in the nation. U.S. CENSUS BUREAU, STATISTICAL ABSTRACT OF THE UNITED STATES: 2012 Table 400: *Persons Reported Registered and Voted by State: 2010.* Registering to vote or voting has never been a condition of a right to representation, and it cannot be used here, especially when the numbers demonstrate such a small percentage of the Hawaii population as a whole is participating in the process. If servicemembers and their families are not "state citizens" because they don't register to vote, then neither are 51.7% of the rest of the population are, either. In short, the state cannot meet its burden of a sufficiently weighty interest in excluding military members and their families, to justify the accompanying burden on their right to representation.

Moreover, the State's methods of determining the servicemembers' intent do not pass muster. In essence, when it apportions its legislative seats, Hawaii attempts to treat servicemembers in Hawaii in the same fashion that the Census counts servicemembers deployed outside of the United States, by attributing them to somewhere other than where they actually are located. But servicemembers actually in Hawaii are obviously not located "overseas" and cannot be treated in the same

42

manner as those physically located outside of the country. Military personnel, their families, and students who pay non-resident tuition are a far cry from the "aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of a crime" that *Burns* suggested a state may not count. *Burns*, 384 U.S. at 92. The Census counts them as "usual residents" of Hawaii, which means that they have "more than mere physical presence, and [have an] … allegiance or enduring tie to a place." *Franklin*, 505 U.S. at 804. The Census already excludes transients such as tourists and those in Hawaii only for a short time; these people are counted where they usually reside. Hawaii, however, lumps the military together with transients and excludes them, while at the same time it unquestioningly includes aliens and "persons denied the vote for conviction of a crime" in its population basis. Despite the economic contribution of the military (which the state gladly accepts) and their actual long-term presence here (tours of duty generally range from 18 months to two or more years), by employing irrational and unevenly applied tests, Hawaii deems them not to be "permanent" residents. Instead of acknowledging them as the usual residents they are (they are

43

more in Hawaii than they are anywhere else), the state imposes a purity test that supposedly measures whether military personnel are truly here.

It imposes this test on no one else, since Hawaii's use of "permanent resident" as interpreted by *Solomon* is irrationally and unevenly applied only to military personnel, their families, and students. In accordance with the Hawaii Supreme Court's mandate in *Solomon*, the Commission simply accepted that if a servicemember declared their desire to pay taxes in a state other than Hawaii on DD2058, that person cannot be a Hawaii "permanent resident" and has not exhibited an intent to remain. In other words, Hawaii presumes that military personnel who do not pay Hawaii income taxes are not here, because paying taxes elsewhere conclusively reveals they are "merely transitory" in Hawaii, and have no intent to remain in Hawaii for a period of time. *See Citizens for Equitable and Responsible Gov't v. County of Hawaii*, 120 P.3d 217, 222 (Haw. 2005) (domiciled means someone who "occupies a dwelling within the State, has a present intent to remain within the State for a period of time, and manifests the genuineness of that intent by establishing an ongoing physical presence

44

within the State together with indicia that his presence within the State is something other than merely transitory in nature.").

The state's assumption is unreasonable and, ultimately, unsupported. The DD2058 form is only for tax withholding purposes, and there is nothing that would prevent a servicemembers who indicated on her DD2058 that she pays state taxes in a state other than Hawaii from registering to vote in Hawaii, from renting or owning property in Hawaii, or undertaking any other activity that would qualify as "domiciling" in Hawaii under the *Citizens* test. Although personally-identifiable information was apparently not disclosed, *see* section 552a(a)(4), servicemembers were "extracted" and denied representation by virtue of personal data they provided, which was supposed to be disclosed only to the taxing state (not Hawaii), and only for tax withholding purposes. Disclosure of information for Hawaii reapportionment was not disclosed to servicemembers, and that use may even have violated the Privacy Act. *See* Exhibit "E", SOF ¶ 21-23. ("PURPOSE: Information is required for determining the correct State of legal residence for purposes of withholding State income taxes from

45

military pay.").[8] A reapportionment plan cannot be predicated on an illegal act, the state's wrongful use of the information in the DD2058. The military had no business turning over this information to the state.

Moreover, the Commission simply could not know whether a servicemember who completed a DD2058 was domiciled here. The DD2058 form cannot be treated as a declaration by servicemembers that they are not "permanent residents" of Hawaii or that they have no intent to remain here. This assumption resulted in the Hawaii Supreme Court's unsupported conclusion that "most military personnel considered Hawaii a temporary home and only 3% opted to become Hawaii citizens." *Solomon*, 270 P.3d at 1015. Moreover, if payment of state taxes is the basis for a determination of "permanent residence," the state does not even attempt to explain why it took no effort to extract others who pay no Hawaii taxes such as children, the unemployed, illegal aliens, and prisoners.

---

[8] Kansas, the only other state that does not use the Census as the population basis, avoids the Privacy Act issues by doing its own survey of military personnel. It ends up extracting very few, because most military personnel do not respond to the survey. *See Summary of the State of Kansas Adjustment to Census Figures for Reapportionment* (Sep. 12, 2011), *available at* http://hawaii.gov/elections/reapportionment/2011/staffreports/KansasAdj.pdf.

46

Second, the fact that the Commission only sought to extract military, families, and students (*see* 2012 Plan at ii), and made no effort to exclude others who have no legal presence in Hawaii at all such as illegal aliens (and thus cannot form an intent to remain), and did not attempt to extract federal workers and their families who are "stationed" in Hawaii in much the same manner as military personnel, reveals the extractions were, in actuality, targeted only at military and students. This strongly suggests that instead of a neutral and good faith attempt to include only permanent residents, Hawaii's effort was focused more on excluding military and students than on a neutral process to not count transients. Indeed, the Hawaii advisory council expressly declared its desire to exclude "only nonresident military," a result plainly unconstitutional under *Davis*. *See Solomon*, 270 P.3d at 1016 n.4. In the end, the Hawaii Supreme Court directed the Commission to subject only "non-permanent university student residents and non-permanent active duty military residents, as well as … the dependents of the 47,082 non-permanent active duty military residents," to the permanent resident/domicile litmus test and did not

require the Commission to apply it to others similarly situated. *Id.* at 1023.

Third, the Commission simply assumed that students who pay nonresident tuition or who listed a "home address" elsewhere failed the "permanent resident" test, another unwarranted and irrational assumption. For example, the University of Hawaii imposes a durational residency requirement of one year in order to begin to qualify for resident tuition. *See Hawaii Residency Requirements* ("you must have been a bona fide resident of Hawaii for at least one calendar year (365 days) prior to the semester for which you want resident tuition status").[9] A student can demonstrate a bona fide intent to make Hawaii his permanent home by paying Hawaii income taxes, registering to vote, opening a local bank account, signing a lease, buying property, or being employed here. *Id.* None of these tests are employed to confirm the domicile of others who were counted by the Commission as "permanent residents," and indeed, this test is more stringent than the domicile test of the *Citizens* case, which does not contain any durational residency requirement.

---

[9] *available at* http://manoa.hawaii.edu/admissions/undergrad/financing/residency.html.

48

Fourth, the Commission made no attempt to extract minors or prisoners, none of whom are eligible to vote. *See* HAW. REV. STAT. § 831-2(a)(1) (1993) ("A person sentenced for a felony, from the time of the person's sentence until the person's final discharge, may not … [v]ote in an election …"). This demonstrates that voting, registering, or even being eligible to vote has no connection to the "permanent residence" test.

Finally, and perhaps most egregiously, the Commission simply "assumed" without inquiry that spouses and other military family members are of the same legal residency as their military spouses and sponsors. 2012 Plan at B-53, B-54. Such a presumption regarding the relationship between spouses is parochial, irrational, and overbroad. The decision to extract military families based on whether the sponsor pays out of state taxes ignores contrary indicators such as the purchase or lease of a Hawaii home, off-base employment, and enrollment in local schools, any of which would verify "permanent residence." If the permanent resident standard were equally applied, such indicators would lead to the family (and the military sponsor) not being extracted.

49

*Burns* does not allow Hawaii to deny all usual residents legislative representation because it deems them not to be "permanent" using standards that are vague, underinclusive, and based on assumptions, and admittedly do not result in a plan even coming close to one based on population (the most obvious impact of the 2012 Plan is that it deprives Oahu residents of a Senate seat). *See also* 2012 Plan at 23 ("Under the methodology generally used by federal courts, the size of deviations, particularly as they relate to ... Kauai, is substantial."). First, the touchstone of *Burns* remains population: the Court upheld the use of "registered voters" *only* because there was no evidence that the resulting plan differed substantially from a plan based on population, a contrary situation than presented in the case at bar. *See id.* at 9 (statewide deviations exceed 10%, so the 2012 Plan is "*prima facie* discriminatory"). Second, because *Burns* only involved a claim of equal voting power, the right of equal representation was not raised, and thus never considered by the Court. Third, as Justice Thomas has pointed out, the Court has "never determined the relevant 'population' that States and localities must equally distribute among their districts." *Chen v. City of Houston*, 532 U.S. 1046 (2001) (Thomas, J., dissenting

50

from denial of cert.). *See also* Timothy M. Mitrovich, *Political Apportioning is Not a Zero-Sum Game: The Constitutional Necessity of Apportioning Districts to be Equal in Terms of Both Total Population and Citizen Voting-Age Population*, 77 WASH. L. REV. 1261, 1263 & n.14 (2002) ("The federal circuit courts are in conflict on this issue. In the Ninth Circuit, states must apportion according to total population in order to ensure representational equality.").

The failure to even attempt to identify others who may not be "permanent residents," and targeting only military, families, and students reveals the bias inherent in Hawaii's scheme. A population basis that on its face is neutral is suspect when it results in a narrow class always bearing the brunt of the exclusion. *See Travis*, 552 F. Supp. at 559 ("*minor*" deviations may be acceptable, if "free from any taint of arbitrariness or discrimination") (emphasis original). A "higher degree of scrutiny" is also appropriate where, as here, the "deviations present begin to approach constitutional limits." *Id.* at 562 n.19. Here, they exceed them.

When the extreme deviations in the 2012 Plan are viewed together with Hawaii's long history of excluding servicemembers from

51

representation starting with its 1959 plan, even a facially neutral standard cannot survive. This court, however, need not make a determination that the state's use of "permanent resident" is a pretext to cover discrimination against the military as prohibited by *Davis*. The gross statewide population ranges in the 2012 Plan are sufficient to shift the burden to the state, which cannot justify completely ignoring the representational rights of all usual residents.

C.    ***Intra*-County Inequality**

Even if it is permissible to ignore persons who were deemed not to be "permanent residents," the 2012 Plan resulted in statewide deviations of 44.22% and 21.57%. These deviations are presumptively unconstitutional. *Brown*, 462 U.S. at 842-43 (10% threshold); 2012 Plan at 9 (2012 Plan is "*prima facie* discriminatory and must be justified by the state"). This court in *Travis* set out the analysis:

> The *Mahan* Court laid out a three step method for analyzing state offered justifications for seemingly substantial population deviations. First, the reason advanced must be a rational one, "free of any taint of arbitrariness or discrimination." … "The inquiry then becomes whether it can reasonably be said that the state policy urged [as a justification for] the divergences in the legislative reapportionment plan … is, indeed, furthered by the plan adopted by the legislature." Finally, "if so justified," the issue is whether "the divergences are also within tolerable limits."

52

> For no matter how rational a state justification may be, it "cannot constitutionally be permitted the emasculate the goal of substantial equality."

*Travis*, 552 F. Supp. at 560 (citations omitted). The only justifications in the 2012 Plan for the deviations are "geographic insularity and unique political and socio-economic identities of the basic island units," and the desire to avoid so-called "canoe" districts (a district that spans more than one island). 2012 Plan at 23, 21. Neither supports the large deviations in the 2012 Plan.

### 1.    People Are Represented, Not Counties

In *Reynolds*, the Supreme Court made geographic and political concerns and the desire to maintain traditional boundaries secondary to population equality:

> the fundamental principle of representative government is one of equal representation for equal numbers of people, without regard to race, sex, or economic status, *or place of residence within a state.*

*Reynolds*, 377 U.S. at 560-61 (emphasis added). Thus, when a plan produces exaggerated population ranges between districts, concerns for political boundaries must yield to population equality.

Moreover, although "canoe districts" may have been unworkable as a practical matter in the past, we no longer travel by canoes. The

53

islands are much more interconnected and unified, and less insular,
with easy air travel between the islands, and direct flights to the
mainland and internationally from every island unit. Technology has
also contributed substantially to making each island less insular and
remote, and it is very simple and inexpensive for those on one island to
communicate with others across the state. Indeed, CD2 is a massive
canoe district, yet it has not seemed to hamper either official or
constituent.

The 2012 Plan does not rigidly adhere to the anti-canoe district
policy, as shown by Senate 7 and House 13, both of which are multi-
island canoe districts encompassing Molokai, Lanai (and Kahoolawe),
along with the distant east side of Maui. *Summaries by Basic Island
Units* at 2, 6 (Mar. 8, 2102) (Exhibit "G".).[10]

The Commission also attempts to lessen the deviations in each
house by combining them in an attempt to show that over- or under-

---

[10] *Brown v. Thomson*, 462 U.S. 835 (1983) did not endorse massive
deviations if arguably supported by legitimate state concerns. In *Brown*,
the Court upheld a plan with an 89% deviation against a challenge to
Wyoming's policy of affording each county at least one seat; the
challenger did not assert the 89% range itself was unconstitutional. In
*Board of Estimate v. Morris*, 489 U.S. 688, 702 (1989), the Court noted
that "no case of ours has indicated that a deviation of some 78% could
ever be justified."

54

represented districts are not impacted as severely because they have substantial equality "per legislator" (as opposed to per Senator, or per Representative). 2012 Plan at 21-22 ("equality of representation as it related to reapportionment among the basic island units has been measured by determining whether the total number of legislators (both house and Senate) representing each basic island unit is fair from the standpoint of population represented per legislator"). This Court has already rejected this "combination" approach. *Travis*, 552 F. Supp. at 563 ("The state is unable to cite a single persuasive authority for the proposition that deviations of this magnitude can be excused by combining and figuring deviations from both houses.").

## 2. Oahu's Ranges Are Excessive

Next, *Travis* determined that Hawaii's desire to provide each island unit with representation is rational. The court concluded, however, that the plan did not serve to advance the policy because Oahu, with its large population and many seats, did not contain "the smallest deviation possible." The court held that the maximum deviations of 9.18% in Oahu's Senate districts, and 9.54% in Oahu's House districts

175768

were not justified by the policy of providing each island with representation, and invalidated the plan. *Id.* at 560-61.

The Oahu deviations in the present case are very similar: Oahu's Senate district overall range is 8.89% (2012 Plan at 15-16, Table 1), and Oahu's House district overall range is 9.53% (*id.* at 16-17, Table 2). As in *Travis*, "it would seem that Oahu's legislative districts could have easily been drawn with only minimal population variations," and the 2012 Plan "provides no other reasons for these [intraisland] deviations." *Travis*, 552 F. Supp. at 561.

### 3.   No Approximation Of Population-Based Plan

Finally, this court noted "it is clear from *Burns* that … the state is obligated to provide some degree of proof that the proposed plan approximates the results of a plan based on an appropriate population base." *Travis*, 552 F. Supp. at 565. The court found "the state's use of registered voters constitutionally impermissible" because the state did not show its plan was close to a population-based plan. *Id.* Here, it is beyond dispute that the 2012 Plan did not approximate a population-based plan. As set out earlier, such a plan would result in Oahu having 18 Senate seats, while it has only 17 seats under the 2012 Plan.

56

The rights to equal representation and to petition government on an equal basis are paramount constitutional rights:

> To refuse to count people in constructing a districting plan ignores these rights in addition to burdening the political rights of voting age citizens in affected districts.

*Garza*, 918 F.2d at 775.

The 2012 Plan dilutes Plaintiffs' right to equal representation, and their First Amendment rights to petition their government as guaranteed by the Due Process Clause of the Fourteenth Amendment, because it places them in districts in which they must compete with more people for the attention of their legislators than others in other districts.

## V.  CONCLUSION

Hawaii's choice of permanent resident/domiciliary does not survive close constitutional scrutiny: "permanent residents" is not "citizens," since Hawaii does not extract noncitizens. It is not the same as "registered voter" or "eligible to vote" because Hawaii makes no attempt to extract non-voters, or those who are not eligible to vote such as aliens or minors. Moreover, the state cannot choose whom to count, and whom to extract, based on where or whether they pay state taxes,

175768

for doing so would be restricting equal representation and the right to petition government on an equal basis by wealth.

DATED:  Honolulu, Hawaii, October 1, 2012.

Respectfully submitted,

DAMON KEY LEONG KUPCHAK HASTERT


/s/ *Robert H. Thomas*
ROBERT H. THOMAS
ANNA H. OSHIRO
MARK M. MURAKAMI

Attorneys for Plaintiffs
   JOSEPH KOSTICK, KYLE MARK TAKAI,
   DAVID P. BROSTROM, LARRY S. VERAY,
   ANDREW WALDEN, EDWIN J. GAYAGAS
   ERNEST LASTER, and JENNIFER LASTER

58

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH KOSTIC; et al., | ) CIVIL NO.  12-00184 JMS/RLP |
| | ) |
| Plaintiffs, | ) (THREE-JUDGE COURT (28 |
| | ) U.S.C. § 2284)) |
| v. | ) |
| | ) **CERTIFICATE RE: WORD** |
| SCOTT T. NAGO, in his official | ) **LIMITATION (LR 7.5)** |
| capacity as the Chief Election | ) |
| Officer State of Hawaii; et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

**CERTIFICATE RE: WORD LIMITATION (LR 7.5)**

Pursuant to LR 7.5(e), I hereby certify:

1.     I am one of the attorneys for the Plaintiffs in the above-captioned action.

2.     The foregoing Memorandum in Support of Motion for Preliminary Injunction was prepared in a proportionally-spaced face (Century Schoolbook), in 14-point size. It was prepared with Microsoft Word, and contains 10,914 words, inclusive of headings, footnotes, and quotations, but exclusive of case caption, table of contents, authorities, exhibits, declarations, certificates of counsel, and certificate of service.

3.      I relied on the word count function of Microsoft Word to count the words in the document.


/s/ *Robert H. Thomas*
ROBERT H. THOMAS

2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH KOSTICK; et al., | ) CIVIL NO. 12-00184 JMS-LEK-MMM |
| Plaintiffs, | ) |
| | ) **CERTIFICATE OF SERVICE** |
| v. | ) |
| | ) |
| SCOTT T. NAGO, in his official capacity as the Chief Election Officer State of Hawaii; et al., | ) **THREE-JUDGE COURT (28 U.S.C. § 2284)** |
| | ) |
| Defendants. | ) |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date, a true and correct of

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNTS I

AND II OF THE FIRST AMENDED COMPLAINT; MEMORANDUM

IN SUPPORT OF MOTION; CERTIFICATE RE: WORD LIMITATION

(LR 7.5) was duly served upon the following individuals electronically

through CM/ECF and/or mailing said copy, postage prepaid, to last

known address as follows:

BRIAN P. ABURANO, ESQ.        Through CM/ECF
JOHN F. MOLAY, ESQ.          Through CM/ECF
Deputy Attorneys General
Department of the Attorney General, State of Hawaii
425 Queen Street
Honolulu, Hawaii 96813
Attorneys for Defendants
  Scott T. Nago, State of Hawaii 2011 Reapportionment
  Commission, Victoria Marks, Lorrie Lee Stone,
  Anthony Takitani, Calvert Chipchase IV,
  Elizabeth Moore, Clarice Y. Hashimoto,
  Harold S. Masumoto, Dylan Nonaka, and
  Terry E. Thomason

DATED:  Honolulu, Hawaii, October 1, 2012.

         DAMON KEY LEONG KUPCHAK HASTERT


         /s/ *Robert H. Thomas*
         ROBERT H. THOMAS
         ANNA H. OSHIRO
         MARK M. MURAKAMI
         Attorneys for Plaintiffs
          JOSEPH KOSTICK, KYLE MARK TAKAI,
          DAVID P. BROSTROM, LARRY S. VERAY,
          ANDREW WALDEN, EDWIN J. GAYAGAS
          ERNEST LASTER, and JENNIFER LASTER


Joseph Kostick, et al. v. Scott T. Nago, etc., et al., Civil No. CV 12-00184 JMS-LEK-MMM, United States District for the District of Hawaii, CERTIFICATE OF SERVICE

2

175768